UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

TEXAS LEAGUE OF UNITED LATIN
AMERICAN CITIZENS,

and

NATIONAL LEAGUE OF UNITED
LATIN AMERICAN CITIZENS

   Plaintiffs,

vs.

DAVID WHITLEY, in his official
capacity as Texas Secretary of State,

and

KEN PAXTON, in his official
capacity as Attorney General
of Texas,

   Defendants.

No. SA19CA0074 FB

FILED JAN 29 2019
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY CLERK

## ORIGINAL COMPLAINT

Plaintiffs, by and through undersigned counsel, allege as follows:

**Preamble: Nature of action**

1. This is a lawsuit under Section 11(b) of the Voting Rights Act, challenging the combined effort of the Secretary of State of Texas and the Attorney General of Texas to intimidate people who are currently legitimately registered to vote into de-registering or just not voting (or both) in the upcoming May 2019 election. These two Texas officials have carefully crafted and orchestrated a program that combines an election advisory ostensibly directed at ensuring that all

those registered to vote in the May election are citizens eligible to vote with the use of data that is suspect on its face and a blackout on public access to the data. Through this approach, they control public access and public media information in such a way as to inform the voting community that they really are targeting, as suspect, participants in the State's election system who should fear such participation. It is, in short, a plan carefully calibrated to intimidate legitimate registered voters from continuing to participate in the election process and to enlist the broader public into joining the two officials in concentrated pressure against such continued participation. Full-fledged United States citizens, legally participating in Texas's election system, particularly those who are part of the Latino community across the State, are being illegally targeted for voter intimidation. This lawsuit seeks to stop such intimidation. The pretextual facade of concern about voter fraud provides no cover for the voter intimidation at work here.

**Jurisdiction and venue**

2. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as 52 U.S.C. §§ 10307 and 10308.

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 124(d)(4) and 1391(b). Defendants have their official place of government business in Austin, Texas.

**Parties**

*Plaintiffs*

4. Plaintiff League of United Latin American Citizens–National (LULAC) is the oldest and largest national Latino civil rights organization in the United States. It is a non-profit organization with a presence in most of the fifty states including Texas. LULAC was founded in Texas with over 125,000 members nationwide and over 20,000 in Texas, on the principle of protecting

the rights of Latinos in civil rights including voting rights. LULAC participates in voter registration throughout the United States and throughout Texas

LULAC has been recognized and accepted as an organizational plaintiff protecting Latino rights in every federal court in which it has participated, including the United States Supreme Court and the Western District of Texas.

5. Plaintiff Texas League of United Latin American Citizens (Texas LULAC) was founded in Texas in 1929. It has over 20,000 members in Texas, and over 1,000 members in Bexar County. Its principal purpose is to protect the civil rights of Latinos, including their voting rights. Texas LULAC participates in voter registration throughout Texas, including all parts of the Western District of Texas.

Texas LULAC has been recognized and accepted as an organizational plaintiff protecting Latino rights in every federal court in which it has participated, including the United States Supreme Court and the Western District of Texas.

***Defendants***

6. David Whitley is the Texas Secretary of State, sued here in his official capacity only. He is designated as the State's chief elections officer. It is purportedly in that capacity that he undertook the actions here complained of.

7. Ken Paxton is the Texas Attorney General, sued here in his official capacity only. In his capacity as Attorney General, he undertook the actions here complained of.

**Factual background**

8. May 4, 2019, is the next general election day for local Texas elections. The election cycle is well underway. Candidate filing opened on January 16, 2019. In-person early voting begins on April 22, 2019. The last day to register to vote for that election is April 4, 2019.

9. On Friday, January 25, 2019, the Texas Secretary of State issued what his office termed "Election Advisory No. 2019-02" to voter registrars and elections administrators in the counties across the State. A copy of the memo is Attachment A to this complaint. It will sometimes be referred to in this complaint as SOS Advisory 2019-02.

10. The Secretary of State had already turned the data discussed in the advisory to the Attorney General, who tweeted the following shortly after noon on the same day as issuance of the SOS advisory (emphases added):

> **VOTER FRAUD ALERT**: The @TXsecofstate discovered approx 95,000 individuals identified by DPS as non-U.S. citizens have a matching voter registration record in TX, approx 58,000 of whom have voted in TX elections. Any **illegal vote** deprives Americans of their voice.

