## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

**FILED**

FEB 0 1 2019

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS,<br><br>and<br><br>NATIONAL LEAGUE OF UNITED LATIN AMERICAN CITIZENS,<br><br>and<br><br>JULIE HILBERG, individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>DAVID WHITLEY, in his official capacity as Secretary of State for the State of Texas,<br><br>and<br><br>KEN PAXTON, in his official capacity as Attorney General for the State of Texas,<br><br>        Defendants. | Civil Action<br>Case No. 5:19-cv-00074-FB<br><br>**FIRST AMENDED CLASS-ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## INTRODUCTION

1.     Plaintiffs bring this action to vindicate the right of newly naturalized citizens to vote under the First and Fourteenth Amendments to the United States Constitution, and to assert their right to be free from voter intimidation, threats, or coercion under Section 11(b) of the Voting Rights Act.

2.     Newly naturalized citizens have the same right to vote as all other citizens, and states may not impose undue burdens on that right or target those citizens for suspicion, intimidation, threats, or coercion. But Defendants Whitley and Paxton have done just that, devising, implementing, and loudly trumpeting a voter purge program that is guaranteed to discriminatorily target newly naturalized citizens and inaccurately label them "noncitizens" based upon stale data, which Defendants admit constitutes "WEAK" evidence. Despite that admission, Defendants Whitley and Paxton have publicly threatened criminal prosecutions, and Defendant Whitley has advised county voter registrars and Elections Administrators to offer a mere 30 days to voters to prove their citizenship or have their registrations canceled.

3.     The voter purge program is deeply flawed, as Defendants have been forced to admit. This should have been obvious at the outset. Texas driver licenses are valid for six years. Over the past six years, nearly 350,000 Texas residents over the age of 18 have become newly naturalized citizens. It is no surprise then that driver license applications from up to six years ago are an exceptionally poor source of current citizenship information.

4.     It should also be no surprise that this voter purge scheme is discriminatory and unlawful, because a nearly identical program was deemed unlawful by a federal district court in Florida, and abandoned by the Florida Secretary of State in 2012.

5.     Notwithstanding the obvious flaws—which likely make the vast majority of the 95,000 people wrongly targeted—and notwithstanding a federal court decision declaring the same methodology unlawful, Defendant Whitley proceeded to advise county registrars and Elections Administrators to send voters notices providing 30 days to prove their citizenship lest their registrations be canceled.

6.      As if it were not enough to proceed with a plan to cancel tens of thousands of registrants based on flimsy and outdated evidence, he chose to publicly raise the specter of criminal prosecutions and voter fraud.

7.      Defendant Paxton loudly proclaimed on his personal and official twitter accounts that VOTER FRAUD was afoot and that 95,000 noncitizens had registered to vote and 58,000 had in fact voted. He then issued a press release warning of voter fraud and crimes and threatening prosecutions. He nowhere acknowledged what he knew to be true—the numbers offered "WEAK" evidence and were likely wildly overstated.

8.      This voter purge program targets, based upon flimsy and incorrect data, newly naturalized citizens who are lawfully registered to vote.  It requires those eligible voters to prove their citizenship within 30 days in order to avoid cancelation and criminal investigations.  This program constitutes an undue burden on the right to vote under the First and Fourteenth Amendments. The irresponsible and knowingly inaccurate publicity and unfounded threats of prosecution and investigations by Defendants Whitley and Paxton constitutes unlawful effort to intimidate, threaten, and coerce eligible voters to avoid registration and voting in violation of the Voting Rights Act.

9.      Defendants must be enjoined from taking any further steps to implement this unconstitutional voter purge program, and must be enjoined from unlawfully intimidating and threatening newly naturalized citizens who have a constitutionally guaranteed right to vote.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

11.     This Court has personal jurisdiction over Defendant Secretary of State Whitley and Defendant Ken Paxton, officials for the State of Texas and residents of the State of Texas.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

13.     This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

14.     Plaintiff League of United Latin American Citizens–National ("LULAC") is the oldest and largest national Latino civil rights organization in the United States. It is a non-profit membership organization with a presence in most of the fifty states, including Texas. LULAC has over 125,000 members nationwide. LULAC was founded with the mission of protecting the civil rights of Latinos, including voting rights. LULAC participates in voter registration throughout the United States.

