**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS, | Civil Action Case No. 5:19-cv-00074-FB |
| and | |
| NATIONAL LEAGUE OF UNITED LATIN AMERICAN CITIZENS, | CLASS ACTION |
| and | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| JULIE HILBERG, individually and on behalf of others similarly situated, | |
| Plaintiffs, | |
| v. | |
| DAVID WHITLEY, in his official capacity as Secretary of State for the State of Texas, | |
| and | |
| KEN PAXTON, in his official capacity as Attorney General for the State of Texas, | |
| Defendants. | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendant Whitley has launched a voter purge program so flawed it defies any rational justification. The purge program is guaranteed to discriminate against newly naturalized citizens who are lawfully registered to vote. Absent action by this Court, lawfully registered voters will be removed from the registration rolls based solely on their naturalized status. Plaintiffs respectfully request that the Court preliminarily enjoin any further implementation of the voter purge program to prevent irreparable harm to Plaintiffs and the proposed Plaintiff Class.

## FACTUAL BACKGROUND

On January 25, 2019, Defendant Whitley issued Election Advisory No. 2019-02 ("Advisory") informing county election officials about new "list maintenance" procedures. Ex. A-1 (Pasternak Dec. Ex. 1).[1] Under the new procedure, the Department of Public Safety ("DPS") identifies individuals who provided documents indicating non-citizen status when applying for a driver license or identification card. Defendant Whitley's office then checks those individuals against the voter registration database. *Id.* The Advisory asserts that the purpose of this program is to identify potential non-citizens who are registered to vote for both law enforcement and list purge purposes. *Id.* In a press release issued the same day, Defendant Whitley announced that his office had "discovered that a total of approximately 95,000 individuals identified by DPS as non-U.S. citizens have a matching voter registration record in Texas, approximately 58,000 of whom have voted in one or more Texas elections." Ex. A-2. Defendant Paxton quickly followed with more allegations, tweeting a "VOTER FRAUD ALERT" and a press release stressing his authority to use Defendant Whitley's list to investigate and prosecute alleged voter fraud. Ex. A-6.

---

[1] A number of exhibits are attached to Exhibit A, the Pasternak Declaration. Those exhibits are referenced as A-# throughout this motion.

But the list generated by the voter purge program is rife with errors, in part because the data provided by the DPS is necessarily stale. A Texas Driver License is good for six years. Ex. A-12 at 4 (Tex. Dep't of Pub. Safety, *Texas Driver Handbook* (2017), http://www.dps.texas.gov/internetforms/Forms/DL-7.pdf). Over the past six years, nearly 350,000 Texas residents over the age of 18 have become newly naturalized citizens. Ex. A-13 (U.S. Dep't of Homeland Sec., *Profiles on Naturalized Citizens,* https://www.dhs.gov/profiles-naturalized-citizens (last visited Feb. 3, 2019). The Census Bureau reports that newly naturalized citizens register to vote 61.7 percent of the time, *see* Ex. A-14 (U.S. Census Bureau, *Voting and Registration in the Election of November 2016*, Table 11 (2017), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html (last visited Feb. 4, 2019), but even if only 27 percent of the newly naturalized citizens in Texas had previously obtained a driver license or identification card and later registered to vote in the past six years, that would be sufficient to explain the 95,000 individuals on the list generated by Defendant Whitley's office.

This is exactly what happened to Plaintiff Julie Hilberg, who was told by her county Elections Administrator that her name was on the list of non-citizens flagged by DPS. *See* Ex. B (Hilberg Dec.). Plaintiff Hilberg last renewed her Texas Driver License in 2014 when she was still a legal permanent resident, but she became a naturalized citizen in 2015 and has since voted in the 2016 and 2018 elections. *Id.* ¶¶ 3-6. Several additional individuals have come forward with experiences similar to that of Plaintiff Hilberg. *See* Complaint, *Garibay v. Whitley*, No. 2:19-cv-00040 (S.D. Tex. Feb. 2, 2019).

