**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS, | § | |
| | § | |
| | § | |
| and | § | |
| | § | |
| NATIONAL LEAGUE OF UNITED LATIN AMERICAN CITIZENS, | § | |
| | § | |
| | § | |
| and | § | |
| | § | |
| JULIE HILBERG, individually and on behalf of others similarly situated, | § | |
| | § | |
| | § | CIVIL ACTION NO. 5:19-CV-00074-FB |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| DAVID WHITLEY, in his official capacity as Secretary of State for the State of Texas, | § | |
| | § | |
| | § | |
| And | § | |
| | § | |
| KEN PAXTON, in his official capacity as Attorney General for the State of Texas, | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

---

**DEFENDANTS' MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6)**

---

State and federal law require the Texas Secretary of State to assist county election officials in maintaining the accuracy of Texas's voting rolls. To that end, the Texas Legislature has mandated that the Texas Department of Public Safety ("DPS") share information with the Secretary of State for the express purpose of attempting to identify non-citizens who are registered to vote. The Secretary of State does not investigate voter eligibility or cancel a voter's registration

for non-citizenship, however, as that authority lies solely with county election officials. Rather, the Secretary's role is limited to providing guidance and information to the counties to ensure that only eligible citizens can cast ballots.

Consistent with his clear statutory duty, starting in March 2018, former Secretary of State Rolando Pablos began working with DPS to obtain data regarding the citizenship of individuals at the time they applied for Texas driver's licenses or identification cards so that it could be compared to the list of registered voters. On January 25, 2019, Secretary of State David Whitley's office provided counties the names of the registered voters who had presented evidence of non-citizenship when they obtained a driver's license or identification card. In doing so, his office carefully described the nature of the information, and the limitations on counties' ability to cancel voter registrations based on that information:

> All records submitted through this process will need to be treated as WEAK matches, meaning that the county may choose to investigate the voter, pursuant to Section 16.033, Election Code, or take no action on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible. The county **may not cancel** a voter based on the information provided without first sending a Notice of Examination (Proof of Citizenship Letter) and following the process outlined in the letter. In order to help counties make a determination regarding whether or not to send a Notice of Examination or close the task without taking further action, information provided by DPS will be provided to each county for further review and comparison against the voter record.

Election Advisory No. 2019-02[1] ("Election Advisory") (emphasis in original).

Secretary Whitley has now been sued in three different federal courts for fulfilling his statutory obligation.[2] Moreover, Plaintiffs in this case—the first case to be filed—also named

---

[1] Election Advisory No. 2019-02, "Use of Non-U.S. Citizen Data obtained from the Department of Public Safety" (dated January 25, 2019), *available at* https://www.sos.state.tx.us/elections/laws/advisory2019-02.shtml (last visited February 8, 2019).

[2] In addition to the original complaint filed in this Court on January 29, 2019, *see* ECF No. 1, related cases have been filed in the Southern District of Texas, Corpus Christi Division, *Garibay*

Texas Attorney General Ken Paxton as a defendant. Plaintiffs allege that Attorney General Paxton did nothing other than send out a press release and other communications confirming that he plans to fulfill his duty to investigate claims of voter fraud. Thus, Plaintiffs ask this Court to enter an injunction that would prevent two State officials from performing their roles as required by the Texas Constitution, Texas statutes, and federal law.

Defendants respectfully request that all claims against Secretary Whitley and Attorney General Paxton be dismissed. Defendants are not responsible for canceling any voter's registration for non-citizenship. That role belongs to the counties. And even if the Plaintiffs had sued the counties, they still have not alleged that they received notices of examination, let alone that any eligible voter has been removed from the rolls as a result of the Election Advisory. If Plaintiffs do receive a notice of examination, they can prevent cancellation by proving their citizenship within 30 days after receiving the notice and can contest cancellation should it occur, and county registrars shall add names back to the rolls if they were wrongfully canceled. Further, if a citizen's registration is cancelled, their registration is required to be reinstated immediately if they subsequently present proof of citizenship to the voting registrar. This can happen at any time, including on election day if a citizen discovers this cancellation when casting a ballot. Thus, Plaintiffs have not suffered an injury that is fairly traceable or redressable by an injunction against

---

*v. Whitley*, No. 2:19-cv-00040 (S.D. Tex. filed Feb. 2, 2019), and in the Southern District of Texas, Galveston Division, *Move Tex. Civic Fund v. Whitley*, No. 3:19-cv-00041 (S.D. Tex. filed Feb. 4, 2019). Defendants are addressing these matters immediately. The plaintiffs in those cases also lack standing, and their complaints suffer from a number of similar defects as Plaintiffs' First Amended Complaint. However, Defendants are alternatively requesting from the Southern District Courts that they stay, dismiss, or transfer their cases to this Court for disposition pursuant to the first-to-file rule. *See, e.g., Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999) ("Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap.").

Defendants, and therefore Plaintiffs lack standing and have not stated a claim upon which relief can be granted.

Secretary Whitley and Attorney General Paxton, each in their official capacities, hereby move to dismiss with prejudice all of Plaintiffs' claims against them pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

### I.     Texas's Election System

Secretary Whitley's constitutional role requires him to assist county election officials and ensure the uniform application and interpretation of election laws throughout Texas. *See, e.g.*, Tex. Const. art. 4, § 21; Tex. Elec. Code § 31.001. Secretary Whitley's Elections Division provides assistance and advice to election officials and the general public on the proper conduct of elections, including hosting seminars and election schools, providing calendars, prescribing forms, certifying ballots, funding primary elections, and providing legal interpretations of election laws to election officials. *See, e.g.*, Tex. Elec. Code §§ 31.003 (duty to maintain uniformity of application of election laws), 31.004 (duty to provide assistance and advice to all election authorities), 31.005 (authority "to protect the voting rights of the citizens of this state"), 31.0055 (duty to maintain a voting-rights hotline), 31.006 (duty to refer complaints alleging criminal conduct to the Attorney General). Secretary Whitley also is required by law to maintain a computerized voter registration list that accurately reflects the official voter roll of the State for use by election officials in Texas. *See id.* § 18.061.

