## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS, | Civil Action Case No. 5:19-cv-00074-FB |
| and | |
| NATIONAL LEAGUE OF UNITED LATIN AMERICAN CITIZENS, | CLASS ACTION |
| and | |
| JULIE HILBERG, individually and on behalf of others similarly situated, | |
| Plaintiffs, | |
| v. | |
| DAVID WHITLEY, in his official capacity as Secretary of State for the State of Texas, | |
| and | |
| KEN PAXTON, in his official capacity as Attorney General for the State of Texas, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6)

## INTRODUCTION

Defendants devote the bulk of their motion to dismiss—the first sixteen pages—to arguing that Plaintiffs' *federal law* claims should be dismissed because Defendants purport they were simply following *state law*. This is effectively a reverse-preemption argument and, of course, has things backwards. *See* U.S. Const. art. VI cl. 2 ("This Constitution, and the laws of the United States . . . shall be the supreme law of the land . . . ."). And Defendants' contention that the voter purge is mandated by state law is flat wrong, as described below.

Plaintiffs plainly have standing, and the allegations in the Amended Complaint plainly state causes of action under the First and Fourteenth Amendments and Section 11(b) of the Voting Rights Act. Defendants' motion should be denied.

## LEGAL BACKGROUND

Nothing in Texas law forced this deeply flawed process on Defendant Whitley. The voter purge challenged in this case is a creation of the Secretary of State, not of Texas law. Defendants repeatedly contend that Secretary Whitley's hands were tied—that he was merely a bit player in a statutorily-mandated system to investigate voters based upon six-year-old citizenship information in the files of the Department of Public Safety ("DPS").[1] But the Court will search the Texas statutes in vain trying to find a law mandating the use of six-year-old DPS citizenship data to investigate and cancel voter registrations. Nor will the Court find a mandate that the Secretary of

---

[1] *See* Mot. at 1 (contending the legislature "mandated" this program); *id.* at 2 (contending Secretary Whitley has been sued for "fulfilling his statutory obligation"); *id.* at 3 (contending that an injunction would block Defendants from "performing their roles as required" by law); *id.* at 8 (contending that Secretary Whitley requested DPS citizenship data "[p]ursuant to [ ] legislative directive"); *id.* at 9 ("[T]his process of investigating citizenship status is mandated by statute . . . ."); *id.* at 15 (contending that Plaintiffs "allege no more than the operation of the State's election-integrity laws"); *id.* at 18 ("Secretary Whitley merely provided county registrars with additional information pursuant to a mandatory disclosure statute."); *id.* at 18-19 (asking Court not to "strike down state law"); *id.* at 21 ("[C]omplying with the notice is merely a function of following the procedures set forth in statute.").

State force local officials to do such a thing. None of the Texas Code provisions Defendants cite requires (or even contemplates) this voter purge program.

Defendants start with Section 730.005(9) of the Transportation Code. *See* Mot. at 7-8. This provision requires DPS to disclose "[p]ersonal information" it obtains "for use in connection with . . . voter registration or the administration of elections by the secretary of state." Tex. Transp. Code § 730.005(9). The Code defines "personal information" as "information that identifies a person, including an individual's photograph or computerized image, social security number, driver identification number, name, [and] address." *Id.* § 730.003(6). The plain text contains no reference to citizenship status information. Not saying anything about it would be a strange way for the Texas legislature to "mandate" the disclosure of citizenship information.

Notwithstanding the absence of the word "citizen" in the statutory text, Defendants contend that the legislature enacted this provision in 2013 with near-unanimous support "for the *express purpose* of attempting to identify non-citizens who are registered to vote." Mot. at 1 (emphasis added). For this proposition, Defendants quote, from the Bill Analysis, a statement from the bill's sponsors that the Secretary needs "more tools" to ensure accurate voter rolls. *See id.* at 7-8 (quoting Tex. B. Ann., H.B. 2512 (May 3, 2013)). But the word "citizen" appears nowhere in the Bill Analysis either. Instead, the bill's sponsors explained that the legislation was necessary to better "ascertain whether registered voters *are deceased* and should be removed from the rolls." Tex. B. Ann., H.B. 2512 (May 3, 2013) (emphasis added). They explained:

> People who registered to vote before 1993 would not have been required to submit certain identifying information, such as Social Security numbers, on their voter registration, but this information would have been gathered by DPS if they had applied for a driver's license or ID certificate. Allowing the secretary of state access to identifying information via DPS would strengthen the required matches and improve accuracy in verifying the voter rolls.

*Id.* That is the sole basis for the legislation proffered by the bill's sponsors. *Id.* If the legislature's "express purpose" in enacting this provision were for the Secretary to use information about citizenship in DPS's files to launch an investigation about non-citizen registered voters, one might expect that purpose to be actually *expressed* somewhere in the statutory text or legislative history.

