IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED
FEB 27 2019
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

| | |
|---|---|
| TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS, ET AL., ) ) ) | |
| Plaintiffs, ) ) | |
| V. ) ) | CIVIL ACTION NO. SA-19-CA-074-FB |
| DAVID WHITLEY, in his Official Capacity as Secretary of State for the State of Texas; ET AL., ) ) ) ) ) | |
| Defendants. ) | |

## ORDER

Before the Court are a number of preliminary issues related to protecting the integrity of the election process and ensuring the Equal Protection of the laws for all Texans. There is unanimity among the parties, counsel and the Court that non-American citizens are ineligible to vote.

The evidence has shown in a hearing before this Court that there is no widespread voter fraud. The challenge is how to ferret the infinitesimal needles out of the haystack of 15 million Texas voters. The Secretary of State through his dedicated employees, beginning in February 2018, made a good faith effort to transition from a passive process of finding ineligible voters through the jury selection system in each county to a proactive process using tens of thousands of Department of Public Safety driver license records matched with voter registration records. Notwithstanding good intentions, the road to a solution was inherently paved with flawed results, meaning perfectly legal naturalized Americans were burdened with what the Court finds to be ham-handed and threatening correspondence from the state which did not politely ask for information but rather exemplifies the power of government to strike fear and anxiety and to intimidate the least powerful among us.[1] *See* Attachment A (TX-LULAC

---

[1] *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 827 (N.D. Ohio 2006) (Boyko, J.) ("This Court has personally presided over numerous naturalization ceremonies and has witnessed firsthand the joy of these new Americans and their intense desire to participate in this nation's democratic process. There is no such thing as a second-class citizen

Exhibit 4). No native born Americans were subjected to such treatment. *See* U.S. CONST. amend XIV, § 1 ("[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws."). Out of 98,000 new American voters on the list, thus far approximately 80 have been identified as being ineligible to vote.[2] Almost immediately upon sending the list, the government had an "oops" moment, realizing that 25,000 names should not have been included. It appears this is a solution looking for a problem. Indeed, Secretary of State Whitley has accepted responsibility and apologized for the failure to seek confirmation of the accuracy, appropriateness, competency and due diligence of the process before the rollout. Though promising more transparency, the Secretary has resisted plaintiffs' legal concerns as opposed to entering into an agreed solution precluding further fear and intimidation. *See* Attachment B (TX-LULAC Exhibit 54); *see also United States v. Florida*, 870 F. Supp. 2d 1346, 1347, 1348 (N.D. Fla. 2012) (Hinkle, J.) (explaining that Florida election officials identified only "a small number" of ineligible voters from Secretary of State's list of "180,000 registered voters who he said might be noncitizens").[3] The Florida program, similar in nature to Texas, was ultimately abandoned by the state. *Florida*, 870 F. Supp. 2d at 1350-51. Here, for the local officials responsible for implementing the program, it was not a Henry David Thoreau moment

---

or a second-class American. Frankly, without naturalized citizens, there would be no America. It is shameful to imagine that this statute is an example of how the State of Ohio says thank you to those who helped build this country."). I concur. (Biery, J.).

[2]The Bard might say this is much ado about nothing. WILLIAM SHAKESPEARE, MUCH ADO ABOUT NOTHING, act 3, sc.1. On the other hand, for the people who perceive discriminatory impact, it is much ado about their constitutionally protected rights.

[3]As plaintiffs' counsel stated at the preliminary injunction hearing, "[o]n the Florida case, . . . they started at 180,000 identified voters in that state, and by the time they went through all the sifting, they ended up with 85" people who were ineligible to vote. (Docket no. 57, at page 52, lines 12-20); *see also Editor's Note on Nov. 12, 2018 to Story Published in May 2012*, https://www.nbcmiami.com/news/local (last visited Feb. 26, 2019) (explaining that Florida election documents show that initial list of 180,000 names was whittled to only 85 ineligible voters).

("Simplify, simplify.").[4] Rather, the Court heard compelling evidence concerning confusing and contradictory communications from the Secretary of State.

While the Court awaits proposed findings of fact and conclusions of law regarding the preliminary injunction issues, the Court is prepared to address some issues.

Defendants Whitley and Paxton have moved to dismiss, alleging the Court has no jurisdiction and plaintiffs have failed to state a claim. To the extent defendants rely upon state statutes in support of the jurisdictional motion, the Court holds that the United States Constitution trumps state law in appropriate circumstances, this being one. Moreover, given the highly credible evidence presented by plaintiffs, the Court finds overwhelmingly that claims for relief have been properly stated. Accordingly, defendants' motion to dismiss (docket no. 20) is DENIED.

Plaintiffs have also sued Attorney General Paxton, whose only involvement shown thus far is a press release, which the Court finds arguably vituperative in tone but nevertheless states the Attorney General's authority and, therefore, without further proof is within his First Amendment right to free speech. *See* Attachment C (TX-LULAC Exhibit 3). Clearly, this statement is not yelling fire in a crowded theater and therefore not subject to being censured.[5] While the Court would prefer that political rhetoric be newtralized to more civil discourse, Article III of the Constitution bestows no power on the federal judiciary to make wishes come true. Accordingly, plaintiffs' request for relief regarding the press release is DENIED.

The Court awaits final advice from the individual counties which are parties concerning whether they will agree to pause the process, particularly not sending any notice of examination letters without

---

[4] HENRY D. THOREAU, WALDEN 91 (J. Lyndon Shanley ed., Princeton Univ. Press 1971) (1854).

[5] As Justice Oliver Wendell Holmes, Jr. stated in *Schenck v. United States*, 249 U.S. 47, 52 (1919): "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic."

prior approval of the Court. Local officials can continue to find out if in fact someone is registered who is not a citizen, so long as it is done without communicating directly with any particular individual on the list. In addition, local officials are ORDERED not to remove any person from the current voter registration list until authorized by this Court. As to the first rollout of 98,000, the Secretary of State is ORDERED to tell other counties which are not parties to this litigation, or party counties which will not agree to a pause, not to send any notice of examination letters nor remove voters from registration without prior approval of the Court with a conclusive showing that the person is ineligible to vote.

With reference to the new lists being prepared based on contemporaneous applications for driver licenses and applications to register to vote, the Secretary of State may proceed with the monthly rollouts. However, the Secretary of State is affirmatively ORDERED to advise and direct local voting officials not to send notice of examination letters nor remove voters from registration without prior approval of the Court.

The Court further finds and concludes the Secretary of State, though perhaps unintentionally, created this mess. As Robert Fulghum taught in *All I Really Need to Know I Learned in Kindergarten*, "always put things back where we found them and clean[] up our own messes." ROBERT FULGHUM, ALL I REALLY NEED TO KNOW I LEARNED IN KINDERGARTEN: UNCOMMON THOUGHTS ON COMMON THINGS (Villard Books 1986).

IT IS SO ORDERED.

SIGNED this 27 day of February, 2019.

FRED BIERY
UNITED STATES DISTRICT JUDGE