### EXPERT REPORT OF LORRAINE C. MINNITE, Ph.D.

***Move Texas Civic Fund, et al.* v. *Whitley, et al.*, No. 5:19-cv-00171, consolidated with *Texas League of United Latin American Citizens, et al v. Whitley, et al.*, No. 5:19-cv-00074-FB***

## I.      SUMMARY OF OPINIONS

In this case, I was asked by plaintiffs' attorneys to prepare a report concerning the incidence of voter fraud generally, and non-citizen registration and voting, in particular. I was also asked to discuss the findings about voter fraud in Texas specifically from my expert report in the *Veasey v. Perry* case challenging Texas' 2011 voter identification law (S.B. 14). I conclude:

**A.**      Texas has a long history of erecting racially discriminatory electoral rules justified by the Legislature or other elected officials as necessary to combat voter fraud.

**B.**      Nationwide and in Texas, the incidence of voter fraud, defined as *the intentional corruption of the electoral process by voters*, is very rare.

**C.**      While non-citizens do sometimes get registered to vote, in the research I conducted for my 2014 expert report in the *Veasey v. Perry* case, I did not find any empirical evidence to suggest that non-citizen registration and voting are problems of any significance in Texas, nor any other state that I have studied closely since then.

## II.      BACKGROUND AND QUALIFICATIONS

I am an associate professor and chair of the Department of Public Policy and Administration at Rutgers, The State University of New Jersey in Camden, New Jersey. I received a Bachelor of Arts degree in History from Boston University, and two Master's Degrees and a Ph.D. in Political Science from the City University of New York. One of my areas of expertise is American Politics with a specialization in elections and the political process. Specifically, I study the incidence and effect of voter fraud in American elections. I am compensated at a rate of $200 per hour for my work in this case.

In June 2010, Cornell University Press published *The Myth of Voter Fraud*, my full-length scholarly treatment of the subject. The book analyzes the empirical evidence of voter fraud, including alleged non-citizen registration and voting, and concludes that the widespread allegation that voter fraud is a rampant problem of unknown proportions in contemporary U.S. elections is unsupported by evidence, and that actual voter fraud is extremely rare. In *The Myth of Voter Fraud*, I conclude and provide evidence to show

that, having no basis in fact, these allegations are motivated by political interests, and are designed to make voting harder for certain populations.[1]

I also authored an analysis of the role of the voter fraud myth in the contemporary voter ID debate in a 2012 book, "Voter Identification Laws: The Controversy over Voter Fraud," published by Routledge and edited by Matthew J. Streb, titled *Law and Election Politics*.  I updated this material in a chapter in "The Voter Fraud Myth," included in the third edition of *America Votes! A Guide to Modern Election Law and Voting Rights*, edited by Benjamin Griffith and published by the American Bar Association in 2016.  A co-authored chapter on "Voter Suppression," will be published next year in a peer-reviewed volume edited by Levon Chorbajian and Daniel Egan titled *Power and Inequality: Critical Readings for a New Era*.[2]

This report incorporates all of the research I have conducted on the subject of voter fraud since 2001, as cited above and published in peer-reviewed books and journals, including expert reports prepared for other parties in previous litigation.[3]  Over the last decade, I have served as an expert witness and testified at trial on the issue of voter fraud in eight federal and two state cases, including *Veasey v. Perry*, challenging a Texas voter identification law, and *Fish v. Kobach*, challenging a Kansas law that requires applicants to provide documentary proof of citizenship when registering to vote.

## III.    DISCUSSION

### A.    Brief History of Voting Restrictions in Texas

The United States has a long history of using electoral rules to suppress voting. Following the emancipation of African Americans and the enfranchisement of Black men by the Civil War Amendments, a reactionary, white supremacist counter-movement in the South arose to re-erect a system of racial subordination.  By the turn of the twentieth century, African Americans had been virtually purged from the electorate of the southern states, at first by the use of violent intimidation and trickery, later by the introduction or reintroduction of a series of superficially color-blind requirements intended to circumvent

---

[1] While working on *The Myth of Voter Fraud*, I published several reports based on my on-going research.  In 2003, I co-authored a study of voter fraud with David Callahan for the public policy research and advocacy organization, Demos, titled, "Securing the Vote: An Analysis of Voter Fraud."  I updated this study with new material in 2007 (*see* Lorraine C. Minnite, "An Analysis of Voter Fraud" (New York: Demos, 2007), *available at* http://www.demos.org/publication/analysis-voter-fraud-united-states-adapted-2003-report-securing-vote).  At that time, Demos published a preliminary report I wrote on voter fraud and same-day registration (*see* Lorraine C. Minnite, "Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security" (New York: Demos, 2007), *available at* http://www.demos.org/publication/election-day-registration-study-voter-fraud-allegations-and-findings-voter-roll-security); and in March of 2007, I published a report, "The Politics of Voter Fraud," for Project Vote, a national nonpartisan, nonprofit voting rights organization (*see* Lorraine C. Minnite, "The Politics of Voter Fraud" (Washington, D.C.: Project Vote, 2007), *available at* http://www.projectvote.org/newsreleases/222-new-report-examines-qthe-politics-of-voter-fraudq.html).

[2] The book will be published by Routledge.

[3] A complete list of my peer-reviewed publications is set forth in my *Curriculum Vitae* at Appendix A; Appendix B contains a list of cases in which I have provided expert testimony on voter fraud.

the Fourteenth and Fifteenth Amendments.[4]  Voter registration requirements were especially important because of the degree to which they ceded discretion to local registrars and election officials, allowing then to adopt rules tailored to disenfranchise African Americans.[5]

When Texas adopted the option of personal voter registration in 1895, it applied only to those qualified electors who resided in cities of 10,000 or more if 500 citizens petitioned to adopt such a system.  The vast population increases in these cities by white and black laborers and railroad workers over the preceding two decades threatened business elites who championed the new rules as a means of tamping down a turbulent urban politics rife with Populist appeal.[6]  Registrars appointed by a commissioners' court in the county in which such cities were located had the power to demand proof in the form of sworn affidavits from two "well known citizens of the city" that an applicant for registration was qualified to vote.  Registration could be denied "should the registrar have doubts or not be satisfied as to the qualifications of the applicant…"[7]  Each person who successfully registered was presented with a certificate of registration that was to be preserved and presented to the election judges.  If the election judges were not satisfied that the person presenting the certificate corresponded with the description of the person as it appeared on the registrar's books, the election judges could deny the person his right to vote.[8]  Such laws requiring voters to show their registration certificates before they were permitted to cast ballots was an effective disenfranchising tactic for those vulnerable to losing track of paperwork, including illiterate and impoverished migrant farmers, and for black voters who were attacked and robbed of their registration papers as they made their way to the polling place.[9]

After Texas amended its constitution in 1902 to institute a poll tax as a prerequisite to voting, certified lists of citizens who paid their poll taxes or received

---

[4] *See* Frances Fox Piven, Lorraine C. Minnite, and Margaret Groarke, *Keeping Down the Black Vote: Race and the Demobilization of American Voters* (New York: The New Press, 2009).  The authoritative work on this subject is J. Morgan Kousser, *The Shaping of the Southern Politics: Suffrage Restriction and the Establishment of the One-Party South* (New Haven: Yale University Press, 1974).

[5] On the power of local elected officials to wield public authority in the post-Civil War South, in general, see Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: HarperCollins, 1988,) 355-356; see also, Randolph B. Campbell, "Grass Roots Reconstruction: The Personnel of County Government in Texas, 1865-1876," *Journal of Southern History* 58, no. 1 (1992): 99-116.

[6] Patrick G. Williams, "Suffrage Restriction in Post-Reconstruction Texas: Urban Politics and the Specter of the Commune," *Journal of Southern History* 68, no. 1 (2002): 31-64.

[7] Revised Civil and Criminal Statutes of Texas, 1895, ch. 6, art. 1781; *available at* http://www.sll.texas.gov/assets/pdf/historical-codes/1895/1895civ8.pdf.  *See also* Williams, "Suffrage Restriction in Post-Reconstruction Texas."

[8] *Ibid.*, ch. 6, art. 1782.

[9] "The Close of the Canvass," *New York Times*, November 7, 1876, 1.

certificates of exemption compiled by the county tax assessor functioned like registration (cities of 10,000 or more could continue to require voter registration).[10] Poll taxes were paid on an annual basis between the first day of October and the first day of February after otherwise qualified voters had resided in the state on the first day of January preceding the poll tax levy.  When a federal court challenge nullified Texas' poll tax,[11] "the state enacted the most restrictive voter registration procedures in the nation to replace the poll tax,"[12] an annual registration requirement that was also then struck down as an unconstitutional infringement on the right to vote.[13]  The state responded by enacting another law in 1975, purging the entire registration list and requiring all voters to re-register, and that requirement likewise was blocked when Texas became covered for preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, and the Justice Department interposed an objection to it.[14]

Texas, like many states, has often attempted to justify restrictions on voter registration and voting in the name of combating "election fraud" or securing the "integrity" of the vote.  However, election fraud documented by early election reformers was not primarily committed by individual voters, but instead by election officials and politicians engaging in conspiracies that were unaffected by these types of reforms.[15]

No conclusive tie between enfranchising reforms and voter fraud has ever been proven.  The Civil Rights Era in American history marked a time of activism to promote, amongst other goals, voting rights.  At each significant effort to protect and extend the right to vote, opponents of enlarging the franchise argued that reduced barriers would lead to voter fraud.  This alleged threat to election integrity as an argument against reducing barriers to voting access has been taken up by opponents, time and time again, for example, in debates over the Voting Rights Act of 1965, the Universal Voter Registration Act of 1977, and the National Voter Registration Act of 1993.[16]  In 2011,

---

[10] Donald S. Strong, "The Poll Tax: The Case of Texas," *American Political Science Review* 38, no. 4 (1944): 693-679, 695.

[11] *United States v. Texas*, 252 F. Supp. 234 (W.D. Tex.) (three-judge court), aff'd. 384 U.S. 155 (1966).

[12] S. Rep. 94-295, at 25 (1975) (reporting P.L. 94-73, "Voting Rights Act of 1965 – Extension").

[13] *Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974).

[14] "Voting Determination Letters for Texas," http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=tx (copy of letter at listing for Dec. 10, 1975 objection).

[15] *See* Joseph P. Harris, *Election Administration in the United States* (Washington, D.C.: The Brookings Institution, 1934), 375-376 ("Isolated, individual cases of election frauds are uncommon and unimportant.  Election frauds cannot be carried on successfully and upon a wide scale without protection, without the pre-arrangement of election officers who will 'deliver' if necessary, and without the backing of a powerful political organization.")

[16] *See, e.g.*, U.S. Congress, Senate Committee on the Judiciary, "To Enforce the 15th Amendment to the Constitution of the United States: Hearings on S.1564," 89th Cong., 1st sess., 1965; U.S. Congress, House Committee on House Administration, "To Establish a Universal Voter Registration Program, and for Other Purposes: Hearings on H.R. 5400," 95th Cong., 1st sess., 1977; and U.S. Congress, House

Governor Rick Perry signed Senate Bill 14 (S.B. 14) into law, which required voters to present one of a limited number of valid photo identification documents to vote. Consistent with a history of justifying voting restrictions targeting racial minorities and marginalized groups, such as the all-white primary, a poll tax, annual re-registration requirements and the like, the proponents of S.B. 14 in the Texas Legislature claimed that the strict photo ID requirement was necessary to combat voter fraud.  Texas' invocation of "voter fraud" to again justify its most recent actions targeting naturalized citizens for special investigation and burdens to re-establish their citizenship is, therefore, just the latest in a long history of manipulating claims of "voter fraud" to restrict access to the ballot by disfavored groups.

## B.    Definition of "Voter Fraud"

Few criminal statutes specifically define "voter fraud."  Instead, nefarious election-related practices are prohibited by state laws criminalizing "double voting" or "falsifying records," and the like.[17]  This legal ambiguity, notwithstanding, methodological rigor in the social sciences requires the precise definition of concepts for purposes of accurate measurement of empirical phenomena.[18]  Therefore, when I began my research on voter fraud in contemporary U.S. elections nearly two decades ago, I had to first clearly define voter fraud in order to measure it.  I approached the problem in an analytical and practical manner.  Since voter fraud only occurs in the context of the electoral process, I began with an analysis breaking down the electoral process into its constituent parts or phases (i.e., the voter registration process, preparations related to administering an election, the process of becoming an official candidate on the ballot, the voting process, the counting process, etc.), and examined the various actors and the roles they play in each phase, as well as their capacities to impact the outcome and the integrity of elections.  Such actors include, but are not limited to, voters, campaign officials, elected officials, and election poll workers.

