**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS, | § § § | |
| and | § § | |
| NATIONAL LEAGUE OF UNITED LATIN AMERICAN CITIZENS, | § § § | |
| and | § § | |
| JULIE HILBERG, individually and on behalf of others similarly situated, | § § § | CIVIL ACTION NO. 5:19-CV-00074-FB |
| *Plaintiffs,* | § § | |
| v. | § § | |
| DAVID WHITLEY, in his official capacity as Secretary of State for the State of Texas, | § § § | |
| and | § § | |
| KEN PAXTON, in his official capacity as Attorney General for the State of Texas, | § § § § | |
| *Defendants.* | § | |

**DEFENDANTS TEXAS SECRETARY OF STATE DAVID WHITLEY, TEXAS ATTORNEY GENERAL KEN PAXTON, TEXAS GOVERNOR GREG ABBOTT, AND KEITH INGRAM'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... 2

INTRODUCTION ........................................................................................................... 5

PROPOSED FINDINGS OF FACT .............................................................................. 7

   I.   TEXAS ELECTIONS SYSTEM .................................................................... 7

   A.  Local Election Officials Have the Exclusive Authority to Decide Whether to Investigate Any Voter for Non-Citizenship ................................................................... 7

   B.  Voters Have the Ability to Cure Any Notice of Examination ........................................... 8

   C.  Any Voter Who is Eligible and Who Neglects to Cure May Still be Immediately Reinstated and Vote a Regular Ballot or May Cast a Provisional Ballot Should Their Local Election Officials Incorrectly Cancel Their Voter Registration ............................... 9

   II.  ELECTION ADVISORY NO. 2019-02 .......................................................... 10

   III. PLAINTIFFS HAVE NOT ESTABLISHED SUFFICIENT EVIDENCE TO PROVE THEY ARE ENTITLED TO INJUNCTIVE RELIEF .................................................... 15

   A.  The Individual Plaintiffs Lack Standing. ........................................................ 15

   B.  The Organizational Plaintiffs Lack Standing.................................................. 17

   C.  Plaintiffs Have Not Established That They Have a Claim Upon Which Relief Can Be Granted.................................................................................................... 18

      1.  Plaintiffs Have Failed to Establish Fourteenth and First Amendment Claims. ........... 18

        a.  Plaintiffs Did Not Show the Character or Magnitude of Their Alleged Injuries Qualify as a Substantial Burden on the Right to Vote. ............................................ 18

        b.  Plaintiffs Did Not Show Their Alleged Burdens Outweigh the State's Interest in Safeguarding the Integrity of the Electoral Process................................................. 23

      2.  The Evidence Shows, and the Court acknowledges, that Defendants Did Not Implement the Matching Process to Silence Minority Voters. .................................... 23

      3.  The Garibay and MOVE TX Plaintiffs' Voting Rights Act Claims Must Fail............ 29

4. The Garibay Plaintiffs Have Failed to Establish a Violation of 45 U.S.C. § 1985, Conspiracy to Interfere with Civil Rights. ................................................. 29

5. The MOVE TX Plaintiffs Have Failed to Establish a Fifteenth Amendment Claim... 29

6. The MOVE TX Plaintiffs Have Failed to Establish Any Due Process Claims. .......... 30

7. The MOVE TX Plaintiffs Have Failed to Allege Facts About Discriminatory Purpose. 30

D. The Evidence Does Not Show That Plaintiffs Have Suffered or Will Suffer an Irreparable Injury, and Plaintiffs Have Not Proven Any Substantial Burden on the Right to Vote. .. 30

E. The Evidence Shows That Plaintiffs' Requested Relief Would Impose a Substantial Burden on Defendants and Disserve Public Interest in Maintaining the Integrity of Elections. ................................................................................................. 31

PROPOSED CONCLUSIONS OF LAW ........................................................................ 32

I. PLAINTIFFS CANNOT PREVAIL ON THE MERITS OF THEIR CLAIMS............... 32

A. Plaintiffs Lack Standing to Assert Their Claims. ........................................... 33

1. The Individual Plaintiffs Lack Standing. ................................................ 34

2. The Organizational Plaintiffs Lack Standing. ......................................... 41

B. Plaintiffs Failed to Prove a Substantial Likelihood of Success on the Merits. ............... 47

1. Plaintiffs' Fourteenth and First Amendment Claims Must Fail. ..................... 47

a. The Character and Magnitude of Plaintiffs' Alleged Injuries Do Not Qualify as a Substantial Burden on the Right to Vote. ................................................ 48

b. The State's Interest in Safeguarding the Integrity of the Electoral Process Outweighs the Alleged Burdens to Plaintiffs. ................................................ 51

c. The Florida Case Relied on By Plaintiffs is Distinguishable and Inapposite. .......... 52

2. Plaintiffs' Voting Rights Act Claims Must Fail. [Garibay] ......................... 55

3. Plaintiffs Have Failed to Establish a Likelihood of Success on Their Claim of a Conspiracy to Interfere with Civil Rights Under 45 U.S.C. § 1985. [Garibay]........... 57

4. Plaintiffs Have Failed to Establish a Likelihood of Success on Their Fifteenth Amendment Claim. [MOVE]...................................................................... 59

5.  Plaintiffs Have Failed to Establish a Likelihood of Success on Their Due Process Claims. [MOVE] .................................................................................... 59

a.  Substantive Due Process ......................................................................... 60

b.  Procedural Due Process .......................................................................... 61

6.  Plaintiffs Have Failed to Establish a Likelihood of Success on their Claim of Discriminatory Purpose. [MOVE] .............................................................. 62

II.   PLAINTIFFS' ALLEGED INJURIES ARE NOT IRREPARABLE. ............................. 63

III.  INJUNCTIVE RELIEF WOULD IMPOSE A SUBSTANTIAL BURDEN ON DEFENDANTS AND WOULD SIGNIFICANTLY COMPROMISE THE PUBLIC'S INTEREST IN THE INTEGRITY OF THE ELECTORAL PROCESS. ........................ 65

CERTIFICATE OF SERVICE .................................................................................. 68

## INTRODUCTION

1.      Defendants Texas Secretary of State David Whitley, Texas Attorney General Ken Paxton, Texas Governor Greg Abbott, and Keith Ingram, in their official capacities, respectfully submit the following Post-Preliminary Injunction Hearing Proposed Findings of Fact and Conclusions of Law:

2.      State and federal law require the Texas Secretary of State to assist county election officials in maintaining the accuracy of Texas's voting rolls. To that end, the Texas Legislature has mandated that the Texas Department of Public Safety ("DPS") share information with the Secretary of State for the express purpose of attempting to identify non-citizens who are registered to vote. The Secretary of State does not investigate voter eligibility or cancel a voter's registration for non-citizenship, however, as that authority lies solely with the county election officials. Rather, the Secretary's role is limited to providing guidance and information to the counties to ensure that only eligible citizens can cast ballots.

3.      Consistent with his clear statutory duty, former Secretary of State Rolando Pablos began working with DPS in March 2018 to obtain data regarding the citizenship of individuals at the time they applied for Texas driver's licenses or identification cards so that it could be compared to the list of registered voters. On January 25, 2019, Secretary of State David Whitley's office provided counties the names of the registered voters who had presented evidence of non-citizenship when they obtained a driver's license or identification card. In doing this, his office carefully described the nature of the information, and the limitations on counties' ability to cancel voter registrations based on that information:

> All records submitted through this process will need to be treated as WEAK matches, meaning that the county may choose to investigate the voter, pursuant to Section 16.033, Election Code, or take no action on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible. The

county **may not cancel** a voter based on the information provided without first sending a Notice of Examination (Proof of Citizenship Letter) and following the process outlined in the letter. In order to help counties, make a determination regarding whether or not to send a Notice of Examination or close the task without taking further action, information provided by DPS will be provided to each county for further review and comparison against the voter record.

LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 2 (emphasis in original).

4.      Secretary Whitley has now been sued for fulfilling his statutory obligation. Plaintiffs also name Texas Attorney General Ken Paxton and Texas Governor Greg Abbott as defendants. Plaintiffs allege that Attorney General Paxton did nothing other than send out a press release and other communications confirming that he plans to fulfill his duty to investigate claims of voter fraud. Similarly, Plaintiffs allege only that Governor Greg Abbott commented about the matching process on Twitter. Thus, Plaintiffs ask this Court to enter an injunction that would prevent State officials from performing their roles as required by the Texas Constitution, Texas statutes, and federal law.

5.      Defendants Texas Secretary of State Whitley, Attorney General Paxton, and Governor Greg Abbott respectfully request that the Court adopt their proposed Findings of Fact and Conclusions of Law in their entirety. Defendants are not responsible for canceling any voter's registration for non-citizenship. That role belongs to the counties. Moreover, no eligible voters have been removed from the rolls as a result of the Election Advisory. If Plaintiffs receive a notice of examination, they can prevent cancellation by proving their citizenship at any time after receiving the notice. Citizens can contest cancellation should it occur, and county registrars must add their names back on the rolls if they were wrongfully canceled. Further, if a citizen's registration is canceled, their registration is required to be reinstated immediately if they present proof of citizenship to the voting registrar. This can happen at any time, including on election day if a citizen discovers this cancellation when casting a ballot. Thus, Plaintiffs have not suffered an

6

injury that is fairly traceable or redressable by an injunction against the Defendants, and therefore Plaintiffs lack standing.

## PROPOSED FINDINGS OF FACT

### I.   TEXAS ELECTIONS SYSTEM

6.      Secretary Whitley's constitutional role requires him to assist county election officials in maintaining Texas's voting rolls. *See, e.g.*, Tex. Const. art. 4, § 21; Tex. Elec. Code § 31.001.; Trial Tr. at 295:9-16.

7.      Secretary Whitley's Elections Division provides assistance and advice to election officials and the general public on the proper conduct of elections, including hosting seminars and election schools, providing calendars, prescribing forms, certifying ballots, funding primary elections, and providing legal interpretations of election laws to election officials. *See, e.g.*, Tex. Elec. Code §§ 31.004 (duty to provide assistance and advice to all election authorities), 31.005 (authority "to protect the voting rights of the citizens of this state"), 31.0055 (duty to maintain a voting-rights hotline), 31.006 (duty to refer complaints alleging criminal conduct to the Attorney General).

### A. Local Election Officials Have the Exclusive Authority to Decide Whether to Investigate Any Voter for Non-Citizenship

8.      Local election officials in Texas are charged with conducting elections and maintaining voter rolls. *See, e.g.*, *id.* § 12.001 (designating a local official as the voter registrar). Each county can assign the duties of the voter registrar to the county clerk, an elections administrator, or the tax assessor-collector. *See id.* Each registrar is authorized by statute to use any lawful means to investigate registration eligibility. *Id.* § 16.033. And only the registrar—that

is, the local election official—can cancel any individual's voter registration after such investigation. *See id.* §§ 16.031-.0332.

### B.  Voters Have the Ability to Cure Any Notice of Examination

9.    The process for cancelling a voter's registration is codified in statute and entails a number of protections to ensure that eligible voters do not forfeit the right to vote. The registrar must first investigate whether the registered voter is currently eligible to vote. Tex. Elec. Code § 16.033. The law further directs the registrar to take certain actions if he or she "has reason to believe that a voter is no longer eligible for registration." *Id*. § 16.033(b).

10.    The registrar is not permitted to cancel a voter's registration before notifying the voter, in writing and sent by forwardable mail to the voter's mailing address and any other addresses known to the registrar, that the voter's registration status is under investigation. *Id*. The notice of examination, as it is called, must specify what information is needed to determine the voter's eligibility. *Id*. § 16.033(c)(1). And the notice must advise the recipient that the requested information must be received within thirty days or the voter's registration will be subject to cancellation. *Id*. § 16.033(c)(2).

11.    In the event that a voter's registration is investigated because the registrar has reason to believe that the voter is a non-citizen, the notice of examination will ask for proof of citizenship. *Id.* A voter may prove his or her citizenship by submitting a birth certificate, United States passport, certificate of naturalization, or any other form prescribed by the Secretary of State. *Id.* § 16.0332(a). And, state law allows voters to submit responsive documentation by "personal delivery, mail, telephonic facsimile machine, or any other method of transmission." *Id*. § 1.007(c). State law requires the registrar to cancel a voter's registration if the registrar determines that the voter is ineligible based on the voter's reply to the notice of examination. *Id*. § 16.033(d).

8

12.    Registration is automatically cancelled if the voter does not respond within 30 days of the notice, or if the notice is returned undeliverable with no forwarding information available. *Id*. But a voter whose registration is cancelled could still submit proof of citizenship and be reinstated immediately by the registrar. *Id*. § 16.037(a), (d).

13.    Voters whose registration is cancelled can also request a hearing with the registrar. *Id.* § 16.061. Upon submitting a signed request for a hearing, an individual's voter registration is reinstated and a hearing is scheduled within 10 days. *Id.* §§ 16.037, 16.064. At the hearing, the voter may appear personally or submit an affidavit without appearing. *Id.* § 16.064. And if the voter disagrees with the registrar's determination at the hearing, the voter can seek judicial review of the decision, during which time any cancellation of the individual's voter registration is delayed. *See id.* § 17.005. Only after a district court rules on the appeal is an individual finally subject to cancellation of their voter registration. *See id.* § 17.008.

