# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CIVIL ACTION NO. 5:19-CV-00074-FB |
| DAVID WHITLEY, et al., | § § § | |
| *Defendants.* | § | |

---

## DEFENDANTS SECRETARY OF STATE DAVID WHITLEY, ATTORNEY GENERAL OF TEXAS KEN PAXTON, AND GOVERNOR GREG ABBOTT'S MOTION TO DISMISS THE GARIBAY PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT [ECF NO. 82]

---

1.     State and federal law require the Texas Secretary of State to assist county election officials in maintaining the accuracy of Texas's voting rolls. To that end, the Texas Legislature has mandated that the Texas Department of Public Safety ("DPS") share information with the Secretary of State for the express purpose of attempting to identify non-citizens who are registered to vote. The Secretary of State does not investigate voter eligibility or cancel a voter's registration for non-citizenship, however, as that authority lies solely with county election officials. Rather, the Secretary's role is limited to providing guidance and information to the counties to ensure that only eligible citizens can cast ballots.

2.     Consistent with his clear statutory duty, starting in March 2018, former Secretary of State Rolando Pablos began working with DPS to obtain data regarding the citizenship of individuals at the time they applied for Texas driver's licenses or identification cards so that it

could be compared to the list of registered voters. On January 25, 2019, Secretary of State David Whitley's office provided counties the names of the registered voters who had presented evidence of non-citizenship when they obtained a driver's license or identification card. In doing so, his office carefully described the nature of the information, and the limitations on counties' ability to cancel voter registrations based on that information:

> All records submitted through this process will need to be treated as WEAK matches, meaning that the county may choose to investigate the voter, pursuant to Section 16.033, Election Code, or take no action on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible. The county **may not cancel** a voter based on the information provided without first sending a Notice of Examination (Proof of Citizenship Letter) and following the process outlined in the letter. In order to help counties make a determination regarding whether or not to send a Notice of Examination or close the task without taking further action, information provided by DPS will be provided to each county for further review and comparison against the voter record.

Election Advisory No. 2019-02[1] ("Election Advisory") (emphasis in original).

3.       Secretary Whitley has now been sued in three different consolidated lawsuits for fulfilling his statutory obligation. Moreover, Plaintiffs in this case also named Texas Attorney General Ken Paxton and Governor Greg Abbott as defendants. Plaintiffs allege that Attorney General Paxton did nothing other than send out a press release and other communications confirming that he plans to fulfill his duty to investigate claims of voter fraud, and Governor Abbott did nothing other than make statements regarding this work. Thus, Plaintiffs ask this Court to enter an injunction that would prevent three State officials from performing their roles as required by the Texas Constitution, Texas statutes, and federal law.

---

[1] Election Advisory No. 2019-02, "Use of Non-U.S. Citizen Data obtained from the Department of Public Safety" (dated January 25, 2019), *available at* https://www.sos.state.tx.us/elections/laws/advisory2019-02.shtml (last visited March 18, 2019).

4.      Defendants respectfully request that all claims against Secretary Whitley, Attorney General Paxton, and Governor Abbott be dismissed. Defendants are not responsible for canceling any voter's registration for non-citizenship. That role belongs to the counties. And even if Plaintiffs had sued all 254 counties in Texas, Plaintiffs have not alleged that any eligible voter has been removed from the rolls as a result of the Election Advisory. If Plaintiffs do receive a notice of examination, they can prevent cancellation by proving their citizenship within 30 days after receiving the notice and can contest cancellation should it occur, and county registrars shall add names back to the rolls if they were wrongfully canceled. Further, if a citizen's registration is cancelled, their registration is required to be reinstated immediately if they subsequently present proof of citizenship to the voting registrar. This can happen at any time, including on election day if a citizen discovers this cancellation when casting a ballot. Thus, Plaintiffs have not suffered an injury that is fairly traceable or redressable by an injunction against Defendants, and therefore Plaintiffs lack standing and have not stated a claim upon which relief can be granted. Secretary Whitley, Attorney General Paxton, and Governor Abbott, each in their official capacities, hereby move to dismiss with prejudice all of Plaintiffs' claims against them pursuant to Rules 12(b)(1), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

### I.      Texas's Election System

5.      Secretary Whitley's constitutional role requires him to assist county election officials and ensure the uniform application and interpretation of election laws throughout Texas. *See, e.g.*, Tex. Const. art. 4, § 21; Tex. Elec. Code § 31.001. Secretary Whitley's Elections Division provides assistance and advice to election officials and the general public on the proper conduct of elections, including hosting seminars and election schools, providing calendars, prescribing

forms, certifying ballots, funding primary elections, and providing legal interpretations of election laws to election officials. *See, e.g.*, Tex. Elec. Code §§ 31.003 (duty to maintain uniformity of application of election laws), 31.004 (duty to provide assistance and advice to all election authorities), 31.005 (authority "to protect the voting rights of the citizens of this state"), 31.0055 (duty to maintain a voting-rights hotline), 31.006 (duty to refer complaints alleging criminal conduct to the Attorney General). Secretary Whitley also is required by law to maintain a computerized voter registration list that accurately reflects the official voter roll of the State for use by election officials in Texas. *See id.* § 18.061.

6.     Local election officials, in turn, are charged with conducting elections in Texas, including maintaining voter rolls as the voter registrar. *See, e.g.*, *id.* § 12.001 (designating a local official as the voter registrar). Each county can assign the duties of the voter registrar to the county clerk, an elections administrator, or the tax assessor-collector. *See id.*  Each registrar is authorized by statute to use any lawful means to investigate registration eligibility. *Id.* § 16.033. And only the registrar—that is, the local election official—can cancel any individual's voter registration. *See id.* §§ 16.031-.0332.

7.     The process for cancelling a voter's registration is codified in statute and entails a number of protections to ensure that eligible voters do not forfeit the right to vote. The registrar must first investigate whether the registered voter is currently eligible to vote. Tex. Elec. Code § 16.033. The law further directs the registrar to take certain actions if he or she "has reason to believe that a voter is no longer eligible for registration." *Id* § 16.033(b). The registrar is not permitted to cancel a voter's registration before notifying the voter, in writing and sent by forwardable mail to the voter's mailing address and any other addresses known to the registrar, that the voter's registration status is under investigation. *Id*. The notice of examination, as it is

4

called, must specify what information is needed to determine the voter's eligibility. *Id*. § 16.033(c)(1). And the notice must advise the recipient that the requested information must be received within 30 days or the voter's registration will be subject to cancellation. *Id*. § 16.033(c)(2).

