IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Texas League of United Latin American Citizens, et al., | § § § | |
| Plaintiffs, | § § | Civil Action No. 5:19-cv-0074-FB |
| v. | § § | [Lead Case] |
| David Whitley, et al., | § § § | |
| Defendants, | § | |
| AND | | |
| Julieta Garibay, et al. | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 5:19-cv-00159-FB |
| Whitley, et al., | § § | [Consolidated Case] |
| Defendants, | § | |
| AND | § § | |
| MOVE Texas Civic Fund, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 5-19-cv-00171-FB |
| Whitley, et al., | § § | [Consolidated Case] |
| Defendants, | § | |

**GARIBAY PLAINTIFFS' RESPONSE IN OPPOSITION TO
STATE DEFENDANTS' MOTION TO DISMISS
THIRD AMENDED COMPLAINT**

## INTRODUCTION

Plaintiffs Julieta Garibay, et al. (Garibay Plaintiffs) file their response in opposition to Defendants' Secretary of State David Whitley, Attorney General of Texas Ken Paxton, and Governor Greg Abbott Motion to Dismiss Garibay Plaintiffs' Third Amended Class Action Complaint.   [Dkt. 128].   Defendants' arguments regarding standing ignore well-established caselaw, and their arguments regarding the sufficiency of Plaintiffs' allegations neglect to address the rulings of this Court and the standards under Rule 12(b)(6).   Garibay Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss their Third Amended Complaint.

## FACTUAL BACKGROUND

### I.   Background of Advisory 2019-02 and the Secretary of State List of Suspect Voters

On January 25, 2019, Defendant Whitley's Director of Elections, Keith Ingram, released Election Advisory No. 2019-02 ("the Advisory") to all voter registrars in Texas.   Garibay Plaintiffs' Third Amended Complaint (hereinafter, "Garibay Third Am. Compl.") ¶ 113.   The Advisory stated that the Office of the Secretary of State, beginning the following day, would provide to Texas counties information about "individuals who provided documentation to DPS showing that the person is not a citizen of the United States during the process of obtaining or acquiring a Texas Driver License or Personal Identification Card from DPS."[1] *Id*.

The Advisory further advised counties that "we believe the data we are providing can be acted on in nearly all circumstances."[2]   Garibay Third Am. Compl. ¶ 114.   The Advisory stated

---

[1]  Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019), available at https://www.sos.state.tx.us/elections/laws/advisory2019-02.shtml (accessed January 30, 2019).

[2] Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019), available at https://www.sos.state.tx.us/elections/laws/advisory2019-02.shtml (accessed January 30, 2019).

that Defendant Whitley's office limited the DPS data that it was going to produce to counties "to individuals who provided valid documents indicating the person is not a citizen of the United States *at the time* the person obtained a Driver License or Personal Identification Card." (emphasis added).[3]  Garibay Third Am. Compl. ¶ 115.

The Advisory anticipated that counties would be met with requests from the public for the lists of non-U.S. citizens but urged counties to contact their "local prosecutor and the attorney general, who have jurisdiction over such matters" if the counties received such requests.[4]  Garibay Third Am. Compl. ¶ 118.  The Advisory instructed that if the information sent by the Office of the Secretary of State "provides the registrar with reason to believe the person is no longer eligible for registration . . . the registrar should send a Notice of Examination for Citizenship (Proof of Citizenship) (PDF) Letter."[5]  *Id.*

The Advisory provided county registrars with instructions to send voters a form letter stating: "Your registration status is being investigated because there is reason to believe you may not be a United States citizen. . . You are now required to confirm your eligibility for registration by providing proof of citizenship to maintain your registration status. . . If you fail to provide this proof of citizenship within 30 days from the date of this letter, your voter registration will be cancelled."[6]  Garibay Third Am. Compl. ¶ 120.

Upon publishing its Advisory, the Texas Secretary of State's office also published a news release on January 25, 2019, announcing that Defendant Whitley had "discovered that a total of

---

[3] *Id.*

[4] Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019), available at https://www.sos.state.tx.us/elections/laws/advisory2019-02.shtml (accessed January 30, 2019).

[5] *Id.*; *see also* "Notice to Registered Voter for Proof of Citizenship," Texas Secretary of State, available at https://www.sos.state.tx.us/elections/forms/bw1-12.pdf (accessed January 31, 2019).

[6] Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019), available at https://www.sos.state.tx.us/elections/laws/advisory2019-02.shtml (accessed January 30, 2019); *see also* "Notice to Registered Voter for Proof of Citizenship," Texas Secretary of State, available at https://www.sos.state.tx.us/elections/forms/bw1-12.pdf (accessed January 31, 2019).

approximately 95,000 individuals identified by DPS as non-U.S. citizens have a matching voter registration record in Texas, approximately 58,000 of whom have voted in one or more Texas elections."   Garibay Third Am. Compl. ¶ 122.   The news release further emphasized that "[v]oting in an election in which the person knows he or she is not eligible to vote is a second-degree felony in the State of Texas" and declared that the Office of the Secretary of State had "immediately provided the data in its possession to the Texas Attorney General's office, as the Secretary of State has no statutory enforcement authority to investigate or prosecute alleged illegal activity in connection with an election."[7]  Garibay Third Am. Compl. ¶ 123.

Defendant Whitley's news release also stated that his office provided the information about potential non-U.S. citizen to counties "so that the county voter registrar can take action."[8] The news release declared that "[i]f a registered voter is identified as a non-U.S. citizen, he or she *should* receive a Notice of Examination (PDF) from the county voter registrar indicating that his or her registration status is being examined on the grounds that he or she is not a U.S. citizen." (emphasis added).[9] Garibay Third Am. Compl. ¶ 124.