Still on that same day, the Attorney General posted a four-paragraph press notice online at https://www.texasattorneygeneral.gov/news/releases/ag-paxton-texas-secretary-states-office-discovers-nearly-95000-people-identified-dps-non-us-citizens. It sprinkles the word "fraud" prominently into the notice seven times, accompanying it with references to "illegal voting," "crimes against the democratic process," and "election crimes."

11. The Advisory outlines what it says was a program started in March 2018 between SOS and the Texas Department of Public Safety (DPS) whereby the SOS would use DPS drivers license and personal identification card data in connection with SOS work on "maintenance" of the State's voter registration rolls. According to SOS (with emphasis added), it would extract from the DPS data and documentation a list of "individuals who provided valid documents indicating the person is not a citizen of the United States *at the time the person obtained*" a driver license or personal ID card from DPS.

12. Nowhere in the advisory, the AG press release, or the AG tweet is there any description or identification of the time period covered by the DPS data it said it was using. Pub-

lished reports since the advisory became public indicate that the DPS data goes back 23 years, at least as far as 1996. The Advisory chose to use the term "DPS non-U.S. Citizen data" to refer to the data set.

13. The Advisory indicated that the SOS's plan was to take this mass of DPS data and match it against "the TEAM system," which is Texas's computerized, centralized statewide voter registration list. ("TEAM" stands for "Texas Election Administration Management."). Then, said the advisory, the SOS plan was to take any "matches" between the DPS data and a registered voter in any given Texas county, collect them by county, and send the information to the local voter registrars and election administrators.

14. Neither the SOS nor the AG made any of the underlying data publicly available at the time of their orchestrated press barrage on January 25th. This, despite the fact that the apparent key to the process was using DPS data that goes back nearly a quarter-century and "matching" it against *current* voter registration data. This meant that, using the data-blackout approach in a highly suspect context, the SOS and the AG could publicly state whatever they wished without fear of contradiction on any specifics, since all of the specifics were tightly held by them and not made available to either the public generally or even to the local voter registrars and election administrators. Among other things (and even setting aside the false-positives that even the state officials must concede is ever present in these situations), this "matching" process fails to take into account a major factor that throws reliance on the old DPS data particularly suspect: the naturalization process, whereby those who came to the United States as non-citizens may later attain citizenship. According to the Migration Policy Institute, in Texas alone in fiscal year 2014, nearly 53,000 people became citizens through the naturalization process. If each of those people had applied to DPS for a driver license or

5

personal ID card before 2014 (even going back to 1996), and registered to vote *after* naturalization (which would be expected in most instances), they would still show up in the SOS "matching" even though they are fully legitimate registered voters. Over just the 2007-2017 decade, 7.5 million people became naturalized citizens, and it is certain that people in Texas are a relatively large percentage of that number. And recently, with the advent of a national administration avowedly hostile to immigration of any sort, the number of those in America seeking naturalization has skyrocketed, increasing by 87% over the number in the previous Presidential administration. The SOS-AG "matching" gambit simply ignores this huge factor that on its surface shows how misguided and inaccurate the touted program is.

15. The advisory said that the matching process had not been completed at the time of its issuance and of the the AG's press release and tweet. This, though, served as no impediment to the AG, who nonetheless included as part of his press release a headline that the SOS had discovered "nearly 95,000 people" as non-U.S. citizens registered to vote in the State. He repeated this assertion in the release's opening paragraph, adding the statement that "roughly 58,000 of them" have voted in at least one Texas election. These numbers and assertions were widely reported in the Texas press, as the SOS and AG certainly expected and planned.

16. Since Friday, January 25th, the SOS has completed its internal matching program for at least some Texas counties, including in particular Bexar County. It forwarded the information to the Bexar County Election Administrator on Monday, January 28th.

17. Even now, the data blackout continues. **The SOS has issued written instructions to the local registrars and election administrators that none of the data may be made public.**

18. When combined with the assignment of responsibilities for what to do with the data and the "matching" performed by the SOS, the process is an openly cynical effort to put the local registrars and election administrators in a difficult-to-impossible situation. The SOS advisory acknowledges that, even its own hidden system for performing the "matches," provides only a "weak" match. And it acknowledges that the duty for what to do with the hidden SOS methodology and data rests with the local officials upon whom it has been dumped, *not* on the SOS. And it even acknowledges that the local registrars and election administrators have it within their power and authority to take no action whatever on the SOS-provided "matches" and "simply close the task as RESOLVED." But the SOS accompanies those necessarily protective assertions with the claim that "we believe the date we are providing can be acted on in nearly all circumstances," a claim which is impossible for either the public or the local officials to test at the front-end given the data blackout.