15.     LULAC has been recognized and accepted as an organizational plaintiff protecting Latino rights in federal courts across the country, including the United States Supreme Court and the Western District of Texas.

16.     Plaintiff Texas League of United Latin American Citizens ("Texas LULAC") is the Texas chapter of LULAC. LULAC was founded in Texas in 1929. LULAC has over 20,000 members in Texas, and over 1,000 members in Bexar County.

17.     Voter registration activity is key to LULAC's mission of increasing civic participation of its members. Texas LULAC commits time, personnel, and resources to voter registration drives throughout Texas.

18.     If Defendant Whitley continues to engage in this unlawful voter purge program, Texas LULAC will be forced to commit resources to educating the Latino community about this

unlawful voter purge program and assisting its members and Latinos throughout the state to respond to improper notices threatening cancellation of their voter registration. Moreover, Texas LULAC's ability to encourage voter registration by eligible newly naturalized citizens is likely to be hampered by Defendants' unlawful intimidation and threats—the loudly trumpeted and unwarranted claims of voter fraud and the specter of unfounded criminal investigations that have accompanied the rollout of the voter purge program.

19.     Plaintiff Julie Hilberg is a 54-year-old citizen of the United States and resident of the state of Texas. She is currently a registered voter in Atascosa County. Plaintiff Hilberg is originally from the United Kingdom. She is married to a United States citizen and retired U.S. Navy officer and became a naturalized citizen on April 16, 2015. She voted in both the 2016 and 2018 elections in Atascosa County. Upon information and belief, Plaintiff Hilberg is one of the registered voters on Defendant Whitley's list of alleged non-citizens on Texas's voter registration list.

20.     Plaintiff Julie Hilberg seeks to represent a Plaintiff Class defined as: All eligible Texas registered voters who appear on Defendant Whitley's list of approximately 95,000 alleged non-citizens and all eligible Texas registered voters who may appear on the forthcoming monthly lists to be prepared pursuant to the voter purge program announced in Election Advisory 2019-02 (the "Advisory").

21.     Upon information and belief, if Defendant Whitley continues to engage in this unlawful voter purge program, Texas LULAC's voter registration activity may be less successful because many of its registrants (often naturalized citizens) will be flagged for cancellation under this program.

22.     Defendant David Whitley is the Texas Secretary of State, a statewide public officer appointed by the Governor, and is the chief election officer for the state of Texas; Defendant Whitley is named in his official capacity.

23.     Defendant Ken Paxton is the Texas Attorney General, a statewide elected public officer, and is named in his official capacity.

## FACTS

### *Defendant Whitley's "Advisory"*

24.     On January 25, 2019, the Secretary of State's office issued the Advisory announcing a new voter purge program. The Advisory is attached hereto as Exhibit A.

25.     The Advisory instructs voter registrars that the Secretary of State's office had worked with the Department of Public Safety ("DPS") to "obtain and use information regarding individuals who provided documentation to DPS showing that the person is not a citizen of the United States during the process of obtaining or acquiring a Texas Driver License or Personal Identification Card from DPS." The Secretary explained that his office would be matching this data set against the current voter registration list to produce "actionable information" for list maintenance.

26.      The Advisory instructs registrars that the data the Secretary of State's office would provide beginning January 26 "can be acted on in nearly all circumstances," despite the fact that the Secretary's Advisory had identified these records as "WEAK" matches.

27.     The Advisory instructs registrars that they could use these matches to send the registered voter a Proof of Citizenship Letter (Notice of Examination) ("NCE") and *cancel* the voter's registration if: (1) the individual did not provide proof of citizenship (in the form of a certified copy of a birth certificate, passport, or naturalization certificate) within 30 days from

when the NCE was sent; or (2) the NCE was returned as undeliverable without forwarding information.

28.    The Advisory also explains that, going forward, the Secretary of State's office intends to run this "match" on a monthly basis and provide this "actionable data" to registrars and that registrars should proceed in the same manner with respect to these subsequent monthly matches.