Notwithstanding the foregoing, the Advisory informs registrars that the list they were provided could be "acted on in nearly all circumstances" and instructs registrars that they may

initiate cancellation of the voter registration by sending the registered voter a Proof of Citizenship Letter (Notice of Examination) ("NCE"). Ex. A-1 (Advisory), A-3 (NCE letter). If either (1) the voter does not provide proof of citizenship (in the form of a certified copy of a birth certificate, passport, or naturalization certificate) within 30 days from when the NCE was sent; or (2) the NCE is returned as undeliverable without forwarding information, the registrar is required by law to cancel the voter's registration. *See* Tex. Elec. Code § 16.033(d); *see also* Ex. A-1 (Advisory).

Data on response rates from similar notices demonstrates that the vast majority of these notices will likely not be returned, and voters will be removed from the rolls. When similar notices were sent to Texas voters (regardless of citizenship status) under the National Voter Registration Act ("NVRA") between the 2014 and 2016 elections, only 14 percent of voters responded to confirm whether they were eligible to vote. Ex. A (Pasternak Dec.) ¶ 22. In contrast, 63 percent of the notices garnered no response from the voters, and 13 percent were returned as undeliverable. *Id*.

An eligible voter whose registration is cancelled pursuant to this process will receive no other notice or communications before his or her registration is cancelled. *See* Tex. Elec. Code § 16.033. In order to be able to vote, the voter will be forced to start the process of registering to vote from the beginning. Defendant Whitley already has indicated that he intends to regularly conduct the DPS match, so there is no reason to think that these voters may not be flagged yet again for removal based on stale data. Ex. A-1 (Advisory). If eligible voters are removed from the rolls after the registration deadline, or do not discover that they have been removed from the rolls until after the registration deadline, they will be denied the right to vote altogether.

In the one week since the Advisory was issued, this unlawful purge program has not only proven ineffectual at identifying noncitizens but also wreaked havoc on election administration,

sowed serious confusion among eligible voters, and stoked anti-immigrant sentiment and intimidation. Some counties such as Galveston County have sent out the NCEs encouraged by the Advisory; others like Bosque County have sent the NCEs and then rescinded them; others have decided not to take action; and still others are waiting in limbo while deciding how to proceed. Ex. A-8 (collected news articles on the purge program); Ex. C (Elfant Dec.). County election officials have received numerous phone calls and in-person visits from concerned registered voters seeking to clarify their status. Ex. C (Elfant Dec). The Secretary of State has quietly admitted to county officials that his office has identified tens of thousands of individuals on the list that had already proven their citizenship to DPS. Ex. A-8 (collected news articles). In McLennan County, the State has admitted that 100% of the individuals on the initial list are citizens. *Id.*; *see also id.* (noting that over two thirds of registered voters notified by the Galveston County under this program had previously been confirmed to be citizens).

Yet, election officials still have not received meaningful guidance from the Secretary of State on how they should identify the "actionable" persons on the lists they have been given. Ex. C (Elfant Dec.).[2] Nor have Defendants rescinded their prior false allegations of illegal voting. To the contrary—and even assuming an absence of intention—they have allowed their statements to provide fodder for false statements, allegations, and intimidation against immigrant communities at all levels.[3]

---

[2] A February 1st email from Defendant Whitley's office continued to instruct officials to use its Advisory and accompanying "list" to identify noncitizens for removal, indicated that the data should be shielded from public view for "law enforcement" purposes, and instructed registrars only of their ability to review application files and "use any lawful means to investigate" a registered voter before sending an NCE. Ex. A-10. This email is cold comfort for the tens of thousands of eligible voters under said "investigation."

[3] *See* Ex. A-7, A-4, A-6 & A-9 (collected tweet from President Donald Trump alleging 58,000 noncitizens voted in Texas; a press release from the Republican Party of Texas alleging "widespread voter fraud" and that "these voters affected election results in 2018"; a tweet commenting on a Texas Tribune article about this case stating "I hope [Julie Hilberg] loses her citizenship! If she loved America she would want people trying to undermine our democracy found!"; another tweet commenting on the same article stating: "Deport [Julie Hilberg]! Not a citizen! Illegal or

**LEGAL STANDARD**

To succeed on a motion for a preliminary injunction, Plaintiffs must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest." *Planned Parenthood v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005).