Local election officials, in turn, are charged with conducting elections in Texas, including maintaining voter rolls as the voter registrar. *See, e.g., id.* § 12.001 (designating a local official as the voter registrar). Each county can assign the duties of the voter registrar to the county clerk, an

elections administrator, or the tax assessor-collector. *See id.* Each registrar is authorized by statute to use any lawful means to investigate registration eligibility. *Id.* § 16.033. And only the registrar— that is, the local election official—can cancel any individual's voter registration. *See id.* §§ 16.031-.0332.

The process for cancelling a voter's registration is codified in statute and entails a number of protections to ensure that eligible voters do not forfeit the right to vote. The registrar must first investigate whether the registered voter is currently eligible to vote. Tex. Elec. Code § 16.033. The law further directs the registrar to take certain actions if he or she "has reason to believe that a voter is no longer eligible for registration." *Id* § 16.033(b). The registrar is not permitted to cancel a voter's registration before notifying the voter, in writing and sent by forwardable mail to the voter's mailing address and any other addresses known to the registrar, that the voter's registration status is under investigation. *Id.* The notice of examination, as it is called, must specify what information is needed to determine the voter's eligibility. *Id.* § 16.033(c)(1). And the notice must advise the recipient that the requested information must be received within thirty days or the voter's registration will be subject to cancellation. *Id.* § 16.033(c)(2).

In the event that a voter's registration is investigated because the registrar has reason to believe that the voter is a non-citizen, the notice of examination will ask for proof of citizenship. A voter may prove his or her citizenship by submitting a birth certificate, United States passport, certificate of naturalization, or any other form prescribed by the Secretary of State. *Id.* § 16.0332(a). And state law allows voters to submit responsive documentation by "personal delivery, mail, telephonic facsimile machine, or any other method of transmission." *Id.* § 1.007(c).

State law requires the registrar to cancel a voter's registration if the registrar determines that the voter is ineligible based on the voter's reply to the notice of examination. *Id.* § 16.033(d).

Registration is automatically cancelled if the voter does not respond within 30 days of the notice, or if the notice is returned undeliverable with no forwarding information available. *Id*. But a voter whose registration is cancelled could still submit proof of citizenship and be reinstated immediately by the registrar. *Id*. § 16.037(a), (d).

Voters whose registration is cancelled can also request a hearing with the registrar. *Id*. § 16.061. Upon submitting a signed request for a hearing, an individual's voter registration is reinstated and a hearing is scheduled within 10 days. *Id*. §§ 16.037, 16.064. At the hearing, the voter may appear personally or submit an affidavit without appearing. *Id*. § 16.064. And if the voter disagrees with the registrar's determination at the hearing, the voter can seek judicial review of the decision, during which time any cancellation of the individual's voter registration is delayed. *See id*. § 17.005. Only after a district court rules on the appeal is an individual finally subject to cancellation of their voter registration. *See id*. § 17.008.

Finally, an individual whose voter registration is cancelled can cast a provisional ballot. Election officials at polling locations must provide provisional ballots to voters who claim to be eligible voters but whose names are not on the list of registered votes. 52 U.S.C. § 21082 (requiring provisional ballots); Tex. Elec. Code § 63.011 (same); 1 Tex. Admin. Code § 81.172(a)(5) (same). The voter can submit proof of citizenship to the registrar and be reinstated immediately or at any time before the provisional ballots are counted. Tex. Elec. Code § 16.037(d). Upon receipt of the necessary documentation, the registrar would note that the voter was erroneously removed from the rolls, 1 Tex. Admin. Code § 81.175(c)(4)(E), and restore him or her to the rolls, *id*. § 81.175(c)(7) ("For purposes of voter registration, the copied Provisional Ballot Affidavit Envelope serves as an original voter registration application or change form.").

The Office of Attorney General (OAG) has statutory authority to investigate and prosecute election offenses statewide. Tex. Elec. Code §§ 273.001, 273.021. These offenses include the misdemeanor offense of unlawful registration, *id*. § 13.007, and the felony offense of illegal voting, *id*. § 64.012. OAG can investigate election matters on its own initiative. *Id*. § 273.001(b). OAG can also receive notices of unlawful voting from registrars, *id*. §§ 15.028, 273.001(c), and referrals of election-related complaints from the Secretary of State, *id*. § 273.001(d). OAG does not have statutory authority to conduct list maintenance or remove registered voters from voter rolls. *See id*. §§ 273.001 *et seq*.

## II.    Election Advisory No. 2019-02

An individual must be a United States citizen to vote in Texas. Tex. Elec. Code § 11.002(a)(2).  By statute, personal information contained in DPS motor vehicle records must be disclosed to the Secretary of State and used "in connection with any matter of . . . voter registration or the administration of elections by the secretary of state." Tex. Transp. Code § 730.005(9); *see also id.* § 521.044(a)(6) (separately authorizing disclosure of social security number information). The Texas Legislature has manifested its intent that this information be used to ensure the integrity of Texas' voter rolls.

The bill requiring DPS to disclose motor vehicle data to the Secretary of State—codified under section 730.005 of the Texas Transportation Code—was enacted in 2013. The law passed the Texas Senate unanimously and secured approval in the Texas House by a broadly bipartisan vote of 123 to 14. Acts 2013, 83rd Leg., ch. 1012 (H.B. 2512). The leaders of the Texas Democratic Party and the Republican County Chairs Association testified in favor of the bill. Tex. B. Ann., H.B. 2512 (May 3, 2013). The bill's supporters explained that the Secretary of State's office is "required to maintain the accuracy of the voter rolls and does not currently have all the necessary

tools at its disposal." *Id*. They contended that the bill's purpose was to help solve that deficiency. By requiring DPS to share the personal data that it receives when individuals apply for driver's licenses and personal identification cards, they maintained, the bill would "improve accuracy in verifying the voter rolls." *Id*.