Defendants also contend that "Texas law requires a matching process to ensure the accuracy of the voting rolls." Mot. at 14. But the provision they cite, Tex. Election Code § 18.0681, requires the Secretary to compare registrations in the statewide registration list "to determine whether any voters have *more than one* voter registration record on file," *id.* (emphasis added). It contains no reference to citizenship information and no instruction to match outdated DPS citizenship data to the statewide registration list.

Defendants do cite a single provision that pertains to citizenship status, but it too offers no support for Defendants' voter purge program. Defendants contend that "[i]n the event that a voter's registration is investigated because the registrar has reason to believe that the voter is a non-citizen," the voter's registration must be canceled if she does not respond to the 30-day notice letter with proof in the form of "'a birth certificate, United States passport, certificate of naturalization, or any other form prescribed by the Secretary of State.'" Mot. at 5 (quoting Tex. Election Code § 16.0332(a). That is not what the statute says.

County registrars are sent lists of persons excused or disqualified from jury service because of their citizenship status. *See* Tex. Election Code § 18.068; Tex. Gov't Code § 62.113. Section 16.0332(a) of the Election Code requires the registrar to compare those non-citizen jury lists against their lists of registered voters and send a notice seeking proof of citizenship to those registered voters. *Id.* It does not, as Defendants contend, apply *generally* whenever a registrar has "reason to believe" a voter is a non-citizen based on *other* sources of information. And the

provision's notice procedure is only triggered when a person is already registered to vote at the time they are excused or disqualified from jury status because of their non-citizenship. *Id.* In other words, the sequence of events—claiming non-citizen status *after* having registered—provides cause to believe the person was not a citizen at the time he registered to vote. Nothing in Section 16.0332(a) authorizes, let alone requires, the 30-day notice program the Secretary has implemented for the DPS data voter purge. And nothing in Section 16.0332(a) authorizes, let alone requires, investigations of newly naturalized citizens who register to vote years *after* DPS records their prior non-citizen status.

The only remaining provision Defendants cite, *see* Mot. at 14, is the county registrar's authority to "use any lawful means" to investigate a voter's eligibility and to deliver a written notice requesting information "[i]f the registrar has reason to believe that a voter is no longer eligible for registration." Tex. Election Code § 16.033(a) & (b). But the disclosure of DPS data is strictly proscribed by statute. *See* Tex. Transp. Code § 73.004 (prohibiting disclosure except as authorized by the Code). County registrars are not among the entities to which disclosure is required, *see id.* § 730.005, and so the only "lawful means" available for registrars to obtain DPS data is either by (1) consent of the individual whose information is at issue, *id.* § 730.006, or (2) as a governmental entity receiving "*only* . . . name and address; date of birth; and driver's license number," *id.* § 73.007(a)(2)(A)(i) & (b) (emphasis added). Moreover, the use of stale DPS citizenship data to target a single class of voters—naturalized citizens—is not a "lawful means" for registrars to pursue. *See U.S. v. Florida*, 870 F. Supp. 2d 1346, 1347-50 (N.D. Fla. 2012).

The upshot is that nothing in the Texas Code mandates this program. Nothing in the Texas Code even contemplates it. It is entirely a creation of the Secretary of State—and perhaps other officials currently in Texas government in collaboration with Secretary Whitley.

## STANDARD OF REVIEW

### A.    Rule 12(b)(1)

A motion to dismiss challenging standing under Rule 12(b)(1) must be denied when plaintiffs sufficiently demonstrate: (1) an injury in fact that is actual or imminent and concrete and particularized, (2) a causal connection that traces the conduct of the defendant to plaintiffs' injury, and (3) that their injury would be redressed by the relief they seek. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs' burden varies depending upon the stage of the litigation. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)) (citations omitted; second bracket in original). At the preliminary injunction stage, plaintiffs must make a "clear showing that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (quotation marks omitted). The burden is higher at later stages of litigation: at summary judgment, allegations will not suffice, but rather affidavits must set out "specific facts" that must be "taken to be true." *Lujan*, 504 U.S. at 561. And at trial, "those facts (if controverted) must be supported adequately by the evidence adduced at trial." *Id.* (quotation marks omitted).