---

Committee on House Administration, Subcommittee on Elections, "Hearing on Voter Registration," 103rd Cong., 1st sess., January 26, 1993.  For an important account of the movement to reform voter registration laws leading to the passage of the National Voter Registration Act of 1993, *see* Frances Fox Piven and Richard A. Cloward, *Why Americans Don't Vote and Why Politicians Want It That Way* (Boston: Beacon Press, 2000); *see also*, Piven, et al., *Keeping Down the Black Vote*.

[17] For example, in Texas a person commits a second-degree felony if that person "votes or attempts to vote in an election in which the person knows the person is not eligible to vote; knowingly votes or attempts to vote more than once in an election; [or] knowingly impersonates another person and votes as the impersonated person..."  Tex. Elec. Code Ann. § 64.012 (2014).  In North Carolina, it is a Class 1 felony for any person "knowingly to swear falsely with respect to any matter pertaining to any primary or election" or "to take corruptly the oath prescribed for voters." N.C. Gen. Stat. § 163-275 (2013). California prohibits specific election-related activity like fraudulent registration, voting in an election in which one is not entitled to vote, voting more than once or to try to buy a vote with the promise of a job.  Cal. Elec. Code § 18520 (1994).  In Minnesota, it is a felony to submit more than one absentee ballot or to assist another in submitting more than one absentee ballot, or to alter another's absentee ballot.  Minn. Stat. § 203B.03 (1999).  In New Jersey, it is a third-degree crime to "fraudulently vote…or in any manner so interfere…with the voters lawfully exercising their rights of voting at the election, as to prevent the election or canvass from being fairly had and lawfully conducted."  N.J. Stat. Ann. § 19:34-11 (2011).

[18] W. Phillips Shively, *The Craft of Political Research*, 5th ed. (Upper Saddle River, New Jersey: Prentice Hall, 2002), 30-8.

Next, since voter fraud is a form of electoral corruption, I examined the parts of the electoral process that different actors could corrupt, and found a distinction between what *voters* can corrupt compared to what other electoral actors could corrupt.  Like other actors in the electoral process, voters are only capable of corrupting the parts of the electoral process to which they have access.  For example, voters cannot corrupt the election count because they do not count the ballots; only officials with broad access to ballots as they are cast or counted can corrupt the count.  If we think about what voters do in elections, the role they play and the actions they can take, as well as the access they have to the various parts of the electoral process, we quickly see that voters are quite limited in their power to corrupt elections.  They mainly control their own registration because until recently, all states relied on what are known as 'personal' voter registration systems to produce lists of qualified voters.  Personal voter registration systems put the onus on voters to get themselves registered to vote.  Voters also control their representation as qualified to vote when they cast ballots.  In sum, voters, as such, have limited means to corrupt the registration process and the casting of ballots: only by falsifying their records or identity on a registration application; fraudulently misrepresenting themselves to poll workers or absentee voting officials; and/or attempting to cast more than one ballot.

I emphasize the importance of intent in my definition of voter fraud, distinguishing election errors such as misspelled names and recording mistakes.  This is consistent with the language states use regarding illegal voter registration and illegal voting.  Innocent administrative errors on the part of election officials and confusion on the part of voters can cause ineligible people to become registered and/or technically illegal ballots to be cast.  Recording mistakes and other wrongful acts resulting from confusion on the part of election administrators or voters, however, are not fraud, and therefore, should not be included in a definition of fraud that limits itself to nefarious acts *intentionally* committed by voters.

Thus, in the United States, as I define the concept, people commit voter fraud when they *knowingly* provide false information concerning their own voter eligibility credentials, or when they *knowingly* cast more than one ballot ("double voting"), or cast a ballot knowing that they are not eligible to vote.[19]  In Texas, for example, a person illegally votes if he or she "votes or attempts to vote in an election in which the person knows the person is not eligible to vote...knowingly votes or attempts to vote more than once in an election...knowingly votes or attempts to vote a ballot belonging to another person, or by impersonating another person...or, knowingly marks or attempts to mark any portion of another person's ballot without the consent of that person, or without specific direction from that person how to mark the ballot."[20]  The voter fraud outlined

---

[19] With some exceptions (i.e., laws concerning age, felon disfranchisement and mental incompetence), voter eligibility requirements are fairly standard across the states: one must be alive when casting a ballot, 18 years of age, a U.S. citizen, and not under state supervision.  In our geographically-based system of representation, voters are usually required to vote in the jurisdiction in which they live.

[20] *See* Tex Rev. Civ. Stat. Ann. Sec. § 64.012.

here can be committed at the time of registration, in person at the polls or early voting sites, or through the use of absentee or mail-in ballots.

By breaking up the electoral process according to its various stages and the actors who participate, I can specify my fraud definition to the data that I study: the behavior of individual voters.  Accordingly, the definition of voter fraud that I use in all of my work on the subject, and that I have derived from an analysis of the electoral process and my research on how behavior defined as voter fraud is criminalized in state and federal law, is, "the intentional corruption of the voting process by voters."  I believe this is the best definition of voter fraud for purposes of social scientific study of the phenomenon because it allows for empirical measurement, distinguishes forms of fraud specific to voters, and does not violate the basic meaning of commonly used terms.[21]

When it comes to non-citizens, the fraud we should be concerned with is the intentional registering and/or voting by non-citizens who know they are ineligible to vote.

**C.    Analysis of Voter Fraud, Including Alleged Voter Fraud Committed by Non-citizens**

**i.    National Incidence of Voter Fraud**

There are no officially compiled national or statewide statistics reliably reporting the instances of voter fraud.  Therefore, to study and measure the contemporary incidence of voter fraud for *The Myth of Voter Fraud*, I used a "mixed methods" research approach, which is common in the social sciences.  This methodology utilizes qualitative, quantitative and archival research.  I interviewed a wide range of people, including, but not limited to, prosecutors, defense lawyers, election officials, voters, academics, and people working on voter registration drives.  The basis of the quantitative research in the book comes from a data set produced by the Administrative Office of the United States Courts that is available to researchers through the Inter-University Consortium for Political and Social Research ("ICPSR").[22]  This data set is a complete and total record of all indictments and cases tried annually in federal courts (district and appellate, including the United States Supreme Court).

In addition, I relied on the record of federal indictments generated during the first several years of a special program at the U.S. Department of Justice initiated after the

---

[21] The next best definition I found is provided by the U.S. Department of Justice.  Their definition of "election fraud" is over-broad because it includes acts to intimidate voters and covers official malfeasance, such as ballot box stuffing or corruption of the count.  *See* Craig C. Donsanto and Nancy L. Simmons, *Federal Prosecution of Election Offenses*, 7th ed., U.S. Department of Justice, Criminal Division, Public Integrity Section (Washington, D.C.: Government Printing Office, 2007).  *See also* U.S. Department of Justice, "Fact Sheet: Protecting Voting Rights and Preventing Election Fraud," July 2, 2008, *available at*: http://www.justice.gov/opa/pr/2008/July/08-crt-585.html.  Because *voters* do not have access to those activities, they are not included in my more accurate definition of voter fraud.

[22] The ICPSR is an international consortium of about 700 academic institutions and research organizations that maintains a data archive of more than half a million files of research in the social sciences.  See www.icpsr.umich.edu for more information.

controversial 2000 election to beef up federal efforts to combat alleged voter fraud and voter intimidation.  In March 2001, United States Attorney General John Ashcroft announced the Ballot Access and Voting Integrity Initiative ("BAVII").[23]  The BAVII brought together civil rights and criminal division lawyers of the Justice Department for an Election Day program.  The stated purpose of this program was to help attorneys better recognize election fraud and voter intimidation and how to prosecute these cases.

A case list of indictments brought under the BAVII was included in the records of a congressional hearing on alleged illegal non-citizen voting held in 2006.[24]  The list, which was prepared by the U.S. Department of Justice, records 95 indictments over the first three years of the program (FY2002 to FY2005).  I concluded that this was a complete list of indictments brought under the BAVII for the study period by comparing it to Justice Department press releases announcing numbers of indictments brought under the program.  I researched the BAVII indictments and concluded that only 40 of the 95 people indicted were voters; the other 55 people were associated with elections in other ways, for example, serving as campaign, party or election officials.  Of the 40 voters indicted, three were charged with double voting in Kansas and Missouri.[25]  Ten were people with felony convictions who violated state laws prohibiting voting until civil rights are restored, and 20 were non-citizens charged with crimes related to registration or voting (over a period of time in which 200 million votes were cast in federal elections).[26]  None of these individuals resided in Texas.

And yet, allegations of voter fraud abound.  In fact, as I argue in *The Myth of Voter Fraud*, and elsewhere, the repetition of false and inaccurate allegations of fraud is part of a political strategy to change public opinion and advance support for restrictions on access to the ballot.  Using the same standard for judging voter fraud crime rates as we do for other crimes, which is to calculate the incidence of crime from law enforcement statistics on arrests, indictments and convictions, however, we must conclude that the scant evidence of arrests, indictments or convictions for any of the practices defined as voter fraud means that little fraud is being committed relative to the millions of votes cast each year in state, local and federal elections.  Based on my extensive research,

---

[23] U.S. Department of Justice, press conference, Washington, D.C., March 7, 2001, *available at* http://www.justice.gov/archive/ag/speeches/2001/0307civilrightspressconf.htm; *see also* Dan Eggen and David A. Vise, "Ashcroft Takes On Voting Issues; Enforcement, Monitoring of Election Laws to Be Increased," *Washington Post*, March 8, 2001, A19.

[24] U.S. Congress, House Committee on House Administration, "Hearing on 'You Don't Need Papers to Vote?': Non-Citizen Voting and ID Requirements in U.S. Elections," 109th Congress, 2d Sess., June 22, 2006, 24-54.

[25] The cases are *U.S. v. McIntosh*, U.S. District Court for the District of Kansas, Case No. 04-CR-20142; *U.S. v. Scherzer*, U.S. District Court for the Western District of Missouri, Case No. 04-CR-00401; and *U.S. v. Goodrich*, U.S. District Court for the Western District of Missouri, Case No. 04-CR-00402.  *See also* Greg Reeves, "People Voting Twice in Kansas, Missouri," *Billings Gazette*, September 5, 2004; Diva Betsy Ross, "Three Charged in Voting Fraud (Up to 5 Years and $250,000 Fine)," *Kansas City Star*, October 22, 2004; "Lawyer Sentenced to Probation for Voting in Kansas and Missouri; Says He Had No Political Agenda in Participation in Both States," *Associated Press*, June 24, 2005.

[26] The remaining seven individuals were charged with double voting or registration-related violations.

*allegations* of voter fraud, with few exceptions, tend to fall into one of the three following categories: unsubstantiated or false allegations of voter fraud made by the losers of close elections;[27] mischief;[28] and claims that later turned out to be based upon cases of voter error or administrative mistakes, but not fraud.[29]  When allegations of "massive fraud," or thousands, if not millions of illegal votes cast in an election are investigated, they typically collapse.

My own work is replete with careful analysis of case studies of alleged fraud that is better explained as election irregularities caused by human error.  Data collected in close elections and recounts provide the best documented cases of the operations of election administration, and therefore, generate data we can use to examine voting irregularities more closely.  In these instances, the statistics on voter fraud are virtually zero.[30]

### ii.      Alleged Non-citizen Voter Fraud

The lack of substantiated evidence of voter fraud is also true in the context of non-citizen registration and voting.  While some isolated incidents of noncitizen registration and voting do exist, there is no evidence to support any claim in any state, including Texas, that fraudulent voting by non-citizens is a significant, substantial or systemic problem requiring further burdens on qualifying voters to prove their eligibility to vote.  Where non-citizen voter fraud has been alleged, careful analysis has revealed

---

[27] For a discussion of fraud and the sore loser, see generally Michelle L. Robertson, "Election Fraud – Winning at All Costs: Election Fraud in the Third Circuit (*Marks v. Stinson*)," *Villanova Law Review* 40, no. 3 (1995): 869-925.

[28] "Mischief" refers to the various anecdotal cases of people "testing the system" by, for example, sending in voter registration applications for their house pets and children.

[29] Minnite, "The Politics of Voter Fraud," 12-13.  For a discussion and extensive documentation of a slightly different set of categories of voter fraud, *see also* Justin Levitt, "The Truth About Fraud," Brennan Center for Justice, 2007; *available at* http://www.brennancenter.org/sites/default/files/legacy/ The%20Truth%20About%20Voter%20Fraud.pdf.  For the research published in *The Myth of Voter Fraud*, I reviewed hundreds of news articles cited in a report by the now defunct American Center for Voting Rights, which purported to be "the most comprehensive and authoritative review of the facts surrounding allegations of vote fraud, intimidation and suppression made during the 2004 presidential election."  From this review I concluded that, "among the more than one hundred cases cited of alleged voter fraud implicating nearly 300,000 potentially fraudulent votes in the 2004 election cycle, only about 185 votes could be confirmed as *possibly* tainted by fraud [emphasis added]."