### C.    Any Voter Who is Eligible and Who Neglects to Cure May Still be Immediately Reinstated and Vote a Regular Ballot or May Cast a Provisional Ballot Should Their Local Election Officials Incorrectly Cancel Their Voter Registration

14.    An individual whose voter registration is cancelled can vote a regular ballot if he or she presents proof of citizenship before or at the time of voting, or may cast a provisional ballot. Election officials at polling locations must provide provisional ballots to voters who claim to be eligible voters but whose names are not on the list of registered votes. 52 U.S.C. § 21082 (requiring provisional ballots); Tex. Elec. Code § 63.011 (same); 1 Tex. Admin. Code § 81.172(a)(5) (same). The voter can submit proof of citizenship to the registrar and be reinstated immediately or at any time before the provisional ballots are counted. Tex. Elec. Code § 16.037(d). Upon receipt of the necessary documentation, the registrar would note that the voter was erroneously removed from the rolls, 1 Tex. Admin. Code § 81.175(c)(4)(E), and restore him or her to the rolls, *id*. §

81.175(c)(7) ("For purposes of voter registration, the copied Provisional Ballot Affidavit Envelope serves as an original voter registration application or change form.").

15.     The Office of Attorney General (OAG) has statutory authority to investigate and prosecute election offenses statewide. Tex. Elec. Code §§ 273.001, 273.021. These offenses include the misdemeanor offense of unlawful registration, *id*. § 13.007, and the felony offense of illegal voting, *id.* § 64.012. OAG can investigate election matters on its own initiative. *Id*. § 273.001(b). OAG can also receive notices of unlawful voting from registrars, *id.* §§ 15.028, 273.001(c), and referrals of election-related complaints from the Secretary of State, *id*. § 273.001(d). OAG does not have statutory authority to conduct list maintenance or remove registered voters from voter rolls. *See id*. §§ 273.001 *et seq*.

## II.     ELECTION ADVISORY NO. 2019-02

16.     The Texas Legislature safeguards voting rights by equipping state and local officials with tools to stop voter fraud. *See, e.g*., 42 U.S.C. § 1973gg-3(b) (explaining that confirming accurate voter registration "protect[s] the integrity of the election process"). The Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker III noted that measures to ensure accurate voter registration lists are necessary because "[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud." Building Confidence in U.S. Elections § 2.5 at 18 (Sept. 2005), *available at* https://www.eac.gov/assets/1/6/Exhibit%20M.PDF. And the Supreme Court has stated that the protection of election integrity "is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982).

17.     Texas law requires a matching process to ensure the accuracy of the voter rolls. As the supervisor of this process, the Secretary of State is required to "periodically compare the information regarding voters maintained as part of the statewide computerized voter registration list to determine whether any voters have more than one voter registration record on file." *Id*. § 18.0681. And as part of the matching process, the Secretary is further instructed to create matching criteria that "produce the least possible impact on Texas voters; and fulfill [the Secretary's] responsibility to manage the voter rolls." *Id*. § 18.0681(b). Finally, the law provides guidance based on whether the matches are "weak" or "strong." Relevant here, the Secretary "may inform the county of the voter's residence that a weak match exists." *Id*. § 18.0681(c).

18.     In March 2018, former Secretary of State Pablos began working with DPS to obtain information about non-citizen holders of driver's licenses or personal identification cards. LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1. DPS is required to share such records in connection with the Secretary's duty to administer elections and maintain accurate voter registration lists. Tex. Trans. Code § 730.005(9). The Secretary of State's office and DPS worked together to disseminate information using the strongest matching criteria to "produce the least possible impact on Texas voters." Tex. Elec. Code § 18.0681(b); LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1. For example, the information was limited to individuals with active DPS driver's licenses or identification cards who provided documentation to DPS showing they were non-citizens within the last six years. LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1.

19.     After the matching process was complete, Secretary Whitley provided information related to the matches to the voter registrar in each applicable county. In his advisory to registrars, Secretary Whitley emphasized that the sharing of the voter data obtained from DPS did not change

or modify the registrar's rights and responsibilities under the Texas Election Code. *Id.* Secretary Whitley cited the statutory provision authorizing the registrar to investigate based on a reasonable belief that a voter is no longer eligible for registration. *Id*. (citing Tex. Elec. Code § 16.033(b)). And he pointed to the legislatively provided framework for conducting these investigations, noting that the notice should be delivered by forwardable mail and that non-responses within the prescribed period and notices returned as non-delivered would result in the voter's removal from the rolls. *Id*. at 1-2 (citing Tex. Elec. Code § 16.033(c)-(d)).

20.     Secretary Whitley underscored the point that the purpose of the information sharing was to expand the data set available to the registrars. *Id.* at 1. As state law makes clear, the registrar is ultimately responsible for determining whether there is a reasonable basis for investigating a voter's eligibility. *Id.* Secretary Whitley noted that the matches should be treated as "weak" matches—again, even though the matching criteria itself was robust—and advised the registrars accordingly that they may choose to investigate or take no action at all. *Id*. at 2. Secretary Whitley issued a statement indicating that "[i]ntegrity and efficiency of elections in Texas require accuracy of our state's voter rolls, and my office is committed to using all available tools under the law to maintain an accurate list of registered voters." LULAC-2, Garibay 3, MOVE TX 2, Secretary Whitley Issues Advisory on Voter Registration List Maintenance Activity, at 1.

21.     Attorney General Paxton issued a statement in response to Secretary Whitley's election advisory, noting that "[n]othing is more vital to preserving our Constitution than the integrity of our voting process, and my office will do everything within its abilities to solidify trust in every election in the state of Texas." LULAC-3, Garibay 40, Paxton Press Release, at 1.

22.     An individual must be a United States citizen to vote in Texas. Tex. Elec. Code § 11.002(a)(2). By statute, personal information contained in DPS motor vehicle records must be

12

disclosed to the Secretary of State and used "in connection with any matter of . . . voter registration or the administration of elections by the secretary of state." Tex. Transp. Code § 730.005(9); *see also id.* § 521.044(a)(6) (separately authorizing disclosure of social security number information). The Texas Legislature has manifested its intent that this information be used to ensure the integrity of Texas' voter rolls. The bill requiring DPS to disclose motor vehicle data to the Secretary of State—codified under section 730.005 of the Texas Transportation Code—was enacted in 2013. The law passed the Texas Senate unanimously and secured approval in the Texas House by a broadly bipartisan vote of 123 to 14. Acts 2013, 83rd Leg., ch. 1012 (H.B. 2512).

23.     The leaders of the Texas Democratic Party and the Republican County Chairs Association testified in favor of the bill. Tex. B. Ann., H.B. 2512 (May 3, 2013). The bill's supporters explained that the Secretary of State's office is "required to maintain the accuracy of the voter rolls and does not currently have all the necessary tools at its disposal." *Id*. They contended that the bill's purpose was to help solve that deficiency. By requiring DPS to share the personal data that it receives when individuals apply for driver's licenses and personal identification cards, they maintained, the bill would "improve accuracy in verifying the voter rolls." *Id*.

24.     Pursuant to this legislative directive, Secretary Whitley obtained from DPS information "regarding individuals who provided documentation to DPS showing that the person is not a citizen of the United States during the process of obtaining or acquiring a Texas Driver License or Personal Identification Card." LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1. Looking at data only from "current (unexpired) Driver License and Personal Identification cards" that met matching criteria described in the Election Advisory, Secretary Whitley compiled the list of individuals registered to vote who had previously been determined by DPS not to be

citizens. *Id*. Secretary Whitley did not tell the counties that ***any*** individual on the list was an illegally registered voter. The Election Advisory stresses that "counties are ***not*** permitted, under current Texas law, to immediately cancel the voter as a result of any non-U.S. Citizen matching information provided." *Id*. at 2-3. The Election Advisory unequivocally advises the registrar to "determin[e] whether or not the information provides the registrar with reason to believe the person is no longer eligible for registration." *Id*. at 2. The registrar must treat all records submitting via this process "as WEAK matches, meaning that the county ***may*** choose to investigate the voter, pursuant to Section 16.033, Election Code, ***or take no action*** on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible." *Id*. at 2 (emphasis added).[1] That is despite those same matching criteria justifying an automatic transfer of registration among counties in certain circumstances. Tex. Elec. Code § 18.0681. The Election Advisory makes clear, however, that county voter registrars who received the data from this matching process are ***not*** required to conduct any investigation "if they do not believe that a voter is ineligible to vote." LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 3. And if a voter registrar does choose to investigate, they have "the right to use any lawful means to investigate whether a registered voter is currently eligible." *Id*. at 2. As with other list-maintenance activities, this is an iterative process involving collaboration between the State and counties to assist counties in fulfilling their investigative role.

25.    This matching process is an effort to provide additional information to voter registrars throughout the State—at the behest of the Legislature—to help election officials discharge their obligations to safeguard the integrity of the State's voter rolls by preventing

---

[1] *See also* Election Advisory at 3 ("For the matching notifications originating from DPS data, ***the [registrar] has the choice to*** either . . . Send a Proof of Citizenship Letter (Notice of Examination) to the voter; thereby starting the 30-day countdown clock before cancellation, or . . . ***Take no action on the voter record and simply close the task as RESOLVED***.") (emphases added).

ineligible persons from casting votes. As described above, this process of investigating citizenship status is mandated by statute and affords the individuals at issue ample opportunity to provide the necessary documentation to prove that they are eligible voters. *See* Tex. Elec. Code § 16.0332. Accordingly, the Election Advisory does not mandate that any action be taken against any voter. It merely outlines the process by which DPS data will be shared with local election officials, and leaves to them the decision whether to investigate any particular voter.

## III.   PLAINTIFFS HAVE NOT ESTABLISHED SUFFICIENT EVIDENCE TO PROVE THEY ARE ENTITLED TO INJUNCTIVE RELIEF

### A.  The Individual Plaintiffs Lack Standing.

26.     Plaintiff Hilberg is a U.S. citizen and Texas resident. LULAC First Am. Compl. ¶ 19; Trial Tr. 218:12-218:15, 219:14-221:1. She became a naturalized citizen in 2015 and voted in the 2016 and 2018 elections. LULAC First Am. Compl. ¶ 19; Trial Tr. 219:14-221:1. Hilberg testified that after Secretary Whitley's advisory, she became concerned based on the date she received her driver's license that she may be among the voters who provided documentation to DPS indicating that she was a non-citizen. *Id*. ¶¶ 66, 71; Trial Tr. 219:14-221:1. She spoke with the election administrator in her county and was informed that her name was on the DPS list. *Id*. ¶ 72; Trial Tr. 223:14-223:23. Hilberg has not received a 30-day letter, and her elections administrator knows that she is a citizen. Trial Tr. 231:11-231:24. She admitted that she was aware that she could verify by email her citizenship status, were she to get a 30-day letter. *Id. at* 232:14-233:5.

27.     The remaining Individual Plaintiffs, Julieta Garibay, Nivien Saleh, Jane Doe #1, Jane Doe #2, Jane Doe #3, John Doe, Elena Keane, Maria Felicitas Barbosa, Martine Hummel, Hilda Castillo, Maria Yolisma Garcia, Lorena Tule-Romain, Abraham Josue Espinosa Flores, Viridiana Tule Carrizales Efren A. Gomez, assert that they are naturalized U.S. citizens and

registered Texas voters. MOVE First Am. Compl. ¶ 28; Garibay Third Am. Compl. ¶ 8-18; Trial Tr. 626:1-626:2. They claim that they are injured because they were allegedly identified by the matching process or they received a Notice of Examination requesting a response within the prescribed period. Trial Tr. 626:2-626:6; MOVE TX First Am. Comp1. ¶ 28; Garibay Third Am. Compl. ¶ 8-18. None of the individual plaintiffs have had their registration cancelled nor have any of them been removed from the voter rolls. MOVE TX First Am. Comp1. ¶ 28; Garibay Third Am. Compl. ¶ 8-18; Trial Tr. 232:14-233:5. Secretary Whitley simply provided county registrars with additional information obtained information from DPS pursuant to a mandatory disclosure statute. Tex. Trans. Code § 730.005; *see also* Trial Tr. 305:2-19, 306:25-307:20; 540:17-24. He did not direct registrars to remove a single voter from the voter rolls based solely on the data provided. Trial Tr. 61:1-22; 62:9-13; 66:2-19; 67:9-68:21; 69:8-70:2; 71:7-16; 100:5-13; 116:16-117:1; 117:11-118:12; 119:8-13; 123:11-20; 124:3-8; 124:15-18; 135:24-136:10; 334:10-15; 340:23-342:21; LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1; LULAC-2, Garibay 3, MOVE TX 2, Whitley Press Release, at 1.

28.     The individual plaintiffs ask this Court to declare unlawful the matching process and Defendants' public statements about data derived as a result of that process, and to prevent Defendants or election officials from taking any action based on Secretary Whitley's advisory. Trial Tr. 592:1-592:13, 597:17-597:21, 616:23-622:24. However, Secretary Whitley's advisory and Defendants' related statements did not direct local election officials to take any action. *See* Pl. Exs. LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1; LULAC-2, Garibay 3, MOVE TX 2, Whitley Press Release, at 1, LULAC-3, Garibay 40, Paxton Press Release, at 1, and LULAC-6, Garibay 6, Paxton Tweet; Trial Tr. 61:1-22; 62:9-13; 66:2-19; 67:9-68:21; 69:8-70:2; 71:7-16; 100:5-13; 116:16-117:1; 117:11-118:12; 119:8-13; 123:11-20; 124:3-8; 124:15-18; 135:24-

136:10; 331:23-332:4; 334:10-15; 340:23-342:21. With or without Defendants' public statements and the Secretary's advisory, the registrars can still make an independent determination of whether to investigate the eligibility of voters across the state, including the Individual Plaintiffs. *Id.*

**B. The Organizational Plaintiffs Lack Standing.**

29.     The Organizational Plaintiffs claim that they will be injured because they will have to devote resources to educating members about the matching process. Garibay Mem. Supp. TRO at 29; MOVE TX Motion for Prelim. Inj. at 13-14; LULAC Motion for Prelim. Inj. at 10. However, if they were approached by individuals, they would merely have to provide education on the law of Texas. Trial Tr. 241:12-245:20. As already stated, the disclosure and use of DPS data was mandatory and any action by a registrar must be based on the registrar's reasonable belief that the voter may be ineligible, not on Secretary Whitley's advisory. *Id.* at 331:23-332:4. Furthermore, complying with the notice is merely a function of following the procedures set forth in statute. Tex. Elec. Code § 16.033. Trial Tr. 243:15-245:20. Here, the Organizational Plaintiffs at most would merely have to point to state law, which clearly sets forth the standards and processes that control the maintenance of accurate voting rolls to ensure election integrity. *Id.* And in the event that anyone is investigated, the basis for the investigation would be the registrar's independent determination, not Defendants' advisory and public statements. Trial Tr. 331:23-332:4; LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1.