8.      In the event that a voter's registration is investigated because the registrar has reason to believe that the voter is a non-citizen, the notice of examination will ask for proof of citizenship. A voter may prove his or her citizenship by submitting a birth certificate, United States passport, certificate of naturalization, or any other form prescribed by the Secretary of State. *Id*. § 16.0332(a). And state law allows voters to submit responsive documentation by "personal delivery, mail, telephonic facsimile machine, or any other method of transmission." *Id*. § 1.007(c).

9.      State law requires the registrar to cancel a voter's registration if the registrar determines that the voter is ineligible based on the voter's reply to the notice of examination. *Id*. § 16.033(d). Registration is automatically cancelled if the voter does not respond within 30 days of the notice, or if the notice is returned undeliverable with no forwarding information available. *Id*. But a voter whose registration is cancelled could still submit proof of citizenship and be reinstated immediately by the registrar. *Id*. § 16.037(a), (d). Voters whose registration is cancelled can also request a hearing with the registrar. *Id.* § 16.061. Upon submitting a signed request for a hearing, an individual's voter registration is reinstated and a hearing is scheduled within 10 days. *Id.* §§ 16.037, 16.064. At the hearing, the voter may appear personally or submit an affidavit without appearing. *Id.* § 16.064. And if the voter disagrees with the registrar's determination at the hearing, the voter can seek judicial review of the decision, during which time any cancellation of the individual's voter registration is delayed. *See id.* § 17.005. Only after a district court rules on the appeal is an individual finally subject to cancellation of their voter registration. *See id.* § 17.008.

10.     Finally, an individual whose voter registration is cancelled can cast a provisional ballot. Election officials at polling locations must provide provisional ballots to voters who claim to be eligible but whose names are not on the list of registered voters. 52 U.S.C. § 21082 (requiring provisional ballots); Tex. Elec. Code § 63.011 (same); Tex. Admin. Code § 81.172(a)(5) (same). The voter can submit proof of citizenship to the registrar and be reinstated immediately or at any time before the provisional ballots are counted. Tex. Elec. Code § 16.037(d). Upon receipt of the necessary documentation, the registrar would note that the voter was erroneously removed from the rolls, 1 Tex. Admin. Code § 81.175(c)(4)(E), and restore him or her to the rolls, *id.* § 81.175(c)(7) ("For purposes of voter registration, the copied Provisional Ballot Affidavit Envelope serves as an original voter registration application or change form.").

11.     The Office of Attorney General (OAG) has statutory authority to investigate and prosecute election offenses statewide. Tex. Elec. Code §§ 273.001, 273.021. These offenses include the misdemeanor offense of unlawful registration, *id.* § 13.007, and the felony offense of illegal voting, *id.* § 64.012. OAG can investigate election matters on its own initiative. *Id.* § 273.001(b). OAG can also receive notices of unlawful voting from registrars, *id.* §§ 15.028, 273.001(c), and referrals of election-related complaints from the Secretary of State, *id.* § 273.001(d). OAG does not have statutory authority to conduct list maintenance or remove registered voters from voter rolls. *See id.* §§ 273.001 *et seq*.

## II.     Election Advisory No. 2019-02

12.     An individual must be a United States citizen to vote in Texas. Tex. Elec. Code § 11.002(a)(2).  By statute, personal information contained in DPS motor vehicle records must be disclosed to the Secretary of State and used "in connection with any matter of . . . voter registration or the administration of elections by the secretary of state." Tex. Transp. Code § 730.005(9); *see*

*also id.* § 521.044(a)(6) (separately authorizing disclosure of social security number information). The Texas Legislature has manifested its intent that this information be used to ensure the integrity of Texas' voter rolls.

13.     The bill requiring DPS to disclose motor vehicle data to the Secretary of State—codified under section 730.005 of the Texas Transportation Code—was enacted in 2013. The law passed the Texas Senate unanimously and secured approval in the Texas House by a broadly bipartisan vote of 123 to 14. Acts 2013, 83rd Leg., ch. 1012 (H.B. 2512). The leaders of the Texas Democratic Party and the Republican County Chairs Association testified in favor of the bill. Tex. B. Ann., H.B. 2512 (May 3, 2013). The bill's supporters explained that the Secretary of State's office is "required to maintain the accuracy of the voter rolls and does not currently have all the necessary tools at its disposal." *Id*. They contended that the bill's purpose was to help solve that deficiency. By requiring DPS to share the personal data that it receives when individuals apply for driver's licenses and personal IDs, they maintained, the bill would "improve accuracy in verifying the voter rolls." *Id*.

14.     Pursuant to this legislative directive, Secretary Whitley obtained from DPS information "regarding individuals who provided documentation to DPS showing that the person is not a citizen of the United States during the process of obtaining or acquiring a Texas Driver License or Personal Identification Card." Election Advisory at 1. Looking at data only from "current (unexpired) Driver License and Personal Identification cards" that met matching criteria described in the Election Advisory, Secretary Whitley compiled the list of individuals registered to vote who had previously been determined by DPS not to be citizens. *Id*.

15.     Secretary Whitley did not tell the counties that ***any*** individual on the list was an illegally registered voter. The Election Advisory stresses that "counties are ***not*** permitted, under

7

current Texas law, to immediately cancel the voter as a result of any non-U.S. Citizen matching information provided." *Id*. at 2-3. The Election Advisory unequivocally advises the registrar to "determin[e] whether or not the information provides the registrar with reason to believe the person is no longer eligible for registration." *Id*. at 2. Indeed, under this matching and information-sharing process, there is no obligation for the registrar to do anything at all; the registrar must treat all records submitting via this process "as WEAK matches, meaning that the county ***may*** choose to investigate the voter, pursuant to Section 16.033, Election Code, ***or take no action*** on the voter record if the voter registrar determines that there is no reason to believe the voter is ineligible." *Id*. at 2 (emphasis added).[2] That is despite those same matching criteria justifying an automatic transfer of registration among counties in certain circumstances. Tex. Elec. Code § 18.0681. The Election Advisory makes clear, however, that county voter registrars who received the data from this matching process are ***not*** required to conduct any investigation "if they do not believe that a voter is ineligible to vote." *Id*. at 3. And if a voter registrar does choose to investigate, they have "the right to use any lawful means to investigate whether a registered voter is currently eligible." *Id*. at 2. As with other list-maintenance activities, this is an iterative process involving collaboration between the State and counties to assist counties in fulfilling their investigative role.