Also on January 25, 2019, Defendant Attorney General Ken Paxton and Defendant Governor Greg Abbott repeated on Twitter the figures regarding non-U.S. citizen voters that Defendant Whitley shared in his press release.  Garibay Third Am. Compl. ¶ 125, 126.  President Donald J. Trump also tweeted about the figures two days later, repeating the claim that all 98,000 voters were in fact non-U.S. citizens.  Garibay Third Am. Compl. ¶ 127.

The Secretary of State's announcement, and subsequent public statements by the Texas Attorney General and Governor, quickly snowballed into news reports declaring that state officials had discovered thousands of non-U.S. citizens on the state's voter rolls.  Various outlets

---

[7] *Id.*
[8] *Id.*
[9] *Id.*

reported that the Secretary of State had in fact discovered tens of thousands of illegal voters. Garibay Third Am. Compl. ¶¶ 128 - 132.

## II.     Plaintiffs Were and Continue to be Directly Affected by the Voter Purge

Garibay Plaintiffs Jane Doe #1, Jane Doe #2, Jane Doe #3, John Doe #1, Elena Keane, and Maria Felicitas Barbosa all received Notices of Examination from their counties informing them that they were suspected of being non-U.S. citizens registered to vote and demanding proof of U.S. citizenship  Garibay Third Am. Compl. ¶¶ 15, 21, 25-27, 32, 34, 41-42.  These Plaintiffs feel afraid, angry, intimidated and stigmatized by the letters and some were forced to spend time and money in order to try to preserve their right to vote.  All are exposed to the risk that Defendant Paxton will prosecute them for voter fraud even though they have done nothing wrong by registering to vote. Garibay Third Am. Compl. ¶¶ 18, 21, 27, 32, 36, 42, 167.  Other individual Garibay Plaintiffs who are aware that their names are included on the Secretary of State's list of "Possible Non U.S. Citizens" have suffered similar injuries including confusion and stigmatization as well as the risk they will be criminally investigated and prosecuted. Garibay Third Am. Compl. ¶¶ 43-59.

## III.    Defendant Whitley's Purge Program Targeted Foreign Born Voters for Investigation of Citizenship Status

### a.   The Secretary of State knew there were naturalized U.S. citizens on its list of suspect voters

The errors in Defendant Whitley's matching procedure are systematic, predictable, and specific to foreign-born U.S. citizens.   Garibay Third Am. Compl. ¶ 170.  Defendant Whitley knew or should have known that his list of suspected non-U.S. citizen voters contained many naturalized citizens because his office was aware of that fact for months before he sent the list to the counties.  Garibay Third Am. Compl. ¶ 171.  Various emails between Betsy Schonhoff, an

employee of the Office of the Secretary of State, and DPS employees show that the methodology would risk including naturalized U.S. citizens and that the SOS or DPS never limited the data in a way to keep naturalized U.S. citizens off of the list.  Garibay Third Am. Compl. ¶ 172-177.

In the months leading up to Defendant Whitley's release of his suspected non-U.S. citizen voter list, the Office of the Secretary of State pressed DPS to provide a list of driver's license/state ID holders who were not U.S. citizens.  Garibay Third Am. Compl. ¶ 174.  DPS responded that "DPS is not an authorizing agency to confirm citizenship."[10]  *Id.*  DPS made clear to the Office of the Secretary of State that DPS collects citizenship information "at the time of the transaction, but that may not be current because when you come in for the driver's license, you get a driver's license for six years, right[…][w]e may not have the current citizenship information."[11]  *Id.*

DPS "suggested [the Office of the Secretary of State] should go directly to DHS if they want current citizenship information."[12]  Garibay Third Am. Compl. ¶ 175.  DPS also made clear that "the contract that we have with DHS [Department of Homeland Security] doesn't allow us to run records like that outside of a DL issuance process."[13]  *Id.*  As a result, DPS was not able to run records through the SAVE database.[14]  *Id.*

The matching procedure employed by Defendant Whitley will continue to identify naturalized U.S. citizens as suspected non-U.S. citizens registered as voters.  Garibay Third Am.

---

[10] (2/19/19 Tr. Testimony of Gayatri Vasan)  210:18-211:6.
[11] *Id.*
[12] *Id.*
[13] (2/19/19 Tr. Testimony of Gayatri Vasan) 212:3-22.
[14] *Id.*

Compl. ¶¶ 179-180.  The matching procedure will flag, routinely and predictably, every newly naturalized citizen who registers to vote and who already has a Texas driver's license.[15]

## IV.     Most naturalized citizens in Texas are Latino or Asian American

Lawful permanent resident immigrants typically become eligible for naturalization in five years.  Garibay Third Am. Compl. ¶ 101.  The waiting period is four years for asylees who have permanent resident status and three years for spouses of U.S. citizens.  *Id.*  Thus a typical permanent resident immigrant in Texas who obtains a six-year driver's license will be eligible to become a U.S. citizen before that driver's license expires.  *Id.*  It may be several years between the time a new U.S. citizen registers to vote and the time she goes to DPS to renew her driver's license and provide updated citizenship information.  *Id.*

According to the U.S. Department of Homeland Security, for fiscal years 2012-2017, less than the time period of a standard driver's license, over 340,000 individuals naturalized in Texas. An average of 58,092 individuals naturalized in Texas in each of those years;  47% of the immigrants naturalized in Texas were originally from Latin American countries, and approximately 25% of them are from Asian countries.  Garibay Third Am. Compl. ¶ 102, 103. According to data from the United States Census Bureau, among Texas naturalized U.S. citizens, 51.7% are Latino and 28.8% are Asian American.  Only 11.6% of Texas naturalized citizens are non-Latino White.[16]  Garibay Third Am. Compl. ¶ 104.