19. By its very design, the entire arrangement outlined above, and its carefully rehearsed roll-out by two of the State's top officials, has led to their control of the public posturing and messaging of the effort. It is designed to cast a pall of suspicion over the validity of local registration rolls. It is designed to pressure local officials, forced to operate in the dark as far as data is concerned yet threatened with attacks for not acting according to the wishes of the SOS and the AG, into setting in motion coercive efforts to force voters on the "match" list to prove they are validly registered to vote—while the broad swath of voters are left alone and undisturbed. The inevitable effect—and no doubt the intended effect, though intent is not required—is to intimidate voters in the state who are more likely to be swept up, or fear being swept up, in an election-related "witch hunt."

20. Registered voters who are citizens and appropriately registered to, and eligible to, vote in the upcoming election are part of the target of the scheme by the SOS and AG. Especially in the current atmosphere of broad and highly-publicized anti-immigrant and anti-Latino publicity and policy efforts, the adverse impact of the SOS and AG's orchestrated effort falls particularly heavily on the Latino community. Members of that community who are properly and legally registered are already reacting to the publicity campaign attending the roll-out of Advisory No. 2019-02 by contacting local voter registrars and election administrators and asking to have their names removed from the voting rolls. In short, the SOS and AG have already successfully used Advisory No. 2019-02 and all the publicity they ensured would come with its issuance to intimidate voters in the upcoming May election into withdrawing from the election system by withdrawing their voter registrations.

21. LULAC and Texas LULAC are organizations whose very purpose is to step in as voluntary associations in these situations to seek protection of the rights of the voters discussed in ¶ 20, above. The very intimidation that threatens them as voters who would be registered for the May election threatens them insofar as they might come forward into federal court as individuals trying to protect their rights from the onslaught of the SOS and AG. Further, the impact of the voter intimidation effort is and will be felt in concrete ways in local counties across the entire State. The impact in Bexar County and the other large counties in Texas, is and will be particularly acute and substantial. Bexar County has one of the largest Latino voting communities in the State. It is a target of the SOS and AG effort at open intimidation.

22. Federal statutory law provides specific protection against the combined effort of the SOS and AG. Specifically, Section 11(b) of the Voting Rights Act prohibits the SOS and

AG's combined action working through Advisory No. 2019-02, the data blackout imposed in conjunction with it, and the SOS and AG publicity campaign taking advantage of the advisory and data blackout to further their intimidation efforts. That statute provides:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of title 42.

52 U.S.C. § 10307(b).

23. Participating in elections, including by registering to vote, is a core First Amendment value furthered by Section 11(b). The provision requires no showing of subjective intent to intimidate, only an objective basis for finding such intimidation present. Subtle and cynical intimidation is forbidden by Section 11(b), which in light of its remedial and protective purposes is to be given an expansive interpretation. Intimidating, threatening, or coercing any person from registering to vote equates to intimidating, threatening, or coercing such person from voting at all. The SOS and AG's manipulative use of the advisory, the data blackout, and coercive use of local election officials as human shields against the charges legitimately leveled at the two state officials themselves is a violation of Section 11(b). It should be invalidated, and the officials should be enjoined from continuing with the manipulative program and from engaging in any such program in the future.

**Legal Claim — 52 U.S.C. § 10307**

24. Paragraphs 1-23 are incorporated for all purposes.

25. Defendants Whitley and Paxton have violated, and continue to violate, 52 U.S.C. § 10307 in pursuing the program set in public motion by SOS Advisory No. 2019-02.

**Prayer for Relief**

26. Based upon the foregoing matters, Plaintiffs respectfully request that this Court grant them the following relief:

a. assume jurisdiction over this action;

b. declare the actions of the Texas Secretary of State and the Texas Attorney General that are complained of herein to be in violation of 52 U.S.C. § 10307(b);

c. issue a preliminary and permanent injunction, barring the Texas Secretary of State and the Texas Attorney General from further actions in connection with pursuit of the program outlined in SOS Advisory No. 2019-02; and

d. grant Plaintiffs such other and further relief as may be necessary, appropriate, and equitable.