29.    On January 25, Defendant Whitley issued a press release to announce the Advisory. The press release, attached hereto as Exhibit B, identifies the voters targeted by this process as "persons identified to not be citizens of the United States" despite knowledge that the DPS database has stale information and that the vast majority of the identified individuals are likely naturalized citizens.

30.    Indeed, the press release asserted that the Secretary of State's office "discovered that a total of approximately **95,000** individuals identified by DPS as non-U.S. citizens have a matching voter registration record in Texas, approximately **58,000** of whom have voted in one or more Texas elections."[1]

31.    The press release also states that every person identified on this list "should receive" an NCE and that their registration will be cancelled if the person fails to provide proof of citizenship within 30 days.

---

[1] Defendant Whitley has not publicly explained the methodology of this matching, including the time period of DPS data that it used. Upon information and belief, the 58,000 estimate of alleged non-citizen voters was generated based on voting records dating back to 1996.

### *A Fatally Flawed Process*

32.     While Defendant Whitley has disclosed little information about the methodology behind his list, the information available thus far makes clear that this list of 95,000 alleged non-citizens is fatally flawed and the vast majority of these individuals are likely naturalized U.S. citizens like Plaintiff Hilberg.

33.     The Advisory explains that the matching process relies on records submitted to DPS at the time a person obtained their state-issued driver's license or personal identification card. This data provides little to no information about the current citizenship status of individuals on the voter registration list.

34.     Data from the U.S. Department of Homeland Security show that between 50,000 and 65,000 Texas residents over the age of 18 become naturalized citizens every year. *See* U.S. Dep't of Homeland Sec., *Profiles on Naturalized Citizens*, https://www.dhs.gov/profiles-naturalized-citizens.

35.     Over the most recent six years of data—the lifespan of a Texas driver license—348,552 Texas residents have become newly naturalized citizens. *Id.*

36.     If even one-third of those newly naturalized citizens with driver licenses or state-issued identification cards registered to vote upon their naturalization,[2] they would significantly outnumber the total number of alleged non-citizen voter registrants on Defendant Whitley's list.

---

[2] A Census Bureau report suggests that first-generation Americans (naturalized citizens) report registering to vote 61.7 percent of the time. U.S. Census Bureau, Voting and Registration in the Election of November 2016, Table 11 (2017), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html (last visited Feb. 1, 2019). Other studies have suggested that first-generation Americans register at a rate of approximately 50 percent. *See, e.g.*, Ctr. for the Study of Immigrant Integration, *Rock the (Naturalized) Vote: The Size and Location of the Recently Naturalized Voting Age Citizen Population*, USCDornsife (2012), https://dornsife.usc.edu/assets/sites/731/docs/Naturalization_and_Voting_Age_Population_web.pdf.

37.     The fundamentally flawed nature of this new voter purge program is not only obvious but has already been found unlawful by a federal court when a Florida Secretary of State engaged in a nearly identical practice.

38.     In 2012, Florida's Secretary of State compiled a list of 180,000 registered voters whose driver license applications disclosed that they were non-citizens at the time of the application, and advised county Election Supervisors to provide those registered voters 30 days to prove their citizenship to avoid cancelation of their registration. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1347-48 (N.D. Fla. 2012).

39.     The court explained that there were "major flaws" with this program because "[t]he Secretary compiled the list in a manner certain to include a large number of citizens." *Id.* at 1347. That was so, the court explained, because 240,000 Floridians became newly naturalized citizens over just a three-year period, while, like in Texas, Florida Driver's Licenses have a six-year renewal period. Thus, the Court found that entire list of 180,000 could consist of people who were, in fact, newly naturalized citizens who were properly registered to vote.

40.     The court held that the program likely violated the National Voter Registration Act ("NVRA") because it would target naturalized citizens and "[a] state cannot properly impose burdensome demands in a discriminatory manner." *Id.* at 1350.[3]

41.     Out of 185,000 registrants identified by Florida's program, less than .05% could lawfully be removed. *See* Steve Bousquet & Amy Sherman, Florida Suspends Non-citizen Voter

---

[3] On February 1, 2019, Plaintiffs sent a notice letter to Defendant Whitley outlining the NVRA violations created by this new voter purge program. If the violations are not cured within the required notice period, Plaintiffs intend to amend their complaint to include those NVRA claims as well. Defendant has thus far refused to make the list of alleged noncitizen voters public. Upon analysis of the list, Plaintiffs suspect that the disparate impact on the Latino community will be plain and give rise to an additional claim under Section 2 of the Voting Rights Act.