I.     **Plaintiffs Are Likely To Succeed On the Merits of Their First and Fourteenth Amendment Claims of Discriminatory, Undue Burdens on the Right to Vote.**

When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). When a burden on the right to vote is severe or discriminatory, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

The burden on voters is both severe and discriminatory. Texas law requires registrars to send an NCE whenever they have "reason to believe that a voter is no longer eligible." Tex. Elec. Code § 16.033(b). The Advisory instructs registrars that the data provided through the DPS match "can be acted on in nearly all circumstances." Ex. A-1 at 3. Thus, unless a registrar can independently verify that a person on the list is eligible, the voter will likely be sent an NCE and

---

naturalized does not equal LEGAL!"; and a tweet from Defendant Paxton alleging "VOTER FRAUD, Defendant Paxton's which  has been retweeted over 35,000 times, has over 82,000 likes, and has over 14,000 comments.)

his registration will be cancelled if he fails to respond with proof of citizenship within 30 days. *Id.;* Tex. Elec. Code § 16.033. Requiring newly naturalized citizens to respond to such notice is not simply a matter of "little import." *U.S. v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012); *see also League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1217 (N.D. Fla. 2018) (finding that creating a "secondary class of voters" by subjecting an identifiable group of voters to heightened burdens is "constitutionally untenable"). Indeed, as data provided by Texas to the federal Election Assistance Commission shows, voters respond to such notices at an abysmally low rate. *See* Ex. A (Pasternak Dec.) ¶ 22 (showing that only 14 percent of voters responded to an NVRA notice during the period between the 2014 and 2016 elections). As a result, tens of thousands of properly registered, eligible voters are at risk for being removed from the voter rolls.[4]

Here, Texas's interests are harmed rather than served by the voter purge program adopted by Defendant Whitley. The state's purported interest is in maintaining accurate voter registration lists. *See* Ex. A-2 (Jan. 25 Press Release) ("This voter registration list maintenance activity is being conducted in accordance with federal and state law to ensure that only qualified voters . . . are registered to vote in Texas elections."). While preventing noncitizen voter registration may be a legitimate state interest, a voter purge program that primarily targets lawfully registered naturalized citizens for removal from the voting rolls does not further that interest. *See Fish v. Kobach*, 309 F. Supp. 3d 1048, 1113 (D. Kan. 2018) (striking down requirement that voter

---

[4] Plaintiffs also face irreparable harm flowing from Defendant Whitley's slipshod rollout of this new voter purge program, all in service to a shocking headline. The massive confusion among voters and election officials created in this past week—the notice and rescinded notices, the Secretary's frantic calls to various county officials regarding errors, the voters' inability to ascertain their own status—is reason alone to enjoin this program. *See Purcell v. Gonzalez,* 549 U.S. 1 (2006) (noting the harms of voter confusion). We entrust our election officials with our most fundamental right to vote. With that responsibility, they must exercise restraint before embarking on a public scare campaign based on flimsy data.

registration applicants provide proof of citizenship because it "disproportionately impacts duly qualified registration applicants, while only nominally preventing noncitizen voter registration").

Given the enormous flaws in the data—which lead to targeting far more eligible voters than ineligible voters—it is neither reasonable nor rational to infer that the data provided by DPS is an appropriate method to identify non-citizen registrants. In 2012, Florida launched a voter purge program nearly identical to the one announced by Defendant Whitley, identifying nearly 180,000 registered voters as potential noncitizens based on data from the Department of Motor Vehicles of individuals who indicated they were noncitizens at the time of obtaining a driver license. *U.S. v. Florida*, 870 F. Supp. 2d at 1347; *see also* Ex. A-17 (attaching exhibits submitted in *U.S. v. Florida* describing the identical Florida program). Because Florida driver's licenses, like Texas, are renewed every six years and 240,000 residents had become naturalized in the three years prior to the program being announced, the judge in *U.S. v. Florida* found that "[t]he suggestion that there was a list of 180,000 improperly registered noncitizens was plainly wrong." *Id.* at 1348.