Pursuant to this legislative directive, Secretary Whitley obtained from DPS information "regarding individuals who provided documentation to DPS showing that the person is not a citizen of the United States during the process of obtaining or acquiring a Texas Driver License or Personal Identification Card." Election Advisory at 1. Looking at data only from "current (unexpired) Driver License and Personal Identification cards" that met matching criteria described in the Election Advisory, Secretary Whitley compiled the list of individuals registered to vote who had previously been determined by DPS not to be citizens. *Id*.

Secretary Whitley did not tell the counties that ***any*** individual on the list was an illegally registered voter. The Election Advisory stresses that "counties are ***not*** permitted, under current Texas law, to immediately cancel the voter as a result of any non-U.S. Citizen matching information provided." *Id*. at 2-3. The Election Advisory unequivocally advises the registrar to "determin[e] whether or not the information provides the registrar with reason to believe the person is no longer eligible for registration." *Id*. at 2. Indeed, under this matching and information-sharing process, there is no obligation for the registrar to do anything at all; the registrar must treat all records submitting via this process "as WEAK matches, meaning that the county ***may*** choose to investigate the voter, pursuant to Section 16.033, Election Code, ***or take no action*** on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible." *Id*.

at 2 (emphasis added).[3] That is despite those same matching criteria justifying an automatic transfer of registration among counties in certain circumstances. Tex. Elec. Code § 18.0681. The Election Advisory makes clear, however, that county voter registrars who received the data from this matching process are ***not*** required to conduct any investigation "if they do not believe that a voter is ineligible to vote." Election Advisory at 3. And if a voter registrar does choose to investigate, they have "the right to use any lawful means to investigate whether a registered voter is currently eligible." *Id*. at 2. As with other list-maintenance activities, this is an iterative process involving collaboration between the State and counties to assist counties in fulfilling their investigative role.

Contrary to Plaintiffs' gross mischaracterization of the Election Advisory as a "voter purge," this matching process is simply an effort to provide additional information to voter registrars throughout the State—at the behest of the Legislature—to help election officials discharge their obligations to safeguard the integrity of the State's voter rolls by preventing ineligible persons from casting votes. As described above, this process of investigating citizenship status is mandated by statute and affords the individuals at issue ample opportunity to provide the necessary documentation to prove that they are eligible voters. *See* Tex. Elec. Code § 16.0332. Accordingly, the Election Advisory does not mandate that any action be taken against any voter. It merely outlines the process by which DPS data will be shared with local election officials, and leaves to them the decision whether to investigate any particular voter.

---

[3] *See also* Election Advisory at 3 ("For the matching notifications originating from DPS data, ***the [registrar] has the choice to*** either . . . Send a Proof of Citizenship Letter (Notice of Examination) to the voter; thereby starting the 30-day countdown clock before cancellation, or . . . ***Take no action on the voter record and simply close the task as RESOLVED***.") (emphases added).

### III. Allegations Against Secretary Whitley

Notwithstanding Plaintiffs' soaring rhetoric, Secretary Whitley is not alleged to have done anything other than issue the Election Advisory. As described above, Plaintiffs' allegations that Secretary Whitley is implementing a voter purge program—or doing anything other than providing data to local election officials, who will then decide whether to investigate pursuant to state law— are flatly contradicted by the clear language of the Election Advisory. *Cf., e.g.*, Compl. ¶¶ 1-9. Secretary Whitley is alleged to have sent out the Election Advisory, which instructs registrars that "they ***could*** use these matches" to conduct further investigations. *Id.* ¶ 27 (emphasis added). Secretary Whitley is further alleged to have issued a press release, *id.* ¶¶ 29-31, and to have been in contact with county officials regarding the Election Advisory and voter data. *See id.* ¶¶ 43, 62. Plaintiffs do not allege that Secretary Whitley sent a single letter to a voter or that he cancelled any voter's registration.

### IV.   Allegations Against Attorney General Paxton

The allegations against Attorney General Paxton are even more disconnected from the relief Plaintiffs seek. Attorney General Paxton is not alleged to have done anything other than use Twitter to acknowledge the Election Advisory and issue a press release regarding his prosecutorial authority over election-related crimes. *See id.* ¶¶ 7, 60. There is no allegation that Attorney General Paxton has yet investigated or prosecuted, or threatened to investigate or prosecute, any individual whose name was identified through Secretary Whitley's matching process.

### V.   Remaining Factual Allegations

Plaintiffs' remaining factual allegations have little to do with Defendants, and instead relate to what they contend could happen where voter registrars elect to initiate investigations. Plaintiffs largely gloss over the facts that the decision whether to investigate is entirely within the authority

of local election officials, that the ability to cure any notice of examination is entirely within the control of the voters themselves, and that voters will not be prevented from casting provisional ballots should their local election officials wrongfully cancel their voter registration. *See id.* ¶¶ 32-54. Plaintiffs also misconstrue the Election Advisory. *See id.* ¶¶ 55-63. The allegations related to Plaintiff Hilberg make clear that it is third parties who are not before this Court that are responsible for the status of Ms. Hilberg's voter registration. *See id.* ¶¶ 64-73. Finally, Plaintiffs' class allegations are conclusory, insufficient, and fail to mention Attorney General Paxton at all. *See id.* ¶¶ 74-81.

## LEGAL STANDARDS

### I.      Rule 12(b)(1)

When the court lacks the statutory or constitutional power to adjudicate a case, the case is properly dismissed for lack of subject-matter jurisdiction. *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction," so that "the plaintiff constantly bears the burden of proof that jurisdiction does, in fact, exist." *Raj v. La. State Univ.*, 714 F.3d 322, 327 (5th Cir. 2013). Under this rule, this Court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009).