### B.    Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) must be denied when the complaint states a plausible cause of action. In making that assessment, courts must accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid*

*Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's ground for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint cannot be dismissed "unless the court determines that it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

I.    **Defendants' Rule 12(b)(1) Motion Should Be Denied Because Plaintiffs Have Clearly Shown They Have Standing.**

A.    **Plaintiff Julie Hilberg Has Standing.**

Defendants' Rule 12(b)(1) motion should be denied because Plaintiffs have made a clear showing that they have standing to challenge Defendants' voter purge program. A plaintiff challenging a voter purge program has standing if she is wrongly identified as a non-citizen who may be required to prove her eligibility to stay registered. In *Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014), the Eleventh Circuit held that a plaintiff wrongly identified as a potential non-citizen had standing to challenge Florida's voter purge program. In 2012, Florida's Secretary of State identified 185,000 registered voters who had previously indicated to the Department of Highway Safety and Motor Vehicles ("DHSMV") that they were non-citizens. *Id.* at 1339. The Secretary advised county officials to "(1) review the names on the list, (2) conduct additional research using 'whatever other sources you have,' and (3) initiate a notice and removal process." *Id.* The individual plaintiffs became naturalized citizens after previously indicating they were non-citizens to DHSMV and so were wrongly included on the Secretary's list. *Id.* at 1341. The court held that plaintiffs "had standing to challenge Secretary Detzner's [voter purge program]

because they were directly injured by it when they were wrongly identified as non-citizens. Even though they were ultimately not prevented from voting, an injury like theirs is sufficient to confer standing." *Id.* That is so because plaintiffs are not required to demonstrate a risk of outright vote *denial* in order to have standing to raise First and Fourteenth Amendment claims; rather they must show an actual or imminent *burden* on their right to vote. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 191 (2008) ("However slight the burden [to the voters] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.").[2]

Plaintiff Hilberg has standing to sue. In 2014, while a permanent legal resident, she obtained a driver license valid through 2020. Hilberg Dec. ¶ 3 (ECF No. 8-2). Ms. Hilberg became a naturalized U.S. citizen on April 16, 2015 and thereafter registered to vote. *Id.* ¶ 6. After being frightened by the voter purge program announced by Defendant Whitley—and trumpeted with threats of criminal investigations by Defendant Paxton—Ms. Hilberg contacted the Atascosa County Elections Administrator to learn whether she was on the Secretary's list. *Id.* ¶¶ 7-8. That official confirmed Ms. Hilberg's name appeared on the list and could not provide her any assurances about the status of her voter registration. *Id.* ¶ 8. These facts alone suffice to prove standing.

Moreover, just this past Friday, Defendant Whitley advised registrars that when voters proactively inquire whether they are included on the list—as Ms. Hilberg did—registrars should

---

[2] The *en banc* Fifth Circuit has already rejected the state's argument that it is free to restrict the right to vote so long as it stops short of outright denial. *See Veasey v. Abbott*, 830 F.3d 216, 253 (5th Cir. 2016) (*en banc*). The court noted that "[i]f the State had its way, the Fifteenth Amendment and Section 2 would only prohibit outright *denial* of the right to vote and overtly purposeful discrimination." The court held that the state's "arguments miss the mark" because both provisions "explicitly prohibit *abridgement* of the right to vote." *Id.* (emphasis in original). The same analysis applies to Plaintiffs' First Amendment claim here. *See* U.S. Const. amend. I (prohibiting laws that "abridge[e] the freedom of speech"). And the Fourteenth Amendment guarantees equal protection of laws, which reaches much more than merely an outright denial of the right to vote.

advise voters appearing on the list that in order for their status to be marked as "RESOLVED," they must provide documentary proof of citizenship, either before or after receiving a 30-day notice.  Ex. 1 (2/15/19 K. Ingram Email). So if Ms. Hilberg wishes to resolve the questions regarding her eligibility, she must provide documentary proof of her citizenship—something millions of Texas voters are not required to do and something that constitutes an actual or imminent injury conferring Article III standing.

In any event, the Advisory on its face demonstrates that *every* voter included on the list faces an actual or imminent risk of facing a burden unique to naturalized citizens—having to provide documentary proof of citizenship in order to vote. That is so because the Advisory expressly states that the Secretary "believe[s] the data we are providing can be acted on in nearly all circumstances," Advisory at 2, meaning that Defendant Whitley initially[3] advised registrars that a voter's mere presence on the list gave them "reason to believe" they were non-citizens, permitting the registrar to immediately mail 30-day notices to all listed voters. *Id.* Were there any doubt about the imminence or concrete nature of the risk to Plaintiff Hilberg and the Plaintiff Class, the February 11, 2019 testimony of state Elections Director Keith Ingram to the House Elections Committee makes that risk clear:

> Q. But if everyone on your database signed – swore – under penalty of perjury that they were a United States citizen, what was your reason to believe a crime had occurred?
>
> A: The fact that the last time they went to DPS they showed evidence of lawful presence and not citizenship, and that they are on the list of registered voters, which means that **there is a potential felony for lying** on their voter registration application.