[30] An important example is the 2004 Washington State gubernatorial election, one of the most closely scrutinized elections in modern history.  The initial winner lost on a recount spurring a blizzard of litigation that produced scrupulous documentation of the electoral process.  In the end, after allegations of voter fraud surfaced during trial proceedings, Chelan County Superior Court Judge, Honorable John E. Bridges, concluded that some 25 ballots or .0009 percent of the total 2,812,675 ballots cast were invalid because they were either cast in the names of deceased voters or were double votes.  What the judge did not find was voter fraud.  In Judge Bridges' words, "The Court concludes that, having neither pled nor disclosed . . . fraud [it] cannot now be claimed and that to the extent that it was claimed, neither the act of fraud nor the causation arising therefrom were proved by the higher burden of proof of clear, cogent and convincing."  Many of these ballots were mailed in for absentee voters, and the judge made no determination that any were in fact *fraudulently* (i.e., intentionally illegally) cast as opposed to attributable to a mistake.

that there has been no fraud, but rather electoral irregularities caused by voter confusion, list-matching errors and administrative mistakes, and that very few non-citizen ballots were actually cast and even fewer counted.  For example, the 1996 contested election for a U.S. House seat in Orange County, California between incumbent Robert Dornan and challenger Loretta Sanchez is one of the most cited cases of alleged non-citizen voter fraud of the last twenty years.  However, multiple investigations conducted over a fourteen-month period, including a Congressional investigation triggered by Dornan's formal contest,[31] ultimately found no evidence of fraud.  Although the investigations, which relied on an unreliable methodology, concluded that a small number of non-citizens had voted, it was determined that they voted out of error and confusion rather than with the intent to deceive.  None were prosecuted for voter fraud.[32]

Another more recent example comes from Kansas, where former Secretary of State Kris Kobach has built a career on making unsubstantiated allegations of "massive" voter fraud in elections.[33]  It is a story of alleged "alien" voting concerning a 2010 contested Democratic primary election in Kansas City, Missouri for the 40th District of the Missouri House of Representatives.  In that race, John J. Rizzo defeated Will Royster by three votes (667 to 664).  A recount shaved Rizzo's margin of victory to one vote (664 to 663).  Royster appealed, filing a petition with the Jackson County Circuit Court.  One of his claims concerned illegal voter assistance to non-English speaking Somali voters.  Here is how former Kansas Secretary of State Kris Kobach told the story in his January 24, 2012 op-ed in the *Topeka Capital-Journal*:

> Another incident [of immigrants corrupting U.S. elections] happened in 2010, just across the state line.  In the 2010 state representative race in Kansas City, Mo., between J.J. Rizzo and Will Royster, the election was allegedly stolen when Rizzo received approximately 50 votes illegally cast by citizens of Somalia.  According to eyewitnesses, the Somalis, who didn't speak English, were coached to vote in his favor by an 'interpreter' at the polling place.  The margin of victory?  One vote.[34]

---

[31] In late July 1997, Richard Gephardt, the House Minority Leader, said that the inquiry was "totally out of control. . . . It costs money to pay lawyers and defend this contested election.  The ulterior motive is to keep her [Sanchez] from raising funds for her reelection campaign."  He continued, "I also suspect they are trying to intimidate voting by new citizens nationwide and particularly in this district."  *See* Peter M. Warren, "House Inquiry Called Political Jab at Sanchez," *Los Angeles Times*, Orange County Edition, July 26, 1997, B1.

[32] For a full account of this case, *see* Minnite, *The Myth of Voter Fraud*, 49-56.

[33] Kobach ran for Kansas Secretary of State and won in 2010 on a platform in which going after voter fraud was a central theme and campaign promise.  Once in office, Kobach lobbied the state legislature to give his office prosecutorial power, arguing that local law enforcement officials were too busy with other matters to spend the time needed to investigate and prosecute the massive amount of voter fraud he believed was being committed in Kansas.  In 2015, the legislature finally agreed making Kris Kobach, the only Secretary of State in the U.S. who could bring criminal indictments for alleged voter fraud.  But the new powers could not overcome the lack of evidence of voter fraud in Kansas.  From 2015 to 2018, Kobach prosecuted around two dozen cases of mostly double voting; only two cases involved non-citizen voting, and of these, only one person was convicted.

[34] Kris Kobach, "Elections Must Be Secure," Op-Ed, *Topeka Capital-Journal*, January 1, 2012.

*Kobach is simply factually wrong*.  A Missouri appeals court upheld a lower court ruling against Royster in October of 2010, finding that no fraud, in fact, took place. Evidence was presented in the bench trial that several voters had difficulty in communicating with the election judges, in reading and writing, and some may have been blind or physically disabled.  One or more persons attempted to help these people by interpreting for them, and at least one interpreter may have been a family member. Election judges who testified all said, without contradiction, that all persons who were given a ballot were registered voters who showed proper identification in the check-in process.  The court found, and the appeals court agreed, that there was no fraudulent activity of any kind in that election, that no person who was not properly registered to vote voted, nor that any registered voter was prevented from casting their ballot as they intended.[35]

Nevertheless, even *after* the Missouri court ruling, Kobach has continued to repeat this story as evidence in support of his claims of widespread voter fraud.[36]  Fact-free allegations or insinuations about immigrants and non-citizens deliberately trying to steal American elections that are lodged by authority-wielding government leaders and elected officials, including Texas Secretary of State Whitley's irresponsible statements concerning the numbers of possible non-citizens who had registered and voted in Texas, are threatening to democracy because they can create unnecessary concern about the integrity of electoral outcomes that could undermine trust and dampen turnout.

In *Fish v. Kobach*,[37] a case challenging a law requiring Kansans to produce documentary proof of citizenship in order to register to vote, Secretary Kobach, acting as

---

[35] *Royster v. Rizzo, et al.*, Missouri Court of Appeals, Western District, Case No. WD72947, *available at* http://www.courts.mo.gov/file.jsp?id=41678.

[36] For example, he repeated the story in a May 23, 2011 op-ed in the *Wall Street Journal*, Kris Kobach, "The Case for Voter ID," Op-Ed, *Wall Street Journal*, May 23, 2011; a July 8, 2011 op-ed in the *Washington Post*, Kris Kobach, "Voter Photo ID Laws Are Good Protection against Fraud," Op-Ed, *Washington Post*, July 8, 2011; a 2012 *Syracuse Law Review* article, Kris W. Kobach, "Why Opponents Are Destined to Lose the Debate on Photo ID and Proof of Citizenship Laws: Simply Put – People Want Secure and Fair Elections," *Syracuse Law Review* 62, no. 1 (2012), 1-14;  a June 29, 2013 op-ed in the *Wichita Eagle*, Kris W. Kobach, "Kansas' Voter Law Isn't the Same as Arizona's," Op-Ed, *Wichita Eagle*, June 29, 2013; in testimony before a subcommittee of the U.S. House Committee on Oversight and Government Reform on February 12, 2015,[36] .S. House of Representatives, Committee on Oversight and Government Reform, Subcommittee on National Security, and Subcommittee on Health Care, Benefits, and Administrative Rules, Hearing on 'The President's Executive Actions on Immigration and Their Impact on State and Local Elections,' Testimony of Kris W. Kobach, Kansas Secretary of State, February 12, 2015; *available at* https://oversight.house.gov/wp-content/uploads/2015/02/Kobach-Testimony-House-OGR-21215.pdf; and again in an interview with nationally syndicated radio host John Hockenberry as recently October 21, 2015, offering the story as a flagrant example of a U.S. election stolen by fraudulent non-citizen voting, John Hockenberry's interview with Kris Kobach may be heard here: http://www.thetakeaway.org/story/kansas-toughest-place-vote-america/?utm_source=local&utm_medium=treatment&utm_campaign=featuredcomment&utm_content=article.  Hockenberry's *The Takeaway* is a widely distributed national news program produced through a partnership with Public Radio International, WNYC Radio, the New York Times, and WGBH Radio.

[37] U.S. District Court for the District of Kansas, No. 2:16-2105, No. 2:15-9300 consolidated).

counsel to the Office of the Secretary of State, called Dr. Jesse Richman as an expert witness to provide analysis to support his claim of massive voter fraud in the form of substantial numbers of non-citizens on the rolls in Kansas.  Dr. Richman examined various official documents, including an attempted match of records produced by the Kansas Secretary of State's Office and the Kansas Division of Vehicles to identify non-citizens on Kansas' voter rolls.  From the varied sources, Dr. Richman developed four different estimates ranging between zero and 32,000 non-citizens registered or attempting to register to vote in Kansas.  U.S. District Court Judge Julie Robinson found grave flaws in Dr. Richman's expert findings[38] and gave *no weight* to Dr. Richman's testimony.

There was a pattern in Dr. Richman's expert report of misreading data and evidence, of inappropriate use of inference and extrapolation, and of drawing unsupported conclusions and exaggerating the evidence of non-citizen voter registration, which continued with Dr. Richman's reference to alleged non-citizen registration and voting in other states.  To buttress his erroneous findings of substantial rates of voter registration among non-citizens in Kansas, Dr. Richman further claimed that "…other types of data from various states" provides "evidence" of non-citizen "involvement" in U.S. elections.  "For instance," citing himself, "Richman (2016a) discusses the report of a matching analysis done by the state of North Carolina which indicated that nearly one percent of individuals who signed up for the DACA program … appeared to be illegally registered to vote in the state."[39]  A closer look at the underlying evidence, however, shows that Dr. Richman wildly overstated his conclusion.

Here Dr. Richman is referring to the Obama Administration's Deferred Action for Childhood Arrivals (DACA) program which provided administrative relief from deportation for young people born abroad who were brought to the United States as small children by undocumented parents.  Regarding the North Carolina incident Dr. Richman discusses in his blog post, a citizenship audit of the North Carolina voter rolls performed in 2014, flagged about 10,000 registered voters as potential non-citizens.[40]  Ultimately, after cross-checking these registered voters against a federal government database containing information about non-citizens (the System Alien Verification for Entitlement or SAVE database), the number was whittled down to 1,454.  According to the executive director of the North Carolina State Board of Elections (SBOE) at the time, of the 1,454 potentially suspect registered voters, 89 attempted to vote on Election Day 2014.[41]  We

---

[38] "The Court finds Dr. Richman's testimony and report about the methodology and basis for concluding that a statistically significant number of noncitizens have registered to vote in Kansas, are confusing, inconsistent, and methodologically flawed…" and that none of Dr. Richman's "wildly varying estimates," ranging from 0 to 32,000, "…represents an accurate estimate of the number of noncitizens registered to vote in Kansas." (*Fish v. Kobach* Opinion, p. 70).

[39] *Fish v. Kobach*, U.S. District Court for the District of Kansas, No. 2:16-2015; and *Bednasek v. Kobach*, U.S. District Court for the District of Kansas, No. 2:15-CV-9300, Expert Report of Dr. Jesse T. Richman, January 30, 2017, 4.

[40] *See* Letter from Kim Westbrook Strach, Executive Director, North Carolina State Board of Elections to Hon. Chris Millis, dated February 6, 2015; https://www.facingsouth.org/sites/default/files/ Correspondence_2_6_2015.pdf.

[41] Strach, 3-4.

do not know precisely how many of these 89 people were actually citizens when they registered and then voted in 2014, but North Carolina officials reported that some number clearly were: "Various counties conducted independent research into citizenship status of the flagged registrants outside the challenge process.  In some instances, the registrant produced a valid U.S. Passport to poll workers prior to any challenge proceeding."[42]

The North Carolina SBOE executive director further reported that, "Ultimately, elections officials challenged 24 registrants, 11 of which were sustained.  *No registrant voted who was flagged as part of the Federal Deferred Action for Childhood Arrivals (DACA) program*"[43] (emphasis added).  If official challenges can be understood as the record of who among the 89 could not be ruled out as non-citizens, then we have to assume that at least 65 and as many as 78 of these people *actually were citizens*.  Thus, in yet another example of claims of potentially massive fraudulent or illegal voting collapsing over time, we go from an official audit of the nearly seven million names on the North Carolina voter rolls, to a list of approximately 10,000 *potential* non-citizens on the rolls in 2014, to just 11 people whose attempts at voting in 2014 were successfully challenged by local election officials.[44]

I also testified in in the *Fish v. Kobach* case, providing for the plaintiffs analysis of the incidence of voter fraud generally, and non-citizen registration and voting in Kansas, in particular.  I reviewed a wide range of materials, including nearly 2,000 news articles appearing in more than 20 different Kansas newspapers and other news sources going back to 1984; documents and analysis of the incidence of voter fraud prepared by the Office of the Kansas Secretary of state; blog posts, press releases, and reports by an array of non-profit and advocacy organizations; and documents produced through litigation concerning documentary proof-of-citizenship requirements in Arizona and Kansas, among a variety of other sources.  I concluded that there was little to no evidence to support the allegation that Kansas had a "massive" problem with voter fraud, and specifically, with non-citizens registering to vote and voting, a conclusion with which the Court agreed.