30.     The Secretary of State cannot tell counties what to do. Trial Tr. at 389:2-8. At least 140 of the counties have elected officials, and the Secretary cannot tell elected officials what to do. *Id.* The Secretary has an obligation to do what it can to obtain and maintain uniformity in the interpretation, application, and operation of the Election Code and election laws outside the code.

*Id*. at 390:16-25. The Secretary of State does so through election advisories, written directives, as well as through assistance and advice set forth in Election Code § 31.004. *Id*.

31.     The Secretary of State does not have the authority to direct any local officials to do anything with respect to individual voters under the matching process. *Id*. at 343:22-344:1. Voters can be immediately reinstated if they show proof of citizenship to the voter registrar, and they can also vote a provisional ballot. *Id*. at 344:2-12.

### C. Plaintiffs Have Not Established That They Have a Claim Upon Which Relief Can Be Granted.

#### 1. Plaintiffs Have Failed to Establish Fourteenth and First Amendment Claims.

##### a. Plaintiffs Did Not Show the Character or Magnitude of Their Alleged Injuries Qualify as a Substantial Burden on the Right to Vote.

32.     The evidence presented shows that citizens born in the U.S. and naturalized citizens both have to submit proof of their citizenship to DPS when initially applying for a driver's license and/or when renewing their driver's license. *Id*. at 271:24-272:5. There are list maintenance activities other than the matching process that require county voter registrars to send out notices of examination to voters. *Id*. at 519:17-520:4. To determine voter eligibility other than residency, the process is sending out a notice of examination that requires the recipient to respond within 30 days, just like that involved in the matching process. *Id*.

33.     Although Plaintiffs presented testimony that there has been confusion among Latinos, Hispanics, and other minorities which have caused a high number of phone calls being placed to TX LULAC, Trial Tr. at 237:15-25, TX LULAC's corporate representative, Lupe Torres, also testified that the organization is currently devoting a lot of its time with the legislative session and developing its legislative agenda. *Id*. at 239:22-240:13. In response to the election advisory, TX LULAC has (1) written a letter making a request under the Public Information Act; and (2)

18

fielded phone calls from members in response to the Election Advisory. *Id*. at 241:12-242:10. However, TX LULAC's director admits that it is a common occurrence for them to receive phone calls from their members regarding certain questions they may have. *Id*.; *see also* 242:11-17.

34.     Torres stated that TX LULAC's district offices can provide information to members regarding the Texas Election Code and that, if a member called into their office after receiving a notice of examination, the office might provide information to the member about how to respond to the letter, including how he or she can verify their citizenship by emailing a copy of his or her naturalization papers to the county voter registrar. *Id*. at 243:10-244:1. Torres further testified that if a member calls into their offices with concerns that they have been incorrectly stricken from the rolls, they would tell members that they could prove their citizenship at any time to their county voter registrar. TX LULAC further conceded that it will point certain members to code provisions that tells them they can get reinstated at any time. *Id*. at 244:13-21.

35.     Torres concedes that if a member is concerned about having been stricken from the voter rolls, TX LULAC's office will inform the member that they are able to cast a provisional ballot under the Texas Election Code, and recognizes that sometimes people have to do that when they don't have all of the proper information. *Id*. at 244:22-245:2. TX LULAC is also aware that any person can go cast a provisional ballot, prove their citizenship, and that provisional ballot will be counted as long as citizenship is proven before the provisional ballots are counted. *Id*. at 245:14-20.

36.     If a person's name appears on the match list, they should not be unilaterally removed from the voter rolls without a 30-day notice being sent. *Id*. at 541:9-25; LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1. It is the county's choice whether to send a 30-day notice under the citizen match project before their voter registration is canceled. *Id*. A citizen

registered to vote who receives a notice of examination can resolve the notice by responding with a copy of their proof of citizenship. Trial Tr. 326:9-25; 327:1-25; 339:5-9; 339:23-25; 526:10-16; Tex. Elec. Code § 1.007. The documents do not have to be certified. *Id*. Acceptable proof of citizenship includes copies of the individual's birth certificate, passport, or naturalization documents. *Id*. The individual may submit their proof of citizenship to the county registrar through a number of methods, including hand delivery, fax, emailing a scanned copy of the proof, emailing a photograph of the proof, or any other acceptable manner. *Id*.

37.     The evidence presented contradicts Plaintiffs' assertion that naturalized citizens will lose their right to vote as a result of the matching process and, instead, shows Texas has multiple safeguards in place to make sure properly registered voters remain on the voter rolls. Plaintiffs' witnesses acknowledged that there are measures people can take if their voter registration has been canceled, including contesting the cancellation with the voter registrar's office and requesting a hearing with the registrar. *Id*. at 278:4-12. Their names can be added back to the voter rolls if they were wrongfully canceled. Trial Tr. 329:1-330:1. In addition, Plaintiffs' witnesses did not deny that voters whose names are not on the voting rolls may still cast provisional ballots. *Id*. at 280:20-281:5; 462:6-21. If a citizen's registration is canceled, their registration is required to be reinstated immediately if they subsequently present proof of citizenship to the voter registrar. *Id*. at 329:1-330:1. They can present their proof of citizenship to the voter registrar at any time after their registration is canceled, including on election day. *See id*. at 462:6-21.

38.     Someone who is a U.S. citizen but had their registration wrongfully canceled can be immediately reinstated on the voter roll with their original effective date of registration when they provide proof of citizenship to their voter registrar—it is not a re-registration. *Id*. at 329:1-330:1. Once they are reinstated on the voter roll, they can vote immediately. *Id*. Voters can be

immediately reinstated and vote a regular ballot if they show proof of citizenship to the voter registrar; they can also vote a provisional ballot and bring proof of citizenship to the registrar later before the provisional ballots are counted. *Id.* at 344:2-12. Even if a voter's registration is canceled, they remain in the registration database for two years—a sufficient time for them to provide their proof of citizenship and be reinstated on the voter roll. *Id.* at 457:6-17.

39.     The evidence shows none of the Plaintiffs have been denied their ability to vote or are otherwise unable to vote as a result of the matching process. Plaintiffs' witnesses testified that they do not know of any individuals who have been taken off the voter rolls or who have had their voter registration cancelled. *Id.* at 271:11-16; 281:6-11. Plaintiffs' witnesses testified that they did not know of anybody who has had charges brought against them for election offenses or who has been prosecuted by the attorney general after receiving a notice of examination, *See id.* at 271:17-23. Plaintiffs failed to present any evidence showing they have and/or will experience difficulties in maintaining their voter registration because of the matching process.

40.     Plaintiffs did not present evidence supporting the invalidation of the entire matching process as an appropriate remedy. The Secretary of State's Election Advisory does not require the counties to send a notice of examination. *Id.* at 341:25-342:21; LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1. It is only if the voter registrar has reason to believe the voter is not eligible should they send a notice of examination. *Id.* If a person receives a notice and does not respond, that person still has the option to vote. *Id.* They can show proof of citizenship and be immediately reinstated and vote a regular ballot, or they can vote a provisional ballot, provide proof of citizenship, and have their provisional ballot counted. *Id.* The Election Advisory doesn't threaten criminal investigation of anyone and the Secretary of State does not have authority to conduct a criminal investigation because they do not have any law enforcement powers. *Id.*

21

41.     The matching process is not something new or different—it is a regular list maintenance process that is required under the law. *Id*. at 400:24-401:6; 434:21-25; 490:6-12. The only difference with this matching process is that it involves a new data set. *Id*. The Secretary of State does not have the authority to direct any local officials to do anything with respect to individual voters under the matching process. *Id*. at 343:22-344:1; LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1. The way list maintenance activities, such as the matching process, work is that the data is sent to the counties. Trial Tr. 507:22-508:13. Once the counties receive the list, they are supposed to follow their normal list maintenance procedures by reviewing the information provided to determine whether they have reason to believe that a person may not be eligible to vote. *Id*. In such instances, the county would then send a notice of examination to the individual. *Id*. If the county does not have reason to believe that a person may not be eligible to vote, then they should close the task and not take any further action. *Id*. Consistent with the wording of the Election Advisory, Betsy Schonhoff testified that it is her understanding that the counties were not just to take the list and send out notices to every individual on the list who resides in their county. *Id*.

42.     The monthly data sent to counties moving forward is different from the initial match data set, involves less individuals, and contains more refined information. *Id*. at 411:9-16; 466:10-22; 480:22-481:11; 486:3-12; LULAC-55 at 1. During the preliminary injunction hearing, the Court took judicial notice that it is highly unlikely that somebody could go to DPS, check the box that they are not a U.S. citizen, then get their driver's license and go through the naturalization ceremony within the 2-3 weeks that would be covered by a monthly dataset. *See* Trial Tr. 481:12-18.

43.     The Secretary of State did not have the ability to obtain data regarding citizenship

from any federal agency during the development of the non-citizen list maintenance project. *Id*. at 540:17-24; Tex. Trans. Code § 730.005. DPS data is utilized for this purpose because the Transportation Code authorizes the Secretary of State to obtain information from DPS for voter registration purposes. *Id*.

> **b.    Plaintiffs Did Not Show Their Alleged Burdens Outweigh the State's Interest in Safeguarding the Integrity of the Electoral Process.**

44.    Plaintiffs' witness, Janet Meek, admitted that it is important for the State of Texas to count only the votes of eligible voters, that the State has an interest in protecting the integrity of the voting process, and that, when citizens have confidence in the integrity of the voting process, that confidence encourages them to vote. *Id*. at 269:17-19, 270:4-7, 270:11-12. Meek further stated that she can't imagine the State would not have any protections in place to protect against voter fraud. *Id*. at 270:11-12.

45.    The Secretary of State believes it is important to maintain the integrity of voter rolls because they want to have the best list possible and want to make sure that nobody's legitimate vote is canceled by an illegitimate vote. *Id*. at 299:5-13.  To maintain the integrity of the voter rolls, the Secretary of State conducts list maintenance activities in an effort to make sure ineligible voters are removed, but eligible voters are not affected, to the fullest extent possible. *Id*. at 299:25-300:18. These list maintenance activities are vital to the Secretary of State's mission of maintaining electoral integrity. *Id*.

> **2.    The Evidence Shows, and the Court acknowledges, that Defendants Did Not Implement the Matching Process to Silence Minority Voters.**

46.    The Secretary of State's job with respect to elections is to obtain and maintain uniformity in the interpretation, application and operation of the election code and election laws outside of the election code. *Id*. at 296:19-25. The Secretary of State primarily does that through

the assistance and advice to election officials. *Id*. It is the responsibility of the Secretary and counties to maintain compliance with Section 31.005 of the Texas Election Code and to protect voters' rights. *Id*. at 297:15-298:6. It is also a shared responsibility among the Secretary of State and counties to maintain the integrity of the voter rolls in Texas. *Id*. The Secretary of State provides data to the counties and the counties use that data to maintain their voter registration lists. *Id*. The States' goals with respect to voter roll maintenance is dual and in a way at odds with each other. *Id*. at 298:7-20. The National Voter Registration Act ("NVRA") and Help America Vote Act ("HAVA") require that the State make voter registration available to all eligible citizens. *Id*. NVRA and HAVA also require the State to maintain the integrity of voter rolls by removing people who are deceased or no longer eligible to be registered to vote or were not eligible to vote in the first place. *Id*. Accordingly, state law has a number of provisions that further those competing goals— to make sure that eligible voters aren't bothered but that ineligible voters are removed from the rolls. *Id*.

47.     HB 2512 was passed in the 2013 legislative session and amended the Transportation Code to authorize the sharing of driver's license records with the Secretary of State for voter registration purposes. *Id*. at 305:2-19. Pursuant to that law, the Secretary of State's office asked DPS for data with regard to citizenship so they could see about matching noncitizens with voter registration and determining whether any individuals should be removed from the voter rolls. *Id*. This process began shortly after a hearing of the Senate Select Committee on Election Security in February 2018. *Id*. At least some of the senators on the committee expressed dissatisfaction with the passive nature of removing non-citizens from the rolls through the jury summons process. *Id*. Although state law does not spell out in detail how the DPS data-matching program is supposed to be conducted, numerous Election Code provisions—including Sections 16.033 and 16.0332—

specify the procedure for conducting list maintenance. *Id.* at 307:23-308:8. The only difference about the matching process here is that it is a new data set. *Id.*

48.     The Secretary of State's goals in developing the matching process were the same as other list maintenance activities: remove ineligible voters from the rolls while minimizing the impact on eligible voters. *Id.* at 309:20-310:1; LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1. It is the same goal and same process as all other list maintenance processes, but using a new data set. *Id.* In addition, the Secretary of State's goal was to tighten up the data received from DPS as much as they could so they would minimize the impact on eligible voters. Trial Tr. 310:2-19.