16.    Contrary to Plaintiffs' gross mischaracterization of the Election Advisory as a "voter purge," this matching process is simply an effort to provide additional information to voter registrars throughout the State—at the behest of the Legislature—to help election officials to discharge their obligations to safeguard the integrity of the State's voter rolls by preventing

---

[2] *See also* Election Advisory at 3 ("For the matching notifications originating from DPS data, ***the [registrar] has the choice to*** either . . . Send a Proof of Citizenship Letter (Notice of Examination) to the voter; thereby starting the 30-day countdown clock before cancellation, or . . . ***Take no action on the voter record and simply close the task as RESOLVED***.") (emphases added).

ineligible persons from casting votes. As described above, this process of investigating citizenship status is mandated by statute and affords the individuals at issue ample opportunity to provide the necessary documentation to prove that they are eligible voters. *See* Tex. Elec. Code § 16.0332. Accordingly, the Election Advisory does not mandate that any action be taken against any voter. It merely outlines the process by which DPS data will be shared with local election officials, and leaves to them the decision whether to investigate any particular voter.

### III.   Allegations Against Secretary Whitley

17.    Notwithstanding Plaintiffs' soaring rhetoric, Secretary Whitley is not alleged to have done anything other than issue the Election Advisory. As described above, Plaintiffs' allegations that Secretary Whitley is implementing a voter purge program—or doing anything other than providing data to local election officials, who will then decide whether to investigate pursuant to state law —are flatly contradicted by the clear language of the Election Advisory. *Cf., e.g.*, Third Amended Class-Action Complaint ("Compl.") ¶¶ 1-5 [ECF No. 82]. Secretary Whitley is alleged to have sent out the Election Advisory and voter data, *see, e.g.*, Compl. ¶¶ 1, 113, which is grossly mischaracterized throughout the Complaint. Secretary Whitley is further alleged to have issued a press release. *See* Compl. ¶¶ 121-23. Plaintiffs also allege that Secretary Whitley's office has been in further contact with county officials regarding the Election Advisory and voter data. *See* Compl. ¶¶ 95-98, 105, 127. Plaintiffs do not allege that Secretary Whitley sent a single letter to a voter or that he cancelled any voter's registration.

### IV.   Allegations Against Attorney General Paxton

18.    The allegations against Attorney General Paxton are even more disconnected from the relief Plaintiffs seek. Attorney General Paxton is not alleged to have done anything other than use Twitter to acknowledge the Election Advisory and issue a press release regarding OAG's

prosecutorial authority for election-related crimes. *See* Compl. ¶¶ 124-25. There is no allegation that Attorney General Paxton has yet investigated or prosecuted, or threatened to investigate or prosecute, any individual whose name was identified through the Secretary's matching process.

### V.   Allegations Against Governor Abbott

19.     Plaintiffs' allegations against Governor Abbott do not demonstrate that he has anything to do with Plaintiffs' alleged injuries, and he is entirely unnecessary to this litigation. Governor Abbott is not alleged to have done anything other than appoint Secretary Whitley and use Twitter to acknowledge the Election Advisory. *See* Compl. ¶¶ 78, 126. Governor Abbott allegedly was also questioned by members of the media about the matching process. Compl. ¶¶ 183, 186. Plaintiffs appear to acknowledge that their allegations are not based on any action by the Governor, but rather based on a media reaction that "quickly snowballed." *See* Compl. ¶ 128. There is no allegation that Governor Abbott has acted or plans to act regarding any individual whose name has been identified through the Secretary's matching process.

### STANDARD OF LAW

### I.   Rule 12(b)(1)

20.     When the court lacks the statutory or constitutional power to adjudicate a case, the case is properly dismissed for lack of subject-matter jurisdiction. *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction," so that "the plaintiff constantly bears the burden of proof that jurisdiction does, in fact, exist." *Raj v. La. State Univ.*, 714 F.3d 322, 327 (5th Cir. 2013). Under this rule, this Court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts

evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009).

**II.      Rule 12(b)(6)**

21.      "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations, quotation marks, and alterations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "mere conclusory statements[] do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

**ARGUMENT**

**I.      The Court Lacks Jurisdiction Because Plaintiffs Do Not Have Standing**

22.      Subject-matter jurisdiction is a threshold question that this Court must determine before addressing the merits of a case. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."). Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to challenge the subject-matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1); Wright & Miller, 5B Federal Practice and Procedure § 1350 (3d. ed) (explaining that a Rule 12(b)(1) motion "raises the fundamental question whether the federal district court has subject matter jurisdiction over the action before it"). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction, *Ramming*, 281 F.3d at 161,

and courts must presume that federal jurisdiction is lacking "unless the contrary appears affirmatively in the record." *DaimlerChrysler Corp.*, 547 U.S. at 342 n.3.

23.     In determining whether federal jurisdiction exists, the fundamental question is whether the dispute presents a "case" or "controversy" within the meaning of Article III. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."). "[T]hat a litigant have standing to invoke the authority of a federal court 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *DaimlerChrysler Corp.*, 547 U.S. at 342 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish standing, a claimant must present (1) an actual or imminent injury that is concrete and particularized, (2) fairly traceable to the defendant's conduct, and (3) redressable by a judgment in the claimant's favor. *Id.*

24.     Here, Plaintiffs' claimed injuries satisfy none of the three elements that comprise the "irreducible constitutional minimum of standing." *Id.* The alleged injuries fail to satisfy the injury-in-fact component because they are not "actual or imminent," but at best merely "conjectural and hypothetical." *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). Their claims are not traceable to Defendants because the injury they complain of is the result of "the independent action of some third party not before the court." *Id.* (quoting *Simon*, 426 U.S. at 41-42). And it is entirely "speculative" that a favorable decision would redress the injuries that Plaintiffs alleged. Because standing is lacking in this case, this Court should dismiss for want of jurisdiction.