## LEGAL STANDARD

---

[15] Election Advisory No. 2019-02, Texas Secretary of State (January 25, 2019), available at https://www.sos.state.tx.us/elections/laws/advisory2019-02.shtml (accessed January 30, 2019).

[16] American Community Survey FactFinder, *Selected Characteristics of the Native and Foreign-Born Populations (Texas)*, United States Census Bureau (2017 5-year ACS data), available at https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_5YR/S0501/0400000US48 (accessed January 31, 2019).

## I.      Standard for Motions Pursuant to 12(b)(1)

A court may find a lack of subject matter jurisdiction based upon: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.  *See Ramming v. United States*, 281 F.3d at 161 (5th Cir. 2001).  A "motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief" *Id*. at 161.

## II.     Standard for Motions Pursuant to 12(b)(6)

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the formal sufficiency of a plaintiff's claim for relief in the complaint. *See Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).  Dismissal under Rule 12(b)(6) is warranted only if the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

The test under Rule 12(b)(6) balances "a party's right to redress against the interests of all parties and the court in minimizing expenditure of time, money, and resources."  *Veasey v. Perry*, 29 F. Supp. 3d 896, 911 (S.D. Tex. 2014) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 558.  Determining if there is plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A motion to dismiss under 12(b)(6) "is viewed with disfavor and is rarely granted."  *Leal v. McHugh*, 731 F.3d at 410 (internal citation omitted).

## ARGUMENT

I.      **The Court Has Jurisdiction**

Contrary to Defendants' arguments in their motion to dismiss (Dkt. 128 at 11), this Court has subject matter jurisdiction over the case and Plaintiffs have standing to raise their claims. Defendants' attempts to shift the blame for the voter purge to the counties and to minimize the harm to Plaintiffs do not establish that Plaintiffs lack standing.

a.    Plaintiffs have established Article III standing
i.

To establish Article III standing, a plaintiff must show (1) an "injury in fact;" (2) causation; and (3) a likelihood that a favorable decision will redress the injury. *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  The presence of one party with standing is sufficient to satisfy Article's III's case-or-controversy requirement. *Texas v. United States*, 809 F.3d 134, 184 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam).

i.   Individual Plaintiffs Have Standing

The individual voter Plaintiffs, members of Plaintiff organizations LUPE and OCA-GH, and Plaintiff organizations LUPE, OCA-GH, Southwest Voter Registration Education Project ("SVREP"), Mi Familia Vota Education Fund ("MFV"), and UnidosUS,  in their own right, all suffer Article III injury in fact.  Injury in fact requires "that a person be 'adversely affected' or 'aggrieved,' and it serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n.14 (1973) (noting that "an identifiable trifle is enough").  An injury-in-fact involves "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

conjectural or hypothetical." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and internal citations omitted).

Individual voter Plaintiffs and members of Plaintiffs LUPE and OCA-GH whose names and other personally identifying information appear on Defendants' voter purge list suffer Article III injury because they have demonstrated that, without court intervention, they will suffer among other things, loss of their right to vote, further investigation of their U.S. citizenship by state and local officials, the risk of prosecution and stigma.

Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, John Doe 1, Elena Keane, and Maria Felicitas Barbosa have further suffered the injury of having received a letter from their counties threatening to cancel their voter registration unless they provide documentary proof of U.S. citizenship.

The legally-protected interest at issue in this case is the right to vote; individual voter Plaintiffs and members of Plaintiff organizations have suffered the "concrete and particularized" injury of having been placed on the purge list and threatened with the "imminent" loss of their right to vote.  Plaintiffs' stake in how Defendants identify and investigate potentially ineligible voters cannot be more direct or personal.

Furthermore, it is enough to establish Article III injury that Defendants have singled out these individuals for unequal treatment.  *See Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (in an equal protection case, Article III injury is the denial of equal treatment from the imposition of a barrier that makes it more difficult for one group to obtain a benefit, not the ultimate inability to obtain the benefit); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (holding that individual voters wrongly identified as non-citizens had standing to challenge voter purge program); *Common*

*Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (holding that individual voters who lacked photo identification had standing to challenge a voter identification law because the voters alleged unequal treatment compared to voters with identification).

In addition, individual voter Plaintiffs, such as Jane Doe #2, Maria Felicita Barbosa, and Elena Keane, have already suffered the actual injury of expending time and money to locate their citizenship documents, travel to county elections offices, and prove their U.S. citizenship so they could remain on the voter rolls.

Defendants' argument that they are simply following the law, and thus Plaintiffs cannot establish standing, is neither logical nor persuasive.   It is exactly Defendants' "operation of the State's election-integrity laws" that is at issue here.  State Motion at 14.  Defendants' argument that Plaintiffs can avoid injury simply by complying with Defendants' discriminatory demands for proof of citizenship is similarly flawed.  Plaintiffs challenge Defendants' disparate treatment; it is not Plaintiffs' responsibility to cure their own injury by successfully navigating the unequal obstacle course set up by Defendants.  Plaintiffs' direct stake in the outcome of the case, as voters targeted in the purge, more than satisfies Article III standing.

ii.  Organizational Plaintiffs Have Standing

Plaintiff organizations LUPE and OCA-GH have associational standing through their aggrieved members.  An organization has standing on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs LUPE and OCA-GH have members who are on Defendants' voter purge lists and these members suffer injury in fact for the reasons described above. Plaintiff LUPE and OCA-GH seek to protect the voting rights of their members and the communities they serve.