Respectfully submitted,

/s/ Luis R. Vera, Jr.
LUIS ROBERTO VERA, JR.
LULAC National General Counsel
Law Offices of Luis Roberto Vera, Jr.
& Assoc
1325 Riverview Towers
111 Soledad
San Antonio, TX 78205-2260
(210) 225-3300
lrvlaw@sbcglobal.net

Counsel for LULAC Plaintiffs

# The State of Texas



Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.state.tx.us

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

**David Whitley**
Secretary of State

### ELECTION ADVISORY
### No. 2019-02

**TO:** Voter Registrars/Elections Administrators

**FROM:** Keith Ingram, Director of Elections

**DATE:** January 25, 2019

**RE:** Use of Non-U.S. Citizen Data obtained from the Department of Public Safety

---

Pursuant to Section 730.005, Transportation Code, personal information obtained by the Department of Public Safety (DPS) in connection with a motor vehicle record shall be disclosed and used for any matter of voter registration or the administration of elections by the secretary of state. The secretary of state has been working with DPS to obtain and use information regarding individuals who provided documentation to DPS showing that the person is not a citizen of the United States during the process of obtaining or acquiring a Texas Driver License or Personal Identification Card from DPS. The initial set of information provided by DPS is being compared to the voter registration rolls, and we are providing information relating to matches out to counties beginning tomorrow.

**Background**: Beginning in early March 2018, our office began working with DPS to review and refine the data able to be provided by DPS for use in this list maintenance process. The goal was to produce actionable information voter registrars could use to assist in their list maintenance responsibilities. In keeping with general guidelines set out under Section 18.0681, Election Code, our office sought to create the strongest matching criteria that produces the least possible impact on eligible Texas voters while fulfilling the responsibility to manage the voter rolls. To that end, our office and DPS spent time evaluating the data and refining the query to limit the information being provided to us for use in this list maintenance exercise to individuals who provided valid documents indicating the person is not a citizen of the United States at the time the person obtained a Driver License or Personal Identification Card. It is important to note that we are not using information self-reported by the person regarding their citizenship status; rather, we are using documents provided by the person to show they are lawfully present in the United States. As part of the processing for issuing a card, these documents would have been validated by DPS against the Systematic Alien Verification for Entitlements (SAVE) Database, which is administered by the U.S. Citizenship and Immigration Services, a component of the Department of Homeland



Security. Once a person's document is validated through SAVE and a card is issued, then the individual's information will be provided to our office in the next data file to be supplied. Our office has obtained the preliminary data file for all current (unexpired) Driver License and Personal Identification cards that meet this criteria, and we will run that set of information tomorrow evening. After that initial data set has been run, DPS will provide information to our office on a monthly basis of individuals obtaining a Driver License of Personal Identification card since the last data file has been provided. We will run those as they are received by our office.

There is likely to be a law enforcement interest in the data that we are providing to you. If you receive any requests from the public for the information, please contact your local prosecutor and the attorney general, who have jurisdiction over such matters.

**Impact of Data being obtained:** It should be noted that the additional source of data being obtained from DPS does not change or modify the voter registrar's rights or responsibilities under Section 16.033, Election Code. The voter registrar has the right to use any lawful means to investigate whether a registered voter is currently eligible for registration in the county. This section **does not** authorize an investigation of eligibility that is based solely on residence. If the registrar **has reason to believe** that a voter is no longer eligible for registration, the registrar shall deliver written notice to the voter indicating that the voter's registration status is being investigated by the registrar. The notice shall be delivered by **forwardable mail to the mailing address** on the voter's registration application **and to any new address** of the voter known to the registrar. If the secretary of state has adopted or recommended a form for a written notice, the registrar must use that form. The obtaining of information from DPS and providing matching data to the voter registrar merely expands the resources available to the registrar for use in list maintenance. The registrar, ultimately, is responsible for determining whether or not the information provides the registrar with reason to believe the person is no longer eligible for registration. If the registrar determines this standard has been met, the registrar should send a Notice of Examination for Citizenship (Proof of Citizenship) Letter.