Purge Efforts, Miami Herald (March 27, 2014), https://www.miamiherald.com/news/politics-government/article2087729.html.

42.     Initial reports from county registrars demonstrate that Defendant Whitley's list is equally deficient in identifying non-citizen registrants. Election administrators across the state have reported identifying thousands of citizens in their counties that appear on the list. Indeed, in McLennan County, the Elections Administrator Kathy Van Wolfe has indicated that 100% of the 366 registered voters on the list in that county had *already proven* their citizenship. Cassie L. Smith, State: *All 366 on Local List of Potential Noncitizen Voters Are Citizens*, Waco Tribune-Herald (Jan. 30, 2019), https://www.wacotrib.com/news/elections/state-all-on-local-list-of-potential-noncitizen-voters-are/article_20771942-538d-506d-bcad-7e7ca79e261d.html.

43.     On information and belief, Defendant Whitley's office has acknowledged to county officials that the list includes voters who were not citizens at the time they applied for a driver's license, but who have since become naturalized. *See* Alexa Ura, "Someone did not do their due diligence." How an attempt to review Texas' voter rolls turned into a debacle, Texas Tribune (Feb. 1, 2019), https://www.texastribune.org/2019/02/01/texas-citizenship-voter-roll-review-how-it-turned-boondoggle/.

44.     Defendant Whitley's voter purge program is not only likely to flag tens of thousands of eligible citizens for removal from the voter registration list but will do so in a discriminatory fashion.

45.     As the district court in Florida explained, such a program is not reasonably designed to identify noncitizen voters but is remarkably well crafted to identify and penalize newly naturalized citizens who choose to exercise their right to vote. These discriminatory burdens placed on naturalized citizens cannot be justified.

46.     And given that the largest group of naturalized citizens in Texas are of Hispanic or Latino heritage, Defendant Whitley's new voter purge program will have a sharply discriminatory racial impact as well.

47.     Defendant Whitley compounded the fatal flaws in generating this list by suggesting that registrars use this faulty data to send notices to all of these voters and then *cancel* them if they do not respond within 30 days or if the notice is returned without a forwarding address.

48.     This is a system designed to remove as many registered individuals as possible, not to simply ensure that the potential stray noncitizen voter on the list is not permitted to vote.

49.     Providing a single notice with a short 30-day time limit for a response with proof of citizenship is exceedingly strict and unlikely to result in a significant response rate from the many eligible voters on this list. According to data reported by Texas to the Elections Assistance Commission, only 14 percent of NVRA notices sent to voters between the November 2014 and November 2016 Elections were returned by the recipients. U.S. Elections Assistance Comm'n, 2016 Election Administration and Voting Survey. In contrast, 13 percent were returned undeliverable, and 63% simply were not returned. *Id.* In addition, mailings addressed to Latinos are disproportionately likely to be returned as undeliverable. *See* Robert Walters and Mark Curriden, *A Jury of One's Peers? Investigating Underrepresentation in Jury Venires*, 43 Judges' J.17, 19-20 (2004) (finding that a disproportionate number of jury summons returned as undeliverable were addressed to Latinos).

50.     Once removed from the registration rolls, these eligible voters will be forced to start the process of registering to vote from the beginning with no assurance that they will not be flagged for removal *again* based on outdated data.

51.     If they do not discover their removal until after the registration deadline (30 days before an election) or at the polls when they appear to vote, they will lose the right to vote altogether.

52.     Some of these notices have already been mailed to registered voters in Texas as early as January 28. Those individuals could face removal from the registration list as early as February 27. For example, the Galveston County tax assessor-collector set out 92 notices as of Monday, January 28, only to later learn that at least 62 of those notices went to eligible voters. *See* Alexa Ura, "Someone did not do their due diligence." How an attempt to review Texas' voter rolls turned into a debacle, Texas Tribune (Feb. 1, 2019), https://www.texastribune.org/2019/02/01/texas-citizenship-voter-roll-review-how-it-turned-boondoggle/.