As such, the purge program announced by Defendant Whitley is substantially more likely to remove eligible voters from the rolls than it is to identify actual non-citizens who are registered to vote. Indeed, all available reliable evidence suggests that noncitizen voting is rare. *See Fish v. Kobach*, 309 F. Supp. 3d at 1108 (finding that assertions of a largescale problem of noncitizen voter registration not credible, and that limited instances of noncitizen registration were likely attributable to "administrative anomalies"). There is substantial evidence, however, that the list generated by Defendant Whitley's office contains large numbers of lawfully registered citizens. This evidence includes personal accounts, admissions by the Secretary of State, investigative news reports, testimony from election officials, and logic. *See supra*. Thus, "the magnitude of potentially disenfranchised voters impacted by [the voter purge] scheme cannot be justified by the . . . need

to ensure the voter rolls are accurate" because it "disproportionately impacts duly qualified registration applicants, while only nominally preventing noncitizen voter registration." *Fish*, 309 F. Supp. 3d at 1112, 1113.

Further, the state has no cognizable interest in taking actions that violate federal law. Voter purge programs that discriminate against newly naturalized citizens violate the NVRA, which requires that such programs be conducted in a "uniform [and] nondiscriminatory" manner. *See* 52 U.S.C. § 20507(b)(1); *U.S. v. Florida*, 870 F. Supp. 2d at 1350.[5] Like Florida, Defendant Whitley's methodology makes it "likely that the properly registered citizens who [will] be required to respond and provide documentation [will] be primarily newly naturalized citizens." *U.S. v. Florida*, 870 F. Supp. 2d at 1350. Thus, "[t]he program [is] likely to have a discriminatory impact on these new citizens," and violates the NVRA because "[a] state cannot properly impose burdensome demands in a discriminatory manner." *Id.* The illegality of the program eliminates any legitimacy in the state's asserted interest in carrying it out.

Defendant Whitley's voter purge program imposes an undue burden on the right to vote of Plaintiff Julie Hilberg and the Plaintiff Class. It is not justified by any legitimate state interest. As such, Plaintiffs are likely to succeed on the merits of their First and Fourteenth Amendment Claims, Counts 1 and 2.

**II.      All Other Equitable Factors Weigh in Favor of Injunctive Relief.**

**a.   Plaintiffs Face Irreparable Harm Absent Injunctive Relief.**

"A violation of the right to vote is presumptively an irreparable harm." *Ind. State Conference of NAACP v. Lawson*, 326 F. Supp. 3d 646, 663 (S.D. Ind. 2018); *Elrod v. Burns*, 427

---

[5] Plaintiffs sent Defendant Whitley notice of these violations on Feb. 1, 2018. *See* Ex. A-11. Pursuant to the NVRA, Plaintiffs may raise an NVRA claim if Defendant does not remedy the violation within 90 days.

U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The unlawful burden on the right to vote for Plaintiff Hilberg, members of the putative Plaintiff Class,[6] and LULAC members are real and imminent. Indeed, some counties have *already* sent out the 30-day notices to residents, beginning a thirty-day clock for cancellation of their voter registration. *See* Ex. A-8. Defendant Whitley's advisory also announces his intent to continue this practice on a monthly basis. Ex. A-1. Thus, every month, newly naturalized citizens will be caught in this fatally flawed net. The experience of registering to vote for the first time as a new citizen— an act encouraged at nearly every naturalization ceremony—will be met with suspicion and result in potential disenfranchisement if new citizens fail to respond with documentary proof to a single notice within 30 days.