### II.      Rule 12(b)(6)

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]

plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations, quotation marks, and alterations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "mere conclusory statements[] do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

## ARGUMENT

### I.      The Court Lacks Jurisdiction Because Plaintiffs Do Not Have Standing

Subject-matter jurisdiction is a threshold question that this Court must determine before addressing the merits of a case. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."). Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1); Wright & Miller, 5B Federal Practice and Procedure § 1350 (3d. ed) (explaining that a Rule 12(b)(1) motion "raises the fundamental question whether the federal district court has subject matter jurisdiction over the action before it"). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction, *Ramming*, 281 F.3d at 161, and courts must presume that federal jurisdiction is lacking "unless the contrary appears affirmatively in the record," *DaimlerChrysler Corp.*, 547 U.S. at 342 n.3.

In determining whether federal jurisdiction exists, the fundamental question is whether the dispute presents a "case" or "controversy" within the meaning of Article III. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court

jurisdiction to actual cases or controversies.”). “[T]hat a litigant have standing to invoke the authority of a federal court ‘is an essential and unchanging part of the case-or-controversy requirement of Article III.’” *DaimlerChrysler Corp*., 547 U.S. at 342 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish standing, a claimant must present (1) an actual or imminent injury that is concrete and particularized, (2) fairly traceable to the defendant’s conduct, and (3) redressable by a judgment in the claimant’s favor. *Id*.

Here, Plaintiffs’ claimed injuries satisfy none of the three elements that comprise the “irreducible constitutional minimum of standing.” *Id*. The alleged injuries fail to satisfy the injury-in-fact component because they are not “actual or imminent,” but at best merely “conjectural and hypothetical.” *Id*. (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). Their claims are not traceable to Defendants because the injury they complain of is the result of “the independent action of some third party not before the court.” *Id*. (quoting *Simon*, 426 U.S. at 41-42). And it is entirely “speculative” that a favorable decision would redress the injuries that Plaintiffs alleged. Because standing is lacking in this case, this Court should dismiss for want of jurisdiction.

## A.  Conduct at Issue

Plaintiffs allege that they are injured by the disclosure of voter data required by state laws aimed at protecting the integrity of the electoral process. Along with Congress and state legislatures across the country, the Texas Legislature has sought to safeguard the voting rights of legal voters by equipping state and local officials to stop voter fraud. *See, e.g*., 42 U.S.C. § 1973gg-3(b) (explaining that confirming accurate voter registration “protect[s] the integrity of the election process”). The Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker III noted that measures to ensure accurate voter registration lists are necessary because “[t]he electoral system cannot inspire public confidence if

no safeguards exist to deter or detect fraud." Building Confidence in U.S. Elections § 2.5 at 18 (Sept. 2005), *available at* https://www.eac.gov/assets/1/6/Exhibit%20M.PDF. And the Supreme Court has stated that the protection of election integrity "is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982).

Numerous election-integrity laws are pertinent to the facts surrounding Plaintiffs' claims. To begin, DPS is mandated to disclose motor vehicle records "in connection with any matter of . . . voter registration or the administration of elections by the secretary of state." Tex. Trans. Code § 730.005(9). Likewise, the voter registrar in each county is authorized to "investigate whether a registered voter is currently eligible for registration in the county." Tex. Elec. Code § 16.033. The law further directs the registrar to take certain actions if he or she "has reason to believe that a voter is no longer eligible for registration." *Id* § 16.033(b). Under such circumstances, the registrar must notify the voter in writing that the voter's registration status is under investigation. *Id*. Among other things, such notice must include "a warning that the voter's registration is subject to cancellation if the registrar does not receive an appropriate reply on or before the 30th day after the notice is mailed." *Id*. § 16.033(c). If the voter does not reply within the statutory period or the notice is returned undelivered and no forwarding address is available, the law requires the registrar to remove the voter from the rolls. *Id*. § 16.033(d).

Moreover, Texas law requires a matching process to ensure the accuracy of the voter rolls. As the supervisor of this process, the Secretary of State is required to "periodically compare the information regarding voters maintained as part of the statewide computerized voter registration list to determine whether any voters have more than one voter registration record on file." *Id*. § 18.0681. And as part of the matching process, the Secretary is further instructed to create

matching criteria that "produce the least possible impact on Texas voters; and fulfill [the Secretary's] responsibility to manage the voter rolls." *Id*. § 18.0681(b). Finally, the law provides guidance based on whether the matches are "weak" or "strong." Relevant here, the Secretary "may inform the county of the voter's residence that a weak match exists." *Id*. § 18.0681(c).

Plaintiffs allege no more than the operation of the State's election-integrity laws. Last year, former Secretary of State Pablos began working with DPS to obtain information about non-citizen holders of driver's licenses or personal identification cards. Election Advisory at 1. DPS is required to share such records in connection with the Secretary's duty to administer elections and maintain accurate voter registration lists. Tex. Trans. Code § 730.005(9). The Secretary of State's office and DPS worked together to disseminate information using the strongest matching criteria to "produce the least possible impact on Texas voters." Tex. Elec. Code § 18.0681(b). For example, the information was limited to individuals with active DPS driver's licenses or identification cards who provided documentation to DPS showing they were non-citizens within the last six years. Election Advisory at 1.

After the matching process was complete, Secretary Whitley provided information related to the matches to the voter registrar in each applicable county. In his advisory to registrars, Secretary Whitley emphasized that the sharing of the voter data obtained from DPS did not change or modify the registrar's rights and responsibilities under the Texas Election Code. Election Advisory at 1. Secretary Whitley cited the statutory provision authorizing the registrar to investigate based on a reasonable belief that a voter is no longer eligible for registration. *Id*. (citing Tex. Elec. Code § 16.033(b)). And he pointed to the legislatively-provided framework for conducting these investigations, noting that the notice should be delivered by forwardable mail

and that non-responses within the prescribed period and notices returned as non-delivered would result in the voter's removal from the rolls. *Id.* at 1-2 (citing Tex. Elec. Code § 16.033(c)-(d)).