---

[3] Defendant Whitley responded to the immediate public outcry by using words like "iterative" and "collaborative" and, rather than vetting the undigested data *he* gathered, is now encouraging counties to look for citizenship proof in *their* files before sending 30-day notice letters. That does not remedy the constitutional violation, because the process will still lead to tens of thousands of eligible voters being forced to prove themselves as citizens—and as non*criminals*—within 30 days. That is so because the counties will lack documentary proof of their citizenship in their files for tens of thousands of eligible voters. No tinkering can correct the unconstitutionally flawed premise of this scheme.

> Q:    Several years into the past in which they might have been naturalized since then?
>
> A:    That's right.
>
> Q:    I still don't understand why the – why the fear that a law had been broken before you actually went through the database to do some further analysis.
>
> A:    The point is that for that kind of investigation, that's appropriate for law enforcement not for us.
>
> Q:    But no laws had been broken – you did not have evidence that a law had been broken.
>
> A:    **I had reasonable cause to suspect that a law has been broken, yes ma'am**.

House Elections Comm'g Hr'g, Testimony of Keith Ingram at 26:55 (Feb. 11, 2019), http://tlchouse.granicus.com/MediaPlayer.php?view_id=44&clip_id=16138.[4] The entire list was referred to the Attorney General for criminal investigation.  *See* Advisory 2019-02.

Defendants' challenge to Ms. Hilberg's standing is misplaced. Defendants contend Ms. Hilberg does not face actual or imminent harm because she has not yet received a 30-day notice. Mot. at 17. But the fact that Ms. Hilberg has been wrongly identified as a non-citizen suffices for standing purposes. *See Arcia*, 772 F.3d at 1339. Moreover, Defendant Whitley just advised registrars on Friday to inform voters in Ms. Hilberg's position that they should submit their proof of citizenship *even if they have not received a 30-day notice letter* if they wish to have their status marked as "RESOLVED." *See* Ex. 1. That obligation imposes a burden on Ms. Hilberg's right to vote sufficient to demonstrate an actual or imminent injury. Together with Mr. Ingram's public testimony that he has reasonable cause to suspect *every* listed voter has committed a crime, it is clear Ms. Hilberg faces an actual or imminent burden on her right vote—a burden Defendants have imposed exclusively on naturalized citizens.

Defendants likewise contend Ms. Hilberg faces no actual or imminent harm because it is "speculative" to conclude she would be removed from the voting rolls even if she were

---

[4] The Court may take judicial notice of Defendants' employees' statements to the legislature. *See Stukenberg v. Abbott*, No. 2:11-CV-84, 2017 WL 74371, at *2 n.3 (S.D. Tex. Jan 9. 2017).

investigated. That is so, Defendants say, because removal would only happen if Ms. Hilberg did not receive the 30-day notice, failed to respond, or she was removed despite providing proof of citizenship. Mot. at 17. Further, Defendants contend that Ms. Hilberg could later be reinstated, and could vote provisionally and later submit proof of citizenship by the deadline for counting provisional ballots. *Id.* at 17-18.

This all misses the point. Ms. Hilberg does not need to allege outright vote *denial* in order to have standing to challenge Defendants' voter purge program as an undue *burden* on the right to vote prohibited by the First and Fourteenth Amendments. All of the actions Defendants describe in their brief—submitting proof of citizenship and being required to vote provisionally after being wrongly removed—constitute actual or imminent *burdens* on the right to vote that all confer Article III standing.

Next, Defendants contend that "[t]here is simply no 'causal connection' between Plaintiff Hilberg's claimed injury and Defendants' conduct." Mot. at 18. This makes no sense whatsoever. Defendant Whitley devised the flawed voter purge program despite knowing it would wrongly target naturalized citizens, and Defendant Whitley created the list that wrongly named Ms. Hilberg. Defendant Whitley issued the Advisory, and the Atascosa County Elections Administrator was unable to clarify Ms. Hilberg's status because of her inclusion on Defendant Whitley's list. *See* Hilberg Dec. ¶ 8 (ECF No. 8-2). Defendant Whitley has advised that for voters like Ms. Hilberg to resolve their status, they should submit proof of citizenship even if they have not received a 30-day notice. None of this would have happened *but for* Defendant Whitley's actions.