After a nearly two-week trial, involving 8 expert witnesses, in which the Kansas Secretary of State could have presented evidence to support his claim that the documentary proof of citizenship law was necessary to prevent substantial numbers of noncitizens from fraudulently or simply illegally registering to vote, the Court, relying in part on my analysis and conclusions, was "…unable to find empirical evidence that a substantial number of non-citizens successfully registered to vote under the attestation regime."  To the contrary, the Court found "only 39 confirmed noncitizens who successfully registered to vote between 1999

---

[42] Strach, 4.

[43] Strach, 3-4.

[44] It is worth noting that North Carolina officials have not said whether any of these people actually registered fraudulently.  We do not know why the challenges to the 11 voters were sustained.  It is still possible that these individuals were in fact U.S. citizens, but could not prove it in whatever way was required at the time their registration and votes were challenged.

and 2013 when the DPOC law became effective.  This is but .002% of all registered voters in Kansas as of January 1, 2013 (1,762,330)."[45]

### D.     Examination of Voter Fraud in Texas

In 2014, I provided expert testimony in *Veasey v. Perry*, a lawsuit in the U.S. District Court for the Southern District of Texas consolidating four challenges to Texas Senate Bill 14 (S.B. 14), the Texas voter identification law.  My expert testimony and accompanying report analyzed the incidence of voter fraud in Texas.  The basis for my conclusions was all of the research I had conducted on voter fraud nationally over the preceding thirteen years, plus additional research on voter fraud in Texas.  After a bench trial, U.S. District Court Judge Nelva Gonzales Ramos found that "...S.B. 14 creates an unconstitutional burden on the right to vote."  Further, Judge Ramos concluded that the law has "an impermissible discriminatory effect against Hispanics and African-Americans," was imposed "with an unconstitutional discriminatory purpose," and constitutes a poll tax.[46]

Texas' voter identification law is not at issue in the current litigation, however, my research and the court's findings in *Veasey v. Perry* are indeed relevant to the Secretary of State's purge program for two important reasons: 1) the issue of preventing voter fraud is central to the purpose of Secretary Whitley's Advisory on Voter Registration List Maintenance Activity (Advisory), as evidenced by Secretary Whitley's accompanying statement that the Purge List was compiled to protect "all eligible Texas voters" from "those who abuse the system," in this case alleged non-citizens fraudulently representing themselves as citizens in order to illegally register and vote in Texas; and 2) because as noted by Judge Ramos in her October 9, 2014 *Veasey v. Perry* opinion, voter fraud has become conflated with a concern over (illegal) immigration in Texas.[47]

Thus, I summarize below the findings from my research on voter fraud in Texas, supporting my expert testimony in *Veasey v. Perry* in order to address a stated motivation behind Secretary Whitley's Advisory, the alleged threat to the integrity of elections in Texas by fraudulent registration and voting on the part of non-citizens in Texas.  My research shows that voter fraud of any kind in Texas is exceedingly rare.

To analyze the incidence of voter fraud in Texas for that report, I relied on a number of official records and hundreds of news reports between 2000 and 2014 contained in the Texas state file of an online news aggregating service called Newsbank (formerly, Access World News).  For the reasons discussed above, my analysis of voter fraud distinguishes among the different actors who participate in the electoral process (i.e., voters, candidates, campaign operatives, political parties, election officials, etc.), and the methods used to cast allegedly fraudulent votes.  Much of the news reporting and

---

[45] *Fish v. Kobach*, U.S. District Court for the District of Kansas, Memorandum and Order, January 3, 2018, 87-88.

[46] *Veasey v. Perry*, U.S. District Court for the Southern District of Texas, Corpus Christi Division, Opinion, October 9, 2014, 2.

[47] *Veasey v. Perry*, Opinion, October 9, 2014, 40.

the definitions and rhetoric used by politicians, law enforcement officers, and legislative researchers both in Texas and nationally do not heed these important and meaningful distinctions.  This is one reason that the incidence of "voter fraud" may seem more prevalent than it is—the other is, of course, fact-free allegations and insinuations.

Of particular note for purposes of my report, on March 12, 2012, the Texas Attorney General's Office issued a press release claiming that,

> Since 2002, the U.S. Department of Justice has prosecuted more than 100 defendants for election fraud.[48]  During the same period, election fraud investigations by the Texas Attorney General's Office have resulted in 50 convictions.  Those cases include a woman who submitted her dead mother's ballot; , a paid operative who cast two elderly voters' ballots after transporting them to the polling place; , a city council member who unlawfully registered ineligible foreign nationals to vote in an election that was decided by a 19-vote margin; , a Starr County defendant who voted twice on Election Day; , a Harris County man who used his deceased father's voter registration card to vote in an election; , an election worker who pled guilty after attempting to vote for another individual with the same last name; , and a Hidalgo County man who presented another voter's registration card and illegally cast that voter's ballot on Election Day.[49]

Politifact Texas followed up with the Office of the Attorney General (OAG).  OAG spokesperson Jerry Strickland sent Politifact reporter Sue Owen a table of 57 election fraud prosecutions.[50]  This table appears to be a version of a spreadsheet maintained by Major Forrest Mitchell, a criminal investigator with the Texas Attorney General's Office.[51]  The most recent version of the Mitchell spreadsheet that I am aware of is dated June 5, 2012, and contains 62 prosecutions, involving primarily the

---

[48] I discuss the first 95 of those indictments above, noting that only 40 of the people indicted were voters, and of these, only 26 were convicted or pleaded guilty.

[49] *See* "Attorney General Greg Abbott on the Department of Justice Denial of Voter ID Preclearance," March 12, 2012; *available at* https://www.texasattorneygeneral.gov/oagNews/ release.php?print=1&id=3991.

[50] "Greg Abbott Claims 50 Election Fraud Convictions Since 2002," PolitiFact Texas, April 17, 2012; *available at* http://www.politifact.com/texas/statements/2012/apr/17/greg-abbott/greg-abbott-claims-50-election-fraud-convictions-2/.  The table is available at https://docs.google.com/file/d/ 0B2Wzr4_cemD5UUtFclRjbl9QSTQ/edit?pli=1.  I *State of Texas v. Holder*, U.S. District Court for the District of Columbia, No. CA 12-128, Transcript of Bench Trial, July 9, 2012, 40.

[51] *See* Plaintiff's Exhibit 42, *State of Texas v. Holder*, Transcript of Bench Trial, July 9, 2012, 40.  In his testimony in *State of Texas v. Holder*, Major Mitchell explained that, "This is the spreadsheet that I maintain as the supervisor of the Special Investigations Unit, and it contains the prosecutions that the Attorney General's Office has either prosecuted or worked with a local district attorney or county attorney to prosecute."

mishandling of absentee ballots.[52]  None in this time period involved fraudulent registration or voting by non-citizens.[53]

In *State of Texas v. Holder*, Major Mitchell testified that he maintained a separate spreadsheet of "charges pending resolution" listing cases of election crimes indicted and awaiting trial.[54]  That list contained two people indicted for voter impersonation.  One was an 81-year old mentally incompetent woman in a wheelchair charged with impersonating her long-dead sister to obtain a second driver's license and vote twice in the 2008 election.[55]  The other case concerned a young man who was indicted and pleaded guilty for having impersonated his incarcerated brother in order to vote twice in a 2009 school board election (the man was sentenced to two years in jail).  Finally, Major Mitchell mentioned one more case of family-organized voter impersonation[56] that was not handled by his office but was prosecuted by a local district attorney.  At the behest of his mother, a young man who was not registered to vote impersonated his father and cast a ballot, presumably for his mother in a Democratic Party Precinct Chairwoman race.[57]

The paltry evidence of voter fraud in Texas found in the investigation and prosecution records of the OAG is significant in light of the statutory authority of the office, and the priority given to voter fraud by then Attorney General and now Governor Greg Abbott.  The efforts of the U.S. Justice Department to find and prosecute voter fraud over the 2002 to 2005 period represent a similar instance in which a major law enforcement agency has the authority to investigate and prosecute voters for intentionally corrupting the electoral process, and was given a mandate to do so.  Like the Ballot Access and Voting Integrity Initiative outlined above, the determined efforts of the Texas Attorney General's office to find and prosecute voter fraud fizzled.

My review of the legislative record of public hearings and debates on S.B. 14 before the Texas state legislature corroborates this conclusion about the lack of evidence

---

[52] The table was provided to me by lawyers in *the* Veasey case.

[53] A more recent controversial case of illegal voting by a legal permanent resident in Texas received national media attention not because it was the "tip of the iceberg" of rampant voter fraud in Texas, but because a judge imposed an unusually heavy penalty of eight years in prison.  The voter, brought to the U.S. as an infant, claimed confusion about her eligibility to vote.  *See*, Michael Wines, "Illegal Voting Gets Texas Woman 8 Years in Prison, and Certain Deportation," *New York Times*, February 10, 2017; *available at* https://www.nytimes.com/2017/02/10/us/illegal-voting-gets-texas-woman-8-years-in-prison-and-certain-deportation.html.

[54] *See State of Texas v. Holder*, Transcript of Bench Trial, July 9, 2012, 42.

[55] *See* Zachary Roth, "Greg Abbott's Bogus Voter Fraud Crusade," MSNBC.com, March 24, 2014; *available at* http://www.msnbc.com/msnbc/greg-abbott-bogus-voter-fraud-crusade.

[56] It is notable that the four known cases of voter impersonation at the polling place in Texas since 2000 all involve family members voting in the name of a deceased father (Jack Carol Crowder), a live father (the son of Hazel Woodard James), a live brother (Lorenzo Almanza) and a deceased sister (Mary Comparin).

[57] Dianna Hunt, "Democratic Precinct Chairwoman Candidate Indicted in Voter Fraud Case in Fort Worth," *Fort-Worth Star-Telegram*, May 1, 2012.

of voter impersonation at the polling place, and more broadly voter fraud in Texas. No witness providing testimony at these hearings presented any compelling evidence of voters, including non-citizens, intentionally corrupting the voting process in the state of Texas in recent years. Instead, legislators were regaled with anecdotes, uncorroborated, allegedly eye-witness accounts and hearsay, and examples of voter intimidation, mishandling of absentee ballots, and other forms of electoral corruption that are not addressed by S.B. 14.[58]

News reports over the 2000 to 2014 period similarly provide no counterfactual information challenging the conclusion that voter impersonation and voter fraud are rare in Texas.[59]

Finally, in the course of conducting the research on voter fraud that is published in *The Myth of Voter Fraud*, I sent public records requests to all state Attorneys General and all Secretaries of State in those states where the Secretary of State serves at the chief elections official, for copies of all records and referrals of all voter fraud cases sent to

---

[58] For example, a retired teacher named Colleen Vera testified that as a poll watcher, she observed a voter "…who spread out multiple voter registration cards like a deck of cards. She said, 'Which one do I use here? They always send me extras.' The clerk told the voter she would have to decide. So the voter handed the clerk one, the clerk confirmed the registration and she proceeded to vote…had she not been an honest citizen, it would have been very easy for her to vote more than one time."

Transcript of Hearing on Voter Fraud Before the House of Representatives of the State of Texas, 82nd Legislature, Vol. 1 (March 1, 2011), 90.

Carol Kitson, another retiree working as an alternate judge at a Harris County precinct during the 2010 election told the committee:

> In the late afternoon the election clerk, who was responsible for giving each voter their JBC ticket to allow them to use the machine, commented to the poll watcher -- to a poll watcher that he had just given a code to a man who had voted earlier that day. The poll watcher agreed with that and I, too, had noticed that particular voter, because he had a very distinguishing characteristic. He had a very distinct -- distinctive facial scar and he had very limited use of one arm, so he was very easy to note. The problem is I did not remember what name was on the voter card that he had used for his first vote. And because we had no way of correctly identifying him, as it is currently illegal to ask for a photo I.D., he voted a second time.

*Ibid.*, 260.

Another election judge named Mary Ann Collins provided a similar unsubstantiated anecdote:

> I have poll watched early voting. And while I was poll watching early voting, I saw a lady come in with purple hair, and that absolutely got my attention. Later that afternoon I saw what I thought was the very same lady with the purple hair coming in to vote, and I thought, she's been here before. Then I thought, oh, no, she's passed the qualifying table, so I'm just misreading things. It turned out later I was talking -- it dawned on me that she indeed probably had been there before and was voting on another person's certificate at that time.

*Ibid.*, 255.

[59] My expert report in *Veasey v. Perry* contained a list of news articles reviewed for the report.

U.S. Attorneys, the Texas Attorney General and local prosecutors since 2000.  The Texas Attorney General's office never replied to my letter; however, the Secretary of State's office sent me the requested information.  In all, there are records of 60 referrals to the OAG, some accompanied by responses from prosecutors.[60]  Of these 60 referrals, only one concerned allegations of illegal non-citizen voting.  Consistent with patterns observed in the other data and records analyzed for this case and discussed above, most of the referrals dealt with allegations of criminal violations of the state's absentee and early voting laws, mishandling of mail ballots, unlawful assistance to the voter, coercion or intimidation of voters, and alleged ballot tampering and electioneering at the polls.