49.     The Secretary of State conducted numerous tests of the data in the matching process prior to rolling out the data to the counties in an effort to minimize the impact on eligible voters. *Id.* at 310:2-19. It also worked with different matching criteria and decided to proceed with only the strongest matching criteria available so they could confirm the identity of the voter involved was the same across data sets. *Id.* In addition, at all relevant times the Secretary of State has maintained communication with DPS throughout the process to make sure the best information is available to distribute to the counties. *Id.*

50.     The Secretary of State advised the counties to treat all of the data matches found in the matching process as weak, even though all of them were strong, because they did not want voters to be incorrectly canceled from the voter rolls. *Id.* at 320:17-321:16; 323:9-25; 324:1-5; LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1. The Secretary of State told counties to treat the matches as if they were weak matches to make sure they go through their investigation process and, if necessary, they send a notice of examination, so the voter has a chance to respond to the notice of examination and to prove that they are a U.S. citizen. *Id.*

51.     The evidence shows that the Secretary of State maintained transparency at all relevant times with respect to this list maintenance project. *Id*. at 311:4-313:6. The Secretary of State began previewing for the counties that this new data source was coming around September 2018. *Id*. Moreover, Keith Ingram spoke publicly regarding the development of the matching process during a panel at Tribune Fest in or around September 2018. *Id*.; *see also id*. at 312:8-313:16; LULAC-66, List Maintenance Training Materials.

52.     The Secretary of State provided the counties with in-person training regarding the matching process at a conference of the Texas Association of Election Administrators (the "TAEA"), which approximately 450 county personnel attended, in addition to nine training webinars that were made available to the counties online and numerous mass email advisories. *Id*. at 314:4-12; 364:7-9; 543:4-17. Moreover, if a county failed to attend the TAEA presentation or any of the webinars, the Secretary of State sent those counties a copy of the slides used in the trainings. *Id*. at 314:14-24; 543:4-17; LULAC-66, List Maintenance Training Materials; Defs' Ex. 10, list of counties who attended Secretary of State webinars on matching process.

53.     On multiple occasions, the Secretary of State clearly relayed to the counties, through its numerous communications, in-person trainings, and webinars, that the county registrars must first investigate the individuals on the list using any lawful means and, only if after such investigation the registrar has reason to believe the individual is ineligible to vote, may then choose to send a notice of examination to such individual. *Id*. at 313:17-314:3; 316:12-317:1; 317:12-319:14; 318:6-21; 318:22-319:14; 320:17-321:16; 323:9-25; 324:1-325:2; LULAC-47; LULAC-55. The counties were also informed that they were not required to send out a notice of examination at any point in time and could choose not to take any action with the data given to them by the Secretary of State. Trial Tr. 333:22-334:15; 336:16-337:10; 341:25-342:21. It is not the process to

automatically cancel voters on the basis of data sent by the Secretary of State. *Id*. at 317:2-11. Nor can the counties cancel a voter's registration for suspected non-citizenship without first sending the individual a notice of examination to give them an opportunity to respond. *Id*. at 338:15-339:4; LULAC-1, Garibay 1, MOVE TX 2, Election Advisory, at 1. Moreover, the counties were informed about the issues with being able to determine citizenship status from the DPS data, including that a person is able to become a U.S. citizen after receiving a driver's license or identification card from DPS. Trial Tr. 536:19-25.

54.    Betsy Schonhoff, the former voter registration manager at the Secretary of State's office, testified that she talked to the counties about the information they had in-house to make sure that an individual had not already provided proof of citizenship being requested currently. *Id*. at 509:2-10. In addition, after some counties sent out notices to every person in their county that was on the list, Schonhoff directed the counties that, if they were able to identify that they received an electronic application containing proof of citizenship from DPS for an individual, they should notify the individual that they have been cleared, no action would be needed from that person, and that the county should close out their investigation. *Id*.

55.    Schonhoff testified that she did not become aware until after the program was rolled out that the list included a number of individuals who had proven their citizenship to DPS. *Id*. at 514:9-515:3. After discovering the issue, Schonhoff immediately called DPS to find out why these individuals were included in the data set. *Id*.

56.    The Secretary of State does not have the ability to cancel any voter's registration for non-citizenship as part of its list maintenance obligations or the matching process, and does not have the ability to send notices of examination to individuals. *Id*. at 330:6-22. Further, the Secretary of State did not instruct the counties to cancel the registrations of any naturalized U.S.

citizens. *Id*. at 333:24-334:15. Nor did the Secretary of State instruct counties to do anything particular with respect to any specific voter. *Id*.

57.    Under Texas law, the voter registrar in the county is responsible for that county's voter registration list. 331:14-332:7; 339:13-20. They are the ones who have to take on the ultimate responsibility of deciding whether or not there is reason to believe that a particular voter is not eligible to be registered to vote. *Id*. If the county makes that determination, they should send a notice of examination. *Id*. This is information county officials should know because it is the process for all list maintenance. *Id*.

58.    The matching process is not an attempt to "purge" voters. *Id*. at 340:23-341:12. The matching process is an attempt to make sure ineligible voters are removed from the rolls and that eligible voters are not disturbed. *Id*. It is a list maintenance process required by federal and state law, and the goal is to have a good voter registration list, not to purge voters. *Id*. The Secretary of State does not have the authority to remove a voter from a voter roll for purposes of non-citizenship. *Id*.

59.    Nobody at the Secretary of State's office intentionally targeted or discriminated against naturalized citizens. *Id*. at 345:18-346:20; 542:20-543:3. Nor did anyone at the Secretary of State's office implement the list maintenance matching process to suppress voter turnout in any way. *Id*. There is no indication of a voter's race or ethnicity in the data used for this list-maintenance process. *Id*. The Secretary of State took every precaution to minimize the impact of the matching process list maintenance acidity on eligible voters, and remains committed to working with counties to continue minimizing impact on eligible voters. *Id*. Keith Ingram testified that he will do everything he can to minimize the impact of this process on eligible voters. *Id*.

60.    The Secretary of State's office called counties on January 29, 2019, to tell them to

28

review their application files, including looking for Code 64s in their database, because that is an indication that a person has become a citizen and registered to vote at DPS, and they should close those tasks without sending those individuals a notice of examination. *Id*. at 368:10-17. In addition, the Secretary of State's office told those counties that, if they had sent notice of examination letters to those individuals, they should send another letter retracting it and telling the voter that their registration is still valid. *Id*. The important thing from the Secretary of State's perspective was to get the information to the counties as soon as possible and verify that the counties received the information. *Id*. at 369:12-370:3. That is the reason why they called the counties in person after they discovered the issue with the matching process containing data relating to naturalized U.S. citizens. *Id*. They immediately called the counties because they wanted to make sure they had this information and that they did not adversely impact eligible voters. *Id*. Keith Ingram testified that, based on his experience, people do not always what that they are sent, so the Secretary of State chose to communicate this important information to counties directly through personal phone calls to make sure voters were not adversely impacted. *Id*.

### 3. The *Garibay* and MOVE TX Plaintiffs' Voting Rights Act Claims Must Fail.

61.     Defendants incorporate sections III(C)(1)(a)-(b) and III(C)(2) above by reference as if fully set forth herein.

### 4. The *Garibay* Plaintiffs Have Failed to Establish a Violation of 45 U.S.C. § 1985, Conspiracy to Interfere with Civil Rights.

62.     Defendants incorporate section III(C)(2) above by reference as if fully set forth herein.

### 5. The MOVE TX Plaintiffs Have Failed to Establish a Fifteenth Amendment Claim.

63.     Defendants incorporate section III(C)(2) above by reference as if fully set forth

herein.

> ### 6. The MOVE TX Plaintiffs Have Failed to Establish Any Due Process Claims.

64.     Defendants incorporate section III(C)(2) above by reference as if fully set forth herein.

> ### 7. The MOVE TX Plaintiffs Have Failed to Allege Facts About Discriminatory Purpose.

65.     Defendants incorporate section III(C)(2) above by reference as if fully set forth herein.

> ### D. The Evidence Does Not Show That Plaintiffs Have Suffered or Will Suffer an Irreparable Injury, and Plaintiffs Have Not Proven Any Substantial Burden on the Right to Vote.

66.     Texas has multiple safeguards in place to make sure properly registered voters remain on the voter rolls. Plaintiffs' witnesses acknowledged that there are measures people can take if their voter registration has been canceled, including contesting the cancellation with the voter registrar's office and requesting a hearing with the registrar. Trial Tr. 278:4-12. Their names can be added back to the voter rolls if they were wrongfully canceled. Trial Tr. 329:1-330:1. In addition, Plaintiffs' witnesses did not deny that voters whose names are not on the voting rolls may still cast provisional ballots. *Id*. at 280:20-281:5; 462:6-21. If a citizen's registration is canceled, their registration is required to be reinstated immediately if they subsequently present proof of citizenship to the voter registrar. *Id*. at 329:1-330:1. They can present their proof of citizenship to the voter registrar at any time after their registration is canceled, including on election day. *See id*. at 462:6-21.

67.     Someone who is a U.S. citizen but had their registration wrongfully canceled can be immediately reinstated on the voter roll with their original effective date of registration when

they provide proof of citizenship to their voter registrar—it is not a re-registration. *Id*. at 329:1-330:1. Once they are reinstated on the voter roll, they can vote immediately. *Id*. Voters can be immediately reinstated if they show proof of citizenship to the voter registrar, and they can also vote a provisional ballot. *Id*. at 344:2-12. Even if a voter's registration is canceled, they remain in the registration database for two years—a sufficient time for them to provide their proof of citizenship and be reinstated on the voter roll. *Id*. at 457:6-17.

68.     The evidence shows none of the Plaintiffs have been denied their ability to vote or are otherwise unable to vote as a result of the matching process. Plaintiffs' witnesses testified that they do not know of any individuals who have been taken off the voter rolls or who have had their voter registration cancelled. *Id*. at 271:11-16; 281:6-11. Plaintiffs' witnesses testified that they did not know of anybody who has had charges brought against them for election offenses or who has been prosecuted by the attorney general after receiving a notice of examination, *See id*. at 271:17-23. Plaintiffs failed to present any evidence showing they have and/or will experience difficulties in maintaining their voter registration because of the matching process.

**E. The Evidence Shows That Plaintiffs' Requested Relief Would Impose a Substantial Burden on Defendants and Disserve Public Interest in Maintaining the Integrity of Elections.**

69.     Plaintiffs' witnesses admit the state has an interest in protecting the integrity of the voting process and that, when citizens have confidence in the integrity of the voting process, that confidence encourages them to vote. Trial Tr. 269:17-19; 270:4-7. Secretary Whitley's constitutional role requires him to assist county election officials and ensure the uniform application and interpretation of election laws throughout Texas. *See, e.g.*, Tex. Const. art. 4, § 21; Tex. Elec. Code § 31.001.; Trial Tr. at 295:9-16. Secretary Whitley's Elections Division provides assistance and advice to election officials and the general public on the proper conduct of elections,

including hosting seminars and election schools, providing calendars, prescribing forms, certifying

ballots, funding primary elections, and providing legal interpretations of election laws to election

officials. *See, e.g.*, Tex. Elec. Code §§ 31.003 (duty to maintain uniformity of application of

election laws), 31.004 (duty to provide assistance and advice to all election authorities), 31.005

(authority "to protect the voting rights of the citizens of this state"), 31.0055 (duty to maintain a

voting-rights hotline), 31.006 (duty to refer complaints alleging criminal conduct to the Attorney

General). Secretary Whitley is required by law to maintain a computerized voter registration list

that accurately reflects the official voter roll of the State for use by election officials in Texas. *See*

*id.* § 18.061; Trial Tr. 298:7-20, 305:2-19; 306:25-307:20; 307:23-308:25. It is the shared

responsibility of the state and county officials to maintain the integrity of the voter rolls in Texas.

Trial Tr. 297:15-298:6. The matching process is not something new or different – it is a regular

list maintenance that is required under the law. *Id.* at 400:24-401:6; 434:21-25; 490:6-12. The only

difference with the matching process is that it involves a new data set. *Id.* The Secretary of State

does not have the authority to direct any local officials to do anything with respect to individual

voters under the matching process. *Id.* at 343:22-344:1.

## **PROPOSED CONCLUSIONS OF LAW**

## **I.     PLAINTIFFS CANNOT PREVAIL ON THE MERITS OF THEIR CLAIMS**

70.     "To be entitled to a preliminary injunction, the applicants must show (1) a

substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will

suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the

threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not

disserve the public interest." *Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013)

(quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir.

2012)). The Fifth Circuit "has repeatedly cautioned that a preliminary injunction is an *extraordinary remedy* which should not be granted unless the party seeking it has *clearly carried the burden of persuasion on all four requirements*." *Steen*, 732 F.3d at 386 (quoting *Lakey*, 667 F.3d at 574 (internal quotation marks omitted)) (emphasis added). If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). Even when a movant satisfies each of the four factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). The decision to grant a preliminary injunction is to be treated as an exception rather than the rule. *Id.*

### A. Plaintiffs Lack Standing to Assert Their Claims.

71.     None of the Plaintiffs have established standing, which requires them to show (1) an actual or imminent injury that is concrete and particularized, (2) fairly traceable to the defendant's conduct, and (3) redressable by a judgment in the claimant's favor. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

72.     Plaintiffs have failed to show the injury-in-fact component of standing because their alleged injuries are not "actual or imminent," but at best merely "conjectural and hypothetical." *DaimlerChrysler Corp.*, 547 U.S. at 342 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). Put simply, there is no guarantee that any given Plaintiff—or member of the proposed Plaintiff class—will have her registration cancelled absent an injunction. Moreover, their claims are not traceable to Defendants because the injury they complain of is the result of "the independent action of some third party not before the court," *id.* (quoting *Simon*, 426 U.S. at 41-42), namely,

33

county election officials. And it is entirely "speculative" that a favorable decision would redress the injuries that Plaintiffs alleged given that no injuries have yet occurred or are certain to occur. None of Plaintiffs' declarations or other evidence attached to their motion alter this conclusion, and Plaintiffs did not establish at the February 19th hearing that they have standing to proceed. Accordingly, their request for a preliminary injunction against Defendants fails on jurisdictional grounds.