A.     Conduct at Issue

25.     Plaintiffs allege that they are injured by the disclosure of voter data required by state laws aimed at protecting the integrity of the electoral process. Along with Congress and state legislatures across the country, the Texas Legislature has sought to safeguard the voting rights of legal voters by equipping state and local officials to stop voter fraud. *See, e.g.*, 42 U.S.C. § 1973gg-3(b) (explaining that confirming accurate voter registration "protect[s] the integrity of the election process"). The Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker III noted that measures to ensure accurate voter registration lists are necessary because "[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud." Building Confidence in U.S. Elections § 2.5 at 18 (Sept. 2005), *available at* https://www.eac.gov/assets/1/6/Exhibit%20M.PDF. And the Supreme Court has stated that the protection of election integrity "is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982).

26.     Numerous election-integrity laws are pertinent to the facts surrounding Plaintiffs' claims. To begin, DPS is mandated to disclose motor vehicle records "in connection with any matter of . . . voter registration or the administration of elections by the secretary of state." Tex. Trans. Code § 730.005(9). Likewise, the voter registrar in each county is authorized to "investigate whether a registered voter is currently eligible for registration in the county." Tex. Elec. Code § 16.033. The law further directs the registrar to take certain actions if he or she "has reason to believe that a voter is no longer eligible for registration." *Id* § 16.033(b). Under such circumstances, the registrar must notify the voter in writing that the voter's registration status is under investigation. *Id*. Among other things, such notice must include "a warning that the voter's registration is subject to cancellation if the registrar does not receive an appropriate reply on or

13

before the 30th day after the notice is mailed." *Id*. § 16.033(c). If the voter does not reply within the statutory period or the notice is returned undelivered and no forwarding address is available, the law requires the registrar to remove the voter from the rolls. *Id*. § 16.033(d).

27.     Moreover, Texas law requires a matching process to ensure the accuracy of the voter rolls. As the supervisor of this process, the Secretary of State is required to "periodically compare the information regarding voters maintained as part of the statewide computerized voter registration list to determine whether any voters have more than one voter registration record on file." *Id*. § 18.0681. And as part of the matching process, the Secretary is further instructed to create matching criteria that "produce the least possible impact on Texas voters; and fulfill [the Secretary's] responsibility to manage the voter rolls." *Id*. § 18.0681(b). Finally, the law provides guidance based on whether the matches are "weak" or "strong." Relevant here, the Secretary "may inform the county of the voter's residence that a weak match exists." *Id*. § 18.0681(c).

28.     Plaintiffs allege no more than the operation of the State's election-integrity laws. Last year, former Secretary of State Pablos began working with DPS to obtain information about non-citizen holders of driver's licenses or personal identification cards. Election Advisory at 1. DPS is required to share such records in connection with the Secretary's duty to administer elections and maintain accurate voter registration lists. Tex. Trans. Code § 730.005(9). The Secretary of State's office and DPS worked together to disseminate information using the strongest matching criteria to "produce the least possible impact on Texas voters." Tex. Elec. Code § 18.0681(b). For example, the information was limited to individuals with active DPS driver's licenses or identification cards who provided documentation to DPS showing they were non-citizens within the last six years. Election Advisory at 1.

14

29.     After the matching process was complete, Secretary Whitley provided information related to the matches to the voter registrar in each applicable county. In his advisory to registrars, Secretary Whitley emphasized that the sharing of the voter data obtained from DPS did not change or modify the registrar's rights and responsibilities under the Texas Election Code. Election Advisory at 1. Secretary Whitley cited the statutory provision authorizing the registrar to investigate based on a reasonable belief that a voter is no longer eligible for registration. *Id.* (citing Tex. Elec. Code § 16.033(b)). And he pointed to the legislatively provided framework for conducting these investigations, noting that the notice should be delivered by forwardable mail and that non-responses within the prescribed period and notices returned as non-delivered would result in the voter's removal from the rolls. *Id.* at 1-2 (citing Tex. Elec. Code § 16.033(c)-(d)).

30.     Secretary Whitley underscored the point that the purpose of the information sharing was to expand the data set available to the registrars. Election Advisory at 1. As state law makes clear, the registrar is ultimately responsible for determining whether there is a reasonable basis for investigating a voter's eligibility. *Id.* Secretary Whitley noted that the matching process produced only "weak" matches—again, even though the matching criteria itself was robust—and advised the registrars accordingly that they may choose to investigate or take no action at all. *Id.* at 2.

31.     Secretary Whitley issued a statement indicating that "[i]ntegrity and efficiency of elections in Texas require accuracy of our state's voter rolls, and my office is committed to using all available tools under the law to maintain an accurate list of registered voters." Secretary Whitley Issues Advisory on Voter Registration List Maintenance Activity (Jan. 25, 2019), *available at* https://www.sos.state.tx.us/about/newsreleases/2019/012519.shtml.   Attorney General Paxton issued a statement in response to Secretary Whitley's election advisory, noting that "[n]othing is more vital to preserving our Constitution than the integrity of our voting process, and my office

will do everything within its abilities to solidify trust in every election in the state of Texas." Texas Secretary of State's Office Discovers Nearly 95,000 People Identified by DPS as Non-U.S. Citizens are Registered to Vote in Texas (Jan. 25, 2019), *available at* https://www.texasattorneygeneral.gov/news/releases/ag-paxton-texas-secretary-states-office-discovers-nearly-95000-people-identified-dps-non-us-citizens.   Likewise, Governor Abbott registered his support for the efforts of Secretary Whitley and Attorney General Paxton, and called for legislation to safeguard against illegal voting practices. Compl. ¶ 126.