All of the Garibay organizational plaintiffs also have standing in their own right. These organizations suffer Article III injury in fact because the organizations face the imminent threat of continued diversion of their funds, resources, and time away from fulfilling their core missions and activities. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (nonprofit organization with a primary mission to promote civic participation suffered an injury in fact when it redirected some of its efforts and resources toward educating its members and other members of the public about Texas's voter interpreter restrictions). Plaintiffs LUPE, OCA-GH, SVREP, MFV, and UnidosUS have spent, and continue to spend, time and resources educating their members and the community about the Advisory and the purge process. Garibay PI Ex. 71 ¶¶ 16–17; Garibay PI Ex. 92 ¶¶ 18–21, 24–25; Garibay Third Am. Compl. ¶¶ 61-64, 68-69. These organizations also have diverted time and resources to assist members targeted in the purge. Garibay PI Ex. 71 ¶¶ 20–21, 23–24; Garibay PI Ex. 92 ¶¶ 21–22; Garibay Third Am. Compl. ¶¶ 62, 64, 66-67, 69, 71-77. Plaintiffs LUPE, OCA-GH, SVREP, MFV, and UnidosUS will bear the time and costs to re-register wrongly purged voters, and their efforts to register and mobilize voters to vote will suffer because Defendant's purge deters individuals from registering to vote and from voting. Garibay PI Ex. 71 ¶¶ 15–16; Garibay PI Ex. 92 ¶ 17–18, 21, 24; Garibay Third Am. Compl. ¶¶ 62, 64, 69.

The voting rights that the organizations seek to protect are germane to the organizations' purposes. Plaintiff LUPE's mission is to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement. Garibay PI Ex. 71

(Valdez-Cox Decl.) ¶ 4; Garibay Third Am. Compl ¶ 65.  Plaintiff OCA-GH's overarching goals are to increase the long-term leadership, civil participation, education, and engagement of Asian Americans in the Greater Houston metropolitan area.  Garibay PI Ex. 92 (Chen Decl.) ¶ 5; Garibay Third Am. Compl ¶ 70.  Plaintiff SVREP's mission is to build political power among Latinos and other minority groups by increasing their participation in the U.S. democratic process.  Garibay Third Am. Compl ¶ 61.  Plaintiff MFV's mission is to expand the Latino electorate and increase justice for Latinos through increased civic participation individuals in states that include Texas.  Garibay Third Am. Compl ¶ 63.  Plaintiff UnidosUS's overarching purpose is to advocate for Latinos in the areas of civic engagement, education, the workforce, civil rights, immigration, health, housing, and the economy.  Garibay Third Am. Compl ¶ 68. These organizations promote the civic engagement of their members and the communities they serve through voter registration, voter education, and get-out-the vote campaigns.  Garibay PI Exs. 71 ¶ 6 , 92 ¶ 6; Garibay Third Am. Compl ¶ 61, 63-68, 72-75.  Plaintiffs LUPE, OCA-GH, SVREP, MFV, and UnidosUS's claims for declaratory and injunctive relief do not require the participation of individual members.  *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996) ("'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members.").

### iii.   Plaintiffs' Injuries are Traceable to Defendants' Actions

Plaintiffs' injuries are fairly traceable to Defendants' actions.  The causation element of Article III standing "does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable' to the defendant."  *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 431 (5th Cir. 2011) (citing *Bennett v. Spear*, 520 U.S. 154,

168–69 (1997)).  For a state official to be a proper defendant in his official capacity, a plaintiff "must demonstrate that the state officer has 'some connection' with the enforcement of the disputed act." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

Plaintiffs' injuries are fairly traceable to Defendant Whitley's actions.  Defendant Whitley is the Texas Secretary of State and serves as Chief Election Officer for Texas.  Garibay Third Am. Compl. ¶ 78.  In this capacity, he assists county election officials and is charged with ensuring the uniform application and interpretation of election laws throughout Texas.  *Id.* Defendant Whitley provides information and instruction to counties on how to administer voter registration and maintain the voter rolls, including when and how to investigate and remove registered voters from the rolls because of suspected non-U.S. citizenship.  *Id.*  As Chief Election Officer, Defendant Whitley is directly responsible for compiling and disseminating the voter purge list and the Advisory, and for the subsequent communications with counties regarding the Advisory. Garibay Third Am. Compl. ¶¶ 113-118.  Defendant Whitley provided the voter purge list to Defendant Paxton for investigation into possible illegal voter activity.  *Id.*

Plaintiffs' injuries are fairly traceable to Defendant Paxton.  Defendant Paxton is the Texas Attorney General, and his office has statewide investigation authority and concurrent prosecution authority with local elected prosecutors over the election laws of the State.  Garibay Third Am. Compl. ¶ 79.  In his capacity as Attorney General, Defendant Paxton and his office investigate and prosecute violations of the Texas Election Code, including illegal voting.  *Id.*  In response to the Advisory and the purge list, Defendant Paxton issued a press release that stated that the office "stands ready to investigate and prosecute crimes against the democratic process when needed."  Garibay Third Am. Compl. ¶ 124.  The Office of the Attorney General, in

14

response to an open records request for disclosure of the voter purge list, filed a letter brief with the Open Records Division of the Attorney General's office arguing that the voter purge list "pertains to an open criminal investigation by the OAG's Election Fraud Section" and that names should not be released to the public because "release would interfere with the detection, investigation, or prosecution of a crime." Garibay Third Am. Compl. ¶ 193. Defendant Paxton's ongoing investigation of Plaintiffs and Plaintiff organizations' members, along with his threat to prosecute individuals on the voter purge list, injure Plaintiffs and establish traceability. *Id.*

Plaintiffs' injuries are fairly traceable to Defendant Abbott. Defendant Abbott is the Governor of Texas. Garibay Third Am. Compl. ¶ 80. In that capacity, he appoints and directs the activities of the Texas Secretary of State. *Id.* Defendant Abbott is the chief executive and chief law enforcement officer of Texas. *Id.* On the day Defendant Whitley released the Advisory, Defendant Abbott tweeted his support for investigation and prosecution of illegal voter registration. Garibay Third Am. Compl. ¶ 126. Defendant Abbott later expressed his support for the voter purge as "a work in progress" and affirmed his "confidence in" Defendant Whitley, stating that Defendant Whitley "did exactly what he was supposed to do[.]" Garibay Third Am. Compl. ¶ 186. Defendant Abbott's push for the voter purge, and ongoing support for the purge, injure Plaintiffs and establish traceability.