**Matching Information:** This DPS non-U.S. Citizen data is matched against the TEAM system, and information will be provided to counties if/when a match is identified between the DPS data and a registered voter in the county. Records are identified as Possible Non U.S. Citizens when one of the following combinations matches between a voter record and the DPS data:
- Last Name (including Former Last Name on the Voter Record), First Name, and Full Social Security Number (SSN) (9 digits);
- Last Name (including Former Last Name on the Voter Record), First Name, and Texas Department of Public Safety (DPS)-Issued Driver License, Personal Identification Card, or Election Identification Certificate Number; or
- Last Name (including Former Last Name on the Voter Record), First Name, Last Four Digits of the SSN, and Date of Birth.

These are some of the strongest possible matching criteria used in TEAM and are the current matching criteria used when determining whether or not to transfer a voter to an Offline County when the Offline County submits a new registration application. A match to a new voter registration application submitted by an Offline County to an existing voter using the above listed criteria will result in the transfer of the voter record. The point of this is to emphasize that our

goal was to produce actionable information for voter registrars while producing the least possible impact on eligible voters, meaning we believe the data we are providing can be acted on in nearly all circumstances.

All records submitted through this process will need to be treated as WEAK matches, meaning that the county may choose to investigate the voter, pursuant to Section 16.033, Election Code, or take no action on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible. The county **may not cancel** a voter based on the information provided without first sending a <u>Notice of Examination (Proof of Citizenship Letter)</u> and following the process outlined in the letter. In order to help counties make a determination regarding whether or not to send a Notice of Examination or close the task without taking further action, information provided by DPS will be provided to each county for further review and comparison against the voter record.

**Workflow for Possible Non-U.S. Citizen Investigation:** Again, counties are **not** permitted, under current Texas law, to immediately cancel the voter as a result of any non-U.S. Citizen matching information provided. This is applicable to notifications received from jury summons responses, as well as the dataset discussed in this advisory: possible non-U.S. Citizen notifications coming from DPS.

- For matching notifications coming from Jury Summons response devices, the county **must** send the voter a Proof of Citizenship Letter (Notice of Examination).
- For the matching notifications originating from DPS data, the county user has the choice to either:
  1. Send a Proof of Citizenship Letter (Notice of Examination) to the voter; thereby starting the 30-day countdown clock before cancellation, or
  2. Take no action on the voter record and simply close the task as RESOLVED.

A voter may only be cancelled based on possible non-U.S. Citizen matching information if a <u>Proof of Citizenship Letter (Notice of Examination)</u> was sent to the voter **and**:
1. The voter responded to the Notice in under 30 days indicating the voter is **not** in fact a U.S. Citizen (you would cancel for not being a citizen – Cancel Reason: Non U.S. Citizen);
2. The voter failed to respond to the Notice within 30 days and is being cancelled for failure to respond to the notice (Cancel Reason: Failure to respond to Notice of Investigation); **or**
3. The notice was mailed and returned as undeliverable to the registrar with no forwarding information available (Cancel Reason: Failure to respond to Notice of Investigation).

To aid in this process, new Dashboard options will be available within the Possible Non U.S. Citizen Dashboard task and a new Event Type has been developed for Offline counties. We are not able to leverage the current Non U.S. Citizen Notification task, which is currently created when a match identifies a voter having responded to a jury summons that he/she is not a United States citizen. We cannot use the current Dashboard line item task/event type because counties are required (by current law) to investigate those records identified as a response to the jury summons response device under the current process. Counties are not, however, required (by current law) to investigate the new DPS data matches if they do not believe that a voter is ineligible to vote.

PAGE 4

However, our office will provide the data obtained from DPS in order to allow counties all the information necessary to make the determination regarding whether or not to investigate the voter.

**Response needed from the voter:** Once a <u>Notice of Examination for Citizenship (Proof of Citizenship) Letter</u> has been issued to a voter, the voter is required to provide proof of citizenship as outlined under Section 16.0332, Election Code. This includes:
- A certified copy of the voter's birth certificate,
- United States passport, or
- Certificate of naturalization

A copy of one of these documents (including a copy of the passport) being returned to the registrar is sufficient to meet the proof requirement. The registrar is required to retain a copy of the notice mailed and any proof of citizenship received by the voter. If the voter comes in person and provides proof, then the registrar should make a copy of the document provided and retain it, along with a copy of the notice that was mailed, with the application file for the voter.

For more information, please contact the Elections Division at 1-800-252-VOTE(8683).

KI:BS