53.     It is well recognized that the duty to register—and in this case re-register—is the primary obstacle to voting. H.R. Rep. No. 103-9, at 3 ("Public opinion polls, along with individual testimony . . . , indicate that failure to become registered is the primary reason given by eligible citizens for not voting. It is generally accepted that over 80 percent of those citizens who are registered vote in Presidential elections."). Indeed, registration problems are routinely among the top problems reported on Election Day to election protection hotlines.

54.     The burdens of re-registration fall unevenly on those voters already facing substantial obstacles to voting, including people with limited access to technology, limited literacy or English language skills, people experiencing homelessness, and people with disabilities.

*An Effort to Stoke Unjustified Fears and Intimidate Voters*

55.     Despite the obviously—and previously litigated—flaws in Defendant Whitley's voter purge program, Defendant Whitley's public statements never acknowledge the likelihood or even the possibility that the individuals identified in his "list" are recently naturalized citizens.

56.     Defendant Whitley's highly publicized statements have prompted a cascade of false accusations of illegal noncitizen voting from Texas Attorney General Paxton, Texas Governor Abbott, President Donald Trump, and many others.

57.     These false allegations cast a pall of suspicion on the democratic process and stoke public fears of noncitizen voting.

58.     Moreover, Defendant Whitley's public statements have specifically invoked the likelihood of law enforcement action against these individuals. Defendant Whitley's press release stresses that voting while ineligible to vote is a "second-degree felony" and that he "immediately provided the data in its possession to the Texas Attorney General's office." Meanwhile, the Advisory states that "[t]here is likely to be a law enforcement interest in the data."

59.     The Advisory also instructs the registrars not to provide any information to the public about this data but instead to contact their local prosecutor and Attorney General Paxton in response to any requests from the public.

60.     On January 25, Attorney General Paxton relied on the Advisory to issue a press release warning seven times of "fraud" and of "illegal voting," "crimes against the democratic process," and "election crimes." He also tweeted a "VOTER FRAUD ALERT" within hours of the release of the Advisory.

13

61.     These intimidating and well-publicized statements have created a hostile environment for newly naturalized voters—a population that is largely Latino—who wish to exercise their right to vote but fear unwarranted law enforcement investigation and harassment.

62.     Upon information and belief, Defendant Whitley's office has admitted to various county election officials that the list is seriously flawed and may even include thousands of individuals who have already provided proof of citizenship to DPS when updating their driver's license.

63.     Nonetheless, Defendant Whitley has thus far refused to rescind the list and Advisory or make any public statements acknowledging these egregious errors.

### Plaintiff Hilberg's Experience Is Illustrative

64.     Plaintiff Hilberg's experience demonstrates the fundamental failure of this new voter purge program.

65.     Julie Hilberg is a naturalized citizen and eligible Texas voter living in Poteet, Texas in Atascosa County.

66.     She most recently renewed her Texas driver's license in 2014, when she was still a legal permanent resident. Her driver license does not expire until 2020.

67.     On April 16, 2015, she became a United States citizen at a naturalization ceremony in Bexar County. She completed a voter registration form at the ceremony and she was told her voter registration form would be sent to her registrar in Atascosa County.

68.     In June 2015, Ms. Hilberg had not yet received a voter registration card.

69.     Concerned about her voter registration status, she went to her local voter registrar's office to re-register. At that time, she showed the election official at the office her

naturalization certificate and completed a voter registration form. She became a registered voter in Texas on June 26, 2015.

70.     Since registering to vote, Ms. Hilberg has voted in primary, general, and special elections in 2016 and 2018.

71.     After Defendant Whitley issued the Advisory, Ms. Hilberg became concerned that she may appear on this "list" of alleged noncitizens and could be removed from the voter registration list.

72.     On January 31, 2019, Ms. Hilberg visited the Elections Administrator's office and spoke to Janice Ruple, Atascosa County's Elections Administrator. Ms. Ruple confirmed to Ms. Hilberg that her name was on the list provided by Defendant Whitley pursuant to the Advisory.