Courts have repeatedly held that the imposition of discriminatory or severe burdens on voter registration, including unlawful purges that require re-registration, threaten irreparable harm for impacted voters. *See, e.g.*, *League of Women Voters v. Browning,* 863 F. Supp. 2d 1155 (N.D. Fla. 2012) (preliminarily enjoining burdensome restrictions on voter registration activity); *Lawson*, 326 F. Supp. 3d at 664 (preliminarily enjoining unlawful voter purge based on the flawed Interstate Crosscheck system). This is so even if voters have the nominal option of resuscitating their right to vote by complying with additional burdensome requirements (in this case, if they receive the notice, understand it, and have access to the necessary paperwork within the short period). *See,*

[6] Plaintiff Hilberg has filed her motion for class certification concurrent with this motion. While this Court has not yet ruled on that motion, this Court's equitable powers support ordering statewide injunctive relief that will address the harms faced by LULAC, Plaintiff Hilberg, and the putative Plaintiff Class. No individualized remedies are necessary. *See, e.g., Fish v. Kobach*, 189 F. Supp. 3d 1107, 1148 (D. Kan.), *aff'd*, 691 F. App'x 900 (10th Cir.), and *aff'd*, 840 F.3d 710 (10th Cir. 2016) ("While the named Plaintiffs' individual experiences are each slightly different, the Court has explained that they are illustrative of the burdensome enforcement scheme necessitated by the Kansas DPOC law. The injunctive relief in this case does not require individualized remedies. Moreover, case law supports this Court's authority to issue classwide injunctive relief based on its general equity powers before deciding the class certification motion.").

*e.g., Lawson,* 326 F. Supp. at 663 ("The harm that occurs from eliminating one required procedural safeguard is not negated by the continued use of a different additional procedural safeguard."); *Fish,* 189 F. Supp. 3d at 1146-47 (preliminarily enjoining documentary proof of citizenship requirement for registration) ("[The proposed alternative procedure] is but one additional burdensome layer in the Kansas enforcement scheme that an applicant must navigate in order to become registered when all else fails."). In this case, the relevant data shows that these notices will largely go unanswered leading to hundreds or thousands of cancellations of eligible naturalized citizens. Ex. A (Pasternak Dec.) ¶ 22.

As organizations, Texas LULAC and LULAC face additional irreparable harm to their mission of engaging Latino Texans in local, state, and federal elections. If this unlawful purge of naturalized citizens goes forward, the LULAC Plaintiffs will be forced to divert resources to educating their membership about this purge program and how to respond to it. They will also face diminished returns for their voter registration efforts in light of the continuous purging of eligible but naturalized citizens, the largest group of whom are Latino.[7] Courts have routinely held that these types of harms constitute irreparable harm. *See Browning*, 863 F. Supp. 2d at 1167 ("[W]hen a plaintiff loses an opportunity to register a voter, the opportunity is gone forever."); *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320, 1350 (N.D. Ga. 2016) ("[C]onduct that limits an organization's ability to conduct voter registration activities constitutes an irreparable injury."); *Lawson*, 326 F. Supp. 3d at 662 ("Much of Plaintiffs' work will have to be done again because of wrongful cancellations of voter registrations.").

As long as this unlawful purge program persists and Defendants continue to promote it, Plaintiff Hilberg, members of the putative Plaintiff Class, and LULAC members will also face

_____

[7] A declaration from LULAC to this effect will be forthcoming.

unwarranted threats of prosecution, intimidation, and highly publicized derision of their equal right to vote. *See supra.* Moreover, Defendants' false and misleading statements have stoked discouraging and intimidating anti-immigrant sentiment. *See supra*, note 3.

The next uniform election date in Texas is May 4, 2019. The deadline to register to vote in that election is only two months away. *See* Texas Sec'y of State, *Important 2019 Election Dates*, https://www.sos.state.tx.us/elections/voter/2019-important-election-dates.shtml (last visited Feb. 4, 2019); *see Fish*, 189 F. Supp. 3d at 1145 (finding that an unlawful registration requirement imposed irreparable harm and noting that early voting would begin two months from the order). Once voters purged under this irrational and unlawful system lose the opportunity to vote in that election, that loss can never be remedied. *League of Women Voters v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress.").

> **b. Injunctive Relief Imposes No Meaningful Burden on Defendants and Injunctive Relief Is in the Public Interest.**

Given the foregoing, the Court's task in weighing the injury to Defendants of granting relief against the injury to Plaintiffs of denying it and assessing the public interest is simple. The state's asserted interest in the purge program is removing ineligible noncitizen voters. As discussed at length above, the purge program does not meaningfully advance that goal. *See supra.* The administrative burdens of ordering Defendants to cease this program and inform election officials to reverse course and cease any activities related to this program are, if any, minimal. Any burden on Defendants is far outweighed by the harms Plaintiffs face absent relief.