Secretary Whitley underscored the point that the purpose of the information sharing was to expand the data set available to the registrars. Election Advisory at 1. As state law makes clear, the registrar is ultimately responsible for determining whether there is a reasonable basis for investigating a voter's eligibility. *Id.* Secretary Whitley noted that the matching process produced only "weak" matches—again, even though the matching criteria itself was robust—and advised the registrars accordingly that they may choose to investigate or take no action at all. *Id.* at 2.

Secretary Whitley issued a statement indicating that "[i]ntegrity and efficiency of elections in Texas require accuracy of our state's voter rolls, and my office is committed to using all available tools under the law to maintain an accurate list of registered voters." Secretary Whitley Issues Advisory on Voter Registration List Maintenance Activity (Jan. 25, 2019), *available at* https://www.sos.state.tx.us/about/newsreleases/2019/012519.shtml.   Attorney General Paxton issued a statement in response to Secretary Whitley's election advisory, noting that "[n]othing is more vital to preserving our Constitution than the integrity of our voting process, and my office will do everything within its abilities to solidify trust in every election in the state of Texas." Texas Secretary of State's Office Discovers Nearly 95,000 People Identified by DPS as Non-U.S. Citizens are Registered to Vote in Texas (Jan. 25, 2019), *available at* https://www.texasattorneygeneral.gov/news/releases/ag-paxton-texas-secretary-states-office-discovers-nearly-95000-people-identified-dps-non-us-citizens.

## B.   Plaintiff Hilberg Lacks Standing

The Individual Plaintiff, Julie Hilberg, is a U.S. citizen and a Texas resident. Compl. ¶ 19. She became a naturalized citizen in 2015 and voted in the 2016 and 2018 elections. After Secretary

Whitley's advisory, Plaintiff Hilberg became concerned based on the date she received her driver's license that she may be among the voters who provided documentation to DPS indicating that she was a non-citizen. *Id*. ¶¶ 66, 71. She then spoke with the election administrator in her county and was informed that her name was on the DPS list. *Id*. ¶ 72. Based on these facts, Plaintiff Hilberg asserts that Defendants have burdened her right to vote and violated section 11(b) of the Voting Rights Act by threatening her not to exercise her right to vote.

There is certainly no "real and immediate" threat that Plaintiff Hilberg's right to vote will be violated. *Lyons*, 461 U.S. at 102. Her claimed injury depends on an attenuated chain of events, none of which has occurred here. As an initial matter, for Plaintiff Hilberg to suffer "actual and imminent" harm, the county register would have to send her a notice based on a reasonable belief that Hilberg is ineligible to vote. Tex. Elec. Code § 16.033(b); *Lujan*, 504 U.S. at 560. Registrars are prohibited from unilaterally removing a voter from the rolls without notice. Tex. Elec. Code § 16.033(c)-(d). And Secretary Whitley emphasized that the matches were "weak" matches, and that registrars could take no action at all based on the DPS data. Election Advisory at 2.

Moreover, even if the registrar were to investigate Plaintiff Hilberg, it is entirely speculative to conclude that she would somehow be removed from the voting rolls. Such an outcome would mean that either Hilberg did not receive the notice or failed to submit a timely response, or that the register erroneously removed her from the list after she presented proof of her naturalization. In the event Hilberg were in fact removed from the voter rolls in error, Texas law provides for immediate reinstatement following receipt of information establishing proof of citizenship. Tex. Elec. Code §§ 1.007(c), 16.037(d). By statute, that information can be emailed, personally delivered, mailed, or even faxed to the registrar. *Id.* And in the event Hilberg discovered such an error on the date of an election, Texas law would allow her to vote provisionally and

submit citizenship proof immediately or any time before the provisional ballots are counted. *See, e.g.*, Tex. Elec. Code §§ 63.011, 65.054.

In sum, Hilberg's ability to vote would be impaired *only if* she is investigated, *and* her registration is cancelled because she does not timely provide proof of citizenship, *and* she is not reinstated because she does not provide proof after cancellation, *and* her provisional vote is not counted because she does not provide proof before her provisional ballot is counted. Because numerous statutory safety valves exist to protect Hilberg's registration status, any claim that she has been injured is purely speculative. Hilberg has suffered no "actual or imminent" harm and cannot therefore satisfy standing requirements. *See Lujan*, 504 U.S. at 560; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013).

Nor are Plaintiff Hilberg's alleged injuries traceable to Defendants. Secretary Whitley merely shared data with the county registrars. What these officials do with the data, Secretary Whitley repeatedly stressed, was for them to decide, in accordance with applicable law. There is simply no "causal connection" between Plaintiff's Hilberg's claimed injury and Defendants' conduct. *Id*. Secretary Whitley merely provided county registrars with additional information pursuant to a mandatory disclosure statute. He did not direct registrars to remove a single voter from the rolls based solely on the data provided. For Plaintiff Hilberg to suffer an injury, there would have to be "independent action" by the county registrar. *Id*. (quoting *Simon*, 426 U.S. at 41-42). Thus, Plaintiff Hilberg's present claims against Defendants must be dismissed. *Id*.

Finally, Plaintiff Hilberg's claims are not redressable by a decision in her favor. She asks this Court to declare unlawful the matching process and Defendants' public statements about data derived as a result of that process and to prevent Defendants or election officials to take any action based on Secretary Whitley's advisory. But this relief would require this Court to strike down state

law without redressing any actual harm to Plaintiff Hilberg. And, in any event, Secretary Whitley's advisory and Defendants' related statements did not direct local election officials to take any action. Thus, even if the Court were to take the extraordinary step of declaring the public statements of two statewide officials to be unlawful, Plaintiff Hilberg's status would remain unchanged. With or without Defendant's public statements and the Secretary's advisory, the registrars can still make an independent determination of whether to investigate the eligibility of voters across the state. Therefore, the requested declaratory or injunctive relief would not redress any action by Defendants that allegedly harmed any voter in Texas.