Moreover, Defendants' contention that this class action must name 254 individual county officials as defendants rather than the Secretary of State is plainly wrong. Texas election law provides that "[t]he secretary of state is the chief election officer of the state," Tex. Election Code

§ 31.001(a), and requires that "[t]he secretary of state shall obtain and maintain uniformity in the application, operation, and interpretation of [the Election] code and of the election laws outside this code," *id.* § 31.003; *see* 52 U.S.C. § 20509 (requiring state to designate official "responsible for coordination of State responsibilities" under the National Voter Registration Act ("NVRA")). Texas election law requires the Secretary of State to issue directives to local election authorities: "[T]he secretary shall prepare detailed and comprehensive written directives and instructions relating to and based on this code and the election laws outside this code." *Id.* Moreover, the Secretary of State "may take appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes," and the Secretary "may order the person to correct the offending conduct." *Id.* § 31.005(a) & (b). The Secretary of State is directly responsible for Plaintiffs' injuries and can effectuate any relief this Court orders. *See Scott v. Schedler*, 771 F.3d 831, 839 (5th Cir. 2014) (holding that Secretary of State is proper defendant in NVRA suit because he is chief election official charged with coordinating compliance with the law and rejecting argument that "chief election official can merely instruct state agencies on NVRA compliance and then disappear from the picture"). It is Defendant Whitley who voluntarily set the whole purge process in motion, and it is Defendant Whitley, in partnership with the Defendant Paxton, who publicly exclaimed it as a public policy to be proud of—despite the subsequent developments revealing that it was anything but that.

Defendants also strangely assert that Ms. Hilberg's injury is not redressable by a Court order rescinding the voter purge program. *See* Mot. at 18-19. Defendants contend that even if this Court enjoins further use of the flawed list, local officials "can still make an independent determination of whether to investigate the eligibility of voters across the state." Mot. at 19. Defendants are wrong. Local officials do not have roving authority to require *any* voter to prove

their eligibility at *any* time lest their registration be canceled in 30 days. Rather, the Election Code only permits an investigation when "the registrar has *reason to believe* that a voter is no longer eligible for registration." Tex. Election Code § 16.033(b) (emphasis added). Defendant Whitley's flawed list is the *only* evidence providing registrars any reason to question the eligibility of Ms. Hilberg and the Plaintiff Class.

Finally, Defendants contend that Attorney General Paxton did not cause Ms. Hilberg any injury because he is uninvolved with voter registration or the ongoing voter purge. *See* Mot. at 19. But Defendant Paxton was only named as a Defendant as to Count III of the Amended Complaint, which alleges unlawful voter intimidation in violation of Section 11(b) of the Voting Rights Act. As Plaintiffs allege in their Amended Complaint, Defendant Paxton's inflammatory and false tweet and press release warning of "VOTER FRAUD" and threatening unfounded criminal prosecutions constituted unlawful voter intimidation. *See* Am. Compl. ¶¶ 58-61. Ms. Hilberg alleges she was intimidated by these words and her name being turned over to the Attorney General for criminal investigation. *See* Hilberg Dec. ¶ 7 (ECF No. 7-2) ("That scared me."). Defendant Whitley has now *apologized* and *admitted* that his words could intimidate voters. *See* Alex Ura, *Texas Secretary of State Apologizes for How He Rolled Out Voter Citizenship Review. But He Still Supports the Effort*, Tex. Tribune (Feb. 14, 2019), https://www.texastribune.org/2019/02/14/david-whitley-delivered-texas-lawmakers-apology-forcitizenship-review/ ("[T]he announcement could have been communicated better . . . . I recognize this caused some confusion about our intentions."). Ms. Hilberg plainly has standing to assert a voter intimidation claim against both Defendants Whitley and Paxton.

Defendants' objections to Ms. Hilberg's standing are strained at best. Her standing is clearly supported by the allegations in the complaint and the record evidence.[5]

### B.    LULAC and Texas LULAC Have Standing.

LULAC and Texas LULAC (collectively, "LULAC") have standing to sue. To begin, the Court need not even address LULAC's standing because Ms. Hilberg plainly has standing. *See Texas v. United States*, 86 F. Supp. 3d 591, 616 (S.D. Tex. 2015) ("It is not necessary, however, for *all* Plaintiffs to demonstrate standing; rather, 'one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)) (emphasis in original)). But LULAC has standing in any event. An organization has standing to sue when it is forced to divert resources in response to a defendant's unlawful actions. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In *Arcia*, the Eleventh Circuit held that three organizations had standing to challenge the Florida Secretary of State's substantially identical voter purge program. "[A]ll three organizational plaintiffs . . . submitted affidavits showing they have missions that include voter registration and education, or encouraging and safeguarding voter rights, and that they had diverted resources to address the Secretary's programs." 772 F.3d at 1341.