## IV.    CONCLUSION

There is a long history in the U.S. and especially in Texas of justifying restrictive electoral rules on concerns about "voter fraud."  Consistent with this history, Texas officials proclaimed "VOTER FRAUD ALERT"[61] and urged prosecution for "illegal vote registration"[62] in response to Secretary of State David Whitley's press release announcing the creation of a list of approximately 95,000 "possible non-citizens" allegedly registered to vote.  A subsequent Election Advisory sent to county election officials by Secretary Whitley's office set out additional procedures those on the list must follow to demonstrate their eligibility to vote or face removal from the voter rolls.

The threat of voter fraud by non-citizens is overblown if experience and empirical evidence are any guide.  The research I conducted for my expert reports in the North Carolina case, *NAACP v. McCrory, et al.*, and the Kansas case, *Fish v. Kobach*, on the incidence of non-citizen registration and voting found that initial allegations of widespread illegality and fraud were not supported by the evidence.  In North Carolina, an initial citizenship audit of the voter rolls flagged approximately 10,000 registered voters as potential non-citizens.  Upon further investigation, the eligibility credentials of just 11 votes were sustained.  In Kansas, U.S. District Court Judge Julie Robinson found just 39 non-citizens had gotten registered in the state over a fourteen-year period, from 1999 to 2013, when Kansas adopted a documentary proof-of-citizenship requirement to register to vote purportedly to stem the alleged (non-existent) threat of non-citizen voting in Kansas.

---

[60] I cross-checked (by date referred) the materials provided by the Texas Secretary of State's office against Major Mitchell's spreadsheet, titled "Election Code Referrals to the Office of the Attorney General, August 2002 – Present," (Exhibit 41 accompanying Major Mitchell's testimony in *State of Texas v. Holder* referenced above).  The two compilations of data largely, but not perfectly, correspond.  Between August 28, 2002 and September 25, 2006, Major Mitchell accounts for 46 referrals, several of which are not accounted for in the Secretary of State's documents.

[61] Tweet from Texas Attorney General Ken Paxton, January 25, 2019, *available at* https://twitter.com/KenPaxtonTX.

[62] Tweet from Texas Governor Greg Abbott, January 25, 2019, *available at* https://twitter.com/GregAbbott_TX?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E10 88918898643271680&ref_url=https%3A%2F%2Fwww.texastribune.org%2F2019%2F02%2F01%2Ftexas-citizenship-voter-roll-review-how-it-turned-boondoggle%2F.

Similarly, my research on voter fraud in Texas prepared for my expert report in *Veasey v. Perry* found that the actual incidence of voter fraud in Texas is rare.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  This Declaration was executed on February 22, 2019, in West Deptford, New Jersey.

# APPENDIX A

# LORRAINE CAROL MINNITE

Rutgers, State University of New Jersey-Camden
Dept. of Public Policy & Administration
401 Cooper Street
Camden, New Jersey 08102
lcm130@camden.rutgers.edu
Tel. (856) 225-2526

## EDUCATION

**The Graduate School and University Center of the City University of New York**
   **Ph.D.** in Political Science, 2000
   *Dissertation:* "Identity, Voting Rights and the Remapping of Political Representation in New York City"
   *Honors:* Distinction

   **M.Phil.** in Political Science, 1994
   *Major field:* American Politics
   *Minor field:* Public Policy

   **M.A.** in Political Science, 1992
   *Master's Thesis:* "The Ecology of the Underclass: William Julius Wilson and the Chicago School"

**Boston University, College of Liberal Arts**
   **B.A.** in History, 1983
   *Area of Concentration:* American Civilization

## ACADEMIC EXPERIENCE

**Associate Professor**
*Rutgers, The State University of New Jersey – Camden Campus, 2011 to present.*
Teach graduate courses in public policy and community development, and undergraduate courses in urban studies and voting rights.

**Assistant Professor**
*Barnard College, Columbia University, January 2000 to 2011.*
Taught undergraduate courses in American politics and urban studies.

**Associate Director**
*The Center for Urban Research and Policy, Columbia University, December 1993 to 2000.*
Responsible for the day-to-day management of the Center; wrote grant proposals and helped secure funding from government and private sources for all activities totaling nearly $2,000,000.

**Instructor and Research Associate**
*Metropolitan Studies Department, New York University, Spring 1991.*
Designed and taught a core course for undergraduates on the political and economic development of post-war American cities.

**Assistant Program Director**
*Borough of Manhattan Community College, City University of New York, 1987 to 1990.*
Assisted the Director in all administrative aspects of the BMCC Summer Immersion Program, a non-traditional, intensive, remedial education program.

**Research Assistant and Data Analyst**
*CUNY Data Service, The Graduate School, City University of New York, 1987 to 1991.*
Programmed and analyzed large data sets from the 1980 STF and PUMS (microdata) Census files, and the New York City Housing and Vacancy Surveys.

**Research Assistant**

***Department of Political Science, The Graduate School, City University of New York, 1985 to 1987.***
Worked on various research projects for Prof. Marilyn Gittell.

## OTHER EMPLOYMENT

### Research Director
***Project Vote, 2010 to 2011.***
Developed a research program and conducted research for a non-profit organization that runs voter registration drives, litigates violations of the National Voter Registration Act of 1993, and advocates for the voting rights of minorities, youth and the poor.

### Issues Director
***The Committee for David N. Dinkins, II, New York City, 1991 to 1993.***
Conducted research for Mayor David N. Dinkins' campaign committee on a wide range of public policy issues and problems facing New York City.

### Campaign Manager
***McCabe for City Council, Brooklyn, New York, 1991.***
Organized and administered a successful campaign for the Democratic Party nomination and the New York City Council seat in the 38th Council District.

### Union Organizer
***District 65/UAW, (AFL-CIO), Northeast Regional Office, Boston, Massachusetts, 1984 to 1985, Summer 1986.***
Participated in the planning and implementation of a union organizing campaign; served as editor of a union local's newsletter; assisted negotiating committee in contract negotiations.

## ACADEMIC AND PROFESSIONAL HONORS

Distinguished Alumni Award, Department of Political Science, CUNY Graduate School, 2014
Jay Sigler Award for Teaching Excellence, Rutgers-Camden Public Administration Student Association, 2013
Affiliated Faculty, Center for Community Leadership, Rutgers-Camden, 2013 to present
Affiliated Faculty, Center for Urban Research and Education, Rutgers-Camden, 2012 to present
Civic Engagement Faculty Fellow, Rutgers-Camden, 2012
Selected a "Top Wonk" in Democracy and Elections, The Agenda Project, 2012
2011 *Choice* Magazine "Outstanding Academic Title" for *The Myth of Voter Fraud*
Carnegie Corporation of New York Special Opportunities Fund Award ($50,000), 2007
Senior Fellow, Dēmos – A Network for Ideas and Action, 2006 to 2014
Member, Working Group on Immigration Challenges, The Century Foundation Homeland Security Project, 2004
Faculty Fellow, Institute for Social and Economic Research and Policy, Columbia University, 2002 to 2011
Member, Working Group on New York's Recovery from 9-11, Russell Sage Foundation, 2002 to 2005
Curriculum Development Award ($1,500), Barnard Project on Diaspora and Migration, 2000
CUNY Graduate School Dissertation Year Fellowship ($10,000), 1996-1997

## PROFESSIONAL AFFILIATIONS

American Political Science Association
American Sociological Association
Association for Public Policy Analysis and Management
Scholars Strategy Network
Social Science History Association
Southern Political Science Association
Urban Affairs Association

## TEACHING ACTIVITIES

### <u>Doctoral Supervision: Chair</u>

***Rutgers-Camden***
Lew Bivona, *in-progress*
Jackie Bradley-McFarlane, *in progress*

Shaina Gaines, *in-progress*
Peggy Jean Craig McCaffery, *in-progress*
Dan Tarng, *in-progress*
Rasheda Weaver, *completed 5/17*
Curtis Williams, *in-progress*
Zachary Wood, *in-progress*

**Doctoral Supervision: Committee Member**

***Rutgers-Camden***
Spencer Clayton, *in-progress*
Ashley Nickels, *completed 5/16*
Wendy Osefo, *completed 7/16*
Jason Rivera, *completed 7/15*

**External Examiner (Ph.D.)**

***Fielding Graduate School***
Gregory Williams, *completed 10/18*

**Courses Taught**

***Rutgers University-Camden (Graduate)***
Alternative Development Strategies for Distressed Cities (Ph.D.)
Civic Engagement, Nonprofits and Community Development (Ph.D.)
Foundations of Policy Analysis (MPA and Executive MPA)
Politics of Community Development (Ph.D.)
Practicum in Community Development (Ph.D.)
Research Workshop (MPA)
Theory and History of Community Development (Ph.D.)
Urbanism and Sustainable Development in Cuba (Undergraduate and Graduate-level Study Trip)

***Rutgers University-Camden (Undergraduate)***
Honors College Seminar: The Right to Vote
Poverty and the Urban Environment

***Barnard College, Columbia University (Undergraduate)***
American Urban Politics
Contemporary Urban Problems
Dynamics of American Politics
Participation and Democracy
Senior Research Seminar in American Politics
Urban Myths and the American City

***New York University (Undergraduate)***
The Crisis of the Modern American City

**Graduate Committee Examiner**

Rutgers University, Ph.D. Program in Public Affairs/Community Development, Dissertation Committees (see above)
Columbia University Ph.D. Program in Political Science, Dissertation Committee, 12/00, 5/03, 5/09.
Columbia University School of Architecture, Planning and Preservation, Dissertation Proposal Committee, 2/08.
Columbia University School of Architecture, Planning and Preservation, Dissertation Committee, 4/10.
CUNY Graduate Center Ph.D. Program in Political Science, Dissertation Committee, 4/05, 5/06, 8/06.
CUNY Graduate Center Ph.D. Program in Political Science, Oral Doctoral Exam, 12/00.

# PEER-REVIEWED PUBLICATIONS

***Books***

*The Myth of Voter Fraud*, Ithaca, New York: Cornell University Press, 2010.

*Keeping Down the Black Vote: Race and the Demobilization of American Voters*, New York: The New Press, 2009; co-authored with Frances Fox Piven and Margaret Groarke.

### Journal Articles

"New Challenges in the Study of Right-wing Propaganda: Priming the Populist Backlash to 'Hope and Change,'" *New Political Science* 34:4 (2012), 506-526.

 "Modeling Problems in the Voter ID-Voter Turnout Debate," *Election Law Journal* 8:2 (2009), 85-102; co-authored with Robert S. Erikson.

 "Models, Assumptions, and Model Checking in Ecological Regressions," *Journal of the Royal Statistical Society* 164, Part 1 (2001), 101-118; co-authored with Andrew Gelman, David K. Park, Stephen Ansolabehere, and Phillip N. Price.

### Chapters in Edited Volumes

"Voter Suppression," in Levon Chorbajian and Daniel Egan, eds., *Power and Inequality: Critical Readings for a New Era*, New York: Routledge, *forthcoming*; co-authored with Frances Fox Piven.

"Competing Concepts of Social Class: Implications and Applications for Community Development," in Mae Shaw and Marjorie Mayo, eds., *Class, Inequality and Community Development*, Bristol, UK: Policy Press at the University of Bristol, 2016; co-authored with Frances Fox Piven.

 "The Voter Fraud Myth," in Benjamin E. Griffith, ed., *America Votes! Challenges to Election Law and Voting Rights*, Chicago: American Bar Association, 2016.

 "Making Policy in the Streets," in James DeFilippis, ed., *Urban Policy in the Time of Obama*, Minneapolis: University of Minnesota Press, 2016*;* co-authored with Frances Fox Piven.

"Poor People's Politics," in David Brady and Linda Burton, eds., *Oxford Handbook of the Social Science of Poverty*, New York: Oxford University Press, 2016; co-authored with Frances Fox Piven.

 "Crisis, Convulsion and the Welfare State," in Kevin Farnsworth and Zoë Irving, eds. *Social Policy in an Age of Austerity*, Policy Press, 2015; co-authored with Frances Fox Piven.

 "Voter Identification Laws: The Controversy Over Voter Fraud," in Matthew J. Streb, ed., *Law and Election Politics: The Rules of the Game*, 2nd Ed., New York: Routledge, 2012.

"Lost in Translation? A Critical Reappraisal of the Concept of Immigrant Political Incorporation," in Jennifer Hochschild and John H. Mollenkopf, eds., *Bringing Outsiders In: Transatlantic Perspectives on Immigrant Political Incorporation*, Ithaca, New York: Cornell University Press, 2009.