### 1. The Individual Plaintiffs Lack Standing.

#### *Plaintiff Hilberg*

73.     Individual Plaintiff Julie Hilberg, is a U.S. citizen and a Texas resident. LULAC First Am. Compl. ¶ 19; Trial Tr. 218:12-218:15. She became a naturalized citizen in 2015 and voted in the 2016 and 2018 elections. *Id.*; Trial Tr. 218:12-218:15**.** After Secretary Whitley's advisory, Plaintiff Hilberg became concerned based on the date she received her driver's license that she may be among the voters who provided documentation to DPS indicating that she was a non-citizen. *Id*. ¶¶ 66, 71; Trial Tr. 219:14-221:1. She then spoke with the election administrator in her county and was informed that her name was on the DPS list. *Id*. ¶ 72. Based on these facts, Plaintiff Hilberg asserts that Defendants have burdened her right to vote and violated section 11(b) of the Voting Rights Act by threatening her not to exercise her right to vote.

74.     There is no "real and immediate" threat that Plaintiff Hilberg's right to vote will be violated. *Lyons*, 461 U.S. at 102; Trial Tr. 231:11-231:24. Her claimed injury depends on an attenuated chain of events, none of which has occurred here. Trial Tr. 231:11-231:24. As an initial matter, for Plaintiff Hilberg to suffer "actual and imminent" harm, the county register would have to send her a notice based on a reasonable belief that Hilberg is ineligible to vote. Tex. Elec. Code

§ 16.033(b); *Lujan*, 504 U.S. at 560; Trial Tr. 231:11-231:24. Registrars are prohibited from unilaterally removing a voter from the rolls without notice. Tex. Elec. Code § 16.033(c)-(d).

75.     Moreover, even if the registrar were to investigate Plaintiff Hilberg, it is entirely speculative to conclude that she would somehow be removed from the voting rolls. Such an outcome would mean that either Hilberg did not receive the notice or failed to submit a timely response, or that the register erroneously removed her from the list after she presented proof of her naturalization. In the event Hilberg were in fact removed from the voter rolls in error, Texas law provides for immediate reinstatement following receipt of information establishing proof of citizenship. Tex. Elec. Code §§ 1.007(c), 16.037(d). By statute, that information can be emailed, personally delivered, mailed, or even faxed to the registrar. *Id.* And in the event Hilberg discovered such an error on the date of an election, Texas law would allow her to submit citizenship proof immediately and vote a regular ballot or vote provisionally and submit proof of citizenship or any time before the provisional ballots are counted. *See, e.g.*, Tex. Elec. Code §§ 63.011, 65.054.

76.     In sum, Hilberg's ability to vote would be impaired *only if* she is investigated, *and* her registration is cancelled because she does not timely provide proof of citizenship, *and* she is not reinstated because she does not provide proof after cancellation, *and* her provisional vote is not counted because she does not provide proof before her provisional ballot is counted. Because numerous statutory safety valves exist to protect Hilberg's registration status, any claim that she has been injured is purely speculative. Hilberg has suffered no "actual or imminent" harm and cannot therefore satisfy standing requirements. *See Lujan*, 504 U.S. at 560; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013); Trial Tr. 231:11-231:24.

77.     Nor are Plaintiff Hilberg's alleged injuries traceable to Defendants. Secretary Whitley merely shared data with the county registrars. What these officials do with the data,

Secretary Whitley repeatedly stressed, was for them to decide, in accordance with applicable law. Secretary Whitley merely provided county registrars with additional information pursuant to a mandatory disclosure statute. He did not direct registrars to remove a single voter from the rolls based solely on the data provided. For Plaintiff Hilberg to suffer an injury, there would have to be "independent action" by the county registrar. *Id* (quoting *Simon*, 426 U.S. at 41-42). Thus, Plaintiff Hilberg's present claims against Defendants must be dismissed. *Id*.

78.     Finally, Plaintiff Hilberg's claims are not redressable by a decision in her favor. She asks this Court to declare unlawful the matching process and Defendants' public statements about data derived as a result of that process and to prevent Defendants or election officials to take any action based on Secretary Whitley's advisory. But this relief would require this Court to strike down state law without redressing any actual harm to Plaintiff Hilberg. And, in any event, Secretary Whitley's advisory and Defendants' related statements did not direct local election officials to take any action. Thus, even if the Court were to take the extraordinary step of declaring the public statements of two statewide officials to be unlawful, Plaintiff Hilberg's status would remain unchanged. With or without Defendant's public statements and the Secretary's advisory, the registrars can still make an independent determination of whether to investigate the eligibility of voters across the state. Therefore, the requested declaratory or injunctive relief would not redress any action by Defendants that allegedly harmed any voter in Texas.

79.     Likewise, Governor Abbott and Attorney General Paxton have no causal connection to any alleged injury-in-fact. In expressing their opinions on the data, the Governor and Attorney General did not direct any local official to take any particular action with regard to Hillberg, or any other resident of Texas. To find any causal connection between the Governor and Attorney General's public statements and the harm complained of here would extend federal

jurisdiction far beyond its Article III limitations into public policy matters that are "not of a Judicial nature." *DaimlerChrysler*, 547 U.S. at 342 (quoting James Madison, 2 Records of the Federal Convention of 1787, at 430 (M. Farrand ed. 1966)). Because Hillberg suffered no "actual or imminent" harm causally connected to the Governor or Attorney General's statements, her claims against the Governor and Attorney General must be dismissed for want of jurisdiction. *See Lujan*, 504 U.S. at 560.

### *Remaining Individual Plaintiffs*

80.     None of the remaining Individual Plaintiffs have met their burden to establish standing. The remaining Individual Plaintiffs assert that they are naturalized U.S. citizens and registered Texas voters. *Id*. ¶¶ 8-40. They claim that they are injured because they were allegedly identified by the matching process or they received a Notice of Examination requesting a response within the prescribed period. *Id*. In either case, there is no "real and immediate" harm to any of the Individual Plaintiffs. *Lyons*, 461 U.S. at 102. Their claimed injuries depend on an attenuated chain of events. For the Individual Plaintiffs to suffer "actual and imminent" harm, the county registrar would have to send them Notice of Examination letters *and* they would have to fail to respond within the prescribed period *and* further fail to provide proof of citizenship for immediate reinstatement *and* fail to vote provisionally and provide proof of citizenship before the provisional votes are counted. The alleged injury "is too speculative to invoke Art. III jurisdiction." *Whitmore v. Arkansas*, 495 U.S. 149, 150 (1990).

81.     With the exception of four Doe Plaintiffs and Plaintiff Felicitas Barbosa, none of the Individual Plaintiffs allege that they have received a Notice of Examination letter. Garibay Third Am. Compl. ¶¶ 8-59. Plaintiff Garibay asserts that her county informed her that she appeared in the matching data, but there is no allegation that she has received any notice of an investigation.

*Id.* ¶¶ 10-11. Likewise, Plaintiffs Hummel, Castillo, Garcia, Tule-Romain, Espinosa Flores, Tule Carrizales, and Gomez allege that they have appeared in the matching data, but none claims to have received a Notice of Examination. *Id.* ¶¶ 43-59. And Plaintiff Keane alleges that, though she did receive a notice concerning her voting eligibility, the sender of the notice—Galveston County Tax Assessor Cheryl Johnson—later confirmed that the notice was sent in error. *Id.* ¶¶ 34-35.

82.     There is no "real and immediate" threat that the right to vote of any of these Plaintiffs will be impaired. *Lyons*, 461 U.S. at 102. Their claimed injury depends on an attenuated chain of events, none of which has occurred here. As an initial matter, the registrar would have to send a Notice of Examination based on a reasonable belief that each is ineligible to vote. Tex. Elec. Code § 16.033(b). Registrars are prohibited from unilaterally removing a voter from the rolls without notice. Tex. Elec. Code § 16.033(c)-(d). And Secretary Whitley emphasized that the matches should be treated as "weak" matches, and that registrars could take no action at all based on the DPS data. Election Advisory at 2. Because these Plaintiffs rely on a purely "speculative chain of possibilities," their claims must be dismissed. *Clapper v. Amnesty Int'l U.S.A.*, 568 U.S. 398, 414 (2013) (rejecting a standing theory premised on numerous assumptions about how the statute might be enforced).

83.     And even with regard to the five Plaintiffs who allege that they received Notices of Examination, it is entirely speculative to conclude that any of them will be removed from the voting rolls. Such an outcome would mean that either the Plaintiff failed to submit a timely response, or that the register erroneously removed her from the list despite receiving proof of citizenship. Further, in the event that an individual is removed from the voter rolls, Texas law provides for immediate reinstatement following receipt of information establishing proof of citizenship. Tex. Elec. Code §§ 1.007(c), 16.037(d). By statute, that information can be emailed,

personally delivered, mailed, or even faxed to the registrar. *Id.* And in the event that an eligible voter discovered that he or she had been removed from the rolls on the date of an election, Texas law would allow him or her to submit citizenship proof immediately and vote a regular ballot or vote provisionally and submit proof of citizenship at any time before the provisional ballots were counted. *See, e.g.*, Tex. Elec. Code §§ 63.011, 65.054.

84.     In sum, the Individual Plaintiffs' ability to vote will be impaired *only if* they are investigated, *and* their registration is cancelled because they do not timely provide proof of citizenship, *and* they are not reinstated because they do not provide proof after cancellation, *and* their provisional vote is not counted because they do not provide proof before the provisional ballots are counted. Because numerous statutory safety valves exist that protect the Individual Plaintiffs' registration status, any claim that they have been injured is purely speculative. The Individual Plaintiffs have suffered no "actual or imminent" harm and cannot therefore satisfy standing requirements. *See Lujan*, 504 U.S. at 560; *see also Clapper*, 568 U.S. at 411-12 (concluding that Plaintiffs' claims were speculative because the statute gave the Executive Branch discretion to determine which communications to target).

85.     The Individual Plaintiffs' alleged injuries are not traceable to Defendants. Secretary Whitley merely shared data with the county registrars. What these officials do with the data, Secretary Whitley repeatedly stressed, was for them to decide, in accordance with applicable law. Secretary Whitley simply provided county registrars with additional information obtained information from DPS pursuant to a mandatory disclosure statute. He did not direct registrars to remove a single voter from the voter rolls based solely on the data provided. For there even to be a theoretical possibility of injury here, at a minimum there would have to be "independent action" by the county registrar. *Id* (quoting *Simon*, 426 U.S. at 41-42).

39

86.     Finally, the Individual Plaintiffs' claims are not redressable by a decision in their favor. They ask this Court to declare unlawful the matching process and Defendants' public statements about data derived as a result of that process, and to prevent Defendants or election officials from taking any action based on Secretary Whitley's advisory. But this relief would require this Court to strike down state law without redressing any actual harm to the Individual Plaintiffs. And, in any event, Secretary Whitley's advisory and Defendants' related statements did not direct local election officials to take any action. Thus, even if the Court were to take the extraordinary step of declaring the public statements of three statewide officials to be unlawful, the Individual Plaintiffs' status would remain unchanged. With or without Defendants' public statements and the Secretary's advisory, the registrars can still make an independent determination of whether to investigate the eligibility of voters across the state, including the Individual Plaintiffs. Therefore, the requested declaratory or injunctive relief would not redress any action by Defendants that actually harmed any voter in Texas.

87.     Likewise, Governor Abbott and Attorney General Paxton have no causal connection to any alleged injury-in-fact. In expressing his opinions on the data, the Governor and Attorney General did not direct any local official to take any particular action with regard to any of the Individual Plaintiffs, or any other resident of Texas. To find any causal connection between the Governor's and Attorney General's public statements and the harm complained of here would extend federal jurisdiction far beyond its Article III limitations into public policy matters that are "not of a Judicial nature." *DaimlerChrysler*, 547 U.S. at 342 (quoting James Madison, 2 Records of the Federal Convention of 1787, at 430 (M. Farrand ed. 1966)). Because the Individual Plaintiffs suffered no "actual or imminent" harm causally connected to the Governor or Attorney General's

statements, their claims against the Governor and Attorney General must be dismissed for want of jurisdiction. *See Lujan*, 504 U.S. at 560.

### 2. The Organizational Plaintiffs Lack Standing.

*Plaintiff LULAC*

88.     The Organizational Plaintiffs can establish their standing through either of two theories, appropriately called "associational standing" and "organizational standing." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). They do not allege that they have standing to sue on behalf of their members who "would otherwise have standing . . . in their own right," *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Nor could they do so because, as explained, no individual member has standing. Instead, the League of United Latin American Citizens (LULAC) and the Texas chapter of LULAC (Texas LULAC) claim organizational standing based on the claim that Texas LULAC will have to divert "resources to educating the Latino community about this unlawful voter purge program and assisting its members and Latinos throughout the state to response to improper notices threatening cancellation of their voter registration." LULAC First Am. Compl. ¶ 18.