### B.   The Individual Plaintiffs Lack Standing

32.    None of the Plaintiffs here have met their burden to establish standing. The Individual Plaintiffs assert that they are naturalized U.S. citizens and registered Texas voters. *Id*. ¶¶ 8-60. They claim that they are injured because they were allegedly identified by the matching process or they received a Notice of Examination requesting a response within the prescribed period. *Id*. In either case, there is certainly no "real and immediate" harm to any of the Individual Plaintiffs. *Lyons*, 461 U.S. at 102. Their claimed injuries depend on an attenuated chain of events. For the Individual Plaintiffs to suffer "actual and imminent" harm, the county registrar would have to send them Notice of Examination letters *and* they would have to fail to respond within the prescribed period *and* further fail to provide proof of citizenship for immediate reinstatement *and* fail to vote provisionally and provide proof of citizenship before the provisional votes are counted. The alleged injury "is too speculative to invoke Art. III jurisdiction." *Whitmore v. Arkansas*, 495 U.S. 149, 150 (1990).

33.    With the exception of four Doe Plaintiffs and Plaintiff Felicitas Barbosa, none of the Individual Plaintiffs allege that they have received a Notice of Examination letter. Compl. ¶¶ 8-59. Plaintiff Garibay asserts that her county informed her that she appeared in the matching data,

but there is no allegation that she has received any notice of an investigation. *Id*. ¶¶ 10-11. Likewise, Plaintiffs Garcia, Tule-Romain, Espinosa Flores, Tule Carrizales, and Gomez allege that they have appeared in the matching data, but none claims to have received a Notice of Examination. *Id*. ¶¶ 43-59. And Plaintiff Keane alleges that, though she did receive a notice concerning her voting eligibility, the sender of the notice—Galveston County Tax Assessor Cheryl Johnson—later confirmed that the notice was sent in error. *Id*. ¶¶ 34-35.

34.     There is no "real and immediate" threat that the right to vote of any of these Plaintiffs will be impaired. *Lyons*, 461 U.S. at 102. Their claimed injury depends on an attenuated chain of events, none of which has occurred here. As an initial matter, the registrar would have to send a Notice of Examination based on a reasonable belief that each is ineligible to vote. Tex. Elec. Code § 16.033(b). Registrars are prohibited from unilaterally removing a voter from the rolls without notice. Tex. Elec. Code § 16.033(c)-(d). And Secretary Whitley emphasized that the matches were "weak" matches, and that registrars could take no action at all based on the DPS data alone. Election Advisory at 2. Because these Plaintiffs rely on a purely "speculative chain of possibilities," their claims must be dismissed. *Clapper v. Amnesty Int'l U.S.A.*, 568 U.S. 398, 414 (2013) (rejecting a standing theory premised on numerous assumptions about how the statute might be enforced).

35.     And even with regard to the Plaintiffs who allege that they received Notices of Examination, it is entirely speculative to conclude that any of them will be removed from the voting rolls, especially with respect to those Plaintiffs who received an additional letter informing them to disregard the Notice of Examination sent to them. Such an outcome would mean that either the Plaintiff failed to submit a timely response or that the register erroneously removed her from the list despite receiving proof of citizenship, neither of which is alleged to have occurred here.

Further, if an individual was in fact removed from the voter rolls, Texas law provides for immediate reinstatement following receipt of information establishing proof of citizenship. Tex. Elec. Code §§ 1.007(c), 16.037(d). By statute, that information can be emailed, personally delivered, mailed, or even faxed to the registrar. *Id.* And in the event that an eligible voter discovered that he or she were removed from the rolls on the date of an election, Texas law would allow him or her to vote provisionally and submit citizenship proof immediately or any time before the provisional ballots are counted. *See, e.g.*, Tex. Elec. Code §§ 63.011, 65.054.

36.    In sum, the Individual Plaintiffs' ability to vote would be impaired *only if* they were investigated, *and* their registration were cancelled because they did not timely provide proof of citizenship, *and* they were not reinstated because they did not provide proof after cancellation, *and* their provisional vote were not counted because they did not provide proof before the provisional ballots were counted. Because numerous statutory safety valves exist that protect the Individual Plaintiffs' registration status, and because they do not allege that any of those safety valves have been triggered, let alone failed to perform as intended, any claim that they have been injured is purely speculative. The Individual Plaintiffs have suffered no "actual or imminent" harm and cannot therefore satisfy standing requirements. *See Lujan*, 504 U.S. at 560; *see also Clapper*, 568 U.S. at 411-12 (concluding that Plaintiffs' claims were speculative because the statute gave the Executive Branch discretion to determine which communications to target).

37.    The Individual Plaintiffs' alleged injuries are not traceable to Defendants. Secretary Whitley merely shared data with the county registrars. What these officials do with the data, Secretary Whitley repeatedly stressed, was for them to decide, in accordance with applicable law. There is simply no "causal connection" between the Plaintiffs' claimed injury and the State Defendants' conduct. *Lujan*, 504 U.S. at 560. Secretary Whitley simply provided county registrars

with additional information obtained information from DPS pursuant to a mandatory disclosure statute. He did not direct registrars to remove a single voter from the voter rolls based solely on the data provided, in fact, he expressly directed them not to do so. For there even to be a theoretical possibility of injury here, at a minimum there would have to be "independent action" by the county registrar. *Id*. (quoting *Simon*, 426 U.S. at 41-42). Thus, the Individual Plaintiffs' claims must be dismissed. *Id*.

38.     Finally, the Individual Plaintiffs' claims are not redressable by a decision in their favor. They ask this Court to declare unlawful the matching process and Defendants' public statements about data derived as a result of that process, and to prevent Defendants or election officials from taking any action based on Secretary Whitley's advisory. But this relief would require this Court to strike down state law without redressing any actual harm to the Individual Plaintiffs. And, in any event, Secretary Whitley's advisory and Defendants' related statements did not direct local election officials to take any action. Thus, even if the Court were to take the extraordinary step of declaring the public statements of three statewide officials to be unlawful, the Individual Plaintiffs' status would remain unchanged. With or without Defendants' public statements and the Secretary's advisory, the registrars can still make an independent determination of whether to investigate the eligibility of voters across the state, including the Individual Plaintiffs. Therefore, the requested declaratory or injunctive relief would not redress any action by Defendants that actually harmed any of the Individual Plaintiffs.