### iv.  Relief will Redress Garibay Plaintiffs' Injuries

The relief Plaintiffs seek will redress their injuries. Plaintiffs seek, among other things, an order requiring Defendant Whitley to rescind his Advisory and purge list and to advise the counties and the public that the list does not contain current evidence of non-U.S. citizenship of voters. Garibay Third Am. Compl. at 70-71. Plaintiffs further seek to enjoin Defendant counties

and Defendants Whitley, Paxton, and Abbott from investigating or instructing any other person or entity to investigate the eligibility to vote of any voter identified through the flawed matching process involving DPS citizenship records. *Id.*

Plaintiffs also seek an order requiring Defendant counties to rescind their purge letters and refrain from investigating or cancelling the voter registration of voters on the purge list without current evidence of non-U.S. citizenship. *Id*. The requested relief will address Plaintiffs' injuries, including unequal treatment, wrongful investigation into Plaintiffs' U.S. citizenship by state and local officials, stigma, and threatened loss of the right to vote. The requested relief will end the purge program that has caused Plaintiffs LUPE, OCA-GH, SVREP, MFV, and UnidosUS to divert their limited organizational time and resources toward efforts to mitigate the purge's impact on members and the communities they serve.

> b. Defendants' Arguments Shifting Blame and Minimizing Plaintiffs' Injuries are Unavailing

Defendants' arguments that Garibay Plaintiffs do not have standing are largely based on two incorrect premises—that State Defendants play no role in the voter purge and that there is no harm or danger of harm to Garibay Plaintiffs. Garibay Plaintiffs' allegations describe how State Defendants created the voter purge that treats naturalized U.S. citizen voters disparately and how State Defendants directed the counties to investigate and purge voters. Plaintiffs' Third Amended Complaint also pleaded that Plaintiffs have suffered injury and face threatened loss of their right to vote without relief from the Court.

## II.    Garibay Plaintiffs Properly Pleaded Their Claims in Their Third Amended Complaint

Defendants fail to show why dismissal under Rule 12(b)(6) of Garibay Plaintiffs' Fourteenth and First Amendments undue burden claim, Voting Rights Act claim, § 1985 conspiracy claim, and class action claim is warranted.

a.   Plaintiffs Properly Pleaded Their Fourteenth and First Amendment Claims

Garibay Plaintiffs properly pleaded their claim that Defendants' voter purge creates undue burdens on the right to vote under the First and Fourteenth Amendments to the United States Constitution.  *See* Garibay Third Am. Compl. ¶¶ 238-242.   Defendants argue that Garibay Plaintiffs' claims warrant dismissal because Plaintiffs fail to allege facts establishing a "substantial burden on the right to vote" and that the State's interest in protecting the "integrity of the electoral process" outweighs the burden.  Defs.' Mot. To Dismiss [Dkt. 128] at 22-26. However, Defendants' arguments ignore the Court's ruling that LULAC Plaintiffs' similar complaint adequately pleads a First and Fourteenth Amendments undue burden claim.  *See Texas LULAC v. Whitley*, Dkt. 61 at 3 ("the Court holds that the United States Constitution trumps state law in appropriate circumstances, this being one. Moreover, given the highly credible evidence presented by plaintiffs, the Court finds overwhelmingly that claims for relief have been properly stated. Accordingly, defendants' motion to dismiss (docket no. 20) is DENIED"). Defendants' arguments also ignore the standard that applies to a 12(b)(6) motion and the severe burdens that Garibay Plaintiffs allege.

The test that applies to the burden imposed by Defendants' voter purge is the *Anderson-Burdick* test.  *See Anderson v. Celebrezze*, 460 U.S. 780 (1983) *and Burdick v. Takushi*, 504 U.S. 428 (1992); *see also Stringer v. Pablos*, 320 F. Supp. 3d 862, 898 (W.D. Tex. 2018) (where plaintiffs challenge "a state voter registration procedure that is alleged to unfairly restrict the right to vote and harm voter participation, the more flexible *Anderson-Burdick* standard applies").  When applying this test, courts weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments against the precise interests put forward by the State as justifications for the burden imposed by its rule." *See Texas*

17

*Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996) (citing *Burdick v. Takushi*, 504 U.S. at 434 and *Anderson*, 460 U.S. at 789).   A state may not place any burdens on the right to vote that are not adequately justified by the state's asserted interests.   *See Anderson v. Celebrezze*, 460 U.S. 780 (1983).

When a state election regulation subjects First and Fourteenth Amendment rights "to severe restriction, the regulation must be narrowly tailored to advance a compelling state interest." *Texas Indep. Party*, 84 F.3d at 182.   "It matters in the Anderson-Burdick analysis ... whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) (internal citations omitted).

The Court has already ruled that LULAC Plaintiffs properly pleaded a Fourteenth and First Amendment burden claim, and Garibay Plaintiffs present more allegations about additional individual plaintiffs that establishes their similar burden claim.   *See* Dkt. 61 (Order denying Defendants' Motion to Dismiss LULAC Plaintiffs' First Amended Complaint (Dkt. 20) for failure to state a burden claim) ("the Court finds overwhelmingly that claims for relief have been properly stated").