73.     Although Ms. Ruple knows Ms. Hilberg personally (including her citizenship status), Ms. Ruple was unable or unwilling to give Ms. Hilberg any information or assurances about whether her registration would be in jeopardy because her name was on Defendant Whitley's list.

## CLASS ALLEGATIONS

74.     Upon information and belief, Defendant Whitley's list of 95,000 voters includes tens of thousands of eligible Texan voters with stories just like Ms. Hilberg's.

75.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Hilberg brings this action on behalf of herself and all other similarly situated persons. Plaintiff Hilberg does not seek claims for compensatory relief. Instead, Plaintiff seeks only declaratory and injunctive relief broadly applicable to members of the Plaintiff Class, as defined above. The requirements of Rule 23, and in particular Rule 23(b)(2), are met with respect to the Plaintiff Class, defined as: All eligible Texas registered voters who appear on Defendant Whitley's list of approximately

95,000 alleged non-citizens and all eligible Texas registered voters who may appear on the forthcoming monthly lists to be prepared pursuant to the voter purge program announced in Advisory 2019-02 (the "Advisory").

76.     The members of the Plaintiff Class are so numerous—up to approximately 95,000—that joinder is impracticable. The members of the Plaintiff Class are also plainly ascertainable since Defendant Whitley has already gathered the relevant list of affected registrants.

77.     The questions of law and fact common to the Plaintiff Class and Plaintiff Subclasses predominate over questions affecting only individual class members, and include, but are not limited to, the following:

> a.     Whether Defendant Whitley's voter purge program imposes an unconstitutionally burdensome obstacle to voting in violation of affected eligible voters' 14th Amendment rights;
>
> b.      Whether Defendant Whitley's voter purge program imposes an unconstitutionally burdensome obstacle to voting in violation of affected eligible voters' 1st Amendment rights;
>
> c.     Whether Defendant Whitley's voter purge program imposes unconstitutional discrimination in access to voting in violation of affected eligible voters' 14th Amendment rights;
>
> d.     Whether Defendant Whitley's and Defendant Paxton's actions constitute unlawful voter intimidation in violation of Section 11(b) of the Voting Rights Act.

78.     Plaintiff Hilberg's claims are typical of the Plaintiff Class and Plaintiff Hilberg is not aware of any conflict between her interests and that of the Plaintiff Class she seeks to represent.

79.     Plaintiff Hilberg can fairly and adequately represent the interests of the Plaintiff Class because she is similarly situated with members of the Plaintiff Class. Plaintiff Hilberg has retained counsel experienced in class-action litigation and voting rights litigation to represent her and the Plaintiff Class for the purpose of this litigation.

80.     Defendant Whitley has acted on grounds generally applicable to the entire class, and final injunctive relief and corresponding declaratory relief are appropriate respecting the classes as a whole.

81.     A class action is superior to other available means for the fair and efficient adjudication of the Plaintiff Class members' claims.

## CLAIMS

### Count 1: Unconstitutional Discriminatory Burden on the Right to Vote, 14th Amendment (against Defendant Whitley in his official capacity) (42 U.S.C. § 1983)

82.     Plaintiffs reallege the facts set forth in paragraphs 1-81 above.

83.     "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure" and the right to an effective vote is protected by the Equal Protection Clause of the Fourteenth Amendment. See *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886)).

84.     When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

85.     When a burden on the right to vote is severe or discriminatory, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

86.     The burden imposed by Defendant Whitley's new voter purge program—both the current list of 95,000 registrants flagged for potential removal and the plan to continue this practice on a monthly basis—imposes a severe and plainly discriminatory burden on naturalized citizens who wish to exercise their right to vote.

87.     Given the extraordinarily improper methodology used by the voter purge program, Defendant Whitley cannot meet his burden of justifying the program as promoting any state interest that makes it "necessary to burden" these eligible voters' rights.

88.     This voter purge program cannot survive even rational basis review and certainly cannot survive the more exacting review given to severe and discriminatory voting restrictions.