There is a great public interest in not denying voters the opportunity to vote and in preventing a violation of the NVRA. Since the public interest always weighs in favor of protecting constitutional rights, "a preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest." *De Leon v. Perry*, 975 F. Supp. 2d 632,

665 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) (citing *Ingebretsen v. Jackson Pub. Sch. Dist.,* 88 F.3d 274, 280 (5th Cir.1996)). Put plainly, the public interest weighs in favor of Plaintiffs because "[t]here is a great public interest in not denying voters the opportunity to vote." *A. Philip Randolph Inst. v. Husted*, 907 F.3d 913, 922 (6th Cir. 2018); *see also League of Women Voters*, 769 F.3d at 247 ("By definition, [t]he public interest . . . favors permitting as many qualified voters to vote as possible." (internal quotation marks omitted)).

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court enter a preliminary injunction as follows:

1. ordering Defendants Whitley and Paxton to rescind the Advisory and accompanying press releases;

2. ordering Defendant Whitley to direct election officials to take no further action on his Advisory or the accompanying lists of voters and rescind any notifications sent pursuant to the Advisory;

3. ordering Defendant Whitley to take no further action pursuant to the purge program outlined in his Advisory;

4. ordering Defendant Whitley to release a statement and post information on the Secretary of State's website indicating that pursuant to Court order, the Advisory has been rescinded and no further action will be taken pursuant to the Advisory until further notice from the Court; and

5. ordering Defendant Whitley to produce to Plaintiffs the original list compiled by his office pursuant to the Advisory and any subsequent revised lists his office has created. *See* Fed. R. Civ. P. 26(d)(1) (allowing discovery before the Rule 26 conference pursuant to court

order); *Greenthal v. Joyce*, 2016 WL 362312 at *2 (S.D. Tex. Jan. 29, 2016) (holding that the appropriate analysis for expedited discovery is "the preliminary-injunction style analysis . . . . or . . . the 'good cause' standard'" (citations omitted)); *see also* 52 U.S.C. § 20507(i) (requiring public disclosure of all voter registration list maintenance records).

Dated: February 4, 2019

Danielle M. Lang*
Mark P. Gaber*
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, DC 20005
Telephone: (202) 736-2200
Facsimile: (202) 736-2222
dlang@campaignlegal.org
mgaber@campaignlegal.org
*motions for admission pro hac vice
forthcoming*

Renea Hicks
State Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, TX 78703
Telephone: (512) 480-8231
rhicks@renea-hicks.com

David Richards
State Bar No. 16846000
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
Telephone: (512) 476-0005
Facsimile: (512) 476-1513

Respectfully submitted,

/s/ Luis Roberto Vera, Jr.
Luis Roberto Vera, Jr.
LULAC National General Counsel
Law Offices of Luis Roberto Vera, Jr. &
 Associates
1325 Riverview Towers
111 Soledad
San Antonio, TX 78205-2260
Telephone: (210) 225-3300
lrvlaw@sbcglobal.net

Chad W. Dunn
State Bar No. 24036507
K. Scott Brazil
State Bar No. 02934050
Brazil & Dunn
3303 Northland Drive, Suite 205
Austin, TX 78731
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com

*Counsel for Plaintiffs*

13

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on February 4, 2019 on the following

counsel for Defendants via electronic mail and is available to counsel of record via CM/ECF.


Adam Bitter
General Counsel, Office of the Secretary of State
generalcounsel@sos.texas.gov

Patrick K. Sweeten
Senior Counsel for Civil Litigation, Office of the Attorney General
patrick.sweeten@oag.texas.gov

Matthew H. Frederick
Deputy Solicitor General, Office of the Attorney General
matthew.frederick@oag.texas.gov


/s/ Luis Roberto Vera, Jr.
Luis Roberto Vera, Jr.