Likewise, Attorney General Paxton did not even remotely cause an injury-in-fact. County registrars—not the Office of Attorney General—are responsible for maintaining accurate voting registration lists. OAG has no authority to conduct list maintenance or remove registered voters from voting lists. *See* Tex. Elec. Code § 273.001 *et seq*. Accordingly, the Attorney General could not and, in fact, did not direct any local official to take a particular action with respect to Plaintiff Hilberg or any other resident of Texas. The Attorney General did nothing more than use Twitter and issue a press release concerning election offenses over which the Office of Attorney General has concurrent jurisdiction. To find any causal connection between the Attorney General's public statements and the harm complained-of here would extend federal jurisdiction far beyond its Article III limitations into public policy matters that are "not of a Judicial Nature." *DaimlerChrysler*, 547 U.S. at 342 (quoting James Madison, 2 Records of the Federal Convention of 1787, at 430 (M. Farrand ed. 1966)). Because Plaintiff Hilberg suffered no "actual or imminent" harm causally connected to the Attorney General's statements, her claims against the Attorney General must be dismissed for want of jurisdiction. *See Lujan*, 504 U.S. at 560.

### C.    The Organizational Plaintiffs Lack Standing

The Organizational Plaintiffs can establish their standing through either of two theories, appropriately called "associational standing" and "organizational standing." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). They do not allege that they have standing to sue on behalf of their members who "would otherwise have standing . . . in their own right," *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Nor could they do so because, as explained, no individual member has standing. Instead, the League of United Latin American Citizens (LULAC) and the Texas chapter of LULAC (Texas LULAC) claim organizational standing based on the claim that Texas LULAC will have to divert "resources to educating the Latino community about this unlawful voter purge program and assisting its members and Latinos throughout the state to response to improper notices threatening cancellation of their voter registration." Compl. ¶ 18.

To demonstrate standing, then, the Organizational Plaintiffs must satisfy the same three-part standing applicable to individual plaintiffs. *OCA-Greater Houston*, 867 F.3d at 610. But the Organizational Plaintiffs' claimed injury is as speculative, non-traceable, and non-redressable as Plaintiff Hilberg's. The Organizational Plaintiffs complain that they may have to devote resources to educating members about the matching process, but they identify no particular individual who has received a notice from a registrar concerning his or her registration status, or who has approached Texas LULAC for assistance in documenting voting eligibility. And even if individuals approached Texas LULAC, they would merely have to provide education on the law of Texas. As already stated, the disclosure and use of DPS data was mandatory and any action by a registrar must be based on the registrar's reasonable belief that the voter may be ineligible, not on Secretary Whitley's advisory or Attorney General Paxton's public statements.

20

Furthermore, complying with the notice is merely a function of following the procedures set forth in statute. Tex. Elec. Code § 16.033. Thus, this case is wholly distinguishable from *OCA-Greater Houston*, where the organizational plaintiffs had to engage in "in-depth conversations" because the pertinent state and federal law requirements were not identical. *OCA-Greater Houston*, 867 F.3d at 608, 610. Here, the Organizational Plaintiffs at most would merely have to point to state law, which clearly sets forth the standards and processes that control the maintenance of accurate voting rolls to ensure election integrity. And in the event that anyone is investigated, there would be no "causal connection" between Organizational Plaintiffs' alleged injury and Defendants' action. *See Lujan*, 504 U.S. at 560. As explained, the basis for the investigation would be the registrar's independent determination, not Defendants' advisory and public statements. For that same reason, ruling against Defendants would not redress the Organizational Plaintiffs' purported harm because they could still be approached by individuals seeking advice on responding to notice issued pursuant to state election law. Because the Organizational Plaintiffs fail to meet each of the standing requirements, this Court lacks jurisdiction over their claims.

In sum, Plaintiffs fail to satisfy any of the standing components and, therefore, their claims must be dismissed for want of jurisdiction under Rule 12(b)(1).

## II.    Plaintiffs Fail to State a Claim on Which Relief May Be Granted

### A.    Plaintiffs' Fourteenth and First Amendment Claims Must Fail

Plaintiffs fail to plead any facts in support of their broad, conclusory assertion that the matching process imposes a severe discriminatory burden on naturalized citizens, and do not otherwise offer facts to overcome the neutral, non-discriminatory interests advanced by the State as justification for the matching process. A court evaluating a constitutional challenge to an election regulation must "weigh the asserted injury to the right to vote against the precise interests

put forward by the State as justifications for the burden imposed by its rule." *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203 (2008). To do this, courts apply a balancing test derived from two Supreme Court decisions, *Anderson v. Celebrezze*, 420 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). "When evaluating a neutral, nondiscriminatory regulation of voting procedure, [the Court] must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *See Crawford*, 553 U.S. at 203.

In passing judgment, the court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). State rules that impose a severe burden on constitutional rights must be "narrowly drawn to advance a state interest of compelling importance." *Id*. "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal citations omitted).

### 1.     The Character and Magnitude of Plaintiffs' Alleged Injuries Do Not Qualify as a Substantial Burden on the Right to Vote

"To deem ordinary and widespread burdens severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of the States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Crawford*, 553 U.S. at 197. "The Constitution does not require that result, for it is beyond question that the States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id* (internal quotations omitted).

Given the fact that Plaintiffs have advanced a broad attack on the constitutionality of the matching process, seeking relief that would invalidate it in all its applications, they bear a heavy burden of persuasion. *See id.* at 200. Plaintiffs ask this Court, in effect, to look specifically at a small number of voters who may experience a special burden and weigh their burdens against the State's broad interests in protecting election integrity. *See* Compl. ¶ 9, p.20-21 (Prayer for Relief). Aside from conclusory and speculative assertions, Plaintiffs do not offer any facts regarding the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified. *See Crawford*, 553 U.S. at 200.