LULAC has demonstrated that it has been, and will continue to be, forced to divert resources to respond to Defendants' voter purge and voter intimidation. Lupe Torres, the State Director for Texas LULAC, has explained that it "conducts voter registration activities throughout Texas" and that voter registration is key to its mission. L. Torres Dec. ¶ 5 (ECF No. 23). Those activities come in many forms and locations, including sometimes "assist[ing] with registering

---

[5] Moreover, because Ms. Hilberg had standing at the time the complaint was filed, and a class certification motion was timely filed, this class action suit would proceed even if Ms. Hilberg's individual claim were somehow resolved. *See Mabary v. Hometown Bank, N.A.*, 276 F.R.D. 196, 202-03 (S.D. Tex. 2011) (explaining Fifth Circuit's "relation back" exception to mootness in class action context).

new citizens at naturalization ceremonies." *Id.* Ms. Torres has explained that LULAC "[m]embers and community members have already expressed concerns to LULAC leadership and volunteers that the voter purge program could affect their voter registration status." *Id.* ¶ 7. Ms. Torres has declared that LULAC will now divert resources to respond to the voter purge and intimidation, including by educating its volunteers and voter registrants, working with naturalized citizens to ensure they are not removed from the rolls and to reinstate eligible voters, and responding to fears of criminal prosecutions of Latino voters. *Id.* ¶¶ 8-10. LULAC has easily shown it has standing. *See also, e.g*, *Veasey v. Perry*, 29 F. Supp. 3d 896, 903-04 (S.D. Tex. 2014) (concluding LULAC had standing to challenge voter ID law).

## II. Defendants' Rule 12(b)(6) Motion Should Be Dismissed Because Plaintiffs Plainly State Plausible Causes of Action.

### A. Plaintiffs State Valid First and Fourteenth Amendment Claims.

Plaintiffs state valid claims under the First and Fourteenth Amendments. Defendants ignore the allegations in Plaintiffs' complaint, ask this Court to view the facts in favor of *Defendants*, and engage in pages of argument about a fact-bound constitutional balancing test appropriately reserved for an evidentiary hearing. *See* Mot. at 21-26. This is not an appropriate invocation of Rule 12(b)(6), and the motion should be denied.

The facts alleged in the Amended Complaint, viewed in the light most favorable to Plaintiffs, plainly state claims for an undue burden on the right to vote under the First and Fourteenth Amendments. To state such a claim, and thus to defeat a motion to dismiss, a plaintiff must allege one of two types of burdens on the right to vote.  First, a plaintiff may allege a burden on the right to vote that plausibly could be characterized as either severe *or* discriminatory—thus triggering the defendant's burden to demonstrate the regulation is "narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (5th Cir. 1992)

(quotation marks omitted). Second, a plaintiff could allege a burden that is "reasonable[ and] nondiscriminatory," thus triggering the defendant's burden to put forth "important regulatory interests" that advance the restriction. *Id.* (quotation marks omitted). All factual allegations and inferences must be viewed in favor of the plaintiffs. *See In re Katrina*, 495 F.3d at 205.

Plaintiffs have alleged facts that plainly support a plausible claim of a severe *and* discriminatory burden:

- Plaintiffs allege that the voter purge program discriminatorily targets a single group of eligible voters: newly naturalized citizens, and requires them and them alone to proof their citizenship to retain their right to vote. *See* Am. Compl. ¶¶ 32-46.  Plaintiffs likewise allege that the largest group of naturalized citizens are of Hispanic or Latino heritage, creating a "sharply discriminatory racial impact as well." *See* Am. Compl. ¶ 46.

- Plaintiffs allege that an identical program in Florida wrongly identified 99.95% of the 185,000 voters originally listed as potential non-citizens. *See* Am. Compl. ¶¶ 38-41.

- Plaintiffs allege "[i]f even one-third of those newly naturalized citizens with driver licenses or state-issued identification cards registered to vote upon naturalization, they would significantly outnumber the total number of alleged non-citizen voters on Defendant Whitley's list." *See* Am. Compl. ¶ 36. That is so because Plaintiffs allege that "[o]ver the most recent six years of data—the lifespan of a Texas driver license—348,552 Texas residents have become newly naturalized citizens." *See* Am. Compl. 35.[6]

---

[6] Defendants' characterization of this lawsuit as a "broad attack" on the voter purge when a "small number of voters [ ] may experience a special burden" is both ironic and peculiar. It is ironic in light of the public broadsides accompanying the purge's launch. It is peculiar in light of Plaintiffs' well-pleaded allegation that nearly *all* of the voters affected will be naturalized citizens eligible to vote. *See* Am. Compl. ¶¶ 39, 45. As Plaintiffs allege, an identical program in Florida had fewer than .05% valid applications identifying ineligible registrants. *Id.* ¶ 41.

- Plaintiffs allege that a 30-day notice prior to cancelation is a severe burden in light of facts showing that exceedingly few voters respond to election notices from governmental officials. *See* Am. Compl. ¶¶ 47-49.

These allegations plainly state a sufficiently plausible severe or discriminatory burden on the right to vote.