"Environmental Risk and Childhood Disease in an Urban Working Class Caribbean Neighborhood," in Sherrie L. Baver and Barbara Lynch Deutsch, ed., *Beyond Sun and Sand: Caribbean Environmentalisms*, New Brunswick, NJ: Rutgers University Press, 2006; co-authored with Immanuel Ness.

"Outside the Circle: The Impact of Post-9/11 Responses on the Immigrant Communities of New York City," in John H. Mollenkopf, ed., *Contentious City: The Politics of Recovery in New York City*, New York: Russell Sage Foundation, 2005.

"Between White and Black: Asian and Latino Political Participation in the 2000 Presidential Election in New York City," in William E. Nelson, Jr. and Jessica Lavariega Monforti, eds., *Black and Latino/a Politics: Issues in Political Development in the United States*, Miami: Barnhardt and Ash, 2005; co-authored with John Mollenkopf.

"The Changing Arab New York Community," in Kathleen Benson and Philip M. Kayal, eds., *A Community of Many Worlds: Arab Americans in New York City*, Syracuse: Syracuse University Press, 2002; co-authored with Louis Abdellatif Cristillo.

"Social Capital, Political Participation and the Urban Community," in Susan Saegert, J. Phillip Thompson, and Mark Warren, eds., *Social Capital and Poor Communities*, New York: Russell Sage Foundation, 2001; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"Patterns of Neighborhood Change," in John H. Mollenkopf and Manuel Castells, eds., *Dual City: Restructuring New York*, New York: Russell Sage, 1991; co-authored with Frank F. DeGiovanni.

# OTHER PUBLICATIONS

### *Chapter in Conference Proceedings*

"The Political Participation of Immigrants in New York," in *In Defense of the Alien: Proceedings of the 2000 Annual National Legal Conference on Immigration and Refugee Policy*, Vol. XXIII. New York: Center for Migration Studies, 2001; co-authored with Jennifer Holdaway and Ronald Hayduk.

### *Encyclopedia Entries*

"Voter Participation," in *The Encyclopedia of Social Work*, 20th ed., New York: Oxford University Press, 2008, online version, 2013; co-authored with Frances Fox Piven.

 "The Underclass," in *The International Encyclopedia of Social and Behavioral Sciences*, 2nd Ed., Waltham, Mass.: Elsevier, 2016; co-authored with Paul J. Jargowsky.

"Welfare," in *The International Encyclopedia of Social and Behavioral Sciences*, 2nd Ed., Waltham, Mass.: Elsevier, 2016; co-authored with Joan Maya Mazelis.

 "The Working Families Party," in Immanuel Ness, ed. *The Encyclopedia of American Third Parties*, Armonk, New York: M.E. Sharpe, Inc., 2000.

### *Book Reviews*

*Waiting for the Cemetery Vote,* by Tom Glaze*, American Review of Politics*, (Spring/Summer 2012).

*Election Fraud: Detecting and Deterring Electoral Manipulation* edited by R. Michael Alvarez, Thad Hall and Susan D. Hyde, *Election Law Journal* 8:3 (2009).

*Governing From Below: Urban Regions and the Global Economy* by Jefferey M. Sellers, Cambridge University Press, 2002, in *Political Science Quarterly* Vol. 118, No. 4 (Winter 2003-2004).

*Social Class, Politics, and Urban Markets: The Makings of Bias in Policy Outcomes* by Herman L. Boschken, Stanford, CA: Stanford University Press, 2002, in *The International Journal of Urban and Regional Research*, Vol. 27, No. 4 (December 2003).

*The Miami Fiscal Crisis: Can A Poor City Regain Prosperity?* by Milan J. Dluhy and Howard A. Frank, Westport, Connecticut: Praeger Publishers, 2002, in *Political Science Quarterly* Vol. 117, No. 4 (Winter 2002-2003).

### *Research Reports, Memoranda and Briefs*

*The Misleading Myth of Voter Fraud in American Elections*, Key Findings Brief, Scholars Strategy Network, February 2014.

*Latino New Yorkers in the 2008 Presidential Election: The New Americans Exit Poll,* New York Latino Research Network (NYLARNet) at The University of Albany, Fall 2011.

*Research Memo: First-time Voters in the 2008 Election,* Project Vote, Washington, D.C., April 2011.

*An Analysis of Who Voted (And Who Didn't Vote) in the 2010 Election*, Project Vote, Washington, D.C., November 2010.

*Research Memo: Debunking the Tea Party's Election Night Message,* Project Vote, Washington, D.C., October 26, 2010.

*What Happened to Hope and Change? A Poll of 2008 Voters*, Project Vote, Washington, D.C., September 2010.

*Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security*, Dēmos – A Network for Ideas and Action, New York, November 2007.

*The Politics of Voter Fraud*, Project Vote, Washington, D.C., March 2007.

*Securing the Vote: An Analysis of Election Fraud*, Dēmos – A Network for Ideas and Action, 2003, New York; updated 2007; co-authored with David Callahan.

### *Journalism*

My expertise on elections and voter fraud was sought and widely cited and I was quoted in print and broadcast media in every federal election since 2008, including, for example, in the following: *The New Yorker Magazine*, *The New Yorker Radio Hour*, *The New Republic*, *Mother Jones*, *The Wall Street Journal*, *In These Times*, *American Prospect*, *Washington Monthly*, *Monthly Review*, *New Left Review*, *The New York Times*, *The Washington Post*, *The Christian Science Monitor, Associated Press*, McClatchy, Al Jazeera English (*Fault Lines*, Washington, D.C.), WZBC (*News*, Boston), WBAI (*Democracy Now!*, New York), WNYC (*The Brian Lehrer Show*, New York), WHYY (*Radio Times*, Philadelphia), NPR (*Morning Edition*, Washington, D.C.), CBS News, ABC News Radio, Salon.com, Talking Points Memo, Alternet, The Huffington Post, Slate Magazine, and CQ Researcher, among many others.

"Why the Democrats and Movements Need Each Other," *In These Times* (cover story), October 17, 2017; co-authored with Frances Fox Piven.

"The Power of Disruption: An Interview with Frances Fox Piven," *Global Dialogue: Newsletter for the International Sociological Association* 5(4): December 2015.

"The Myth of Voter Fraud," BillMoyers.com, March 9, 2015.

"Movements Need Politicians – And Vice Versa," *The Nation*, October 22, 2012; co-authored with Frances Fox Piven.

"The Other Campaign: Who Gets To Vote," *New Labor Forum*, May 2012; co-authored with Frances Fox Piven.

"Why We Need ACORN," *Los Angeles Times*, April 22, 2010; co-authored with Frances Fox Piven.

"Re-Drawing the Map of U.S. Politics," *Red Pepper*, April, 2008; co-authored with Frances Fox Piven.

"N.C. Rejects Politics of Fear," *The Charlotte Observer*, Charlotte, North Carolina, July 18, 2007.

"They Are Arriving: Immigrants Are Gaining Power in New York's Voting Booths," *New York Daily News,* New York, July 24, 2005.

"Albany's Making Bad Elections Worse," *New York Daily News,* New York, August 22, 2004.

## UNPUBLISHED PAPERS, PRESENTATIONS AND REPORTS

### *Works in Progress*

"*Demosprudence* and Grassroots Struggles to Protect and Expand the Right to Vote"

"Does Concentration Worsen Poverty? The Case of Philadelphia"

"Human Error in Election Administration"

"Felony Disfranchisement and the New Three-Fifths Rule"

"The Voting Rights of the Poor"

*Conference Participation, Papers and Invited Presentations*

"Human Error in Election Administration," paper presented at the 89th Annual Meeting of the Southern Political Science Association, New Orleans, January 4-6, 2018.

Invited Panelist, "Impasses: Beyond Social Democracy," Transcending Pessimism, Reimagining Democracy: A Conference in Honor of Leo Panitch, York University, Toronto, October 6-7, 2017.

Invited Lecture, "The Politics of Voting: Who Shall Be the Electors?" Saul O. Sidore Lecture Series, Centers on Race, Class and Gender in a Divided America, University of New Hampshire-Manchester, Manchester, New Hampshire, March 21, 2017.

"Deadwood and Disenfranchisement: Maintaining Election Lists in the United States," paper presented at the 87th Annual Meeting of the Southern Political Science Association, New Orleans, January 12-14, 2017; co-authored with Margaret Groarke.

Invited Speaker, "Defending Democracy: How Political Scientists Are Engaging in the Fight Over Voting Rights (And Why You and Your Dept. Should Too)," roundtable presented by the Scholars Strategy Network at the 112th Annual Meeting of the American Political Science Association, Philadelphia, September 1-4, 2016.

Invited Panelist, "Beyond Neoliberalism: Social Justice after the Welfare State," Symposium Sponsored by the Center for the Study of Social Difference, Women Creating Change, the Heyman Center for the Humanities, and the History Department at Columbia University, New York City, April 2, 2016.

Invited Panelist, "Voting Rights at 50," 22nd Annual First Monday Celebration, Eric R. Neisser Public Interest Program, Rutgers School of Law, Newark, New Jersey, October 7, 2015.

Panel Organizer and Chair, "Electoral Rules, Voting and Turnout: New Pathways for Research," panel at the 111th Annual Meeting of the American Political Science Association, San Francisco, September 3-6, 2015.

"Community and Class in a Neoliberal Age," paper presented at the 110th Annual Meeting of the American Sociological Association, Chicago, August 22-25, 2015; co-authored with Frances Fox Piven.

"Black Urban Liberalism: A Case Study of Democratic Inclusion and Economic Exclusion in Philadelphia, 1970-2010," paper presented at the 45th Annual Meeting of the Urban Affairs Association, Miami, April 8-11, 2015.

Invited Speaker, "Does Concentration Worsen Poverty? The Philadelphia Case," Center for Urban Research and Education, Rutgers University, Camden, December 12, 2014.

Invited Speaker, "The State of Voting Rights," sponsored by the Atlanta Chapter of the Scholars Strategy Network, Atlanta, December 2, 2014.

"The Poverty of Politics in a Northern City: A Case Study of Democratic Inclusion and Economic Exclusion in Philadelphia, 1970-2000," paper presented at the 39th Annual Meeting of the Social Science History Association, Toronto, November 6-9, 2014.

"Crisis, Convulsion and the Welfare State," roundtable presentation at the 109th Annual Meeting of the American Sociological Association, San Francisco, August 16-19, 2014; co-authored with Frances Fox Piven.

 "Making Policy in the Streets," paper presented at the 44th Annual Meeting of the Urban Affairs Association, San Antonio, March 20, 2014; co-authored with Frances Fox Piven.

Invited Panelist, "Voter Suppression, Equal Rights, and the Promise of Democracy," sponsored by the Scholars Strategy Network, the Center for American Political Studies, and the Malcolm Wiener Center for Social Policy, Harvard University, March 6, 2014.

"Crisis, Convulsion and the Welfare State," paper presented at the 11th Annual Meeting of the European Sociological Association, Torino, Italy, August 28-31, 2013; co-authored with Frances Fox Piven.

Invited Panelist, "Anatomy of A Public Interest Lawsuit: Voter ID Legislation – A Public Interest Legal Challenge," sponsored by Penn Law Clinical Programs, Lawyering in the Public Interest, Toll Public Interest Center, American

Constitution Society and the Civil Rights Law Project, University of Pennsylvania Law School, Philadelphia, Pennsylvania, November 5, 2012.

Invited Panelist, "Disenfranchise This: The Cost of Voter Suppression," 19th Annual First Monday Celebration, Eric R. Neisser Public Interest Program, Rutgers School of Law, Newark, New Jersey, October 3, 2012.

Invited Panelist, "The Voting Rights Act: Where Do We Go From Here?" Rutgers University Law Review Symposium, Trenton, New Jersey, April 13, 2012.

Invited Panelist, "Voting Rights," Civil Rights Law Society, Columbia University Law School, New York City, March 20, 2012.

Invited Panelist, "Race and Public Policy," conference at George Mason University School of Public Policy, Arlington, Virginia, October 10, 2011.

Invited Panelist, "Organizing the Poor for Rights: The Work of Frances Fox Piven," 107th Annual Meeting of the American Political Science Association, Seattle, September 1-4, 2011.

"Is Political Polarization Good or Bad for Democracy?," paper presented at the 69th Annual Meeting of the Midwest Political Science Association, Chicago, March 30-April 2, 2011.

Invited Roundtable Participant, "Voter Disenfranchisement in American Politics," 82nd Annual Meeting of the Southern Political Science Association, New Orleans, January 6-8, 2011.

Invited Panelist, "Voter Participation," New York City Charter Revision Commission, New York City, June 2, 2010.

Discussant, "Immigrant Voters: Asian Americans and the 2008 Election," Immigration Seminar Series, Graduate School and University Center of the City University of New York, May 4, 2009.

"Purging Voters Under the NVRA," paper presented at the 67th Annual Meeting of the Midwest Political Science Association, Chicago, April 2-5, 2009; co-authored with Margaret Groarke.