89.     To demonstrate standing, then, the Organizational Plaintiffs must satisfy the same three-part standing test that applies to individual plaintiffs. *OCA-Greater Houston*, 867 F.3d at 610. But the Organizational Plaintiffs' claimed injury is as speculative, non-traceable, and non-redressable as Plaintiff Hilberg's. The Organizational Plaintiffs complain that they may have to devote resources to educating members about the matching process, but they identify no particular individual who has received a notice from a registrar concerning his or her registration status, or who has approached Texas LULAC for assistance in documenting voting eligibility. And even if individuals approached Texas LULAC, they would merely have to provide education on the law

of Texas. As already stated, the disclosure and use of DPS data was mandatory and any action by a registrar must be based on the registrar's reasonable belief that the voter may be ineligible, not on Secretary Whitley's advisory or Attorney General Paxton's public statements.

90.     Furthermore, complying with the notice is merely a function of following the procedures set forth in the statute. Tex. Elec. Code § 16.033. Thus, this case is wholly distinguishable from *OCA-Greater Houston*, where the organizational plaintiffs had to engage in "in-depth conversations" because the pertinent state and federal law requirements were not identical. *OCA-Greater Houston*, 867 F.3d at 608, 610. Here, the Organizational Plaintiffs at most would merely have to point to state law, which clearly sets forth the standards and processes that control the maintenance of accurate voting rolls to ensure election integrity. As explained, the basis for the investigation would be the registrar's independent determination, not Defendants' advisory and public statements. For that same reason, ruling against Defendants would not redress the Organizational Plaintiffs' purported harm because they could still be approached by individuals seeking advice on responding to notice issued pursuant to state election law. Because the Organizational Plaintiffs fail to meet each of the standing requirements, this Court lacks jurisdiction over their claims.

### Plaintiffs MOVE and LWV

91.     Plaintiffs MOVE and LWV allege that they have standing to seek a preliminary injunction because they may have to devote resources to responding to the Advisory and the program, but they identify no particular individual who has received a notice from a registrar concerning his or her registration status. *See* No. 3:19-cv-00041, Doc. 10, MOVE Motion for Preliminary Injunction.

92.     Plaintiffs fail to satisfy any of the standing components. Plaintiff LWV claims it has members who are naturalized citizens registered to vote and are threatened with removal from the voter rolls, and it has had to divert substantial resources to responding to the Advisory and the list maintenance program and away from its other advocacy, education, voter assistance, and lobbying efforts. MOVE argues that it has standing on its own behalf because it has had to divert substantial resources to responding to the Advisory and the list maintenance program and away from its other communications, advocacy, voter assistance, and civic engagement activities.

93.     LWVTX complains that Defendants' actions somehow impair voter registration. To identify a cognizable injury based on Defendants' vague and conclusory allegation requires piling "inference upon inference" in a manner that would extend federal jurisdiction far beyond its Article III limitations. *Cf. United States v. Lopez*, 514 U.S. 549, 567 (1995). Defendants have taken no actions that harm a naturalized citizen's right to vote or an organization's ability to register citizens. Secretary Whitley merely made available a data set. Registrars are prohibited from unilaterally removing a voter from the rolls without notice. Tex. Elec. Code § 16.033(c)-(d). And Secretary Whitley emphasized that the matches should be treated as "weak" matches, and that registrars could decide to take no action at all based on the DPS data. Election Advisory at 2. Further, he advised the registrars of their prerogative to make an independent determination and reiterated the legal notice requirements. There is simply no "real and immediate" threat any person's right to vote or register someone to vote will be violated. *Lyons*, 461 U.S. at 102.

94.     LWVTX's members also fail to satisfy the other necessary elements of constitutional standing. Their alleged injuries are not traceable to Defendants. There is no "causal connection" between Secretary Whitley's advisory and the ability of LWVTX's members to register naturized citizens to vote. *Lujan*, 504 U.S. at 560. Nor is there any link between the

Defendant county officials and the harm to LWVTX's members. The pleadings merely allege that these local election officials are responsible for maintaining the local voter registrations lists. MOVE First Am. Compl. ¶¶ 31-38. None are claimed to have made an independent determination that violated an individual's right to vote. Thus, LWVTX's members have no suffered no alleged harm that is traceable to Defendants.

95.     Finally, the alleged injury to LWVTX's members are not redressable by a decision in its favor. Plaintiffs ask this Court to declare unlawful the matching process and the Election Advisory, and to prevent Defendants or local election officials from taking any action based on the advisory. But this relief would require this Court to strike down state law without redressing any actual harm to LWVTX's members. And, in any event, Secretary Whitley's advisory and Defendants' related statements did not direct local election officials to take any action. Thus, even if the Court were to take the extraordinary step of declaring an advisory statement to be unlawful, LWVTX's members would be no better off. With or without the Secretary's advisory, the registrars can still make an independent determination whether to investigate the eligibility of voters across the state, including LWVTX's members and those registered by LWVTX's members. Therefore, the claimed injuries are also not redressable.

96.     To demonstrate standing, then, Plaintiffs must show that they have "organizational standing." This requires satisfying the same three-part standing applicable to individual plaintiffs. *OCA-Greater Houston*, 867 F.3d at 610. Plaintiffs complain that the State Defendants' actions caused their organizations to divert resources to educating members about the matching process. MOVE First Am. Compl. ¶¶ 25-27. But, as already explained, DPS was mandated to disclose the voter data at issue to the Secretary. Tex. Trans. Code § 730.005(9). Secretary Whitley simply made the data set available to the registrars, who are prohibited from unilaterally removing a voter from

the rolls without notice. Texas Elec Code § 16.033(c)-(d). Further, Secretary Whitley emphasized that the matches should be treated as "weak" matches. And he indicated that any action by a registrar to investigate a voter must be based on the registrar's reasonable belief that the voter may be ineligible, and that registrars could take no action at all based on the DPS data. Election Advisory at 2. Even if a registrar were to investigate an individual, it is therefore purely "conjectural" to conclude that he or she would be removed or that Plaintiffs would have to divert resources as a result of the investigation. *See Lujan*, 504 U.S. at 560.

97.     Furthermore, complying with the notice of examination is merely a function of following the procedures set forth by statute. *See* Tex. Elec. Code § 16.033. Thus, this case is wholly distinguishable from *OCA-Greater Houston*, where the organizational plaintiffs had to engage in "in-depth conversations" because the pertinent state and federal law requirements were not identical. *OCA-Greater Houston*, 867 F.3d at 608, 610. Here, Plaintiffs would at most have to point to state law, which clearly sets forth the standards and processes that control the maintenance of accurate voting rolls to ensure election integrity. And in the event that anyone is investigated, there would be no "causal connection" between Plaintiff's alleged injury and Defendants' conduct. *See Lujan*, 504 U.S. at 560. As explained, the basis for the investigation would be the registrar's independent determination, not Defendants' advisory and public statements. For that same reason, ruling against Defendants would not redress the harm Plaintiffs claim because they could still be approached by individuals with inquiries concerning their voting registration status. Because Plaintiffs fail to meet each of the standing requirements, this Court lacks jurisdiction over their claims.

*Plaintiffs SVREP, MFV, LUPE, UnidosUS, and OCA-Greater Houston*

98.     Southwest Voter Registration Project, Mi Familia Vota Education Fund, and UnidosUS, and OCA-Greater Houston claim organizational standing based on the assertion they will have to divert resources as a result of Defendants' actions. Garibay Third Am. Compl. ¶¶ 61-77. La Unión Del Pueblo Entero (LUPE) claims injury in the form of resource diversion and further alleges that its members were injured because the matching process identified them. *Id.* ¶¶ 65-67.

99.     The Organizational Plaintiffs can establish their standing through either of two theories, appropriately called "associational standing" and "organizational standing." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Only LUPE alleges that it has standing to sue on behalf of its members who "would otherwise have standing . . . in their own right," *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). But this basis for standing fails for the same reason that the Individual Plaintiffs cannot show standing. The claimed injury is based on the same "speculative chain of possibilities" that defeats the Individual Plaintiffs' standing. *Clapper*, 568 U.S. at 414. And the hypothetical injuries would not, in any event, be traceable to Defendants or redressable with a favorable decision. To demonstrate standing, then, the Organizational Plaintiffs must satisfy the same three-part standing test that applies to individual plaintiffs. *OCA-Greater Houston*, 867 F.3d at 610. But the Organizational Plaintiffs' claimed injury is as speculative, non-traceable, and non-redressable as the injury alleged by the Individual Plaintiffs. The Organizational Plaintiffs complain that they may have to devote resources to educating members about the matching process, but they would not be injured even if they were approached by an individual who received a Notice of Examination. Under those circumstances, the Organizational Plaintiffs would merely have to provide education on the law of Texas. As already stated, the disclosure and use of the matching data was mandatory and any action

by a registrar must be based on the registrar's reasonable belief that the voter may be ineligible, not on Secretary Whitley's advisory or Governor Abbott's or Attorney General Paxton's public statements.

100.    Furthermore, complying with the notice of examination is merely a function of following the procedures set forth in the statute. Tex. Elec. Code § 16.033. Thus, this case is wholly distinguishable from *OCA-Greater Houston*, where the organizational plaintiffs had to engage in "in-depth conversations" because the pertinent state and federal law requirements were not identical. *OCA-Greater Houston*, 867 F.3d at 608, 610. Here, the Organizational Plaintiffs at most would have merely to point to state law, which clearly sets forth the standards and processes that control the maintenance of accurate voting rolls to ensure election integrity. As explained, the basis for the investigation would be the registrar's independent determination, not Defendants' advisory and public statements. For that same reason, ruling against Defendants would not redress the harm the Organizational Plaintiffs claim because they could still be approached by individuals seeking advice on responding to notices issued pursuant to state election law. Because the Organizational Plaintiffs fail to meet each of the standing requirements, this Court lacks jurisdiction over their claims.

**B.  Plaintiffs Failed to Prove a Substantial Likelihood of Success on the Merits.**

**1.  Plaintiffs' Fourteenth and First Amendment Claims Must Fail.**

101.    Plaintiffs failed to demonstrate a likelihood of success on their claim that the matching process imposes a severe discriminatory burden on naturalized citizens, and they did not produce evidence to overcome the neutral, non-discriminatory interests advanced by the State as justification for the matching process. A court evaluating a constitutional challenge to an election regulation must "weigh the asserted injury to the right to vote against the precise interests put

forward by the State as justifications for the burden imposed by its rule." *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203 (2008). To do this, courts apply a balancing test derived from two Supreme Court decisions, *Anderson v. Celebrezze*, 420 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). "When evaluating a neutral, nondiscriminatory regulation of voting procedure, [the Court] must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *See Crawford*, 553 U.S. at 203.

102.    In passing judgment, the court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). State rules that impose a severe burden on constitutional rights must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal citations omitted).

### a.  The Character and Magnitude of Plaintiffs' Alleged Injuries Do Not Qualify as a Substantial Burden on the Right to Vote.

103.    "To deem ordinary and widespread burdens severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of the States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Crawford*, 553 U.S. at 197. "The Constitution does not require that result, for it is beyond question that the States may, and

inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id* (internal quotations omitted).

104.    Given the fact that Plaintiffs have advanced a broad attack on the constitutionality of the matching process, seeking relief that would invalidate it in all its applications, they bear a heavy burden of persuasion. *See id*. at 200. Plaintiffs ask this Court, in effect, to look specifically at a small number of voters who may experience a special burden and weigh their burdens against the State's broad interests in protecting election integrity. *See* LULAC First Am. Compl. ¶ 9, p.20-21 (Prayer for Relief); Garibay Third Am. Compl. ¶ 5, pp. 70-72 (Prayer for Relief). Plaintiffs do not offer evidence regarding the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified. *See Crawford*, 553 U.S. at 200.

105.    Plaintiffs complain that having to provide proof of their citizenship within thirty days from the date they received notice is exceedingly strict and that the imposition of additional requirements to register to vote and maintain voter registration violates their Equal Protection and First Amendment Rights *See, e.g.*, LULAC First Am. Compl. ¶ 82-91; Garibay Third Am. Compl. ¶¶ 238-242; MOVE First Am. Compl. ¶¶ 156-158. However, the Supreme Court has already established that, although a somewhat heavier burden may be placed on a limited number of persons, inconveniences such as making an extra trip to the DMV and gathering additional required documents for voter registration do not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting. *Crawford*, 553 U.S. at 198-99. Such requirements are wholly justified and, therefore, would not pose a constitutional problem. *See id*. at 199-200.

106.    Plaintiffs also speculatively allege, without substantiating facts, that the matching process will deprive them of their right to vote. *See, e.g.*, LULAC First Am. Compl. ¶ 82-91;

Garibay Third Am. Compl. ¶¶ 216-231; MOVE First Am. Compl. ¶¶ 159-162. Plaintiffs offer no evidence to support this claim. As set forth in Section I, *supra*, Texas allows multiple safeguards to ensure properly registered voters remain on the voting rolls, including immediate, same-day reinstatement upon presentation of citizenship verification, and provisional voting pursuant to Texas Election Code §16.037(d) and § 63.011. *See Crawford*, 553 U.S. at 197-98 (the availability of the right to cast a provisional ballot provides an adequate remedy for burdens arising from life's vagaries). In other words, even if Plaintiffs' names do not appear on the list of registered voters and their registration status cannot be determined, multiple statutory provisions secure qualified voters their rightful place on the voting rolls. *See id*.

107.    Further, none of the Plaintiffs produced evidence that they have been denied their ability to vote or are otherwise personally unable to vote. *Id*. at 201. Nor have Plaintiffs shown that they have lost or misplaced their proof of citizenship, attempted to obtain proof of citizenship, or encountered difficulty in obtaining proof of citizenship or timely providing such proof for voter registration purposes. *Id*. Plaintiffs do not assert facts regarding difficulties they have experienced that are severe enough to overcome the State's interest in employing safeguards against voter fraud. Even assuming, *arguendo*, that an unjustified, special burden on some voters existed, Plaintiffs have not shown a burden sufficient to justify the invalidation of the entire matching process as an appropriate remedy. Further, Plaintiffs are not likely to succeed in proving that any such obstacles are severe enough to overcome the State's interest in implementing the matching procedure. *See Crawford*, 553 U.S. at 202-03.