39.     Likewise, Governor Abbott and Attorney General Paxton have no causal connection to any alleged injury-in-fact. In expressing their opinions on the data, the Governor and Attorney General did not direct any local official to take any particular action with regard to any of the Individual Plaintiffs, or any other resident of Texas. To find any causal connection

between the Governor's and Attorney General's public statements and the harm complained of here would extend federal jurisdiction far beyond its Article III limitations into public policy matters that are "not of a Judicial nature." *DaimlerChrysler*, 547 U.S. at 342 (quoting James Madison, 2 Records of the Federal Convention of 1787, at 430 (M. Farrand ed. 1966)). Because the Individual Plaintiffs suffered no "actual or imminent" harm causally connected to the Governor's or Attorney General's statements, their claims against the Governor and the Attorney General must be dismissed for want of jurisdiction. *See Lujan*, 504 U.S. at 560.

### C.    The Organizational Plaintiffs Lack Standing

40.    Southwest Voter Registration Project, Mi Familia Vota Education Fund, and UnidosUS, and OCA-Greater Houston claim organizational standing based on the assertion they will have to divert resources as a result of Defendants' actions. Garibay Third Am. Compl. ¶¶ 61-77. La Unión Del Pueblo Entero (LUPE) claims injury in the form of resource diversion and further alleges that its members were injured because the matching process identified them. *Id.* ¶¶ 65-67.

41.    The Organizational Plaintiffs can establish their standing through either of two theories, appropriately called "associational standing" and "organizational standing." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Only LUPE alleges that it has standing to sue on behalf of its members who "would otherwise have standing . . . in their own right," *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). But this basis for standing fails for the same reason that the Individual Plaintiffs cannot show standing. The claimed injury is based on the same "speculative chain of possibilities" that defeats the Individual Plaintiffs' standing. *Clapper*, 568 U.S. at 414. And the hypothetical injuries would not, in any event, be traceable to Defendants or redressable with a favorable decision. To demonstrate standing, then, the Organizational Plaintiffs must satisfy the same three-part standing test that

20

applies to individual plaintiffs. *OCA-Greater Houston*, 867 F.3d at 610. But the Organizational

Plaintiffs' claimed injury is as speculative, non-traceable, and non-redressable as the injury alleged

by the Individual Plaintiffs. The Organizational Plaintiffs complain that they may have to devote

resources to educating members about the matching process, but they would not be injured even

if they were approached by an individual who received a Notice of Examination. Under those

circumstances, the Organizational Plaintiffs would merely have to provide education on the law of

Texas. As already stated, the disclosure and use of the matching data was mandatory and any action

by a registrar must be based on the registrar's reasonable belief that the voter may be ineligible,

not on Secretary Whitley's advisory or Governor Abbott's or Attorney General Paxton's public

statements.

       42.    Furthermore, complying with the notice of examination is merely a function of

following the procedures set forth in the statute. Tex. Elec. Code § 16.033. Thus, this case is wholly

distinguishable from *OCA-Greater Houston*, where the organizational plaintiffs had to engage in

"in-depth conversations" because the pertinent state and federal law requirements were not

identical. *OCA-Greater Houston*, 867 F.3d at 608, 610. Here, the Organizational Plaintiffs at most

would have merely to point to state law, which clearly sets forth the standards and processes that

control the maintenance of accurate voting rolls to ensure election integrity. As explained, the basis

for the investigation would be the registrar's independent determination, not Defendants' advisory

and public statements. For that same reason, ruling against Defendants would not redress the harm

the Organizational Plaintiffs claim because they could still be approached by individuals seeking

advice on responding to notices issued pursuant to state election law. Because the Organizational

Plaintiffs fail to meet each of the standing requirements, this Court lacks jurisdiction over their

claims.

43.     In sum, Plaintiffs fail to satisfy any of the standing components and, therefore, their claims must be dismissed for want of jurisdiction under Rule 12(b)(1).

**III.     Plaintiffs Fail to State a Claim on Which Relief May Be Granted**

**A.     Plaintiffs' Fourteenth and First Amendment Claims Must Fail**

44.     Plaintiffs fail to plead any facts in support of their broad, conclusory assertion that the matching process imposes a severe discriminatory burden on naturalized citizens, and they do not otherwise offer facts to overcome the neutral, non-discriminatory interests advanced by the State as justification for the matching process. A court evaluating a constitutional challenge to an election regulation must weigh the asserted injury to the right to vote against the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008). To do this, courts apply a balancing test derived from two Supreme Court decisions, *Anderson v. Celebrezze*, 420 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). "When evaluating a neutral, nondiscriminatory regulation of voting procedure, [the Court] must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *See Crawford*, 553 U.S. at 203.

45.     In passing judgment, the court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). State rules that impose a severe burden on constitutional rights must be "narrowly drawn to advance a state interest of compelling importance." *Id*. "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify

'reasonable nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal citations omitted).

>    **1.     The Character and Magnitude of Plaintiffs' Alleged Injuries Do Not Qualify as a Substantial Burden on the Right to Vote.**

46.     "To deem ordinary and widespread burdens severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of the States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Crawford*, 553 U.S. at 197. "The Constitution does not require that result, for it is beyond question that the States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id.* (internal quotations omitted).

47.     Given the fact that Plaintiffs have advanced a broad attack on the constitutionality of the matching process, seeking relief that would invalidate it in all its applications, they bear a heavy burden of persuasion. *See id.* at 200. Plaintiffs ask this Court, in effect, to look specifically at a small number of voters who may experience a special burden and weigh their burdens against the State's broad interests in protecting election integrity. *See* Compl. ¶ 5, pp. 70-72 (Prayer for Relief). Aside from conclusory and speculative assertions, Plaintiffs do not offer any facts regarding the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified. *See Crawford*, 553 U.S. at 200.

48.     Plaintiffs, through improperly broad and conclusory assertions, complain that the imposition of additional requirements to register to vote and to maintain voter registration violates their Equal Protection and First Amendment rights. *See, e.g.*, Compl. ¶¶ 238-42. However, the Supreme Court has already established that, although a somewhat heavier burden may be placed on a limited number of persons, inconveniences such as making an extra trip to the DMV and gathering additional documents required for voter registration do not qualify as a substantial

burden on the right to vote, or even represent a significant increase over the usual burdens of voting. *Crawford*, 553 U.S. at 198-99. Such requirements are wholly justified and, therefore, would not pose a constitutional problem. *See id*. at 199-200. Even assuming that the burden may not be justified (Defendants contend it is), that conclusion is by no means sufficient to invalidate the matching process. *See id*.