Garibay Plaintiffs' Third Amended Complaint, filed after more fact development in the case, includes even more detailed allegations about inaccuracies in the list of suspected non-U.S. citizen voters (Garibay Third Am. Compl. ¶¶ 172-180, 186-191), facts based on the experiences of Garibay Plaintiffs who received notices of examination (¶¶ 12-36), and facts about how the voter purge was directed at naturalized U.S. citizens (¶¶ 172-180, 190).   These additional allegations are more than enough to overcome the 12(b)(6) dismissal standard, particularly in light of the Court's denial of Defendants' motion to dismiss LULAC Plaintiffs' complaint.

Defendants' voter purge places severe burdens for Plaintiffs' right to vote which go beyond mere inconvenience. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (burdens are severe if they go beyond the merely inconvenient). Garibay Plaintiffs have had to contact, and sometimes make repeated phone calls to, county officials who were not sure how to resolve Plaintiffs' notices, travel across counties to copy documents, and present themselves personally to registrars. Plaintiffs have also received conflicting communications from county officials, risked criminal investigation and prosecution and endured the embarrassment of being singled out and having to prove their U.S. citizenship only because they were naturalized. Such efforts are beyond mere inconvenience. *See Georgia Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (burdens went beyond mere inconvenience when voter had to make "two trips to the polls, his own research, and [hunt] down a name and telephone number to give to election officials so that his U.S. citizenship status could be verified, all after he had already submitted proof of U.S. citizenship with his voter registration application").

In addition, the burdens imposed by Defendants' voter purge are severe because they treat naturalized U.S. citizens, Latino voters, and Asian American voters disparately. Garibay Plaintiffs pleaded that the data gathering procedures employed by Defendants have and will continue to target naturalized U.S. citizens. Garibay Third Am. Compl. ¶¶ 168-180. Because Latinos make up 51.7% of naturalized U.S. citizens in Texas and because Asian Americans comprise 28.8% of naturalized U.S. citizens in Texas, Latino and Asian American voters are treated disparately by the voter purge. Garibay Third Am. Compl. ¶¶ 103-104. Indeed, Keith Ingram, the Secretary of State's election director, testified before a Texas House committee that he "understood there was a significant possibility" that the list of voters the Secretary of State

was sending to counties for citizenship reviews included naturalized U.S. citizens.[17]  *Id*. ¶ 190.

Disparate treatment of naturalized U.S. citizens matters in the application of the *Anderson-Burdick* test, and in this case, it means that Defendants'' disparate treatment of Garibay Plaintiffs creates severe burdens.  *See Georgia Coal. for People's Agenda, Inc*, 347 F. Supp. 3d at 1264 (N.D. Ga. 2018) (Based in part on "the uncontested evidence of disparate impact on a particular class of individuals," Court found severe burden).

Defendants fail to address how the voter purge is narrowly tailored to achieve a compelling state interest, which Defendants claim is to "protect voter confidence in the integrity and legitimacy of the electoral process" because the "voter rolls may be inflated with individuals, such as non-U.S. citizens, who are" ineligible to vote.  Defs.' Mot. to Dismiss at 25-26; *see Georgia Coal. for People's Agenda, Inc.*, 347 F. Supp. at 1264 ("the process of verifying proof of citizenship may only survive if it is narrowly tailored and advances a compelling state interest"). Defendants offer no explanation in their motion of how the voter purge is narrowly tailored, and further argue that Plaintiffs should submit to the burdens imposed by the purge.  Defs.' Mot. to Dismiss at 24-26 (citing "same-day reinstatement upon presentation of citizenship verification and provisional voting").  As Garibay Plaintiffs detail in their complaint, these additional hurdles are imposed only on naturalized U.S. citizens and the supposed safeguards are speculative and unmoored in the actual language of the Texas Election Code.  Garibay Third Am. Compl. ¶¶ 209-215 (e.g., "even if the voter casts a provisional ballot and presents proof of citizenship to the registrar within five days, it is within the discretion of the voter registrar to reinstate the voter or require the voter to re-register").

---

[17] Alex Ura, *The AG's office told lawmakers it isn't investigating voters on Texas' citizenship review list. It told a local official the opposite*, The Texas Tribune (Feb. 11, 2019), https://www.texastribune.org/2019/02/11/texas-ags-office-said-it-was-investigating-voters-citizenship-review-l/

Garibay Plaintiffs properly pleaded that naturalized U.S. citizens will have to obtain and present their proof of citizenship when other U.S. citizens will not.  Garibay Third Am. Compl. ¶¶ 12-36, 96-100.  Because it singles out naturalized U.S. citizens for additional burdens, the purge is not narrowly tailored to serve Defendants' claimed compelling state interest. Defendants admitted that their list of suspect voters had multiple errors and cast too wide a net. Garibay Third Am. Compl. ¶¶ 186-191.  Additionally, Defendants fail to explain how their procedures to investigate voters who ask to be excused from jury service on the basis of non-U.S. citizenship, as well as the required oath of U.S. citizenship under penalty of perjury for voter registration, are insufficient for preserving the "integrity" of the electoral process.  *See* Garibay Third Am. Compl. ¶¶ 200-205.