### Count 2: Unconstitutional Discriminatory Burden on the Right to Vote, 1st Amendment (against Defendant Whitley in his official capacity) (42 U.S.C. § 1983)

89.     Plaintiffs reallege the facts set forth in paragraphs 1-88 above.

90.     Voting and participating in the election process is a form of speech and expression. It is the ultimate form of political speech and association and is entitled to First Amendment protection.

91.     As unjustified restrictions on access to the right to vote, Defendant Whitley's new voter purge program violates the First Amendment.

### Count 3: Voter Intimidation
### Section 11(b) of the Voting Rights Act,
### (52 U.S.C. § 10307) (against Defendants Whitley and Paxton in their official capacities)

92.     Plaintiffs allege the facts set forth in paragraphs 1-91 above.

93.     Section 11(b) of the Voting Rights Act prohibits any person, whether acting under color of law or otherwise, from intimidating, threatening, or coercing, or attempting to intimidate, threaten, or coerce any person for voting or attempting to vote. 52 U.S.C. § 10307(b).

94.     Defendant Whitley coordinated a highly publicized press campaign to assert that he had identified nearly 100,000 ineligible noncitizens on the voter registration rolls, that nearly 60,000 of those individuals had unlawfully voted, and that he was passing this information on to law enforcement for criminal investigation.

95.     This conduct is objectively intimidating to the tens of thousands of naturalized citizens that are currently on Defendant Whitley's "list" of allegedly suspect voters and those who worry they may be included on that list.

96.     While intent is not a required element, Defendant Whitley had every reason to know that his list was fatally flawed and yet continued to make these assertions and coordinate them with Attorney General Paxton to create fear of unwarranted criminal investigation and stoke public anxiety about noncitizen voting.

97.     Since the January 25 public announcement, reporting from election officials has made plain that this list is comprised largely of eligible Texan voters and yet Defendant Whitley has refused to rescind his Advisory, apologize for his errors, or take any concrete public steps to ensure that the registrations of these eligible Texas voters are not endangered.

98.     Defendant Whitley has engaged in unlawful intimidation of eligible naturalized citizen voters in Texas in violation of Section 11(b) of the Voting Rights Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

   a.   Certify the Plaintiff Class;

   b.   Issue a declaratory judgment that Defendant Whitley's new voter purge program violates the First and Fourteenth Amendments;

   c.   Issue a declaratory judgment that Defendant Whitley's Advisory and Defendant Whitley's and Defendant Paxton's accompanying public statements constitute unlawful voter intimidation in violation of Section 11(b) of the Voting Rights Act;

   d.   Order Defendant Whitley to rescind Election Advisory No. 2019-02 and direct election officials to take no action pursuant to the program identified in Election Advisory No. 2019-02 and rescind any notifications sent to voters pursuant to Election Advisory No. 2019-02;

   e.   Enjoin Defendant Whitley from taking any further action pursuant to the program identified in Election Advisory No. 2019-02;

   f.   Award Plaintiffs their costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Voting Rights Act and the

Civil Rights Attorneys Fees Awards Act, 52 U.S.C. § 10310(e) and 42 U.S.C § 1988;

g.   Grant such other equitable and further relief as the Court deems just and proper.

February 1, 2019

Respectfully submitted

Luis Roberto Vera, Jr.
LULAC National General Counsel
Law Offices of Luis Roberto Vera, Jr. &
 Associates
1325 Riverview Towers
111 Soledad
San Antonio, TX 78205-2260
Telephone: (210) 225-3300
lrvlaw@sbcglobal.net

Chad W. Dunn
State Bar No. 24036507
K. Scott Brazil
State Bar No. 02934050
Brazil & Dunn
3303 Northland Drive, Suite 205
Austin, TX 78731
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com

Danielle M. Lang*
Mark P. Gaber*Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, DC 20005
Telephone: (202) 736-2200
Facsimile: (202) 736-2222
dlang@campaignlegal.org
mgaber@campaignlegal.org
*motions for admission pro hac vice
forthcoming

Renea Hicks
State Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, TX 78703
Telephone: (512) 480-8231
rhicks@renea-hicks.com

David Richards
State Bar No. 16846000
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
Telephone: (512) 476-0005
Facsimile: (512) 476-1513

*Counsel for Plaintiffs*