Plaintiffs complain that having to provide proof of citizenship within thirty days from the date they received notice is "exceedingly strict." Compl. at ¶ 49. However, the Supreme Court has already established that, although a somewhat heavier burden may be placed on a limited number of persons, inconveniences such as making an extra trip to the DMV, and gathering additional documents required for voter registration, do not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting. *Crawford*, 553 U.S. at 198-99 (emphasis added). Such requirements are wholly justified and, therefore, would not pose a constitutional problem. *See id.* at 199-200. Even assuming that the burden may not be justified (Defendants contend it is), that conclusion is by no means sufficient to invalidate the matching process. *See id.*

Plaintiffs also speculatively allege, without substantiating facts, that "[i]f they do not discover their removal until after the registration deadline (30 days before an election) or at the polls when they appear to vote, they will lose the right to vote altogether." Compl. at ¶ 51. Plaintiffs are simply wrong. As set forth in Section I, *supra*, Texas allows multiple safeguards to ensure properly registered voters remain on the voting rolls, including immediate, same-day reinstatement

upon presentation of citizenship verification and provisional voting pursuant to Texas Election Code §16.037(d) and § 63.011. *See Crawford*, 553 U.S. at 197-98 (the availability of the right to cast a provisional ballot provides an adequate remedy for burdens arising from life's vagaries). In other words, even if Plaintiffs' names appear on the list of registered voters and their registration status cannot be determined, multiple statutory provisions secure qualified voters their rightful place on the voting rolls. *See id*.

Further, none of the Plaintiffs assert facts showing they have been denied their ability to vote or are otherwise personally unable to vote. *Id*. at 201. Nor have Plaintiffs pleaded any facts showing that they have actually lost or misplaced their proof of citizenship, or have attempted to obtain proof of citizenship, or describing difficulty they have had in obtaining proof of citizenship or timely providing such proof for voter registration purposes. *Id*. Plaintiffs' Complaint does not assert any facts regarding the difficulties Plaintiffs have experienced as a result of the matching process, much less difficulties severe enough to overcome the State's interest in employing safeguards against voter fraud. Even assuming *arguendo* that an unjustified, special burden on some voters existed, Plaintiffs fail to plead facts to support the invalidation of the entire matching process as an appropriate remedy. Further, Plaintiffs have failed to plead facts sufficient to demonstrate that such obstacles are severe enough to overcome the State's interests in implementing the matching procedure. *See Crawford*, 553 U.S. at 202-03. Moreover, Plaintiffs fail to plead specific facts tying Secretary Whitley's actions to their Equal Protection claim.

Because the Complaint fails to properly plead any facts showing the matching process imposes "excessively burdensome requirements" on any class of voters, Plaintiffs cannot show that the character or magnitude of their alleged injuries qualify as a substantial burden on their right to vote. *Id.* at 203-04.

2.      **The State's Interest in Safeguarding the Integrity of the Electoral Process Outweighs the Alleged Burdens to Plaintiffs**

The Supreme Court has acknowledged that not only is the risk of voter fraud real, it could affect the outcome of a close election. *See Crawford*, 553 U.S. at 194-97. Accordingly, the electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. *Id.* at 194 (citing Building Confidence in U.S. Elections § 2.5 (Sept. 2005), App. 136-37 (Carter-Baker Report) (footnote omitted)). The Court has further stated:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

*Id.* at 196. The Supreme Court has also stated that "[w]hile [the interest in the integrity and legitimacy of representative government] is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Id.* at 197.

It is well-established that the State of Texas has a significant interest in protecting voter confidence in the integrity and legitimacy of the electoral process. *See id.* at 194-97. As part of its mission to safeguard voter confidence, Texas also has an interest in deterring and detecting voter fraud. *See id.* at 196 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). On its own, the fact that voter rolls may be inflated with individuals, such as non-citizens, who are not eligible to vote provides a neutral and nondiscriminatory reason supporting the State's decision to implement the matching process. *See id.* at 196-97. Moreover, the State has a valid interest in participating in a nationwide effort to improve and modernize election procedures. *See id.* at 194-97. Further, the State has an interest in

the uniform application and interpretation of election laws throughout Texas. *See*, *e.g.*, Tex. Const. art. 4, § 21. Under the law, Texas's important interests enumerated above are enough to justify implementation of the matching process.

Plaintiffs' First and Fourteenth Amendment claims must therefore be dismissed.

### B.     Plaintiffs Have Failed to State a Claim Under 52 U.S.C. § 10307

In Count 3, Plaintiffs allege a claim pursuant to § 11(b) of the Voting Rights Act, which provides: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote . . . ." 52 U.S.C. § 10307(b); *see* Compl. ¶¶ 92-98. Plaintiffs allege that Secretary "Whitley coordinated a highly publicized press campaign" that "is objectively intimidating to the tens of thousands of naturalized citizens" allegedly identified through the matching process. Compl. ¶¶ 94-95. Plaintiffs also claim Attorney General Paxton for "creat[ing] fear of unwarranted criminal investigation and stok[ing] public anxiety about noncitizen voting." *Id.* ¶ 96.

As an initial matter, Plaintiffs have not established that they have a private right of action to proceed under this provision. The Voting Rights Act explicitly authorizes the U.S. Attorney General to bring a civil action for injunctive relief to stop a practice prohibited by Section 11, but it says nothing about extending that enforcement authority to private parties. *See* 52 U.S.C. § 10308(d). Furthermore, the Supreme Court has called into doubt the entire enterprise of recognizing implied private causes of action in civil rights statutes. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275 (2001); *see also, e.g.*, *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1856 (2017) ("If the statute does not itself so provide, a private cause of action will not be created through judicial mandate."). Thus, Plaintiffs are not permitted to bring a cause of action pursuant to Section 11.