That is enough to defeat Defendants' motion, but it bears noting that the allegations in the Amended Complaint, taken as true, likewise show that Defendants cannot demonstrate the voter purge program advances even an important regulatory interest, let alone a narrowly tailored and compelling one sufficient to sustain the discriminatory burden imposed exclusively on newly naturalized citizens. Plaintiffs allege that, at the time of the complaint's filing, "thousands of citizens" were identified among those on Defendant Whitley's list. Am. Compl. ¶ 42. Moreover, Plaintiffs allege that because of the reliance on stale and inaccurate DPS data, the voter purge, like the one invalidated by a federal court in Florida, "is not reasonably designed to identify noncitizen voters but is remarkably well crafted to identify and penalize newly naturalized citizens who choose to exercise their right to vote." Am. Compl. ¶ 45.

Defendants' motion to dismiss Plaintiffs' First and Fourteenth Amendment claims should be denied.

### B.    Plaintiffs State a Valid Voter Intimidate Claim Under 52 U.S.C. § 10307.

Plaintiffs state a valid voter intimidation claim under 52 U.S.C. § 10307. Defendants first contend that Section 11(b) of the Voting Rights Act ("VRA") does not authorize a private right of action—that only the U.S. Attorney General can raise claims under this provision. *See* Mot. at 26. Not so. Courts have long recognized that Congress intended to create a private right of action to enforce the guarantees of the VRA. The Supreme Court recognized such a right to enforce Section

5 of the VRA in *Allen v. State Bd. of Elections*, 393 U.S. 544, 557 (1969). In 1996, the Supreme Court further explained that Congress's intent applied more generally to the VRA, not just to Section 5.  "Congress has not only ratified *Allen*'s construction of § 5 in subsequent reenactments, but extended its logic to other provisions of the Act. Although § 2, like § 5, provides no right to sue on its face, 'the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965.'" *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (Stevens, J. & Ginsburg, J.) (lead opinion); *id.* at 240 (Breyer, J., O'Connor, J., & Souter, J., concurring in judgment) (agreeing with opinion of Justice Stevens regarding private right of action under the VRA). The Court explained that Congress enacted the VRA "against a 'backdrop' of decisions in which implied causes of action were regularly found," and thus the contemporaneous legal understanding was that Congress did not need to specify the private right of action it clearly intended. *Id.* at 231. In *Morse*, the Court held that Section 10 of the Voting Rights Act, which prohibits imposition of poll taxes, likewise authorizes a private right of action. "It would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language." *Id.*

Defendants articulate no reason why Section 11(b) should be the sole provision of the VRA that does not authorize a private right of action. The Supreme Court's decision in *Morse* forecloses Defendants' contention that Section 11(b) claims may only be brought by the U.S. Attorney General. Whatever may be said of later-enacted statutes, the Supreme Court has made clear that Congress intended a private right of action to enforce all the guarantees of the VRA.

Section 11(b) provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote" or likewise for "urging or aiding any person to vote or attempt to

vote." 52 U.S.C. § 10307(b). Intent is not an element of a Section 11(b) claim. In *LULAC v. PILF*, No. 1:18-cv-00423, 2018 WL 3848404, at *3-4 (E.D. Va. Aug. 13, 2018), the court concluded that intent is not an element of a Section 11(b) claim. First, the court noted that the text of Section 11(b) "makes no reference" to an intent requirement. *Id.* at *3. Second, the court compared the text of Section 11(b) with that of Section 131(b) of the 1957 Civil Rights Act—a statute that preceded the enactment of Section 11(b). "A statutory reading that omits 'specific intent' and 'racial animus' requirements is further buttressed by a comparative statutory analysis of § 11(b) and § 131(b) of the 1957 Civil Rights Act, a similarly-worded statutory provision on voter intimidation that predated § 11(b)." *Id.* That statute provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person *for the purpose of* interfering with the right of such other person to vote . . . ." 52 U.S.C. § 10101(b) (emphasis added).  The *LULAC* court thus reasoned that "[t]he text of § 11(b), unlike § 131(b), plainly omits 'for the purpose of,' suggesting § 11(b)'s *deliberately unqualified reach.*" 2018 WL 3848404, at *4 (emphasis added).

In addition to concluding Section 11(b) did not require proof of intent, the *LULAC* court explained that conduct linking an eligible voter's name to unlawful registration constitutes sufficient allegations of intimidation under Section 11(b). "Defendants have linked Plaintiffs' names and personal information to a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium." *Id.* at *4.