Invited Panelist, "Democracy in America: The African-American Experience – Then, Now and Future," U.S. Mission to the United Nations, New York, March 17, 2009.

Invited Speaker, "Voter Suppression in the 2008 Presidential Election," Funders Committee for Civic Participation, Washington, D.C., December 9, 2008.

Invited Panelist, "Stealing the Vote in 2008," A Panel Discussion at New York University, October 16, 2008.

Invited Panelist, "Keeping Down the Vote: Vote Suppression and the 2008 Election," Sarah Lawrence College, September 23, 2008.

"Modeling Problems in the Voter ID-Voter Turnout Debate," paper presented at the 8th Annual State Politics and Policy Conference, Temple University, Philadelphia, May 30-31, 2008; co-authored with Robert S. Erikson.

Panelist, "Keeping Down the Black Voter: Race and the Demobilization of American Voters," *Left Forum*, New York, March 16, 2008.

Panel Discussant, "Group Mobilization, Partisanship, Ideas, and Leadership: The Los Angeles and New York Mayoral Elections of 2005," 102nd Annual Meeting of the American Political Science Association, Philadelphia, August 31-September 3, 2006.

"Re-thinking Immigrant Political Incorporation," paper presented at the 36th Annual Meeting of the Urban Affairs Association, Montreal, Canada, April 19-22, 2006.

"Immigrant Politics in an Age of Terror," paper presented at the 101st Annual Meeting of the American Political Science Association, Washington, D.C., September 1-4, 2005.

Panel Discussant, "Immigrants As Local Political Actors," 100th Annual Meeting of the American Political Science Association, Chicago, September 1-4, 2004.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, August 5, 2004.

"The Impact of 9/11 on Immigrant Politics in New York, With a Focus on Arab, Muslim, and South Asian Immigrant Communities," Columbia University Seminar on the City, New York City, March 23, 2004.

Invited Participant, "The Impact of Post-9/11 Immigration and Law Enforcement Policies," The Century Foundation, New York City, February 4, 2004.

Workshop Participant, Multi-race Study Group, *Harvard CAPS Workshop on Methodologies to Study Immigrant Political Incorporation*, Harvard University, Cambridge, October 30-31, 2003.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, July 10, 2003.

Panelist, "Rebuilding Post-War Iraq: Domestic and International Implications;" Community Forum, Barnard College, New York City, April 21, 2003.

"Political Participation and the Neglected Role of Spatial Form;" paper presented at the 33rd Annual Meeting of the Urban Affairs Association, Cleveland, Ohio, March 27-30, 2003.

Invited Speaker, "Teach-In on Iraq;" Barnard College, New York City, November 8, 2002.

Panelist, "Colloquium on Responding to Violence," in honor of Virginia C. Gildersleeve Lecturer, Jody Williams, Barnard Center for Research on Women, Barnard College, New York City, October 25, 2002.

Panel Moderator, "Who is Brooklyn?" at *The Future of Brooklyn* Conference, Brooklyn College, June 7, 2002.

"Asian and Latino Participation in New York City: The 2000 Presidential Election," paper presented at the 97th Annual Meeting of the American Political Science Association, San Francisco, August 29 – September 2, 2001; co-authored with John H. Mollenkopf.

Organizer and Panelist, *The Changing Face of New York's Electorate: The Immigrant Vote in 2000 and Beyond*, A Panel Discussion and Media Briefing sponsored by the New York Immigration Coalition and Barnard College, New York City, May 2, 2001.

Organizer and Panelist, *The Muslim Communities in New York City Project; A One-Day Conference*, sponsored by the Center for Urban Research and Policy and the Middle East Institute at the School of International and Public Affairs, Columbia University, New York City, April 30, 2001.

Panelist, *Democratizing New York City; Re-imagining City Government*, sponsored by the Center for Humanities, CUNY Graduate Center, New York City, March 27, 2001.

Organizer and Panel Moderator, *Independent Politics in A Global World*, sponsored by the Independent Politics Group, CUNY Graduate Center, New York City, October 6-7, 2000.

"Political Capital and Political Participation," paper presented at the 96th Annual Meeting of the American Political Science Association, Washington, D.C., August 31-September 3, 2000; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"The Political Participation of Immigrants in New York," at *Immigrant Political Participation in New York City; A One-Day Working Conference*, sponsored by the Center for Urban Research/CUNY and the International Center for Migration, Ethnicity, and Citizenship, New York City, June 16, 2000

"The Muslim Community in New York City Project," with Louis Abdellatif Cristillo; *Muslims in New York: An Educational Program for Religious Leaders in New York City*, seminar on faith traditions in New York; sponsored by the Interfaith Center of New York and the Imans Council of New York, New York City, June 14, 2000.

"The Political Participation of Immigrants in New York," Session VI on *Integration of Immigrants and Their Descendents,* Center for Migration Studies 20th Annual National Legal Conference on Immigration and Refugee Policy, Washington, D.C., March 30-31, 2000.

"The Changing Arab New York Community," with Louis Abdellatif Cristillo; *A Community of Many Worlds: Arab Americans in New York City*, symposium sponsored by the Museum of the City of New York, New York City, February 5-6, 2000.

"The Political Incorporation of Immigrants in New York," paper presented at the 95th Annual Meeting of the American Political Science Association, Atlanta, September 1-4, 1999; co-authored with Jennifer Holdaway and Ronald Hayduk.

"Political Capital and Political Participation," co-authored with Ester R. Fuchs and Robert Y. Shapiro; paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999.

"Racial and Ethnic and Urban/Suburban Differences in Public Opinion and Policy Priorities," paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999; co-authored with Ester R. Fuchs, Robert Y. Shapiro, and Gustavo Cano.

"The Importance of Full Disclosure of Non-response Due to Refusals and the Nature of Potential Bias in Phone Surveys," with Robert Y. Shapiro, evening workshop presentation to the New York City chapter of the American Association for Public Opinion Research, New York City, March 9, 1999.

"White, Black and Latino Voter Turnout in the 1993 New York City Mayoral Election:  A Comparison of Ecological Regression Techniques and Exit Poll Data," paper presented at the 94th Annual Meeting of the American Political Science Association, Boston, September 4, 1998; co-authored with David K. Park and Daniel M. Slotwiner.

Panel Discussant, "Race, Rights, and American Politics;" panel at the 27th Annual Meeting of the Northeastern Political Science Association and International Studies Association-Northeast, Newark, New Jersey, November 9-11, 1995.

"Assessing the Quality of Political Reform: Redistricting and the Case of New York City," paper presented at the Annual Meeting of the New York State Political Science Association, Albany, New York, April 22, 1994.

### Research Reports

*How to Think About Voter Participation*, White Paper, New York City Charter Revision Commission, July 2010.

*The Myth of Voter Fraud*, White Paper, Dēmos – A Network for Ideas and Action, May 2002.

*Evaluation of the New York Immigration Coalition's '200,000 in 2000: New Americans Pledging to Strengthen Democracy and New York' Initiative,* Final Report to the New York Foundation, with John H. Mollenkopf, August 2001.

*A Study of Attitudes Among Low-Income Parents Toward Environmental Health Risks and Childhood Disease: The Brooklyn College COPC Survey*, with Immanuel Ness, June 2001.

*Political Participation and Political Representation in New York City; With a Special Focus on Latino New Yorkers*, Report of the Columbia University/Hispanic Education and Legal Fund Opinion Research Project, co-authored with Robert Y. Shapiro and Ester R. Fuchs, December 1997.

### Expert Participation in Federal and State Voting Rights Cases

Expert Witness, *League of Women Voters of New Hampshire v. Gardner*, State of New Hampshire Superior Court, Hillsborough, SS, Southern District, 2018.

Expert Witness, *Fish v. Kobach*, U.S. District Court for the District of Kansas, 2016-2018.

Expert Witness, *One Wisconsin Institute v. Nichols et al.*, U.S. District Court for the Western District of Wisconsin, 2016.

Expert Witness, *Lee v. Virginia State Board of Elections*, U.S. District Court for the Eastern District of Virginia, 2016.

Expert Witness, *Ohio Democratic Party v. Husted*, U.S. District Court for the Southern District of Ohio, 2015.

Expert Witness, *North Carolina State Conference of the NAACP v. McCrory*, U.S. District Court for the Middle District of North Carolina, 2014-2016.

Expert Witness, *Veasey v. Perry*, U.S. District Court for the Southern District of Texas, 2014-2015.

Expert Witness, *Frank v. Walker/LULAC (formerly Jones) et al. v. Deininger*, U.S. District Court for the Eastern District of Wisconsin, 2012-2013.

Expert Witness, *Applewhite v. Commonwealth of Pennsylvania*, Commonwealth Court of Pennsylvania, 2012-2013.

Expert Report, *Rutgers University Student Assembly et al. v. Middlesex County Board of Elections*, Superior Court of New Jersey/Middlesex County, 2011.

Expert Witness, *Democratic National Committee, et al. v. Republican National Committee, et al.*, U.S. District Court in the District of New Jersey, 2008-2009.

***Amicus Filings and Congressional and Other Testimony***

U.S. Commission on Civil Rights Briefing, "An Assessment of Minority Voting Rights Obstacles in the United States," Raleigh, North Carolina, February 2, 2018 (oral and written testimony).

*Shelby County, Alabama v. Holder*; U.S. Supreme Court, Brief of Historians and Social Scientists as *Amici Curiae* in Support of Respondents, February 1, 2013 (signatory).

*League of Women Voters v. Rokita;* Supreme Court of Indiana, Brief of *Amici Curiae* Lonna Rae Atkeson, Matt A. Barreto, Lorraine C. Minnite, Jonathan Nagler, Stephen A. Nuño and Gabriel Ramon Sanchez in Opposition to Defendant's Petition to Transfer, November  2009.

U.S. Senate Committee on Rules and Administration, *Hearing on In-Person Voter Fraud: Myth and Trigger for Voter Disenfranchisement?*, March 12, 2008 (invited written testimony).

Expert Witness, U.S. House Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Civil Liberties, *Oversight Hearing on Voter Suppression*, February 26th, 2008 (oral and written testimony).

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.; U.S. Supreme Court,* Brief of *Amici Curiae* The Brennan Center for Justice, Demos: A Network for Ideas and Action, Lorraine C. Minnite, Project Vote, and People for the American Way Foundation *in Support of Petitioners*, November 2007.

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.; U.S. Supreme Court,* Brief of *Amici Curiae* of Historians and Other Scholars *in Support of Petitioners*, November 2007 (signatory).

Fact Witness, *ACORN et al. v. Bysiewicz*, U.S. District Court in the District of Connecticut, 2004-2005.


# RESEARCH AND OTHER GRANTS

*Principle Investigator*, "Camden City Exit Poll," Rutgers Research Council Award, 2018-2019 ($2,000).

*Co-Recipient*, Rutgers University Centers for Global Advancement and International Affairs, 2016 ($10,000).

*Recipient,* Rutgers-Camden Learning Abroad Office, Course Development Grant, 2015 ($1,000).

*Principle Investigator*, "The Political Exclusion of the Urban Poor," Rutgers Research Council Award, 2013-2014 ($3,000).

*Recipient*, RU FAIR ADVANCE (NSF) Rutgers-Camden Travel Award, March/April 2013 ($1,590). Funded by the Rutgers University Office for the Promotion of Women in Science, Engineering, and Mathematics (SciWomen) Institutional Transformation grant from the ADVANCE program of the National Science Foundation.

*Principal Investigator*, "University Collaborative Exit Poll," November 2008 to October 2009 ($30,000).  Funded by Columbia University Institute of Social and Economic Research and Policy, Center for Urban Research at the Graduate School and University Center of the City University of New York, and the New York Latino Research and Resources Network at the University of Albany, State University of New York.

*Co-Principal Investigator*, "2006 New Americans Exit Poll," November 2006 to October 2007 ($10,000).  Funded by the Graduate School of Arts and Sciences, Columbia University.

*Recipient*, Special Assistant Professor Leave Travel Grant, September 2003 to September 2005 ($7,700).  Funded by the Provost's Office, Winston Fund, Barnard College.

*Recipient*, Conference Grant, September 2003 to September 2005 ($3,000).  Funded by the Provost's Office, Forman Fund, Barnard College.

*Member*, Working Group on New York's Recovery from September 11th, June 2002 to June 2005 ($30,000). Funded by the Russell Sage Foundation.

*Principal Investigator*, "2002 New Americans Exit Poll," December 2002 to March 2003 ($1,800).  Funded by the Faculty Research Fund of Barnard College.

*Principal Investigator*, "Evaluation of the New York Immigration Coalition's '200,000 in 2000' Campaign," July 2000 to July 2001 ($40,000). Barnard College, Columbia University.  Funded by the New York Foundation.