108.    Because Plaintiffs have not shown that they are likely to succeed on their claim the matching process imposes "excessively burdensome requirements" on any class of voters, they

50

cannot show that the character or magnitude of their alleged injuries qualify as a substantial burden on their right to vote. *Id.* at 203-04.

### b. The State's Interest in Safeguarding the Integrity of the Electoral Process Outweighs the Alleged Burdens to Plaintiffs.

109.    The Supreme Court has acknowledged that not only is the risk of voter fraud real, it could affect the outcome of a close election. *See Crawford*, 553 U.S. at 194-97. Accordingly, the electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. *Id*. at 194 (citing Building Confidence in U.S. Elections § 2.5 (Sept. 2005), App. 136-37 (Carter-Baker Report) (footnote omitted)). The Court has further stated:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

*Id*. at 196. The Supreme Court has also stated that "[w]hile [the interest in the integrity and legitimacy of representative government] is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Id*. at 197.

110.    It is well-established that the State of Texas has a significant interest in protecting voter confidence in the integrity and legitimacy of the electoral process. *See id*. at 194-97. As part of its mission to safeguard voter confidence, Texas also has an interest in deterring and detecting voter fraud. *See id.* at 196 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). On its own, the fact that voter rolls may be inflated with individuals, such as non-citizens, who are not eligible to vote provides a neutral and nondiscriminatory reason supporting the State's decision to implement the matching process. *See id*. at 196-97. Moreover, the State has a valid interest in participating in a nationwide effort to

improve and modernize election procedures. *See id*. at 194-97. Further, the State has an interest in the uniform application and interpretation of election laws throughout Texas. *See*, *e.g.*, Tex. Const. art. 4, § 21. Under the law, Texas's important interests enumerated above are enough to justify implementation of the matching process.

> ### c. The Florida Case Relied on By Plaintiffs is Distinguishable and Inapposite.

111.     Plaintiffs rely heavily on a list maintenance program that occurred in Florida, but for several reasons, Plaintiffs' reliance on the Florida program is misplaced. *See* Pls.' Mot. at 6-7. First, the Florida program commenced just a few months before statewide primary elections. *See* Exhibit, *Arcia v. Detzner*, No. 1:12-cv-22282-WJZ (S.D. Fla. filed Sept. 26, 2012) [ECF No. 79-2] (indicating that a preliminary list of names would be sent on April 3, 2012). Also, the chief elections officer disseminated the list to election supervisors "with a detailed set of instructions— or at least suggestions—on how to use the list." *United States v. Florida*, 870 F. Supp. 2d 1346, 1347 (N.D. Fla. 2012). They were instructed, for example, to contact and investigate the individuals identified on the list. Exhibit 2 at 2, *Arcia*, No. 1:12-cv-22282-WJZ [ECF No. 79-2] ("Please remember that you are still responsible for contacting these individuals and going through the process of verifying citizenship status before making a determination of eligibility for voter registration.").

112.     The federal government and private plaintiffs sued to enjoin the Florida program. Neither was successful in the district court. In the litigation brought by the federal government, the district court rejected the argument that the Florida program violated the National Voter Registration Act's (NVRA) prohibition against list maintenance practices intended to systemically remove ineligible voters from the rolls within 90 days of an election. The court found that the 90-

day quiet period prevented the removal on grounds that arise after an initial *proper* registration. *Florida*, 870 F. Supp. 2d at 1350. Thus, the Florida program did not violate this portion of the NVRA because the quiet period did not apply to the revocation of a *noncitizen's* improper registration. *Id*. The court explained that the NVRA imposed no time limitations on when a state could remove noncitizens from the voter rolls to protect election integrity. It noted that a state "can and should" block noncitizens "on the front end" and prevent them "from registering in the first place." *Id*. And the court added that states should remove noncitizens registered in error "well in advance" of an election. *Id.* "But the NVRA," the court concluded, "does not require a state to allow a noncitizen to vote just because the state did not catch the error more than 90 days in advance." *Id*.

113.    The federal government also alleged the Florida program violated the NVRA's provision requiring state voter maintenance programs to be "uniform" and "nondiscriminatory." But the court did not reach the merits of that claim because Florida had suspended the program. *Id*. at 1351.[2] It opined, nevertheless, that a "program that accurately identifies noncitizens who are registered to vote without unnecessarily challenging citizens could meet the requirement of uniformity and nondiscrimination." *Id*.

114.    The private plaintiffs also were unsuccessful in stopping the Florida program in a separate lawsuit at the district court. The district court read the NVRA's 90-day provision in the same way that the court had in the lawsuit brought by the federal government and concluded that the states were not required to sit idly on the sidelines as an election nears. It similarly held that

---

[2] The court speculated that the Florida Secretary's program "probably ran afoul" of this provision of the NVRA while it was being pursued as the Florida Secretary's "proposal was to send letters to the listed individuals requiring a response and ultimately to require them to provide documentation of their citizenship." *Id.* at 1350. The Court did not rule on that issue, however, as the program had already been suspended. Moreover, unlike the Florida program, Secretary Whitley's program envisions an iterative process whereby local election officials would make individualized determinations about the need to investigate the eligibility of voters on the lists. It does *not* contemplate—and has not engendered—indiscriminate mass mailings by local election officials to persons whose names appeared on the lists.

the quiet period did not apply to the removal from the voter rolls of noncitizens who were improperly registered in the first place. *Arcia v. Detzner*, 908 F. Supp. 2d 1276, 1281-83 (S.D. Fla. 2012), *rev'd*, 772 F.3d 1135 (11th Cir. 2014). The court had no occasion to address whether the Florida program was uniform and nondiscriminatory because private plaintiffs did not bring a claim under this portion of the NVRA. *See id.*

115.    The Florida program and related litigation does not apply to this case. Plaintiffs do not seek to enjoin Secretary Whitley's Election Advisory under the NVRA. In addition, Secretary Whitley issued the advisory well in advance of the NVRA's quiet period. This is important because the Election Advisory contemplates an iterative process involving collaboration between the State and counties to assist counties in fulfilling their investigative role. Unlike the Florida program, which was accompanied by specific instructions about contacting individuals identified on the list, the Election Advisory does not mandate an investigation of any voter. The Secretary of State's office has acted merely as a conduit of information, in accordance with the office's constitutional and statutory mandates. *See, e.g.*, Tex. Const. art. 4, § 21; Tex. Elec. Code §§ 31.001, 31.003-.004.

116.    Texas law further requires mandatory disclosure of personal information contained in DPS motor vehicle records in connection with the maintenance of accurate voter rolls. Tex. Transp. Code § 730.005(9). Pursuant to this legislative directive, Secretary Whitley obtained information from DPS and disseminated the matching data with specific instructions that the registrars were to make independent determinations and could ***"take no action*** on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible." Election Advisory at 2 (emphasis added). The Election Advisory simply provides additional information to voter registrars throughout the State—at the behest of the Legislature—to help election officials

discharge their obligations to safeguard the integrity of the State's voter rolls by preventing ineligible persons from casting votes. The Secretary of State's actions are lawful.

117.    Plaintiffs' are not entitled to a preliminary injunction because they have not shown a likelihood of success on their First and Fourteenth Amendment claims.

## 2. Plaintiffs' Voting Rights Act Claims Must Fail. [*Garibay*]

118.    Plaintiffs allege that the matching process has a discriminatory effect in violation of Section 2 of the Voting Rights Act, which proscribes any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). Plaintiffs also cite in a separate count the general Voting Rights Act provision that requires uniform standards for voting qualifications. *See* Garibay Third Am. Compl. ¶¶ 227-231 (citing 52 U.S.C. § 10101(a)(2)(A)).[3] But because Plaintiffs have failed to show that they are likely to succeed on these claims, their request for a preliminary injunction should be denied.

119.    "To prove that a law has a discriminatory effect under Section 2, Plaintiffs must show not only that the challenged law imposes a burden on minorities, but also that 'a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'" *Veasey v. Abbott*, 830 F.3d 216, 243-44 (5th Cir. 2016) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (internal quotation marks omitted)). The Fifth Circuit has adopted a two-part framework to evaluate Section 2 "results" claims:

---

[3] To the extent that Plaintiffs are attempting to allege a separate claim from their Voting Rights Act § 2 count, this provision of the Voting Rights Act does not include a private right of action. *See Ne. Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 629-30 (6th Cir. 2016). But even if Plaintiffs could maintain a cause of action under 52 U.S.C. § 10101, such claim would fail for the same reasons as all their others—a Complaint based on speculation and conclusion rather than factual allegations. Accordingly, even though this provision is cited as a separate count, it is treated alongside the Voting Rights Act § 2 claim.

(1) The challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and

(2) That burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Id*. at 244.

120.     "The first part of this two-part framework inquires about the nature of the burden imposed and whether it creates a disparate effect in that 'members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice'—this encompasses Section 2's definition of what kinds of burdens deny or abridge the right to vote." *Id*. at 244-45. The second part of the two-part framework "provides the requisite causal link between the burden on voting rights and the fact that this burden affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both." *Id*. at 245.

121.     As discussed in the preceding sections, Plaintiffs failed to introduce evidence that the matching process imposes a discriminatory burden on them, much less one such that provides them with less opportunity than other members of the electorate to participate in the political process or to elect representatives of their choice. Nor have Plaintiffs shown that minorities are disparately affected by the matching process. Further, Plaintiffs do not offer evidence to connect each Defendant to their Section 2 claim. Even assuming the existence of a burden, the evidence does not establish a likely causal link between the purported discriminatory burden on voting rights and the fact that this burden affects minorities disparately *because* it interacts with social and historical conditions that have historically produced discrimination against minorities. *Veasey*, 830

56

F.3d at 244. Because the Plaintiffs fail to show that they are likely to satisfy the required two-part

framework, they are not entitled to a preliminary injunction based on their Voting Rights Act

claims.

> **3. Plaintiffs Have Failed to Establish a Likelihood of Success on Their Claim of a Conspiracy to Interfere with Civil Rights Under 45 U.S.C. § 1985. [*Garibay*]**

122.    A person injured as the result of a conspiracy to interfere with his civil rights may

bring an action under 42 U.S.C. § 1985. Subsection 3 concerns the acts of two or more persons

conspiring to deprive any person of certain civil rights. *Suttles v. U.S. Postal Serv.*, 927 F. Supp.

990, 999-1000 (S.D. Tex. 1996) (citing *Holdiness v. Stroud*, 808 F.2d 417, 424 (5th Cir.1987)).

Section 1985(3) provides, in pertinent part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more conspirators.

*Suttles*, 927 F. Supp. at 1000 (quoting 42 U.S.C. § 1985). To prove liability under 42 U.S.C. §

1985(3), the plaintiff must allege: (1) a conspiracy involving two or more persons; (2) for the

purpose of depriving, either directly or indirectly, a person or class of persons of the equal

protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to

a person or property, or a deprivation of any right or privilege of a citizen of the United States. *Id.*

at 1000-01 (citing *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 828-29

(1983)); *Hilliard v. Ferguson*, 30 F.3d 649, 652-53 (5th Cir. 1994); *Deubert v. Gulf Fed. Sav.

Bank*, 820 F.2d 754, 757 (5th Cir. 1987). The plaintiff must also prove "some racial, or perhaps

otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *see Hilliard*, 30 F.3d at 653 (citing *Burns-Toole v. Byrne*, 11 F.3d 1270, 1276 (5th Cir. 1994), *cert. denied*, 512 U.S. 1207 (1994)); *Miss. Women's Medical Clinic v. McMillan*, 866 F.2d 788, 793 (5th Cir. 1989).

123.    "In this circuit, we require an allegation of a race-based conspiracy to present a claim under § 1985(3)." *Johnson v. Dowd*, 305 F. App'x 221, 224 (5th Cir. 2008) (citing *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 271 (5th Cir. 2001) (internal quotation omitted)). "Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences." *Bray v. Alexandria Womens Health Clinic*, 506 U.S. 263, 271-72 (1993). "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 273. The same principle applies to the "class-based, invidiously discriminatory animus" requirement of § 1985(3). *Id*. It does not suffice for the application of § 1985(3) that a protected right be incidentally affected. *Id*. at 275. A conspiracy is not for the purpose of denying equal protection simply because it has an effect upon a protected right—the right must be "aimed at" and its impairment must be a conscious objective of the enterprise. *See id*. The "intent to deprive of a right" requirement demands that the defendant do more than merely be aware of the deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it. *Id*. at 275-76.

124.    The record is devoid of any factual support for the Garibay Plaintiffs' conclusory assertions that improper or unlawful considerations motivated the Defendants' conduct. Nor do Plaintiffs provide evidence sufficient to show a likelihood of success on each of the four elements required to properly plead a conspiracy claim under § 1985(3), or to show a likelihood that

Defendants selected or reaffirmed the matching process because of its adverse effects upon Plaintiffs. That failure is not surprising, as Plaintiffs did not even plead facts showing any of the Defendants intended to deprive Plaintiffs of their constitutional rights or that they acted at least in part for the very purpose of producing the alleged deprivation. Accordingly, Plaintiffs' § 1985 claim cannot support a preliminary injunction. *See Johnson*, 255 F.3d at 271; *Suttles*, 927 F. Supp. at 1002.