49.     Plaintiffs also speculate, without supporting factual allegations, that they "could be deprived of their right to vote" because of the matching process. *See* Compl. ¶¶ 216-31. Plaintiffs provide no specific allegations to support this claim. As set forth in Section I, *supra*, Texas provides multiple safeguards to ensure properly registered voters remain on the voting rolls, including same-day reinstatement upon presentation of citizenship verification and provisional voting pursuant to Texas Election Code §16.037(d) and § 63.011. *See Crawford*, 553 U.S. at 197-98 (the availability of the right to cast a provisional ballot provides an adequate remedy for burdens arising from life's vagaries). In other words, even if Plaintiffs' names appear on the list of registered voters and their registration status cannot be determined, multiple statutory provisions secure qualified voters their rightful place on the voting rolls.  *See id*.

50.     Further, none of the Plaintiffs assert facts showing they have been denied their ability to vote or are otherwise personally unable to vote. *Crawford*, 553 U.S. at 201. Nor have Plaintiffs pleaded any facts showing that they have actually lost or misplaced their proof of citizenship or attempted to obtain proof of citizenship, or describing the difficulty they have had in obtaining proof of citizenship or timely providing such proof for voter registration purposes. *Id*. Plaintiffs' Complaint does not assert any facts regarding the difficulties Plaintiffs have experienced as a result of the matching process. Even assuming *arguendo* that an unjustified, special burden on some voters existed, Plaintiffs fail to plead facts to support the invalidation of the entire

matching process as an appropriate remedy. Further, Plaintiffs have failed to plead facts sufficient to demonstrate that such obstacles are severe enough to overcome the State's interests in implementing the matching procedure. *See Crawford*, 553 U.S. at 202-03. Moreover, Plaintiffs fail to plead specific facts tying each Defendant to their constitutional claims.

51.     Because the Complaint fails to properly plead any facts showing the matching process imposes "excessively burdensome requirements" on any class of voters, Plaintiffs cannot show that the character or magnitude of their alleged injuries qualify as a substantial burden on their right to vote. *Id.* at 203-04.

## 2. The State's Interest in Safeguarding the Integrity of the Electoral Process Outweighs the Alleged Burdens to Plaintiffs.

52.     The Supreme Court has acknowledged that not only is the risk of voter fraud real, it could affect the outcome of a close election. *See Crawford*, 553 U.S. at 194-97. Accordingly, the electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. *Id*. at 194 (citing Building Confidence in U.S. Elections § 2.5 (Sept. 2005), App. 136-37 (Carter-Baker Report) (footnote omitted)). The Court has further stated:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

*Id*. at 196. The Supreme Court has also stated: "[w]hile [the interest in the integrity and legitimacy of representative government] is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Id*. at 197.

53.     It is well-established that the State of Texas has a significant interest in protecting voter confidence in the integrity and legitimacy of the electoral process. *See id.* at 194-97. As part of its mission to safeguard voter confidence, Texas also has an interest in deterring and detecting voter fraud. *See id.* ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). On its own, the fact that voter rolls may be inflated with individuals, such as non-citizens, who are not eligible to vote provides a neutral and nondiscriminatory reason supporting the State's decision to implement the matching process. *See id.* at 196-97. Moreover, the State has a valid interest in participating in a nationwide effort to improve and modernize election procedures. *See id.* at 194-97. Further, the State has an interest in the uniform application and interpretation of election laws throughout Texas. *See*, *e.g.*, Tex. Const. art. 4, § 21. Under the law, Texas's important interests enumerated above are enough to justify implementation of the matching process.

54.     For the foregoing reasons, Plaintiffs' constitutional claims must be dismissed.

## B.     Plaintiffs' Voting Rights Act Claims Must Fail

55.     Plaintiffs allege that the matching process has a discriminatory effect in violation of Section 2 of the Voting Rights Act, which proscribes any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). Plaintiffs also cite in a separate count the general Voting Rights Act provision that requires uniform standards for voting qualifications. *See* Compl. ¶¶ 227-31 (citing 52 U.S.C. § 10101(a)(2)(A)).[3] But because

---

[3] To the extent that Plaintiffs are attempting to allege a separate claim from their Voting Rights Act § 2 count, this provision of the Voting Rights Act does not include a private right of action. *See Ne. Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 629-30 (6th Cir. 2016). But even if Plaintiffs could maintain a cause of action under 52 U.S.C. § 10101, such claim would fail for the same reasons as all their others—a Complaint based on speculation and conclusion rather

Plaintiffs have failed to allege facts to support their claims, Plaintiffs' Voting Rights Act claims must be dismissed.

56.   "To prove that a law has a discriminatory effect under Section 2, Plaintiffs must show not only that the challenged law imposes a burden on minorities, but also that 'a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'" *Veasey v. Abbott*, 830 F.3d 216, 243-44 (5th Cir. 2016) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (internal quotation marks omitted)). The Fifth Circuit has adopted a two-part framework to evaluate Section 2 "results" claims:

> (1) The challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and
>
> (2) That burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Id*. at 244.

57.   "The first part of this two-part framework inquires about the nature of the burden imposed and whether it creates a disparate effect in that 'members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice'—this encompasses Section 2's definition of what kinds of burdens deny or abridge the right to vote." *Id*. at 244-45. The second part of the two-part framework "provides the requisite causal link between the burden on voting rights and the fact that this burden

---

than factual allegations. Accordingly, even though this provision is cited as a separate count, it is treated alongside the Voting Rights Act § 2 claim.

affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both." *Id*. at 245.

58.     As discussed in the preceding sections, Plaintiffs fail to plead facts showing the matching process imposes a discriminatory burden on them, much less one that provides them with less opportunity than other members of the electorate to participate in the political process or to elect representatives of their choice. Nor have Plaintiffs pled facts showing minorities are disparately affected by the matching process. Further, Plaintiffs do not offer evidence to connect each Defendant to their Section 2 claim. Even assuming the existence of a burden, the evidence does not establish a likely causal link between the purported discriminatory burden on voting rights and the fact that this burden affects minorities disparately *because* it interacts with social and historical conditions that have historically produced discrimination against minorities. *Veasey*, 830 F.3d at 244. Because the Plaintiffs fail to show that they are likely to satisfy the required two-part framework, their Voting Rights Act claims must be dismissed.

## C.     Plaintiffs Have Failed to State a § 1985 Claim

59.     A person injured as the result of a conspiracy to interfere with his civil rights may bring an action under 42 U.S.C. § 1985. Subsection 3 concerns the acts of two or more persons conspiring to deprive any person of certain civil rights. *Suttles v. U.S. Postal Serv.*, 927 F. Supp. 990, 999-1000 (S.D. Tex. 1996) (citing *Holdiness v. Stroud*, 808 F.2d 417, 424 (5th Cir.1987)). Section 1985(3) provides, in pertinent part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the

party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more conspirators.

*Suttles*, 927 F. Supp. at 1000 (quoting 42 U.S.C. § 1985). To prove liability under 42 U.S.C.

§ 1985(3), the plaintiff must allege: (1) a conspiracy involving two or more persons; (2) for the

purpose of depriving, either directly or indirectly, a person or class of persons of the equal

protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to

a person or property, or a deprivation of any right or privilege of a citizen of the United States. *Id.*

at 1000-01 (citing *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 828-29

(1983)); *Hilliard v. Ferguson*, 30 F.3d 649, 652-53 (5th Cir. 1994); *Deubert v. Gulf Fed. Sav.*

*Bank*, 820 F.2d 754, 757 (5th Cir. 1987). The plaintiff must also prove "some racial, or perhaps

otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*

*v. Breckenridge*, 403 U.S. 88, 102 (1971); *see Hilliard*, 30 F.3d at 653 (citing *Burns-Toole v.*

*Byrne*, 11 F.3d 1270, 1276 (5th Cir. 1994), *cert. denied*, 512 U.S. 1207 (1994)); *Miss. Women's*

*Medical Clinic v. McMillan*, 866 F.2d 788, 793 (5th Cir. 1989).

60.     "In this circuit, we require an allegation of a race-based conspiracy to present a

claim under § 1985(3)." *Johnson v. Dowd*, 305 F. App'x 221, 224 (5th Cir. 2008) (citing *Horaist*

*v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 271 (5th Cir. 2001) (internal quotation omitted)).

"Discriminatory purpose . . . implies more than intent as volition or intent as awareness of

consequences." *Bray v. Alexandria Womens Health Clinic*, 506 U.S. 263, 271-72 (1993). "It

implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in

part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at

273. The same principle applies to the "class-based, invidiously discriminatory animus"

requirement of § 1985(3). *Id.* It does not suffice for the application of § 1985(3) that a protected

right be incidentally affected. *Id.* at 275. A conspiracy for the purpose of denying equal protection

29

does not exist simply because a governmental act has an effect upon a protected right—the right must be "aimed at" and its impairment must be a conscious objective of the enterprise. *See id*. The "intent to deprive of a right" requirement demands that the defendant do more than merely be aware of the deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it. *Id*. at 275-76.

61.     The record is devoid of any factual support for the Garibay Plaintiffs' conclusory assertions that improper or unlawful considerations motivated the Defendants' conduct. Nor do Plaintiffs plead facts sufficient to show a likelihood of success on each of the four elements required to properly plead a conspiracy claim under § 1985(3), or to show a likelihood that Defendants selected or reaffirmed the matching process because of its adverse effects upon Plaintiffs. That failure is not surprising, as Plaintiffs did not even plead facts showing any of the Defendants intended to deprive Plaintiffs of their constitutional rights or that they acted at least in part for the very purpose of producing the alleged deprivation. Accordingly, Plaintiffs' § 1985 must be dismissed. *See Johnson*, 255 F.3d at 271; *Suttles*, 927 F. Supp. at 1002.

### D.     Plaintiffs Have Insufficiently Pled a Class Action

62.     Plaintiffs have alleged a putative class action and contend that the requirements of Rule 23 of the Federal Rules of Civil Procedure are satisfied by the Third Amended Class-Action Complaint. *See* Compl. ¶¶ 247-52. Because the Court lacks jurisdiction over Plaintiffs' claims, and because Plaintiffs have failed to state a claim upon which relief can be granted, there is no basis for certifying a class action in this litigation, and Plaintiffs' class allegations should be dismissed as well. Nonetheless, Defendants reserve the right to oppose Plaintiffs' request for class certification (should they file such a motion) and will do so in a timely manner and as ordered by the Court.

## CONCLUSION

For the foregoing reasons, the Court should grant this Motion to Dismiss.

Respectfully submitted.


KEN PAXTON
Attorney General of Texas

JEFFERY C. MATEER
First Assistant Attorney General

RYAN BANGERT
Deputy Attorney General for Legal Counsel

*/s/ Todd Lawrence Disher*
PATRICK K. SWEETEN
*Attorney-in-Charge*
Associate Deputy for Special Litigation
Texas Bar No. 00798537
Southern District of Texas No. 1829509

TODD LAWRENCE DISHER
Trial Counsel for Civil Litigation
Texas Bar No. 24081854
Southern District of Texas No. 2985472
MICHAEL TOTH
Special Counsel for Civil Litigation
Texas Bar No. 24100608
Southern District of Texas No. 2970180
ROLA DAABOUL
Assistant Attorney General
Texas Bar No. 24068473
Southern District of Texas No. 1813386
CHRISTOPHER D. HILTON
Assistant Attorney General
Texas Bar No. 24087727
Southern District of Texas No. 3029796
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
FAX: (512) 320-0667
Patrick.Sweeten@oag.texas.gov

31

Todd.Disher@oag.texas.gov
Michael.Toth@oag.texas.gov
Rola.Daaboul@oag.texas.gov
Christopher.Hilton@oag.texas.gov

**ATTORNEYS FOR DEFENDANTS
SECRETARY OF STATE WHITLEY,
ATTORNEY GENERAL PAXTON, AND
GOVERNOR ABBOTT**

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March, 2019, a true and accurate copy of the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system, and served on all attorney(s) and/or parties of record, via the CM/ECF service and/or via electronic mail.

*/s/ Todd Lawrence Disher*
TODD DISHER