Garibay Plaintiffs properly pleaded that under the *Anderson-Burdick* test, Defendants' voter purge imposes severe burdens to the right to vote that are unjustified and not narrowly tailored to achieve a compelling state interest.  *See League of Women Voters of Fla., Inc. v. Detzner*, 354 F. Supp. 3d 1280, 1288 (N.D. Fla. 2018) (sufficient for 12(b)(6) motion for plaintiffs to allege that regulation "burdened their voting rights"); *see also Am. Ass'n of People with Disabilities v. Herrera,* 690 F. Supp. 2d 1183, 1220 (D.N.M. 2010), *on reconsideration in part*, No. CIV 08-0702 JB/WDS, 2010 WL 3834049 (D.N.M. July 28, 2010) (motion to dismiss burden claim denied where plaintiffs alleged that state law burdened their ability to conduct voter registration activities and therefore court could not "properly weigh those factual determinations on a motion to dismiss").

      b.  Plaintiffs Sufficiently Pleaded That the Voter Purge Violates Section 2 of the Voting Rights Act

Garibay Plaintiffs adequately pleaded that Defendants' voter purge has a racially disparate impact on, and intentionally targets, minority voters because the purge only involves

naturalized U.S. citizens (who are overwhelmingly Latino and Asian American).  Garibay Third

Am. Compl. ¶¶ 103-104, 168-180.   Contrary to Defendants' arguments, Plaintiffs pleaded

sufficient facts even under *Veasey v. Abbott*, which dealt with an appeal of a district court's

ruling following a trial.  *See* Defs.' Mot. to Dismiss 27 (citing *Veasey v. Abbott*, 830 F.3d 216,

243-44 (5th Cir. 2016)).   Garibay Plaintiffs therefore also overcome the 12(b)(6) dismissal

hurdle because Defendants make no argument about how *Veasey* applies to Plaintiff's'

complaint.

Defendants mistakenly identify the Fifth Circuit's decision in *Veasey v. Abbott* as the

pleading standard, but Garibay Plaintiffs meet it in any case.  The two-part framework from

*Veasey* that Defendants' propose is as follows:

> [1] [T]he challenged standard, practice, or procedure must impose
> a discriminatory burden on members of a protected class, meaning
> that members of the protected class have less opportunity than
> other members of the electorate to participate in the political
> process and to elect representatives of their choice, [and]

> [2] [T]hat burden must in part be caused by or linked to social and
> historical conditions that have or currently produce discrimination
> against members of the protected class.

*Veasey*, 830 F.3d at 244 (citing *League of Women Voters of N.C. v. North Carolina*, 769 F.3d

224, 240 (4th Cir. 2014)).  However, Defendants ignore the fact that the *Veasey* opinion says that

a court may use the "*Gingles* factors," or "Senate Factors," to examine causality under the

second part of the two-part analysis.  *See Veasey*, 830 F.3d at 245 (citing *Thornburg v. Gingles*,

478 U.S. 30, 36-37 (1986)).[18]  According to the Fifth Circuit in *Veasey*, "[t]hese factors are not

---

[18] The Senate Factors:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

exclusive, and there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  *Id*. at 246.

As described above, Garibay Plaintiffs pleaded disparate treatment and impact with Census statistics and the testimony of Keith Ingram about the impact on naturalized U.S. citizens who are majority Latino and Asian American.  Plaintiffs sufficiently pleaded that the voter purge is linked to increasing political participation of minority—in this case, Latino and Asian American—voters in Texas (Garibay Third Amd. Compl. ¶¶ 106-112), and *Veasey* itself establishes that Texas has a "legacy of state-sponsored discrimination" against minority voters. *See Veasey v. Abbott*, 830 F.3d 216, 264–65 (5th Cir. 2016); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) ("political, social, and economic legacy of past discrimination for Latinos in Texas[…] may well hinder their ability to participate effectively in the political process") (internal quotations omitted).  The discrimination to which the disparate treatment or impact from part one of the test can be "linked" can be discrimination from the "present," and the linkage in question must be part of a very local appraisal. *See League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 241 (4th Cir. 2014) (quoting *Gingles*, 478 U.S. at 78) (courts examining the challenged practice's interaction with

---

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.[…]
[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]
[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *See Veasey*, 830 F.3d at 245–46.

discrimination "make an intensely local appraisal of the design and impact of electoral administration in the light of past and present reality").

Additionally, Plaintiffs alleged that "Asian Americans in Greater Houston face language, cultural, and economic barriers that can limit the Asian American community from attaining its hopes and aspirations."  Garibay Third Am. Compl. ¶ 70; *see also* Veasey, 830 F.3d at 251 (disparate impact where "[l]ower income respondents were also more likely to lack the underlying documents" needed to obtain voter identification required by election law).  Garibay Plaintiffs also allege that there were inaccuracies in the suspect voter list and that the data-gathering deployed by Defendants targeted naturalized U.S. citizens, not illegally registered non-U.S. citizens.  Garibay Third Am. Compl. ¶¶ 133-144, 168-180, 184-186.  These facts render Defendants' stated policy of election integrity tenuous.  See *Veasey*, 830 F.3d at 245–46 ([*Gingles*/Senate Factor 9:] "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.").

Defendants present no authority or precedent supporting dismissal of Plaintiffs' Voting Rights Act section 2 claim at the pleading stage.  As explained above, Garibay Plaintiffs alleged that the voter purge was aimed at and has a disparate impact on Latino and Asian American voters and included facts about how the purge links to present and past discrimination and social conditions.  In other section 2 Voting Rights Act cases, such allegations are sufficient to overcome a motion to dismiss.  *See Hall v. Louisiana*, 974 F. Supp. 2d 978, 992 (M.D. La. 2013) (plaintiffs did not fail to plead sufficient facts to state a plausible claim under Section 2 of the Voting Rights Act" where they met "threshold" showing under *Gingles* but only 2-3 of the Senate Factors); *see also Luna v. Cty. of Kern,* No. 116CV00568DADJLT, 2016 WL 4679723, at

*6 (E.D. Cal. Sept. 6, 2016) ("Because the totality-of-the-circumstances inquiry is employed to establish § 2 *liability*, see 52 U.S.C. § 10301(b), [a] court need not look beyond the threshold *Gingles* preconditions to determine whether the complaint states facts sufficient to state a plausible vote dilution claim.") (emphasis in original); *Mark Wandering Med. v. McCulloch*, No. CV 12-135-BLG-DWM, 2014 WL 12588302, at *6 (D. Mont. Mar. 26, 2014) (denying motion to dismiss when plaintiffs alleged comparative residence rates, various burdens on Native Americans and individual voters, and perceived discrimination).

> c.  Plaintiffs Pleaded that Defendants Conspired to Deny Plaintiffs Their Civil Rights Under § 1985 Claim

Garibay Plaintiffs' Third Amended Complaint properly pleaded a conspiracy to deny Plaintiffs their right to vote between Defendants Abbott, Paxton, and Whitley.   Under the relevant portion of § 1985, a plaintiff must allege: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.  *See Hilliard v. Ferguson,* 30 F.3d 649, 652–53 (5th Cir. 1994).

Defendants argue incorrectly that there must be racial motivation for all conspiracy § 1985 claims.  *See* Defs.' Mot. To Dismiss at 29.   Defendants fail to provide authority or otherwise argue that there is an discriminatory intent requirement for the separate clause of of 42 U.S.C. § 1985(3) that prohibits a conspiracy "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner." *See* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173, 203–04 (2015) ("The KKK Act similarly does not

require any allegation of racial motivation" for intimidation conspiracy).  Plaintiffs properly state a claim under the *Hilliard* equal protection deprivation test and pleaded that Defendants had invidious intent.  Plaintiffs also state a claim that Defendants conspire to intimidate voters.

Garibay Plaintiffs pleaded that two or more persons—Defendants Abbott, Paxton, and Whitley—conspired to deprive Plaintiffs of their equal protection and their right to vote. Garibay Third Am. Compl. ¶¶ 232, 233, 236.  Defendants all performed acts in furtherance of the conspiracy.   Attorney General Paxton made public statements supporting the voter purge threatened to prosecute voters on the purge list and filed a letter brief blocking Plaintiffs from obtaining information.   Garibay Third Am. Compl. ¶ 193.   Defendants Paxton and Abbott repeated and then defended the intimidating language accusing tens of thousands of voters of being illegally registered.   Garibay Third Am. Compl. ¶¶ 125-130.  Defendant Abbott continued defending the voter purge in the media, saying that his nominee, Defendant Whitley, should continue with the purge.  Garibay Third Am. Compl. ¶ 186.  Defendants' conspiracy resulted in and continues to result in undue burdens on Plaintiffs' right to vote.

The other type of conspiracy claim that Garibay Plaintiffs allege is that Defendants conspired "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector."  Garibay Third Am. Compl. ¶ 234 (citing 42 U.S.C. § 1985(3)).   Texas does not seek to dismiss this conspiracy claim, and Garibay Plaintiffs have alleged sufficient facts to overcome a 12(b)(6) motion on that claim.   As Plaintiffs alleged, "[s]uch intimidation and threats included the Election Advisory, release of lists of suspect voters to counties, and public statements that Plaintiffs' past and future actions to register to vote and to vote amount to voter fraud."  Garibay Third Am. Compl. ¶ 236.

d.   Plaintiffs Pleaded a Class Action

Defendants' argument that Plaintiffs failed to plead a class action is based on the supposed failure to plead the claims described above.  Because Plaintiffs sufficiently pleaded their unconstitutional burden, Voting Rights Act, and § 1985 conspiracy claims, they have sufficiently pleaded a class action.

**CONCLUSION**

Because Garibay Plaintiffs have shown that the Court has subject matter jurisdiction and because they properly pleaded undue burden under the First and Fourteenth Amendments, Voting Rights Act, § 1985 conspiracy, and class action claims, dismissal of their claims is unwarranted.  Garibay Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss (Dkt. 128).

Dated:  April 3, 2019                                    Respectfully Submitted,

                                                                    **MEXICAN AMERICAN LEGAL
                                                                    DEFENSE AND EDUCATIONAL FUND**
                                                                    By:  */s/ Nina Perales*
                                                                    Nina Perales (Tex. Bar No. 24005046)
                                                                    Ernest I. Herrera (Tex. Bar No.
                                                                    24094718)
                                                                    Alejandra Ávila (Tex. Bar No. 24089252)*
                                                                    Jack Salmon (Tex. Bar No. 24068914)
                                                                    110 Broadway, Suite 300
                                                                    San Antonio, Texas 78205
                                                                    Phone:  (210) 224-5476
                                                                    Facsimile:  (210) 224-5382
                                                                    Email: nperales@maldef.org
                                                                    *(*Admitted Pro Hac Vice)*

                                                                    **ASIAN AMERICANS ADVANCING
                                                                    JUSTICE | AAJC**

Niyati Shah°* (NJ Bar No. 026622005)
Eri Andriola+* (NY Bar No. 5510805)
1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098
Facsimile: (202) 296-2318
*° Admitted in New Jersey and New York
only. DC practice limited to federal courts.
+ Admitted in New York only.*

**ASIAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND**
Jerry Vattamala+* (NY Bar No. 4426458)
Patricia Yan+* (NY Bar No. 5499173)
99 Hudson Street, 12th Floor
New York, NY 10013
Phone: (212) 966-5932
Facsimile: (212) 966-4303
*+ Admitted in New York only.*

*\*Admitted pro hac vice*

Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on the 3rd day of April, 2019, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*
Nina Perales