Even if Plaintiffs were authorized to proceed under Section 11, their claims still fail. "Limited precedent on Section 11(b) indicates that, in order to succeed on such a claim, a plaintiff must show both an act of intimidation or attempt to intimidate, and that the act was done with the specific intent to intimidate or attempt to intimidate." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va.) (citing *Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985)); *see also United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (holding that Section 11(b) "essentially requires proof of two ultimate facts: (1) that there was an intimidation, threat, or coercion, or an attempt to intimidate, threaten or coerce, and (2) that the intimidation was for the purpose of interfering with the right to vote") (internal quotation marks omitted); *Am. Federation of State, Cnty. & Mun. Emps., Council 25 v. Land*, 583 F. Supp. 2d 840 (E.D. Mich. 2008) (same). Section 11 "does not protect voters against inadvertent or technical violations of voting procedures but against conduct **intended** to 'intimidate, threaten, or coerce.'" *Willingham v. County of Albany*, No. 04-369, 2005 WL 1660114 at *7 (N.D.N.Y. July 12, 2005) (quoting *Olagues*, 770 F.2d at 804). Because Plaintiffs' allegations fall well short of this standard, Plaintiffs cannot satisfy either of these elements.

First, Defendants are not alleged to have committed any act that constitutes intimidation, threats, or coercion of any lawful voter. The Election Advisory merely outlines a process by which information and data will be shared with local voter registrars, who then may or may not choose to investigate potentially ineligible voter registrations. The press releases merely describe this process. "[S]ome citizens' disquietude with a new process" does not rise to the level of actionable intimidation. *Parson*, 157 F. Supp. 3d at 498. And even if Plaintiffs find Defendants' public statements "false," "repugnant," or unwise, public statements about potential voter fraud are "not, without more, sufficient to justify the extraordinary relief that an injunction constitutes." *Ariz.*

*Democratic Party v. Ariz. Republican Party*, No. 16-03752, 2016 WL 8669978, at *9 (D. Ariz. Nov. 4, 2016). Accordingly, because Plaintiffs' allegations of voter intimidation rest on nothing more than a few Twitter posts and press releases, they cannot state a claim for a Section 11(b) violation.

Second, even if any voter intimidation could be said to have occurred—which it did not— Plaintiffs cannot offer anything other than speculation and their own unsupported conclusions to demonstrate a specific intent by Defendants to interfere with the right to vote. The Election Advisory is explicit that the purpose of the matching process was to "produce[] the least possible impact on eligible Texas voters while fulfilling the responsibility to manage the voter rolls." Election Advisory at 1. The information was based on "documents provided by [each] person to show they are lawfully present in the United States," and the stated "goal was to produce actionable information for voter registrars while producing the least possible impact on eligible voters." Election Advisory at 1-2. The Court should accept this stated purpose. *Cf. Am. Federation*, 583 F. Supp. 2d at 846 (accepting the affidavit of a defendant explaining the purpose of a challenged directive). Plaintiffs' First Amended Complaint does not contain factual allegations that could support an inference of bad faith on the part of Defendants, especially in light of Defendants' good faith objective of maintaining the integrity of the State's voter rolls. *Cf. Olagues*, 770 F.2d at 804. Accordingly, Plaintiffs cannot state a claim that Defendants have violated Section 11 of the Voting Rights Act.

### C.    Plaintiffs Have Insufficiently Pled a Class Action

Plaintiffs have alleged a putative class action and contend that all of the requirements of Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure are satisfied by the First Amended Complaint. *See* Compl. ¶¶ 74-81. Because the Court lacks jurisdiction over Plaintiffs'

claims, and because Plaintiffs have failed to state a claim upon which relief can be granted, there is no basis for certifying a class action in this litigation, and Plaintiffs' class allegations should be dismissed as well. Nonetheless, Plaintiffs have filed a Motion for Class Certification. ECF No. 10. Defendants reserve the right to oppose Plaintiffs' motion and will do so in a timely manner and as ordered by the Court.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion to dismiss.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFERY C. MATEER
First Assistant Attorney General

RYAN BANGERT
Deputy Attorney General for Legal Counsel

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Associate Deputy for Special Litigation
Texas Bar No. 00798537
TODD LAWRENCE DISHER
Trial Counsel for Civil Litigation
Texas Bar No. 24081854
MICHAEL TOTH
Special Counsel for Civil Litigation
Texas Bar No. 24100608
ROLA DAABOUL
Assistant Attorney General
Texas Bar No. 24068473
CHRISTOPHER D. HILTON
Assistant Attorney General
Texas Bar No. 24087727

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
FAX: (512) 320-0667
Patrick.Sweeten@oag.texas.gov
Todd.Disher@oag.texas.gov
Michael.Toth@oag.texas.gov
Rola.Daaboul@oag.texas.gov
Christopher.Hilton@oag.texas.gov

**Counsel for Defendants**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on **February 11, 2019**, and that the person(s) identified below was served by CM/ECF:

Danielle M. Lang*
Mark P. Gaber*
**Campaign Legal Center**
1411 K Street NW, Suite 1400
Washington, DC 20005
dlang@campaignlegal.org
mgaber@campaignlegal.org

*motions for admission pro hac vice*
*Forthcoming*

Renea Hicks
**Law Office of Max Renea Hicks**
P.O. Box 303187
Austin, TX 78703
rhicks@renea-hicks.com

David Richards
**Richards, Rodriguez & Skeith LLP**
816 Congress Avenue, Suite 1200
Austin, TX 78701

Luis Roberto Vera, Jr.
General Counsel
**Law Offices of Luis Roberto Vera, Jr. & Associates**
1325 Riverview Towers
111 Soledad
San Antonio, TX 78205-2260
lrvlaw@sbcglobal.net

Chad W. Dunn
K. Scott Brazil
**Brazil & Dunn**
3303 Northland Drive, Suite 205
Austin, TX 78731
chad@brazilanddunn.com

/s/ Christopher D. Hilton
CHRISTOPHER D. HILTON