Here, Plaintiffs plainly state a cause of action for voter intimidation under Section 11(b). Plaintiffs allege that Defendants Whitley "specifically invoked the likelihood of law enforcement action against these individuals" by warning of "second-degree felony" and that he issued a splashy press release noting that he "immediately provided the data . . . to the Texas Attorney

18

General's office" and that "[t]here is likely to be a law enforcement interest in the data." Am. Compl. ¶ 58. Defendant Paxton then tweeted a "VOTER FRAUD ALERT" and issued a press release warning seven times of "fraud" and of "illegal voting" among the listed individuals. *Id.* ¶ 60. By their actions, Defendants have linked Plaintiff Hilberg and the Plaintiff Class to voter fraud, which Plaintiffs allege is "objectively intimidating to the tens of thousands of naturalized citizens that are currently on Defendant Whitley's 'list' of allegedly suspect voters and those who worry they may be included on that list." Am. Compl. ¶ 95. Moreover, Plaintiffs note that while intent is not an element, "Defendant Whitley had every reason to know that his list was fatally flawed and yet continued to make these assertions and coordinate them with Attorney General Paxton to create fear of unwarranted criminal investigations and stoke public anxiety about noncitizen voting." *Id.* ¶ 96. These well-pleaded allegations, taken as true and viewed in Plaintiffs' favor, easily state a claim under Section 11(b).

Defendants conflate Section 11(b) of the VRA and Section 131(b) of the Civil Rights Act in arguing that Plaintiffs must plead intent. *See* Mot. at 27-28. They cite *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967), but that case was about a claim under Section 131(b) of the Civil Rights Act, which as the *LULAC* court explained specifically contains a "purpose" requirement in the statutory text, unlike Section 11(b). The same is true for Defendants' reliance on *AFSCME Council 25 v. Land*, 583 F. Supp. 2d 840 (E.D. Mich. 2008), which likewise involved a Section 131(b) claim, not a Section 11(b) claim. Defendants also cite *Arizona Democratic Party v. Arizona Republican Party*, No. 16-03752, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016), but in

that case the court noted that it "agrees with Plaintiff that the plain language of [Section 11(b)] does not require a particular *mens rea*." *Id.* at *4 n.3.

The other cases cited by Defendants mistakenly relied upon *McLeod* in assessing Section 11(b) claims. *See Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985); *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016); *Willingham v. County of Albany*, No. 04-369, 2005 WL 1660114, at *7 (N.D.N.Y. July 12, 2005). The *LULAC* court properly explained that the few cases that have suggested intent is required under Section 11(b) have erroneously done so by conflating the two distinct statutory provisions. "These cases trace back to *United States v. McLeod*, which, in fact, adjudicated claims brought under the 1957 Civil Rights Act. 385 F.2d 734, 738 (5th Cir. 1967). Therefore, in the absence of plain statutory text, statutory history, or binding case law to the contrary, the Court does not find that a showing of specific intent or racial animus is required under § 11(b)." *LULAC*, 2018 WL 3848404, at *4.

There is no intent requirement under Section 11(b).[7] Plaintiffs have plainly alleged facts plausibly stating a claim for unlawful voter intimidation under Section 11(b). Defendants' motion to dismiss should be denied.[8]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) should be denied.

---

[7] Even if there were such a requirement, Plaintiffs have alleged Defendants made intimidating public statements linking Plaintiff and the Plaintiff Class to felony voter fraud accusations and threatening criminal investigations when they had every reason to know the vast majority of the listed voters were eligible, newly naturalized citizens. Am. Compl. ¶ 96. That would suffice at the motion to dismiss stage, at which point Plaintiffs have not yet had the opportunity to take discovery necessary to further explore Defendants' intentions.

[8] Defendants briefly contend Plaintiffs' class action allegations are insufficient because they believe Plaintiffs lack standing and fail to state a claim for relief on the merits. *See* Mot. at 28-29. Because both contentions are wrong, so too is Defendants' objection to the class allegations.

Dated: February 18, 2019

Respectfully submitted,

Danielle M. Lang*
Mark P. Gaber*
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, DC 20005
Telephone: (202) 736-2200
Facsimile: (202) 736-2222
dlang@campaignlegal.org
mgaber@campaignlegal.org
*admitted pro hac vice

Renea Hicks
State Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, TX 78703
Telephone: (512) 480-8231
rhicks@renea-hicks.com

David Richards
State Bar No. 16846000
Richards, Rodriguez & Skeith LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
Telephone: (512) 476-0005
Facsimile: (512) 476-1513

/s/ Luis Roberto Vera, Jr.
Luis Roberto Vera, Jr.
LULAC National General Counsel
Law Offices of Luis Roberto Vera, Jr. &
 Associates
1325 Riverview Towers
111 Soledad
San Antonio, TX 78205-2260
Telephone: (210) 225-3300
lrvlaw@sbcglobal.net

Chad W. Dunn
State Bar No. 24036507
K. Scott Brazil
State Bar No. 02934050
Brazil & Dunn
3303 Northland Drive, Suite 205
Austin, TX 78731
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served on February 18, 2019 on all counsel of record via the Court's CM/ECF system.

<div style="margin-left:50%">

/s/ Luis Roberto Vera, Jr.
Luis Roberto Vera, Jr.

</div>