*Co-Principal Investigator*, "Muslim Communities in New York City," July 1998 to July 2001 ($350,000). The Center for Urban Research and Policy, Columbia University.  Funded by the Ford Foundation.

# SERVICE

### College and University

Invited Panelist, "Voting Law in the 2016 Election: Perspectives from Political Science, Public Policy and Public Law," Rutgers University, Camden, New Jersey, December 7, 2016.
Member, Steering Committee, Rutgers University-Camden International Conference on Sustainable Community Development and STEAM Fields: What We Can Learn from A Changing Cuba," October 31 – November 3, 2016.
Chair, Department of Public Policy and Administration, Rutgers-Camden, 2016 to present.
Member, Advisory Committee, Continuing Education Program in Historic Preservation, Rutgers-Camden, 2016 to present.
Member, Global Research and Education Committee, Rutgers-Camden, 2016-2017.
Member, Tenure and Third-Year Review Committees, Department of Political Science, Rutgers-Camden, 2015 to present.
Member, Rutgers-Camden Department of Public Policy & Administration Ph.D. Committee, 2014-present.
Co-Organizer, "Symposia on Urban Poverty and Inequality," Rutgers University-Camden, February 4, February 19, April 2, and April 22, 2014.
Member, Rutgers-Camden Department of Public Policy & Administration Ph.D. Exam (Theory) Committee, 2013-present.
Member, General Education Committee, Subcommittee on Engaged Civic Learning, Rutgers-Camden, 2013-2014, 2015.
Marshal, Rutgers-Camden Commencement, 2013, 2014.
Member, Rutgers-Camden Department of Political Science Search Committee, 2013.
Member, Rutgers-Camden Department of Public Policy & Administration Search Committee, 2012, 2013.
Director, Undergraduate Urban Studies Program, Rutgers-Camden, 2011 to 2016.
Member, Ford Faculty Seminar on Inequality in New York, Barnard College, 2009-2010.
Panelist, "Obama and the Immigrant Vote," Barnard Forum on Migration, October 30, 2008.

Panel Moderator, "Is Democracy Democratic?" at the Thirty-Third Annual *The Scholar and the Feminist Conference*, Barnard College, March 11, 2008.

Participant, Mellon 23 Assembly, Macalester College, St. Paul, Minnesota, February 15-17, 2008.

Panelist, "Election Reflections: The Bush Legacy and the Coming Presidential Elections," Barnard College, Oct. 8, 2007.

Member, *The Scholar and the Feminist Conference* Planning Committee, Barnard Center for Research on Women, 2006.

Member, Faculty Programs and Governance Committee, 2005-2007 (on leave Spring 2007).

Member, Faculty Committee, Barnard Leadership Initiative, 2005-2007 (on leave Spring 2007).

Member, Medalist Committee, Barnard College, 2004-2006, 2007-2009 (on leave Spring 2007).

Member, Columbia University Seminar in Political and Social Thought, 2004 to 2011.

Faculty Mentor, Francene Rodgers Scholarship Program, Barnard College, Summer 2004.

Panel Moderator, "Governance by the Media: Feminists and the Coming Election," at the Twenty-Ninth Annual *The Scholar and the Feminist Conference*, Barnard College, April 3, 2004.

Member, Ph.D. Subcommittee in Urban Planning, Columbia University School of Architecture, Planning and Preservation, 2003 to 2011.

Member, Columbia University Seminar on Globalization, Labor, and Popular Struggles, 2001 to 2011.

Member, Columbia University Seminar on the City, 2001 to 2011.

Faculty Mentor, Columbia University Graduate School of Arts and Sciences Summer Research Program, 2001.

Advisory Board Member, Barnard Center for Research on Women, 2000 to 2011.

First Year Adviser, Barnard College, 2000 to 2004, 2009 to 2011.

One-Year Replacement Member, Committee on Programs and Academic Standing, Barnard College, 2000-2001.

### *Professional*

I have reviewed numerous journal articles for the *American Political Science Review*, *American Journal of Political Science*, *American Review of Politics, British Journal of Industrial Relations*, *Community Development Journal, Election Law Journal, Ethnic and Racial Studies*, *Journal of Electoral Studies, Journal of Ethnic and Migration Studies*, *Law and Society Review*, *New Political Science, Perspectives on Politics*, *Political Behavior, Political Communication, Political Research Quarterly, Political Science Quarterly*, *Public Opinion Quarterly, Urban Affairs Review*, and *Working U.S.A.: The Journal of Labor and Society*; and book proposals and manuscripts for Blackwell Publishers, Lexington Books, Routledge, M.E. Sharpe, Inc., New York University Press, and The New Press.

Chair, Social Science History Association President's Book Award Selection Committee, 2018.

Co-Organizer, "Insurgency from Below and the Future of American Democracy: A Conference in Celebration of the Work of Frances Fox Piven and Richard A. Cloward," Graduate School and University Center of the City University of New York, New York City, October 11, 2017.

Member, Social Science History Association President's Book Award Selection Committee, 2017.

Invited Speaker, Voting Rights Institute Expert Witness Training Conference, sponsored by The Campaign Legal Center, the American Constitution Society and Harvard University Center for Governmental and International Studies, Cambridge, September 14, 2016.

Dissertation Fellowship Reviewer, Center for Engaged Scholarship, 2016-present.

Faculty Presenter, American Bar Association, "The Voter Fraud Myth, Voter ID, Immigration and Voting Rights, and State Legislative Reapportionment," February 18, 2016 (1.5 CLE credits).

Co-Chair, Scholars Strategy Network, New Jersey Chapter, 2015 to present.

Consulting Expert, U.S. Government Accountability Office, Issues Related to State Voter Identification Laws, May 2013.

Guest Seminar Speaker, Carnegie-Knight News21 Initiative Reporting Seminar on Voting Rights, The Walter Cronkite School of Journalism and Mass Communication, Arizona State University, February 2, 2012.

Member, Best Book Committee, Urban Section, American Political Science Association, 2010-2011, 2012-2013.

Executive Council Member, Urban Section, American Political Science Association, 2005-2006, 2008-2010.

Member, Charles A. McCoy Career Achievement Award, New Politics Section, APSA, 2008-2009.

Member, Best Dissertation Committee, Urban Section, American Political Science Association, 2008-2009.

Co-chair, Local Host Committee, American Sociological Association Annual Conference, 2006-2007.

Nominating Committee, Urban Section, American Political Science Association, 2006-2007.

Chair, Piven and Cloward Award Committee, New Political Science Section, American Political Science Association, 2005-6.

Member, Best Paper Committee, Urban Section, American Political Science Association, 2005-2006.

Editorial Board Member, *Working USA: The Journal of Labor and Society*, 2004 to present.

Grant Reviewer, Research Award Program, The City University of New York, 2003.

Member, New York Colloquium on American Political Development, 2001 to 2011.

***Community***

Invited Speaker, National Organization for Women, South Jersey 'Alice Paul' Chapter, Moorestown, New Jersey, February 14, 2018.

Invited Speaker, Annual Fall Meeting of the Mercer County Division of Elections, Clerks Workshop, October 3, 2017.

Invited Keynote Speaker, League of Women Voters of Burlington County, New Jersey, Annual Fall Conference, Moorestown Friends, Moorestown, New Jersey, September 18, 2017.

Poll Worker, Gloucester County Board of Elections, June 6, 2017 Primary Election (Republican Party Representative).

Faculty Adviser and Organizer, Graduate Student Conference on State and Local Economic Development Policy, The Neighborhood Center, Camden, New Jersey, April 17, 2016; March 28, 2017.

Invited Panelist, "Voting Fraud, Voter Suppression: Myths and Realities," League of Women Voters of Connecticut Education Fund Annual Fall Conference, Darien Library, Darien, Connecticut, October 24, 2015.

Member, Participatory Budgeting in New York City Research Board, Community Development Project of the Urban Justice Center, 2013-2015.

Invited Speaker, Registrar's of Voters Association of Connecticut, Annual Meeting, Cromwell, CT, April 12, 2012.

Keynote Speaker, Federal Aviation Administration William J. Hughes Technical Center 2012 Black History Month Celebration, Atlantic City, New Jersey, February 15, 2012.

Organizer, "National Teach-in on Debt, Austerity and How People Are Fighting Back," Judson Memorial Church, New York City, April 11, 2011.

Host Committee, New York State Immigrant Action Fund, 2010.

Board Member, The Left Forum, 2009 to 2013.

Member, New York City Comptroller-Elect John Liu Transition Committee Working Group on External Affairs, 2009.

Board Member, Project Vote, 2008-2009.

Speaker, "The Immigrant Voter in New York City," New York Voter Assistance Commission, New York City, May 19, 2005; Citizens Union, New York City, May 18, 2005; New York Immigration Coalition, New York City, February 17, 2005; New York City Central Labor Council, New York City, April 28, 2004.

Speaker, "The Post-9/11 Crackdown on Immigrants," Coney Island Avenue Project, Brooklyn, New York, March 25, 2004.

Volunteer, *New York Immigration Coalition*, Voter Registration at INS Naturalization Ceremonies, 1998 to 2002.

# PAID CONSULTANTSHIPS

***American Civil Liberties Union Voting Rights Project, 2016-2018***
Wrote expert reports for plaintiffs in *Fish v. Kobach*, U.S. District Court for the District of Kansas.

***Perkins Coie, LLP, 2015-2018.***
Wrote expert reports and testified at trial for plaintiffs in *Ohio Democratic Party v. Husted*, U.S. District Court for the Southern District of Ohio, Eastern Division; *Lee v. Virginia State Board of Elections*, U.S. District Court for the Eastern District in Virginia, Richmond Division; and *One Wisconsin v. Wisconsin Government Accountability Board* in the U.S. District of the Western District of Wisconsin; and wrote expert report for plaintiffs in *League of Women Voters of New Hampshire v. Gardner*, State of New Hampshire Superior Court, Hillsborough SS., Southern District.

***Kirkland & Ellis, LLP, 2014-2016.***
Wrote expert reports and testified for plaintiffs in *North Carolina State Conference of NAACP v. McCrory*, U.S. District Court for the Middle District of North Carolina.

***Dechert, LLP, 2014***
Wrote expert report for plaintiffs and testified at trial in *Veasey v. Perry*, U.S. District Court for the Southern District of Texas.

***Arnold & Porter LLP, 2012-2013.***
Wrote expert reports for plaintiffs (2012, 2013) and testified (2012) at trial in *Applewhite v. Commonwealth of Pennsylvania*, Commonwealth Court of Pennsylvania.

***New York City Charter Revision Commission, 2010.***

Analyzed the problem of voter participation in New York City and possible solutions for consideration by Commissioners as they prepared ballot referenda to be placed before the voters in 2010.

***New York Latino Research and Resources Network at the University of Albany, State University of New York, 2008.***
Analyzed survey and other data and wrote report on Latino political participation in New York City and New York State in the 2008 presidential election.

***New York Immigration Coalition, New York, New York, 2006.***
Provided technical assistance to a three-city exit poll survey project for the 2006 national midterm elections.

***Brennan Center for Justice at New York University School of Law, 2004-2005.***
Provided expert report on voter fraud and testified as a fact witness in *ACORN, et al. v. Bysiewicz,* Civil Action No. 3:04-CV-1624 (MRK), U.S. District Court for the District of Connecticut.

***Howard Samuels State Management and Policy Center, Graduate School and University Center of CUNY, 2002.***
Consulted on survey design for a project on the efficacy of community-based organizations.

***Dēmos, New York, New York, 2001 to 2002.***
Researched and wrote a study of voter fraud in contemporary American politics.

***1199 Child Care Fund, New York, New York, 2000 to 2002.***
Prepared demographic data for Fund-eligible union members and their children.

(2/19)

# APPENDIX B

## LORRAINE C. MINNITE

## LIST OF EXPERT TESTIMONY SINCE 2010

- *Applewhite v. Commonwealth of Pennsylvania*, No. 330 MD 2012 (Pa. Cmmw. Ct. 2014).

- *Frank v. Walker/LULAC (formerly Jones) et al. v. Deininger*, Civ. No. 2:12-cv-00185 (E.D. Wis. 2013).

- *Veasey v. Perry*, Civ. No. 13-cv.00193 (S.D. Tex. 2014).

- *North Carolina State Conference of the NAACP v. McCrory, et al.*, No. 1:13-cv.00658 (M.D.N.C. 2014).

- *Ohio Democratic Party v. Husted*, No. 2:15-cv.1802 (S.D. Ohio 2016).

- *Lee v. Virginia State Board of Elections*, Civ. No. 3:15-cv-357 (E.D. Va. 2016).

- *One Wisconsin Institute v. Nichols et al.*, No. 15-cv-324 (W.D. Wis. 2016).

- *Fish v. Kobach*, No. 2:16-cv-02105 (D. Kansas, 2018).

- *League of Women Voters of New Hampshire v. Gardner*, No. 226-2017-cv-00433 (N.H. Super. N.D. 2018).