### 4.   Plaintiffs Have Failed to Establish a Likelihood of Success on Their Fifteenth Amendment Claim. [MOVE]

125.   The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," and it gives Congress the "power to enforce this article by appropriate legislation." *Shelby County, Alabama v. Holder*, 570 U.S. 529, 536 (2013). The Amendment is not designed to punish for the past; its purpose is to ensure a better future. *Id.* at 553 (citing *Rice v. Cayetano,* 528 U.S. 495, 512 (2000) ("Consistent with the design of the Constitution, the [Fifteenth] Amendment is cast in fundamental terms, terms transcending the particular controversy which was the immediate impetus for its enactment.")). As discussed above, the MOVE Plaintiffs have not asserted any facts, let alone introduced evidence, to support their conclusory assertions that discriminatory, non-neutral considerations motivated Defendants' conduct.

### 5.   Plaintiffs Have Failed to Establish a Likelihood of Success on Their Due Process Claims. [MOVE]

126.   The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." This Court has held that the Due Process Clause protects individuals against two types of government action. So-called

"substantive due process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325-26 (1937). When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). This requirement has traditionally been referred to as "procedural" due process.

### a.  Substantive Due Process

127.    "Substantive due process 'bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.'" *Marco Outdoor Adver., Inc. v. Reg'l Transit Auth.*, 489 F.3d 669, n.3 (5th Cir. 2007) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (internal quotations omitted)). "[It] requires only that public officials exercise professional judgment, in a nonarbitrary and capricious manner, when depriving an individual of a protected [life, liberty, or] property interest." *Lewis v. Univ. of Tex. Med. Branch at Galveston*, 665 F.3d 625, 631 (5th Cir. 2011) (citing *Tex. v. Walker*, 142 F.3d 813, 819 (5th Cir.1998)). Accordingly, "[t]o establish a violation of substantive due process, 'a plaintiff must prove that (1) he was deprived of a life, liberty, or property interest (2) in an arbitrary or capricious manner.'" *Aragona v. Berry*, No. 3:10-CV-1610-G, 2012 WL 467069, at *7 (N.D. Tex. Feb. 14, 2012) (internal citations omitted).

128.    In support of their substantive due process claim, the MOVE Plaintiffs merely allege that "[t]he Secretary arbitrarily prescribed this inadequate opportunity for voters to rebut the allegations of non-citizenship in apparent violation of Texas Election Code 16.033." MOVE First Am. Compl. ¶ 148. However, none of the Plaintiffs plead any facts, much less introduce evidence, showing that any of the alleged actions taken by the Defendants were arbitrary or rose to such a

level as to "shock the conscience." Accordingly, the substantive due process claim does not support a preliminary injunction.

### b.  Procedural Due Process

129.    There are "three distinct factors for a court to weigh in considering whether the procedural due process provided is adequate: 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Meza v. Livingston*, 607 F.3d 392, 402 (5th Cir. 2010). "Procedural due process considers not the justice of a deprivation, but only the means by which the deprivation was effected." *Caine v. Hardy*, 943 F.2d 1406, 1411 (5th Cir. 1991). Thus, the injury that stems from a denial of due process is not the liberty or property that was taken from the plaintiff, but the fact that it was taken without sufficient process. *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 220 (5th Cir. 2012). A due process injury is therefore complete at the time process is denied. *Id*. (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (stating that "the constitutional violation actionable under § 1983 is complete when the wrongful action is taken")).

130.    In support of their procedural due process claim, the MOVE Plaintiffs assert that "[t]he process for removing registrants on the [list] from the voter rolls does not provide voters with notice and an opportunity to be heard at a meaningful time or in a meaningful manner." MOVE First Am. Compl. ¶ 146. However, the MOVE Plaintiffs assert that Texas counties have mailed letters to individuals notifying them of the need to prove their citizenship (notice) and providing them with an opportunity to provide the requested proof of citizenship (an opportunity

to be heard), and they also acknowledge that the Secretary of State's webpage has a form for individuals to respond to an investigation into their citizenship status. *See, e.g.*, *id.* ¶¶ 54, 56, 57, 61. Other than baseless, unsubstantiated assertions, the Plaintiffs have not provided any facts showing such actions do not constitute notice and an opportunity to be heard, or that they are not meaningful in time or manner. Nor do Plaintiffs offer any evidence that their private interests outweigh those of the State or that additional statutory procedural safeguards are available. Critically, Plaintiffs have not pled and cannot plead that any voters have been removed from the voter rolls as a result of Defendants' actions. Plaintiffs have not shown that they are likely to succeed on their procedural due process claim; therefore, the claim does not warrant a preliminary injunction.

### 6. Plaintiffs Have Failed to Establish a Likelihood of Success on their Claim of Discriminatory Purpose. [MOVE]

131.    The MOVE Plaintiffs also claim that the State Defendants acted for a discriminatory purpose. MOVE First Am. Compl. ¶¶ 156-58. Although this count appears to be merely support for the MOVE Plaintiffs' other claims, and does not appear to be a separately alleged cause of action, the allegations unsupported. U.S. citizenship is a requirement for voter eligibility in Texas. Tex. Elec. Code § 11.002(a)(2). Secretary Whitley has the obligation and responsibility to ensure that Texas election laws are being enforced throughout the State, including this citizenship requirement. *See, e.g.*, Tex. Elec. Code § 31.003. The Texas legislature has directed DPS to provide this data to the Secretary of State. Tex. Transp. Code § 730.005(9). And the Election Advisory is explicit that the purpose of the matching process was to "produce[] the least possible impact on eligible Texas voters while fulfilling the responsibility to manage the voter rolls." Election Advisory at 1. The information was based on "documents provided by [each]

person to show they are lawfully present in the United States," and the stated "goal was to produce actionable information for voter registrars while producing the least possible impact on eligible voters." Election Advisory at 1-2.

132.    In contrast to these unambiguous statements and statutory requirements, Plaintiffs have offered nothing other than their own unsupported speculation and conclusory opinions that all these indicia of good faith should be ignored. According to Plaintiffs, the State Defendants cannot fulfil their duties to safeguard and secure the validity of elections in Texas as allowed by law, and state officials are constitutionally prohibited from maintaining the integrity of voter rolls in a way that the law allows. The Court should reject Plaintiffs' attempt to secure a preliminary injunction based on claims of discriminatory purpose, which are wholly devoid of any supporting factual allegations in the Complaint, let alone evidence in the record.

## II.    PLAINTIFFS' ALLEGED INJURIES ARE NOT IRREPARABLE.

133.    Defendants' alleged actions cause no injury—irreparable or otherwise—to Plaintiffs. Plaintiffs' theory of injury requires a "speculative chain of possibilities" before any actual harm may result. *Clapper v. Amnesty Int'l U.S.A.*, 568 U.S. 398, 414 (2013) (rejecting a standing theory premised on numerous assumptions about how the statute might be enforced). First, the registrar would have to send a Notice of Examination based on a reasonable belief that each is ineligible to vote. Tex. Elec. Code § 16.033(b). Registrars are prohibited from unilaterally removing a voter from the rolls without notice. Tex. Elec. Code § 16.033(c)-(d). And Secretary Whitley emphasized that the matches should be treated as "weak" matches, and that registrars could not take action to cancel registrations based on the DPS data alone. Election Advisory at 2.

134.    Second, the notice would either have to go undelivered—despite the fact that it must be sent by forwardable mail to the recipient's listed address and all other addresses known to

the registrar—or the recipient would have to fail to submit a timely response. Tex. Elec. Code § 16.033(c)-(d). But for notices that are sent and properly delivered, the recipient could respond by emailing, delivering, mailing, or faxing proof of citizenship to the registrar. *Id.* § 1.007.

135.    Third, even if an eligible voter were injured by being removed from the rolls in error, that injury is easily redressable under Texas law, which provides for immediate reinstatement following receipt of information establishing proof of citizenship. *Id*. § 16.037(d). And if an eligible voter is not reinstated before voting begins, he or she can still vote provisionally and be reinstated by providing proof of citizenship at any time before the provisional ballots are counted. *Id*; *see also* Tex. Elec. Code § 63.011 (requiring provisional ballots).

136.    Contrary to Plaintiffs' conjectural claims of injury, Defendants' actions and the matching process described in the Election Advisory do not impair the ability to register or the right to vote. Rather, the Secretary of State's office has merely provided additional tools to help registrars maintain accurate voter rolls. The Election Advisory unequivocally advises the registrar to "determin[e] whether or not the information provides the registrar with reason to believe the person is no longer eligible for registration." *Id*. at 2. There is no harm from Secretary Whitley sharing data with the local officials who are responsible under state law for investigating voter eligibility. Tex. Elec. Code § 16.033. And Attorney General Paxton is not even remotely connected to any potential injury because the Office of Attorney General has no authority to conduct list maintenance or remove registered voters from voting lists. *See* Tex. Elec. Code § 273.001 *et seq.*

137.    Plaintiffs claim that the matching process imposes "severe burdens" because registrars could require some registered voters to submit proof of eligibility. This argument "would subject virtually every electoral regulation to strict scrutiny, hamper the ability of the States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes."

*Crawford*, 553 U.S. at 197. The Supreme Court has already established that ordinary measures required to prove voting eligibility do not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting. *Id*. at 198-99. Moreover, the inconvenience associated with gathering official documents is slight when compared with the necessity to protect "public confidence" in the electoral system by adopting safeguards "to deter and detect [election] fraud." Jimmy Carter and James A. Baker III, Building Confidence in U.S. Elections § 2.5 at 18 (Sept. 2005), *available at* https://www.eac.gov/assets/ 1/6/Exhibit%20M.PDF. And, as already explained, Texas law provides several statutory safety valves to ensure that eligible voters who are removed from the rolls in error can be reinstated immediately at any time before provisional votes are counted.

138.    None of Plaintiffs' evidence changes that, and Plaintiffs have not established that they will be irreparably injured absent a preliminary injunction. Thus, the Election Advisory will not cause irreparable harm to any of voters, and there is no need for the "extraordinary remedy" of a preliminary injunction. *Steen*, 732 F.3d at 386.

## III.    INJUNCTIVE RELIEF WOULD IMPOSE A SUBSTANTIAL BURDEN ON DEFENDANTS AND WOULD SIGNIFICANTLY COMPROMISE THE PUBLIC'S INTEREST IN THE INTEGRITY OF THE ELECTORAL PROCESS.

139.    Finally, the Court must consider whether Plaintiffs' "substantial injury outweighs the threatened harm to the party to be enjoined" and whether "granting the preliminary injunction will not disserve the public interest." *Steen*, 732 F.3d at 386. Both factors weigh against the entry of a preliminary injunction as Plaintiffs' requested relief would both impose a severe burden on Defendants and disserve the public interest. None of Plaintiffs' evidence can establish otherwise, which is a sufficient reason for the Court to deny Plaintiffs' motion. *Id.*; *Lakey*, 667 F.3d at 574.

140.    U.S. citizenship is a requirement for voter eligibility in Texas. Tex. Elec. Code §

11.002(a)(2). Secretary Whitley has an obligation to ensure that Texas election laws are being

enforced throughout the State, including the citizenship requirement. *See, e.g.*, Tex. Elec. Code §

31.003. The Texas legislature directed DPS to provide data to the Secretary of State. Tex. Transp.

Code § 730.005(9). But according to Plaintiffs, the public interest would be served by *preventing*

Defendants from fulfilling their duties to safeguard the validity of elections in Texas, and by

*prohibiting* Defendants from maintaining the integrity of voter rolls. Plaintiffs' position is plainly

at odds with the democratically expressed will of the people as evidenced by state law.

141.    Moreover, Plaintiffs' requested injunction is simply unworkable. The matching

process outlined in the Election Advisory is an iterative and collaborative process. Halting it now

would end that collaboration and disrupt the State's list maintenance activities, which are

authorized by law. Plaintiffs ask this Court to require Defendants to make new, unknown public

statements and "rescind" previous ones, creating more confusion and disruption. Plaintiffs also ask

this Court to order Defendants to take actions in excess of their statutory authority—direct the

activities of voter registrars, local officials with sole authority and responsibility for removing

individuals from voter rolls for non-citizenship. And Plaintiffs ask this Court to prohibit the State's

election officials from acting on any information provided pursuant to the Election Advisory's

matching process, even if it means knowingly allowing unqualified voters to remain on the rolls.

Such a result would impose an intolerable burden on Defendants and the State of Texas and

disserve the public interest in maintaining the integrity of the democratic process.

                                    Respectfully submitted.

                                    KEN PAXTON
                                    Attorney General of Texas

                                    JEFFERY C. MATEER

First Assistant Attorney General

RYAN BANGERT
Deputy Attorney General for Legal Counsel

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Associate Deputy for Special Litigation
Texas Bar No. 00798537
TODD LAWRENCE DISHER
Trial Counsel for Civil Litigation
Texas Bar No. 24081854
MICHAEL TOTH
Special Counsel for Civil Litigation
Texas Bar No. 24100608
ROLA DAABOUL
Assistant Attorney General
Texas Bar No. 24068473
CHRISTOPHER D. HILTON
Assistant Attorney General
Texas Bar No. 24087727

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
FAX: (512) 320-0667
Patrick.Sweeten@oag.texas.gov
Todd.Disher@oag.texas.gov
Michael.Toth@oag.texas.gov
Rola.Daaboul@oag.texas.gov
Christopher.Hilton@oag.texas.gov

***Counsel for Defendants***

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of March, 2019, the foregoing Defendants Texas Secretary of State David Whitley, Texas Attorney General Ken Paxton, Texas Governor Greg Abbott, and Keith Ingram's Proposed Findings of Fact and Conclusions of Law was Electronically filed with the Clerk of the Court using the CM/ECF system and served on all attorney(s) and/or parties of record, via the CM/ECF service and/or via electronic mail.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN